## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

A.M.C., by her next friend,
C.D.C.;
K.A., by his next friend,
J.Y.;
S.F.A., by her next friend,
C.M.A.;
VIVIAN BARNES, by her next friend,
Glenda Surrett;
CARLISSA CAUDILL;
RHONDA CLEVELAND;
S.L.C., by her next friend,
C.B.C.;
D.D.;
T.E.W.;
S.D.W., by her next friend,
D.D.;
Y.A.D. by his next friend,
D.D.;
Z.M.D., by his next friend,
D.D.;
X.M.D., by his next
next friend, D.D.;
CHARLES E. FULTZ, by his next friend,
Mary Fultz;
MICHAEL S. HILL, by his next friend,
Kimberly Noe;
J.S.K.;
J.C.K.;
M.S.K., by her next friend,
J.S.K.;
M.N.S., by her next friend,
J.C.K.;
D.C.S., by his next friend,
J.C.K.;
E.I.L., by his next friend,
J.N.L.;
WILLIAM C. MONROE;
LINDA REBEAUD, by her next friend,
James Rebeaud;
D.R.;
J.Z., by his next friend,
D.R.;

Civil Action No._____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**CLASS ACTION**

1

M.X.C., by her next friend
D. R.;
J.C., by his next
friend, D.R.;
M.A.C., by her next
friend, D.R.;
S.L.T.;
T.J.T.;
A.L.T., by her next friend,
T.J.T.;
J.L.T., by his next friend,
T.J.T.;
F.T., by his next friend,
T.J.T.;
KERRY A. VAUGHN;
JOHNNY L. WALKER, by his next friend,
Paige Walker,
on their own behalf and on behalf of all others
similarly situated,

       Plaintiffs,

v.

STEPHEN SMITH, in his official capacity as
Deputy Commissioner of Finance and
Administration and Director of the Division of
TennCare,

       Defendant.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................4

JURISDICTION AND VENUE ............................................................................................7

PARTIES ................................................................................................................................7

   Named Plaintiffs ...............................................................................................................7

   Defendant...........................................................................................................................10

FACTUAL ALLEGATIONS ................................................................................................10

   The Federal Medicaid Program in Tennessee....................................................................10

   Federal Medicaid Eligibility Requirements .......................................................................12

2

Children's Eligibility for TennCare ......................................................................................... 12

Adult Eligibility for TennCare ............................................................................................... 13

Applying for and Renewing Medicaid ..................................................................................... 16

Tennessee's Eligibility Redetermination Process ................................................................. 19

Systemic Defects in the TennCare Redetermination Process ..................................................... 22

TennCare Fails to Use Information  Already on File to Redetermine Eligibility ................. 22

TennCare Requires Enrollees to Provide Irrelevant Information  And Ignores Information
That Establishes Their Eligibility ......................................................................................... 22

TennCare Does Not Send Families   Redetermination Packets and Other Notices .............. 24

TennCare Ignores Information Submitted by Enrollees to  Establish Continued Eligibility 25

TennCare Generates Notices That Fail to Provide Enrollees Information  Essential for the
Maintenance of Their Coverage ........................................................................................... 26

TennCare Fails to Timely Process Appeals .......................................................................... 28

TennCare Lacks Systemic Accommodation Procedures  Necessary for Enrollees with
Disabilities ............................................................................................................................ 30

TennCare is Aware of the Problems with Its Redetermination Process,  But Refuses to
Correct Them ........................................................................................................................ 33

Injuries to the Named Plaintiffs ............................................................................................... 33

Plaintiff A.M.C. .................................................................................................................... 33

Plaintiff K.A. ........................................................................................................................ 39

Plaintiff S.F.A. ...................................................................................................................... 42

Plaintiff Vivian Barnes ......................................................................................................... 47

Plaintiff Carlissa Caudill ...................................................................................................... 53

Plaintiff Rhonda Cleveland ................................................................................................... 55

Plaintiff S.L.C. ...................................................................................................................... 58

Plaintiff D.D. and Family ..................................................................................................... 61

Plaintiff Charles E. Fultz ...................................................................................................... 67

Plaintiff Michael Hill ............................................................................................................ 71

Plaintiff J.S.K. and Family .................................................................................................... 75

Plaintiff E.I.L. ....................................................................................................................... 78

Plaintiff William C. Monroe ................................................................................................. 80

Plaintiff Linda M. Rebeaud .................................................................................................. 84

Plaintiff D.R. and Family ...................................................................................................... 86

Plaintiff T.J.T. and Family .................................................................................................... 92

Plaintiff Kerry A. Vaughn ..................................................................................................... 95

3

Plaintiff Johnny Walker ............................................................................................ 97
Plaintiff Class & Subclass .......................................................................................... 100
    Definitions of Plaintiff Class and Subclass ......................................................... 100
    Numerosity ........................................................................................................... 100
    Issues of Law and Fact Common to the Plaintiff Class and Disability Subclass ............... 104
    Typicality of Claims and Defenses ...................................................................... 108
    Adequate Representation of Class ........................................................................ 109
    Appropriateness of Declaratory and Injunctive Relief Under Fed. R. Civ. P. 23(b)(2) ..... 109
CLAIMS FOR RELIEF ............................................................................................... 110
    First Cause of Action: Due Process Provisions of the Medicaid Act, 42 U.S.C. § 1396a(a)(3)
    ............................................................................................................................. 110
    Second Cause of Action: Procedural Protections under the Due Process Clause ................ 111
    Third Cause of Action: Americans with Disabilities Act ....................................... 111

## INTRODUCTION

1)      This class action challenges Tennessee policies and practices that unlawfully deprive eligible children and adults of vitally necessary medical care under the Medicaid program, known in Tennessee as TennCare. The state employs a defective process for the periodic reevaluation of the eligibility of individuals enrolled in TennCare. As a result, thousands of Tennesseans who rely on TennCare for health coverage have been terminated from that benefit without notice, many only learning they do not have coverage after seeking medical care. The flawed and illegal redetermination processes are ongoing, subjecting the 1.4 million people enrolled in TennCare to the risk of unlawful disenrollment. Systemic problems in the redetermination process screen out enrollees with disabilities and deny them coverage, despite their continued eligibility.

2)      Federal law requires a state's redetermination process to be streamlined, fair, and compliant with due process. The state has instituted unlawful bureaucratic roadblocks and

4

policies in TennCare's redetermination process. From start to finish, the TennCare redetermination process has been and continues to be rife with errors, and state policies thwart families' efforts to appeal such errors and retain or reinstate their coverage pending appeal, in violation of law, in the following respects:

    a) The state makes a determination of ineligibility and terminates coverage without first considering all bases of eligibility, in particular eligibility based on categories that utilize disability as an eligibility criterion, thereby screening out people with disabilities.

    b) The state fails to make eligibility decisions using information it already has available in its files, including information that individuals are disabled, to determine whether someone is still eligible at renewal.

    c) The redetermination process employs standardized notices that are inaccurate and misleading, request unnecessary and burdensome information, and that fail to provide the individualized information necessary for families to know what they should do to maintain their TennCare coverage.

    d) The state ignores information submitted by enrollees in response to the TennCare's requests and wrongfully terminates coverage on the grounds the enrollees failed to respond.

    e) The state fails to make available and provide in-person assistance that is required to be available to all persons whose eligibility is being renewed, and that is particularly essential for the accommodation of many people with disabilities, in order to help them comply with program requirements and retain their eligibility for benefits.

5

f) The State routinely ignores requests by enrollees who seek to exercise their right to continued coverage pending the appeal of wrongful terminations, resulting in the immediate disruption of their medical coverage.

g) For many families who try to appeal erroneous termination of their coverage, the state arbitrarily denies appeals without a hearing.

3) TennCare uses policies and practices that deny individuals with disabilities equal access to the TennCare program and substantially impair health coverage for such individuals. TennCare employs methods that tend to screen out individuals with a disability from the redetermination process, including failing to provide reasonable accommodations for people with disabilities as necessary to enable them to complete the redetermination process or obtain a fair hearing.

4) Defendants policies and practices as set forth in the Complaint violate the Due Process Clause of the United States Constitution, provisions of the Medicaid Act, and Title II of the ADA. Plaintiffs ask the Court to enter declaratory and injunctive relief that prohibits:

A. prohibits the state from terminating TennCare coverage of Plaintiff Class members unless and until the Defendant has considered all potential coverage for which they may be eligible, and only after giving enrollees advance individualized written notice and an opportunity to appeal;

B. requires the state to prospectively reinstate TennCare coverage of the Plaintiff Class members until such time as the state determines that enrollees are in fact no longer eligible, based on a redetermination process that reliably complies with the Medicaid Act, Due Process Clause, 42 U.S.C. § 1396a(a)(3) and the ADA.

6

## JURISDICTION AND VENUE

5)      Jurisdiction is conferred on this court by 28 U.S.C. § 1331, which provides for jurisdiction over all civil suits involving questions of federal law, including actions under 42 U.S.C. § 1983 to redress the deprivation under color of state law of any rights, privileges, or immunities guaranteed by the U.S. Constitution and Acts of Congress; and by 42 U.S.C. § 12133, which provides for jurisdiction over actions arising under Title II of the ADA.

6)      Plaintiffs seek declaratory, injunctive and other appropriate relief, pursuant to 28 U.S.C. § 2201; 42 U.S.C. § 1983 and 42 U.S.C. § 12133.

7)      Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### Named Plaintiffs

8)      A.M.C. is a minor resident of Cumberland City, Houston County, Tennessee. She brings this action by her mother, C.D.C., acting as her next friend.

9)      K.A. is a minor resident of Nashville, Davidson County, Tennessee. He brings this action through his mother, J.Y., acting as his next friend.

10)      S.F.A. is a minor resident of Campbell County, Tennessee. She brings this action through her mother, C.A., acting as her next friend.

11)      Vivian Barnes is an adult resident of Cosby, Cocke County, Tennessee. Due to her disabilities, she brings this action through her daughter, Glenda Surrett, acting as her next friend.

12)      Carlissa Caudill is an adult resident of Russellville, Hamblen County, Tennessee.

13)     Rhonda Cleveland is an adult resident of Jefferson City in Jefferson County, Tennessee.

14)     S.L.C. is an adult resident of Nashville, Davidson County, Tennessee. Due to her disabilities, she brings this action by her father, C.B.C., acting as her next friend.

15)     D.D. is an adult resident of Nashville, Davidson County, Tennessee, as is her daughter, T.E.W. D.D. brings this action on her own behalf and as next friend of her four minor children, S.D.W., Y.A.D., Z.M.D, and X.M.D.

16)     Charles E. Fultz is an adult resident of Morristown, Hamblen County, Tennessee. Due to his disabilities, he brings this action by his wife, Mary Fultz, acting as next friend.

17)     Michael S. Hill is an adult resident of Morristown, Hamblen County, Tennessee. Due to his disabilities he brings this action by his sister, Kimberly Noe, acting as next friend.

18)     J.S.K. and his wife, J.C.K., are adults who live with their children in Alexandria, Dekalb County, Tennessee. J.S.K. and J.C.K. bring this action on their own behalf. J.S.K. also brings this action on behalf of his minor son, M.S.K., acting as Michael's next friend. J.C.K. also brings this action on behalf of her minor children, M.S.K. and D.C.S., acting as their next friend.

19)     E.I.L. is a minor resident of Nashville, Davidson County, Tennessee. He brings this action through his mother, J.N.L., acting as his next friend.

20)     William C. Monroe is an adult resident of Finley, Dyer County, Tennessee.

21)     Linda Rebeaud is an adult resident of Waynesboro, Wayne County, Tennessee. Due to her disabilities, she brings this action by her husband, James Rebeaud, acting as next friend.

22)     D.R. is an adult resident of Memphis, Shelby County, Tennessee. She lives with her four minor children, J.Z., M.X.C., J.C., and M.A.C., on whose behalf she brings this action as next friend.

23)     T.J.T. and S.L.T. are adult residents of Tullahoma, Coffee County, Tennessee. They are the parents of minor children A.L.T. and J.L.T., who bring this action by T.J.T. acting as their next friend.

24)     Kerry A. Vaughn is an adult resident of Nashville, Davidson County, Tennessee.

25)     Johnny L. Walker is an adult resident of Franklin County, Tennessee. Due to his disabilities, he brings this action by his daughter, Paige Walker, acting as next friend.

26)     As explained more fully at ¶¶ 434 et seq., *infra,* the named Plaintiffs bring this action on behalf of a Plaintiff class of all persons similarly situated. The Plaintiff Class comprises all individuals who meet the eligibility criteria for TennCare coverage and who, since March 19, 2019, have been or will be disenrolled from TennCare. The class excludes individuals, and the parents and legal guardians of individuals, who requested withdrawal from the TennCare program.

27)     Plaintiffs S.F.A., Vivian Barnes, S.L.C., Charles E. Fultz, Michael S. Hill, William C. Monroe, Linda Rebeaud and Johnny Walker assert additional claims on behalf of a subclass, referred to hereafter as the Disability Subclass. The Disability Subclass is defined as: Plaintiff Class members who are "qualified individuals with a disability" as defined in 42 U.S.C. § 12131(2).  They seek certification of the subclass in order to assert claims available to persons with disabilities.

9

**Defendant**

28) Defendant Stephen Smith is sued in his official capacities as Deputy Commissioner of the Tennessee Department of Finance and Administration ("DFA") and as the Director of that Department's Division of Health Care Finance and Administration ("HCFA"), which includes the Division of TennCare. The Department of Finance and Administration ("DFA") is designated as the "single state agency" responsible for administering Tennessee's Medicaid program consistent with federal law. 42 U.S.C. § 1396a(a)(5). DFA is also a "public entity" subject to Title II of the Americans with Disabilities Act., 42 U.S.C. § 12131(1)(B), and the federal regulations promulgated thereunder. Deputy Commissioner Smith oversees all of the health-care related programs within the DFA, including TennCare.

## FACTUAL ALLEGATIONS

### The Federal Medicaid Program in Tennessee

29) Title XIX of the Social Security Act, enacted in 1965 and known as the Medicaid Act, provides medical assistance to certain individuals who cannot afford to pay for needed health care. 42 U.S.C. § 1396. Medicaid is administered at the federal level by the Centers for Medicare & Medicaid Services ("CMS") of the Department of Health and Human Services ("HHS").

30) The state and federal governments share responsibility for funding and administering Medicaid. States must administer the program subject to federal requirements imposed by the Medicaid Act, as well as by CMS regulations and policy directives.

31) Federal funding covers approximately 65% of the cost of services provided to Tennessee Medicaid beneficiaries, while Tennessee provides the remaining 35%.

10

32) The state must administer Medicaid in conformity with a CMS-approved "State Plan" describing its program in detail and containing the state's commitment to comply with the conditions and requirements imposed by the Medicaid Act and related regulations. 42 U.S.C. § 1396a.

33) The Medicaid Act authorizes coverage for certain populations (e.g., low-income children and people with disabilities) and the provision of specified types of medical services (e.g., hospital care and physician services). 42 U.S.C. § 1396a(a)(10)(A).

34) Since 1994, Tennessee's Medicaid program has operated under a demonstration waiver approved by the Secretary of Health and Human Services pursuant to Section 1115 of the Social Security Act, 42 U.S.C. § 1315. The waiver program, known as TennCare, contracts with commercial managed care organizations ("MCOs") to administer the health benefits of the program's enrollees. The waiver has been periodically reauthorized by the Secretary pursuant to 42 USC § 1396n and was recently renewed until June 30, 2021.

35) As a public entity, TennCare must comply with the obligations of Title II of the Americans with Disabilities Act and ensure that no qualified individual with a disability, by reason of disability, is excluded from participation in or is denied the benefits of TennCare, or is subject to discrimination by TennCare. 42 U.S.C. § 12132. This includes an obligation to not employ criteria or other methods of administration that have the purpose or effect of impairing the objective of the program with respect to individuals with disabilities. *Id.*; 28 C.F.R. § 35.130(b)(3). As a public entity, TennCare is obligated to make reasonable modifications in policies, practices, and procedures as necessary to avoid discrimination on the basis of disability unless TennCare can demonstrate that doing so would fundamentally alter the nature of the program. 28 C.F.R. § 35.130(b)(7).

11

**Federal Medicaid Eligibility Requirements**

36)     To enroll in Medicaid, individuals are required to meet specified eligibility criteria.  First, they must meet citizenship requirements and be a resident of the state where they are applying for coverage. Second, they must meet so-called "categorical eligibility" rules by showing that they are aged, blind, disabled, or pregnant, or that they are children or the "caretaker relatives" (usually the custodial parents) of children. Third, they must show that their income is below certain limits, which vary depending on the categorical eligibility group to which they belong. Finally, individuals in some, but not all, categorical eligibility groups have to meet additional limits on the amount of resources, or assets, they own.

37)     States must ensure that, once enrolled, an individual's Medicaid coverage continues until she voluntarily withdraws or is found to be ineligible in any category, as determined through specific processes prescribed by federal law.

38)     States must operate their Medicaid programs "in the best interests of the recipients." 42 USC 1396a(a)(19).

*Children's Eligibility for TennCare*

39)     By federal law, all state Medicaid programs must cover several mandatory categories of children. The largest is the so-called "MAGI" Medicaid category. In determining eligibility for this category, the state compares the household's modified adjusted gross income ("MAGI") to the applicable income limit. 42 U.S.C. § 1396a(e)(14). For children, income limits vary by age, ranging from 200% of the federal poverty level ("FPL") (currently $52,400 annually for a family of four) for infants, to 133% of the FPL ($34,846 annually for a family of four) for children aged 6 – 18. 42 U.S.C. § 1396a(a)(10)(A)(i); 42 C.F.R. § 435.118. Households who meet the income limits are eligible, regardless of the amount of assets or resources they own.

12

40)     Children who are approved by the Social Security Administration ("SSA") to receive cash assistance through the Supplemental Security Income ("SSI") program are automatically enrolled in Medicaid. 42 U.S.C. § 1396a(a)(10)(A)(i)(II)(aa); 42 C.F.R. § 435.120. To qualify for SSI, a child must be blind or disabled, as defined by the Social Security Act, have limited resources and have an income that does not exceed 78% of the FPL.

41)     A child born to a mother who is enrolled in Medicaid at the time of the child's birth is deemed to have applied for and been found eligible for Medicaid on the date of such birth. 42 U.S.C. § 1396a(e)(4). These "deemed infants" remain eligible for Medicaid until their first birthday, regardless of any changes in their family or financial circumstances. *Id.* The state must then assess their continued eligibility in other potential categories of coverage.

42)     Federal law requires the state to cover several other categories of coverage for children, and TennCare covers additional children and adults beyond those statutorily prescribed categories.

*Adult Eligibility for TennCare*

43)     Mandatory Medicaid eligibility for adults includes several categories of people with low incomes. The most populous category of adult enrollees includes parents and other caretaker relatives of children who qualify in the MAGI category.

44)     Like children, adults who receive SSI are automatically enrolled in Medicaid. 42 U.S.C. § 1396a(10)(A)(i)(II)(aa); 42 C.F.R. § 435.120.

45)     Pregnant women are required to be covered with incomes up to 195% of the FPL and may be covered at high incomes as a state option. 42 C.F.R. § 435.116.

46)     Federal law provides for the coordination of benefits for Medicaid beneficiaries who are also eligible for Medicare, the federal health insurance program for disabled workers

13

and the elderly. Through what is known as the "Medicare buy-in," TennCare pays the Medicare premiums and cost-sharing for these dually eligible individuals. 42 C.F.R. § 431.625.

47) Several mandatory categories are designed to protect the coverage of certain individuals who currently receive Social Security benefits and formerly received SSI benefits and who, for purposes of Medicaid eligibility, are treated as if they continue to receive SSI benefits:

a) Disabled Adult Children ("DAC") qualify for TennCare if they become disabled before age 22 and lose SSI because they start receiving Social Security benefits based on a parent's death or retirement. These DAC beneficiaries' Social Security income is not counted in determining their eligibility, effectively raising the income limit well above the federal poverty level for some individuals. 42 U.S.C. § 1383c(c); TennCare R. 1200-13-20-.02(26), 1200-12-20-.08(2).

b) Some former SSI beneficiaries are eligible under the federal Pickle Amendment, Section 503 of Public Law 94-566. These include Social Security beneficiaries who at some time since 1977 received Social Security and SSI benefits in the same month. They qualify for Medicaid under the Pickle Amendment if they lost SSI but would currently be eligible for SSI if the Social Security Cost of Living Adjustments ("COLAs") received since their SSI termination were disregarded. TennCare refers to this category as "Pickle Passalong."

c) Widow/Widower coverage is available to disabled, widowed individuals between the ages of 50 and 65 who have lost their SSI but who would still be eligible for SSI if their initial entitlement to, and/or increases in, their Social Security widow/widower benefits were disregarded. TennCare R. 1200-13-20-.08(4).

14

48)     TennCare covers uninsured women under age 65 who need active treatment for breast or cervical cancer and who have incomes below 250% of the FPL (currently $31,900 a year for an individual). These women apply through their local county health department, which submits their application to TennCare.

49)     TennCare also administers what is known as the Medicare Savings Programs ("MSP"). The MSP is a Medicaid program that provides limited assistance to certain individuals enrolled in Medicare. Unlike Medicaid for those who are dually eligible for Medicare and Medicaid, the MSP only helps defray the Medicare expenses of beneficiaries whose incomes are above the SSI limit but are inadequate to cover the full costs of Medicare coverage. The following programs, which are differentiated by their income eligibility criteria and the benefits they provide, together comprise the MSP:

   a)   Qualified Medicare Beneficiary ("QMB"), covering individuals with incomes up to 100% FPL, pays Medicare premiums, co-payments and deductibles.

   b)   Specified Low-Income Beneficiary ("SLMB"), covering individuals with incomes from 100% - 120% FPL, pays Medicare Part B premiums only.

   c)   Qualified Individual ("QI"), covering individuals with incomes from 120% - 135% FPL, pays Medicare Part B premiums subject to available funding.

TennCare is responsible for enrolling eligible Medicare beneficiaries in the MSP for which they qualify. The MSP is a Medicaid-administered program and must follow Medicaid requirements, but does not afford access to full Medicaid benefits.

50)     Individuals whose functional limitations require long-term services and supports, such as nursing home care or in-home nursing, can qualify to receive such services through the TennCare CHOICES program, authorized by the terms of TennCare's Section 1115 Waiver. To

15

qualify, an individual must have limited assets and an income that does not exceed approximately $2,400 per month.

51)     Individuals with intellectual or developmental disabilities who require long-term services and supports can qualify to receive such services through TennCare's Employment and Community (ECF) CHOICES program, authorized by the terms of TennCare's Section 1115 Waiver. To qualify, an individual must have limited assets and an income that does not exceed approximately $2,400 per month.

**Applying for and Renewing Medicaid**

52)     The Affordable Care Act ("ACA") took full effect in January 2014. Among other things, the ACA integrated application and eligibility processes across all health insurance affordability programs. Health insurance affordability programs encompass Medicaid and the Children's Health Insurance Program ("CHIP"), as well as commercial coverage subsidized under the ACA and available through an online insurance exchange. 42 U.S.C. §§ 1396w-3, 18083(b).

53)     Under these simplified processes for individuals, a single application determines eligibility for all health insurance affordability programs, including Medicaid.

54)     The ACA prohibits states from asking for information that is irrelevant or that is already available to it from its own files, including its SNAP and WIC eligibility files, or from a federal data hub. 42 U.S.C. § 18083(b)(1); 42 C.F.R. §§ 435.907(e), § 435.952(c).

55)     The state must accept applications and redetermination information in person, online, by phone or by mail. 42 U.S.C. § 18083(b)(1)(A); 42 C.F.R. §§ 435.905, 435.916.

16

56)     Federal law and state policy require that individuals with Medicaid coverage undergo renewal, also referred to as "redetermination," of their eligibility every 12 months. 42 C.F.R. § 435.916; TennCare R. 1200-13-20-.09.

57)     The state must redetermine eligibility without requiring information from the person if it is able to do so based on its own review of reliable information available from state or federal records, including the state's own SNAP, WIC, and unemployment insurance records. 42 C.F.R. §§ 435.916(a)(2) and (b), § 435.948; *Crippen v. Kheder*, 741 F.2d 102 (6th Cir. 1984).

58)     If the state cannot renew eligibility based on such available information, it must provide the individual with a renewal form in plain language and in a manner that is accessible to persons with disabilities. 42 C.F.R. §§ 435.905(b), 435.916(g).

59)     The state must use a renewal form that is pre-populated with any relevant information already available to the state, and the form may only ask for information relevant to, and necessary for, the determination of eligibility. 42 C.F.R. §§ 435.916(a)(3) and (e), 435.907(a).

60)     The state must accept the renewal information in person, online, by phone or by mail and must provide in-person assistance to individuals, including those with disabilities, who need help completing the redetermination process. 42 C.F.R. §§ 435.905, 435.908(a), 435.916.

61)     Prior to making a determination of ineligibility for Medicaid, the state must consider all bases of eligibility. 42 C.F.R. § 435.916(f)(1).

62)     For individuals who submit renewal forms to the state and are determined ineligible for Medicaid, the state must promptly determine their potential eligibility for other insurance affordability programs, including CHIP, known as CoverKids in Tennessee, or subsidized coverage through an online insurance exchange known as the federally facilitated

17

marketplace ("FFM"). Upon determining that the person is potentially eligible for such other program, the state must notify the individual, electronically transfer the person's account to that other insurance affordability program and inform the other program of the status of the person's Medicaid eligibility. 42 U.S.C. § 1396w-3; 42 C.F.R. §§ 435.916(f)(2), 435.1200(e).

63)     The state must timely notify an individual of its decision regarding the renewal of her Medicaid eligibility. The notice must be provided in plain language and in a manner that is timely and accessible to individuals who are living with disabilities. 42 C.F.R. §§ 435.905(b), 435.916(a)(3)(i)(C), 435.916(g). The state must inform enrollees that, if a person's coverage is terminated for failure to submit the renewal form or other necessary information, the state must timely reconsider and determine the person's eligibility on the basis of any information submitted within 90 days of the termination, without requiring a new application. 42 C.F.R. §§ 435.905, 435.916(a)(3)(C)(iii).

64)     If the state determines that a person is ineligible, it must provide the person due process as specified in the implementing regulations of 42 U.S.C. § 1396a(a)(3) and the constitutional requirements established in *Goldberg v. Kelly*, 397 U.S. 254 (1970). 42 C.F.R. Part 432, Subpart E; 42 C.F.R. § 435.916(a)(3)(i)(C). Those requirements include the state's obligation to provide the person advance notice of the termination of her coverage. The notice must accurately inform the person of the reasons and of her right to contest the action by requesting a fair hearing. Upon timely request by the enrollee, the state must ensure that her coverage is maintained pending disposition of her appeal. 42 C.F.R §§ 431.205, 431.211, 431.230; 42 C.F.R. §§ 435.905(b), 435.916(a)(3)(i)(C).

65)     The state must provide a fair hearing and render a decision within 90 days of receipt of a timely enrollee request for appeal. 42 C.F.R. § 431.244.

18

66)     The state must take prompt corrective action if the hearing decision is favorable to the enrollee, or if the state Medicaid agency decides in the enrollee's favor before the hearing. 42 C.F.R. § 431.246.

*Tennessee's Eligibility Redetermination Process*

67)     Until 2014, individuals applied for TennCare in person at a Tennessee Department of Human Services ("TDHS") office in the county where they lived, and a trained case manager would help them compile and submit eligibility information and documentation on the applicant's behalf. Enrollees, including people who needed in-person assistance due to their disabilities, could go to their local TDHS offices to get assistance completing the annual redetermination process.

68)     In January 2014, the state transferred these functions from TDHS to TennCare. All applications are submitted online, by mail, or over the phone. Except for applicants seeking long-term services and supports through TennCare's CHOICES program, which has an entirely separate application process, the state provides no meaningful in-person assistance.

69)     TennCare planned to use a new computer system, the TennCare Eligibility Determination System ("TEDS"), to meet the ACA's new eligibility and enrollment provisions described above. When the provisions took effect on January 1, 2014, TEDS was not operable. There were pervasive delays and defects in the processing of TennCare applications, which the state refused to allow applicants to appeal. This Court enjoined the state from continuing to deny such appeals, and the order was affirmed by the Sixth Circuit Court of Appeals. *Wilson v. Gordon*, 822 F.3d 934 (6th Cir. 2016).

70)     Likewise, the State failed to implement a redetermination process that complied with the requirements. As a result, CMS approved a series of mitigation plans for applications

19

and redeterminations. This included approving suspension of all redeterminations from January 2014 through October 2015.

71) In 2016, TEDS was still not operational, but the state began a three-phase redetermination process for TennCare. The state exempted only about 35,000 TennCare enrollees who were receiving long-term services and supports in nursing homes or in-home and community-based settings.

72) In Phase 1, the State renewed coverage for individuals whose TennCare eligibility could be determined based on records of their SNAP eligibility.

73) In Phase 2, the State renewed eligibility for MAGI households based on a self-attestation that there had been no changes to their household composition.

74) In Phase 3, the State subjected all remaining enrollees to a partially manual redetermination process that involved the use of large paper packets. TennCare's contractor purportedly mailed packets to more than 400,000 enrollees, who were required to complete and return the packets in order to confirm their continued eligibility. These lengthy, complex packets failed to comply with federal requirements and to compound these problems, in-person assistance in completing the packets or providing requested documentation was also not available as required. Phase 3 extended until March 19, 2019, when TEDS became operational and the TEDS-based redetermination process went into effect.

75) According to data provided by the state to the Plaintiffs' counsel in response to a request under the Tennessee Open Records Act, nearly a quarter million children, or 84.2% of the children who went through Phase 3 of Tennessee's redetermination process in 2017-2018, lost their coverage.

20

76)     Of those children terminated, more than two thirds (67.1%) were terminated because their parents or guardians allegedly failed to respond to requests for information. On information and belief, in many instances, the failure to respond was actually due to the state's failure to notify the family that they needed to supply information. In other cases, families did respond but lost their coverage anyway because the state failed to process their responses. The state terminated coverage for failure to respond, regardless of whether documents available to the state already established the families' continuing eligibility.

77)     On March 19, 2019, TennCare implemented TEDS statewide with assurances that TEDS would accurately and reliably perform the required TennCare eligibility functions. The system's enrollee-facing online portal is called TennCare Connect, which is also the name of the TennCare call center.

78)     TennCare Connect's online portal and call center remain the only avenue for most Tennesseans to inquire about their application or redetermination process.

79)     Despite the state's assurances of TEDS' accuracy and reliability, systemic defects in the eligibility redetermination process continue to cause eligible enrollees to lose TennCare coverage. TennCare enrollees continue to receive incorrect and contradictory information, or no notice at all during the redetermination process, and are routinely denied access to pre-termination hearings and continued benefits. As a result, many enrollees only learn that they have been terminated when they seek medical care and learn that they no longer have coverage.

80)     Enrollees often end up submitting an entirely new application when they learn they have lost TennCare. But when enrollees reapply to regain TennCare, they routinely encounter the same systemic problems that resulted in their wrongful termination in the first place. And even if an application is successful, the new coverage is only prospective from the

21

date of the re-application, leaving the family with medical debts incurred during the period when they were without coverage.

### Systemic Defects in the TennCare Redetermination Process

*TennCare Fails to Use Information*
*Already on File to Redetermine Eligibility*

81)     To fulfill its duty to redetermine eligibility based on information it already possesses, TennCare has access to several state databases which contain information about Medicaid enrollees, including SNAP eligibility, SSI eligibility, unemployment insurance, and WIC records.

82)     TennCare does not use the information readily available to it in redetermining eligibility. As a result, TennCare routinely asks individuals to verify information it already has and terminates coverage if an individual fails to respond, even when information available to TennCare establishes the person's continued TennCare eligibility.

83)     TennCare has required class members, including named plaintiffs Vivian Barnes, Carlissa Caudill, S.L.C., Charles E. Fultz, Michael Hill, Damarys Roche, and Johnny Walker, to provide duplicative information which it already has on file, or lose their coverage.

*TennCare Requires Enrollees to Provide Irrelevant Information*
*And Ignores Information That Establishes Their Eligibility*

84)     TennCare's redetermination packets sent to enrollees require the submission of information or documentation that the state is prohibited from demanding and state that the material is essential for the redetermination of the enrollees' eligibility, when in fact the information is irrelevant.

22

85)     For instance, TennCare required plaintiff Vivian Barnes to submit information regarding the amount of her utility bills, homeowner's insurance premiums, and telephone bills, which are not relevant to any TennCare eligibility category.

86)     If enrollees fail to submit the irrelevant information requested, TennCare issues notices of termination.

87)     At the same time, the redetermination packet fails to request information that is necessary to evaluate eligibility for certain categories.

88)     For instance, the standard redetermination packets do not ask if an individual is currently receiving SSI or has received SSI in the past. Form TN 304 is a two-page questionnaire, consisting of eight questions, each to be answered with a yes or no. If a member answers "no" to all questions, TennCare will determine that the member is ineligible for any category of TennCare. None of the questions asks whether the member receives or has received SSI.

89)     The redetermination packets also do not ask whether an individual is currently receiving long-term services and supports.

90)     Receipt of SSI or long-term services and supports, however, can establish eligibility for several categories of Medicaid. *See supra* ¶¶ 44, 47, 50-51.

91)     As a result, TEDS does not reliably test for eligibility in at least the following categories:

> a)     Disabled Adult Child coverage under 42 U.S.C. § 1383c(c);
>
> b)     Coverage of former SSI recipients (referred to by the state as "Pickle Passalongs") eligible under the Pickle Amendment, Pub. L. 94-566, § 503;
>
> c)     Disabled Widow/Widower coverage under 42 U.S.C. § 1383c(b);

23

d) Institutional Medicaid, for individuals requiring care in a medical institution, other than a nursing home, for at least 30 days, under 42 U.S.C. §§ 1396a(a)(10)(ii)(V), 1396b(f)(4)(C), and 42 C.F.R.§ 435.236;

e) Eligibility for home and community-based services through the CHOICES program, which serves adults with severe functional limitations pursuant to terms of TennCare's Section 1115 Waiver; and

f) Eligibility for the Employment and Community First ("ECF") CHOICES program, which serves individuals with severe intellectual and developmental disabilities pursuant to terms of TennCare's Section 1115 Waiver.

Disability is an eligibility criterion for each of these categories.

92) TennCare has incorrectly determined that class members, including named plaintiffs, Vivian Barnes, Clarissa Caudill, S.L.C., Charles E. Fultz, Kerry Vaughn, and Johnny Walker, were not eligible for benefits when they in fact remained eligible for one of the above eligibility categories.

*TennCare Does Not Send Families*
*Redetermination Packets and Other Notices*

93) TennCare's mailing process remains flawed. TennCare does not reliably maintain accurate address information for enrollees, as TennCare or its contractors fail to send mail to the correct addresses, even when enrollees or their advocates repeatedly report and attempt to correct TennCare address errors.

94) For many years, state regulations have required and continue to require individuals to report changes of address to TDHS. Tenn. Comp. R. & Regs. § 1200-13-13-.02(a).

24

Yet, on information and belief, TennCare does not check TDHS's databases for address information before sending a redetermination packet, or before it terminates coverage because an enrollee has failed to return the packet or other requested information.

95) As a result, TennCare often repeatedly sends class members' redetermination packets to addresses it knows, or should know, to be inaccurate.

96) When class members fail to respond to redetermination packets they never received, TennCare terminates their coverage. TennCare then sends the termination notice to the same incorrect address.

97) Class members, including named plaintiffs S.F.A., Vivian Barnes, A.M.C., Carlissa Caudill, D.D., J.S.K., E.I.L., William C. Monroe, D.R., T.J.T., have not received redetermination requests and/or termination notices that TennCare purportedly sent to them, despite maintaining up-to-date address information and receiving other TennCare information at the updated address.

*TennCare Ignores Information Submitted by Enrollees to*
*Establish Continued Eligibility*

98) Even when Medicaid enrollees do receive and respond to the TennCare redetermination packets, TennCare routinely fails to consider the information provided by the enrollees in the redetermination process.

99) TennCare also arbitrarily and incorrectly separates members of the same household and will treat some members of the household as having not responded to a request for information, even though it acknowledges receipt from other members of the same household.

25

100)    When TennCare fails to recognize that it has received information from an enrollee, the state issues notices of termination, and maintains a record of the reason for termination as failure to respond or failure to provide requested information.

101)    Class members, including named plaintiffs Michael Hill, Linda Rebeaud, D.R., and T.J.T., have had their coverage terminated for failing to provide requested information, although they in fact sent the requested information to TennCare.

102)    TennCare is aware that it routinely fails to consider information provided by enrollees. The Appeals Unit has developed a form notice for situations when an enrollee was terminated for failure to submit information but has since proven that they did submit the information.

### TennCare Generates Notices That Fail to Provide Enrollees Information Essential for the Maintenance of Their Coverage

103)    When TennCare determines an individual is no longer eligible for Medicaid coverage, it is required to send a pre-termination notice. As described *supra*, TennCare often fails to send such notices. TennCare enrollees frequently suffer termination of their coverage because of their alleged failure to respond to the state's demand for information, when they have never received such a demand, and circumstances make it probable that the state failed to mail the demand to their correct address.

104)    When enrollees do receive notice directing them to provide information as part of the redetermination process, the notices routinely misrepresent the enrollees' rights and responsibilities, impairing their ability to maintain their coverage. For example, the notices tell enrollees that the state requires them to submit information or documents needed to determine

26

their eligibility; however, the state already has information establishing the enrollees' eligibility and is prohibited from requesting such information from enrollees.

105) TennCare uses computer-generated termination notices, which include standard blocks of text. The notices do not adequately explain the basis for the agency's decision. For example, a stock phrase used in termination notices states that the decision was made "when we received or you reported a change." The notices do not identify what the change was or explain why it justifies termination of coverage.

106) Termination notices often follow an earlier form notice telling the enrollee that, "We've made a change to your income." The earlier notice tells the enrollee that, "To protect your privacy we are not printing this change in this letter" and advises them to contact TennCare Connect by phone or log into their online account to find out what income TennCare is attributing to them. When enrollees attempt to get that information, it is not available from TennCare Connect through either the call center or online portal. When coverage is terminated based on asserted financial ineligibility, these notice defects leave the enrollee unable to find out what income information the state is using, how it was calculated, or where it came from.

107) When the state makes a substantive determination that an enrollee is no longer eligible, it represents to the enrollee that the state has considered all of the enrollee's facts and each kind of coverage group, and that the person is not eligible in any category. This representation is inaccurate and misleading, since the state does not even collect or consider information needed to assess eligibility for several categories.

108) TennCare termination notices fail to inform enrollees that, if they submit requested information within 90 days of the termination, the information will be reviewed and, if

27

the enrollees are found eligible, their coverage will be reinstated without requiring a new application. 42 C.F.R. §§ 435.905, 435.916(a)(3)(C)(iii).

109)    TennCare termination notices falsely represent that the state has the authority to deny appeal rights that are guaranteed by federal law. *See* Section *TennCare Improperly Refuses Appeal Requests infra*.

110)    Frequently, TennCare sends multiple, contradictory notices, finding an individual both eligible and ineligible for the same program. Class members including named plaintiffs, Vivian Barnes, Charles Fultz, and T.J.T. have received inadequate and/or contradictory termination notices that do not adequately explain the basis for the agency's decision.

*TennCare Fails to Timely Process Appeals*

111)    When an enrollee submits a timely request for an appeal, or a timely request for a continuation of benefits, coverage frequently ends anyway or the enrollee does not receive a hearing, because TennCare claims to have no record of the enrollee's request.

112)    In cases in which TennCare acknowledges receipt of a timely appeal, TennCare frequently fails to provide a hearing and take final administrative action within 90 days, or to take prompt corrective action as required. 42 C.F.R. §§ 431.244(f), 431.246.

113)    Class members, including plaintiffs Vivian Barnes, Carlissa Caudill, Charles E. Fultz, Michael Hill, E.I.L., T.J.T., and Kerry Vaughn, have been denied appeals, although they timely submitted a request.

*TennCare Improperly Refuses Appeal Requests*

114)    Defendant's policies and practices are improperly rejecting individuals' requests for appeals.

28

115) Under TennCare rules, an individual's appeal must be received by TennCare within 40 days from the date on the TennCare notice or prior to the date of action specified in the notice, whichever is later, "unless good cause can be shown as to why the appeal or request for a hearing could not be filed within the required time limit." Tenn. Comp. R. & Regs. § 1200-13-19-.06(3).

116) When enrollees attempt to appeal after TennCare's deadline and explain that the delay was caused by the fact that they did not receive a notice of decision, TennCare refuses to accept the appeal.

117) TennCare requires enrollees to appeal within 20 days of the date on a TennCare notice of decision, if they seek continuation of benefits pending appeal. When enrollees request continuation of benefits after TennCare's deadline and explain that the delay was caused by their failure to receive a notice of decision, TennCare refuses to maintain or reinstate their coverage pending appeal.

118) Tenn. Comp. R. & Regs. § 1200-13-19-.05(3) states that all eligibility appeals are first subject to a screening process that requires appellants to demonstrate that their appeal raises a "valid factual dispute." If an appellant is unable to do so to the satisfaction of state officials, the state rule requires that her appeal be summarily "dismissed without an opportunity for a hearing." *Id*.

119) The defendant applies the policy in all cases, not just those that arise in the narrow circumstances authorized by federal regulations, where the sole issue is a federal or state law requiring an automatic change adversely affecting some or all beneficiaries. 42 C.F.R. §§ 431.220(b), 431.223. The termination notices reiterate this policy, stating: "If you don't think we made a mistake about a fact, you can't have a hearing."

29

120)    As a result, class members are unable to challenge denials based on an inaccurate application of law or policy, such as failing to screen for certain eligibility categories, such as a person protected by the Pickle Amendment. This crucially misstates the scope of the enrollee's right to a fair hearing under the Constitution and applicable federal law. *Goldberg v. Kelly*, 397 U.S. at 268.

121)    Class members including plaintiffs, S.F.A., A.M.C., D.D., Michael Hill, William C. Monroe, D.R., T.J.T., and Johnny Walker, have been denied continuation of benefits while they attempt to appeal TennCare's erroneous eligibility determination, leaving them without coverage and forced to pay for care out of pocket.

*TennCare Lacks Systemic Accommodation Procedures*
*Necessary for Enrollees with Disabilities*

122)    The Defendant systemically fails or refuses to provide reasonable accommodation to qualified persons with disabilities in the form of assistance needed to successfully complete the eligibility redetermination process and maintain their TennCare coverage.

123)    The redetermination process denies TennCare enrollees with disabilities effective exercise of their due process rights to contest the wrongful denial or termination of TennCare.

124)    The TennCare Administrative Manual, Policy Manual No. 200.010, provides:

> TennCare is required to make reasonable modifications in its policies, practices and procedures so that qualified individuals with disabilities can take part in TennCare's programs, services, or activities, unless a requested modification would result in a fundamental alteration or undue financial and administrative burden to TennCare.[1]

---

[1] *Division of TennCare Eligibility Policy Consolidated*, TennCare, 3, https://www.tn.gov/content/dam/tn/tenncare/documents/HCFAEligibilityPolicyConsolidated.pdf (last visited Mar. 19, 2020).

30

125)     Beyond this summary statement of the agency's ADA compliance, TennCare, as administered by the Defendant, has no written regulations or adequate policies, protocols, or guidelines providing meaningful instructions for eligibility workers, supervisors, managers, or other agency staff  regarding: (a) actions to take if persons with disabilities request reasonable modifications of TennCare rules or policies regarding assistance with accessing or maintaining eligibility for TennCare benefits and coverage; (b) acknowledging whether persons with disabilities have made requests for such reasonable modifications; (c) what types of reasonable modifications can be requested and granted; (d) how to respond to or decide whether to grant requests for reasonable modifications; (d) which agency staff have authority to decide reasonable modification requests; (e) the timelines and substantive criteria or standards for deciding reasonable modification requests; (f) how disputes concerning reasonable modification requests are to be resolved; (g) tracking persons with known disabilities who may need reasonable modifications; or (h) the provision of individual notice to persons with disabilities of their right to request reasonable modifications.

126)     TennCare previously acknowledged that successful completion of the redetermination process is more difficult for persons with disabilities than for those without disabilities.[2] TennCare also acknowledged that, for those enrollees whom its own eligibility records identified as qualified individuals with disabilities, TennCare's due process obligations required the implementation of appropriate systemic procedures for reasonable accommodation, through its recordkeeping, individual outreach and assistance and appeal processes. For enrollees

---

[2] The eligibility category in which these individuals qualified was abolished in 2005, and their eligibility in surviving disability-related categories was evaluated through a redetermination process similar to the process at issue here. *Rosen v. Goetz,* 410 F.3d 919, 923, 932 (6th Cir. 2005).

31

eligible on the basis of severe and persistent mental illness (SPMI), those accommodations included the identification of community mental health centers where each enrollee had most recently received treatment, and notification of those centers to conduct outreach and proactively assist with the reverification of their eligibility. Accommodation also involved notification all enrollees of the availability of a good cause extension of deadlines for responding to state requests and for submitting appeals.

127)     The current redetermination process is at least as challenging for enrollees to successfully complete as it was when TennCare implemented those systemic accommodations, and the current process and is plagued by systemic problems of which TennCare officials are well aware. Yet the Division of TennCare abandoned those systemic procedures for accommodating the needs of those known to the Division to be qualifying individuals with disabilities. TennCare. TennCare no longer discloses the existence of a good cause exception to time limits and refuses to apply the exception even when enrollees seek extensions based on circumstances, such as the failure to receive TennCare notices, that clearly qualify.

128)     TennCare is required to implement and maintain systemic accommodation procedures. 28 C.F.R. § 35.130(b)(7)-(8).

129)     Members of the Disability Subclass, including Vivian Barnes, D.R., William C. Monroe and Johnny Walker, are harmed by these systemic defects. The failure of TennCare to implement and maintain a system of ensuring reasonable accommodations, as mandated by the ADA, results in enrollees with disabilities being unable to comply with complex redetermination procedures without assistance. Consequently, Defendant terminates these persons' benefits, or places them at imminent risk of having their benefits terminated.

32

*TennCare is Aware of the Problems with Its Redetermination Process,*
*But Refuses to Correct Them*

130) TennCare is responsible for programming its computers to make accurate eligibility redeterminations.

131) Enrollees and advocates have repeatedly raised these systemic problems in correspondence with TennCare officials, and in appeal hearings (when they have been permitted), but the state has failed or refused to correct them.

132) Despite being informed of specific issues with the TEDS redeterminations regarding categories related to disability, TennCare continues to redetermine those categories of TennCare eligibility using TEDS and without additional protections to prevent inaccurate eligibility notices and determinations for those categories.

## Injuries to the Named Plaintiffs

### *Plaintiff A.M.C.*

133) A.M.C. is a 3-year-old child who lives with her mother, C.D.C., and two sisters in Cumberland City, Tennessee. A.M.C. has epilepsy and experiences seizures. She also has related developmental delays. Her conditions can be treated with therapy and daily prescription medication. She also relies on emergency epilepsy medication for seizures that last longer than five minutes, as such seizures are potentially lethal.

134) A.M.C. has been continuously eligible for TennCare in the MAGI category since her birth. C.D.C. and her other two daughters are in A.M.C.'s household and are eligible for coverage under the MAGI category. TennCare has repeatedly terminated A.M.C.'s coverage and denied her eligibility in error; in one instance TennCare terminated A.M.C.'s coverage while maintaining coverage for her sisters and mother.

33

135)    In 2018, C.D.C. discovered that A.M.C. had lost her TennCare coverage when their pharmacy would not fill A.M.C.'s prescriptions. C.D.C. called A.M.C.'s former MCO, Amerigroup, to figure out what happened. The Amerigroup representative said that their household didn't have coverage but did not know the reason.

136)    About a week after her mother was turned away from the pharmacy without A.M.C.'s seizure medication, A.M.C. had to be transported by air ambulance to a Nashville hospital when she had a dangerous seizure that left her unresponsive.

137)    A.M.C. was hospitalized for two days. During this health crisis, C.D.C. learned the household had lost their TennCare coverage for failure to return a renewal packet that C.D.C. had never received. A caseworker at the hospital helped C.D.C. re-apply, but at the time of her discharge, A.M.C. still did not have coverage, and C.D.C. still could not afford her medications. A.M.C.'s neurologist sent her home with a temporary supply. A.M.C. and her household regained coverage.

138)    In the beginning of 2019, C.D.C. received a renewal packet for her household. C.D.C. promptly filled it out and returned it to TennCare.

139)    Beginning what would turn out to be a five-month ordeal, C.D.C. learned in August 2019 that TennCare had terminated A.M.C. once again. As before, C.D.C. learned of the termination when she sought to refill a prescription for A.M.C.'s epilepsy medication and the pharmacy refused because A.M.C. was uninsured. And as before, C.D.C. had received no notice from TennCare informing her of the termination, the reasons for the termination, or A.M.C.'s appeal rights.

140)    C.D.C. promptly called A.M.C.'s former MCO. The representative stated that A.M.C. lost coverage but she didn't know why and could not give her the reason because it was

not her department. The representative stated it might be an address issue and directed C.D.C. to contact the Office of Vital Records to make sure C.D.C.'s address was correct.

141)	C.D.C. confirmed that her information was correct with Vital Records and called A.M.C.'s former MCO once again, this time they directed her to contact TennCare Connect.

142)	C.D.C. contacted TennCare Connect and was told that A.M.C.'s coverage had indeed been terminated because A.M.C. didn't qualify because she wasn't in a group covered by TennCare. C.D.C. responded that A.M.C. was in a group covered and she asked to appeal the decision. C.D.C. also told the TennCare representative that she had not received notice and explained the urgency of A.M.C.'s medical needs. The TennCare representative accepted the appeal but refused to reinstate A.M.C.'s benefits, because more than 20 days had passed since the notice of decision that C.D.C. had never received. The TennCare Connect representative advised her that the best way for A.M.C. to get coverage during her appeal was for C.D.C. to file a new application and explain the emergency, which she did.

143)	C.D.C. followed up regularly to inquire about the status of the appeal and the new application. TennCare reported that both were pending. Finally, in one follow-up call to TennCare Connect, she was told that the application had been denied because A.M.C. did not qualify. TennCare Connect representatives also stated that TennCare had sent a notice of decision to C.D.C. regarding the denial. C.D.C. told the TennCare representative she was not receiving notices regarding A.M.C.'s TennCare. When C.D.C. tried to explain that A.M.C. was eligible, the TennCare representatives told her that they were not the ones who made the decision and could not give her more information or reasons. C.D.C.'s filed another appeal.

144)	In September 2019, A.M.C. again had to be rushed to the hospital because she was experiencing a seizure. A.M.C. still had not regained her TennCare coverage. A hospital

caseworker advised C.D.C. that A.M.C. should qualify for TennCare. The caseworker helped her submit a new application and requested that it be expedited.

145) A few days later C.D.C. contacted the caseworker and was told that she would have to wait 45 days for a decision on A.M.C.'s application.

146) In October 2019, with A.M.C. still lacking coverage, C.D.C. took her to the Houston County Health Department, where the family also access their WIC benefits, because A.M.C. was wheezing, had a high fever, and was not breathing properly. C.D.C. was told to immediately take A.M.C. to the hospital. At the hospital, the doctors told C.D.C. that they believed A.M.C. had asthma. They directed her to take A.M.C. to see a specialist and prescribed an inhaler. However, A.M.C. remained uninsured, and C.D.C. could not take her to a specialist. She paid for A.M.C.'s inhaler out-of-pocket, making it even more difficult to pay for A.M.C.'s other medical needs.

147) Despite the Houston County Health Department's experience dealing with TennCare eligibility, department staff were unable to resolve the problem. However, during another visit to the Houston County Health Department in late fall of 2019, an employee helped her create a TennCare Connect online account.

148) In C.D.C.'s TennCare Connect account, she found that A.M.C.'s TennCare coverage showed a termination of August 5, 2019. C.D.C. also found a copy of a form notice that she had not received, TN 301.2, dated August 8, 2019, that she had not received, informing her that A.M.C.'s TennCare was denied because she was "not in a group covered by TennCare or CoverKids." She discovered that this and other notices had purportedly been sent to her address with the recipient as her mother, A.M.C.'s maternal grandmother. Neither C.D.C. nor her mother received any of those letters. The account also indicated that notices were purportedly being sent

36

to "Parallon" at 2300 Patterson St., Nashville, TN 37203-1538. "Parallon" is the address of TriStar Centennial Medical Center. This is the hospital where A.M.C. and her younger sister were born and where A.M.C. has received treatment for her seizures.

149)    C.D.C. also found through the online account that her mother and brother had been incorrectly added to her account and household without her knowledge. C.D.C. has not lived with her mother or brother for over five years. C.D.C. currently gets TennCare letters for her mother and her brother.  C.D.C.'s mother has not received any notices regarding C.D.C. or her daughters though the notices have her name on them. At this point no one has received a single notice in the mail for A.M.C.

150)    After accessing the online account, C.D.C. called the TennCare Connect call center to report the address, household, and eligibility errors she had found in the account. A TennCare representative recommended that C.D.C. reapply for TennCare for her entire household in an attempt to fix those problems. C.D.C. completed the application over the phone. This call lasted more than three hours. At the end of the call, she was promised that a manager would call her back, but a manager never did.

151)    In November 2019, C.D.C. received a notice in the mail from A.M.C.'s former TennCare MCO informing her that it was time for A.M.C.'s 2-year-old well-child checkup. A.M.C. was three years old at the time.

152)    At this point, C.D.C. had filed multiple appeals and multiple applications. C.D.C. talked to over 20 representatives with TennCare and A.M.C.'s former MCO about A.M.C.'s case. During one call to inquire about the status of the appeal, C.D.C. learned that they had no record of an appeal having been filed. In another call with TennCare Connect she was on the

37

phone for over two hours. At the end of the call, she was promised that a supervisor would call her back, but a supervisor never did.

153)    C.D.C. learned of the Tennessee Justice Center and contacted TJC for help. On February 18, 2020, TJC sent a letter to TennCare's general counsel notifying the agency that A.M.C. had been wrongly terminated. The letter explained that A.M.C. remained eligible and requested the immediate reinstatement of her TennCare coverage and correction of A.M.C.'s household members.

154)    TennCare sent C.D.C. two form Notices of Decision, TN 301.5, two days apart. One notice dated February 24, 2020, approved A.M.C. for ongoing TennCare with a start date of December 1, 2019 and approved her mother and siblings for ongoing TennCare with a start date of March 17, 2019. The other notice dated February 25, 2020, approved A.M.C. for TennCare coverage from October 22, 2018 through November 17, 2019. There was no explanation of the gap in A.M.C.'s coverage from November 17, 2019 through December 1, 2019.

155)    Meanwhile, the bills C.D.C. incurred during A.M.C.'s gap in coverage have been sent to collections and are threatening to affect C.D.C.'s credit rating. C.D.C. is receiving calls nearly every day from the collection agency.

156)    C.D.C. filed an appeal requesting that A.M.C.'s coverage be backdated to November 17, 2019 to correct the gap in her coverage. She is awaiting a response to that appeal.

157)    C.D.C. recently received A.M.C.'s 1095-B tax document from TennCare and it shows that A.M.C. was not covered from September through December of 2019.

158)    When A.M.C. was without coverage, her mother struggled to buy her regular seizure medication, and had been unable to afford the emergency medication to be used if she suffers a severe seizure. Without coverage, A.M.C. has also been forced to go without

38

occupational therapy or begin her speech therapy which was set to start in September 2019. After A.M.C. regained coverage, she was reviewed for speech and occupation therapy. Her occupational therapy report shows that she regressed since going without her occupational therapy due to her loss of coverage since August. Her speech therapy report states that she would have been at a more advanced stage had she started in September. Without coverage, A.M.C. has been forced to go without therapy or specialty medical care. Another interruption of her coverage will endanger her health and safety.

159)     A.M.C. and her family must undergo TennCare's redetermination of their eligibility at least annually and are subject to additional redeterminations at any time, such as the one that resulted in A.M.C.'s recent loss of coverage without any notice or the ability to maintain coverage during an appeal. A.M.C.'s medical fragility is such that the defects in TennCare's eligibility redetermination and appeal processes place her at risk of irreparable harm through the disruption of vitally necessary medical care that depends on the maintenance of her TennCare coverage.

*Plaintiff K.A.*

160)     K.A. is an infant who lives with his mother, J.Y., his father and his five-year old brother in Nashville, Tennessee. J.Y. works at a hospital as a phlebotomist and lab technician, where she receives employer-sponsored health insurance and approximately $800 every two weeks. J.Y. and her children are eligible for TennCare in the MAGI category.

161)     J.Y. has been enrolled in TennCare since September 2015 without interruption. J.Y.'s older son, has been enrolled in TennCare since his birth in February 2015 and has been covered by TennCare without interruption.

39

162)     J.Y.'s younger son, K.A., was born in September 2019. Because J.Y. was enrolled in TennCare when she gave birth, he was deemed by law to be eligible for, and covered by, TennCare from the moment of birth through his first year of life, and thereafter until TennCare assesses him for continued eligibility in another TennCare category. *See supra* ¶ 41.

163)     When J.Y. reported K.A.'s birth to TennCare on October 10, 2019, TennCare retroactively denied coverage for the time period between the date she reported to the day he was born. J.Y. never received a Notice of Decision informing her of TennCare's action.

164)     J.Y. took K.A. to a doctor's appointment in mid-October and received an outstanding bill for $700 for services provided to K.A. during his gap in coverage from his birthday to the effective date of coverage, October 10. This was the first time J.Y. learned that TennCare had retroactively denied him several weeks of coverage.

165)     J.Y. promptly appealed TennCare's action as soon as she learned at the doctor's office that TennCare had retroactively eliminated his coverage for the first weeks of his life. J.Y. appealed by calling the TennCare Connect call center. TennCare never processed her appeal, and now there is no record of the appeal in her TennCare Connect online account.

166)     For weeks, J.Y. called the TennCare Connect call center to try to figure out what was going on with K.A.'s coverage effective date. On one such call on or around December 19, 2019, a TennCare Connect operator informed her that she should reapply, as she already had the outstanding appeal for the effective date of K.A.'s coverage, despite there being no record in TennCare Connect of the appeal. J.Y. provided the application information over the phone.

167)     According to a form letter on TennCare Connect's online portal, TN 305.2, dated December 20, 2019, TennCare had added K.A. to J.Y.'s case, however the status of his application was still pending.

168)     Days later, J.Y. discovered that K.A.'s TennCare was terminated altogether when she took him to the Emergency Room on December 27, 2019. K.A. became ill with a double ear infection, 105-degree fever, and other infections. J.Y. was unable to visit K.A.'s pediatrician because the $700 bill was still outstanding from K.A.'s initial coverage gap.

169)     In an act of desperation, J.Y. added K.A. to her private insurance coverage effective January 2020 to ensure he had some form of coverage, although she could not afford it on her salary, and the coverage was incomplete.

170)     In a form letter Notice of Decision, TN 301.5, dated January 3, 2020, TennCare approved K.A.'s TennCare coverage, but only from December 19, 2019, the date J.Y. submitted an application at the suggestion of the TennCare Connect operator. TennCare still did not acknowledge that, as a deemed infant, K.A. should have been continuously covered from birth, nor did it mention the appeal Ms. Ybarra had tried to file.

171)     On January 6, 2020, J.Y. contacted TJC for assistance with K.A.'s coverage. When TJC's representative contacted TennCare Connect by phone to get more information regarding her appeal, the TennCare operator said that there were still two open cases for K.A. The TennCare operator explained that when J.Y. tried to file the appeal in October, TennCare Connect attempted to merge these two open cases for K.A., and in this process ended up terminating K.A.'s coverage altogether.

172)     J.Y. appealed again, seeking to restore K.A.'s TennCare coverage back to his date of birth.

173)     J.Y. was only able to afford her employer-insurance for K.A. for January and February 2020.

41

174) In a form Notice of Decision, TN 301.5, dated March 2, 2020, TennCare approved K.A.'s coverage from September 20, 2019 to October 10, 2019. A few days later, in a form letter, TN 600.4, dated March 5, 2020, TennCare informed J.Y. that K.A.'s appeal had been closed because it "reviewed the facts of your case and agree with you so we have resolved your issue." However, this appeal was closed without a hearing, and without taking corrective action to restore his coverage back to the date of his birth.

175) In a notice of decision, TN 301.6, dated March 2, 2020, K.A. was approved for TennCare from September 20, 2019 to October 10, 2020. However, as of March 14, 2020, K.A.'s TennCare Connect online account still indicates that K.A.'s coverage did not begin until December 20, 2019.

176) K.A. remains at risk of the future loss of TennCare coverage, so long as TennCare remains incapable of reliably maintaining the coverage of infants who are deemed eligible until during their first year of life and until TennCare has accurately assessed their eligibility for continued coverage beyond their first birthday. Moreover, for as long as he remains eligible for TennCare, the prospect of eligibility redeterminations at least annually leaves K.A. at risk of wrongfully losing his coverage. In the event of another erroneous termination of K.A.'s coverage without adequate notice, the state's failure to reliably administer a fair and effective appeal process leaves him without effective recourse.

*Plaintiff S.F.A.*

177) S.F.A. is a one-year-old child who lives in Campbell County with her mother, C.M.A. At birth, S.F.A. was enrolled in TennCare. She has spina bifida and hydrocephalus, a condition that requires the implantation and maintenance of a ventriculoperitoneal shunt to drain cerebrospinal fluid from her brain. In order to monitor her condition, S.F.A. needs an MRI every

42

month. When her shunt malfunctions she requires immediate surgery to correct the shunt and drain any fluid buildup. If she does not receive this surgery the accumulated fluid may back up into her brain, resulting in brain damage or even death. S.F.A. recently underwent her ninth surgery to treat her condition. S.F.A. also needs consistent physical therapy, feeding therapy, and a catheter change every three hours.

178)    Since her birth, S.F.A. has been continuously eligible for TennCare in the MAGI category. *See supra* ¶ 39.

179)    In February 2019, S.F.A. and her family moved to a new address in Campbell County. C.M.A. reported the change of address to the TennCare call center. C.M.A. reported that she and her husband were separating and that he no longer lived in the household with S.F.A. She also informed TennCare that C.M.A.'s husband had changed jobs.

180)    C.M.A. received a form notice, TN 305, dated April 15, 2019, from TennCare acknowledging that it had received a change in her address and income, as well as S.F.A.'s Social Security number.

181)    On July 24, 2019, C.M.A. discovered that S.F.A. had lost her TennCare after S.F.A's MRI provider contacted C.M.A. to cancel S.F.A.'s appointment due to S.F.A.'s loss of coverage.

182)    C.M.A. contacted TennCare Connect by phone the same day she received the call canceling S.F.A.'s MRI appointment. She learned that S.F.A.'s coverage had been terminated on July 23, 2019. C.M.A. explained the urgency of S.F.A.'s medical needs and requested an appeal. She informed the TennCare Connect representative that she had never received notice of the termination and requested reinstatement of S.F.A.'s benefits pending the appeal.

43

183) TennCare Connect lodged the appeal but did not reinstate S.F.A.'s coverage. Her mother managed to obtain some care for S.F.A. after her termination because the Campbell County Health Department, concerned by the urgency of S.F.A.'s need, prevailed upon several providers to keep on caring for S.F.A. and hold off on billing the family pending S.F.A.'s appeal.

184) C.M.A. is also eligible for TennCare coverage in the MAGI category by virtue of the fact that she is S.F.A.'s caretaker relative. Although she and S.F.A. are in the same household and should both be covered, TennCare terminated S.F.A.'s coverage and continued coverage only for C.M.A.

185) Like other county health departments, the Campbell County Health Department is responsible for enrolling pregnant women and women with breast and cervical cancer in the TennCare program, and the Department's staff routinely works with TennCare to help Campbell County residents with their TennCare eligibility. However, the Department's knowledgeable staff was unable to determine what had caused S.F.A.'s loss of TennCare coverage, or how to get her reinstated.

186) C.M.A. contacted the Tennessee Justice Center on August 30, 2019. TJC helped C.M.A. create a TennCare Connect online account. The account contained copies of six TennCare notices that had purportedly been mailed to C.M.A. Of the six notices, C.M.A. had received only the April 15, 2019, TN 305, notice that acknowledged TennCare's receipt of a reported change of address and income, and of S.F.A.'s Social Security number.

187) The five other notices in the account all had S.F.A.'s correct address, but she had never received any of them. Among the five was form notice, TN 303, also dated April 15, 2019, which requested proof of income for S.F.A.'s father.

44

188) C.M.A. has had no difficulty receiving other mail at either her former or present address, including mail from Amerigroup, the MCO with which the state contracts to administer S.F.A.'s TennCare benefits. At the time of S.F.A.'s termination, Amerigroup and her TennCare-approved health care providers all had her up-to-date contact information, and none had any difficulty communicating with S.F.A.'s mother.

189) Because C.M.A. did not receive the April 15, 2019 notice, TN 303, request for C.M.A.'s husband's, she was unaware of the request, so she did not provide the requested information. TennCare proceeded to terminate S.F.A.'s coverage for her failure to respond.

190) On September 20, 2019, and again on October 18, 2019, TJC sent documentation of S.F.A.'s father's income to TennCare Connect by fax and through C.M.A.'s TennCare Connect online portal. TJC also sent a cover letter to TennCare Connect explaining that S.F.A. was eligible for TennCare through the MAGI category and that S.F.A.'s coverage had been terminated without notice to C.M.A.

191) In November 2019, C.M.A. received a notice from the Social Security Administration informing her that S.F.A. was approved for Supplemental Security Income (SSI). Individuals who are eligible for SSI are automatically entitled to Medicaid. Tenn. Comp. R. & Regs. § 1200-13-20-.02 (100). S.F.A. was therefore eligible for TennCare through SSI even if she was not already eligible in the MAGI category. However, TennCare continued to deny S.F.A. coverage.

192) On November 8, 2019, 127 days after C.M.A. filed her appeal, and after repeated efforts by C.M.A., the Campbell County Health Department and S.F.A.'s TJC attorneys, S.F.A. was approved for TennCare. Her coverage was reinstated back to July 24, 2019, the date of her termination.

45

193)     On February 10, 2020, TJC discovered in reviewing her TennCare Connect online account that S.F.A. had been terminated again from TennCare on January 28, 2020. Neither TJC, who was on record with TennCare as her authorized representative, nor S.F.A.'s mother had received notice of the termination. There were no notices in the household's TennCare Connect account providing notice of the termination.

194)     At the time of that discovery, S.F.A. was in the hospital recovering from surgery to remove her L3 spinal segment. This was her ninth surgery in her first twenty-two months of life.

195)     On February 10, 2020, TJC filed an appeal on S.F.A.'s behalf to TennCare by email and fax.

196)     On February 13, 2020, a TennCare attorney contacted TJC by phone and stated that S.F.A. was enrolled in TennCare through the SSI category. That same day, the TennCare attorney emailed TJC a copy of a TennCare Notice of Decision, TN 301.4, dated December 13, 2019 that had purportedly been mailed to C.M.A. notifying her that S.F.A. was approved for TennCare. Neither C.M.A. nor TJC had received the notice. This notice also does not appear on the household's TennCare Connect account.

197)     The December 13, 2019 notice, TN 301.4, indicated that the effective date of S.F.A.'s coverage began in January 4, 2019.

198)     S.F.A.'s family must undergo TennCare's redetermination of eligibility at least annually and are subject to additional redeterminations at any time, such as the one that resulted in S.F.A.'s recent loss of coverage without any notice or the ability to maintain coverage during an appeal.

46

199)    S.F.A. now receives TennCare through the SSI recipient category, however S.F.A. remains at risk of harm because TennCare is unable to reliably maintain the coverage of individuals, like her, who are eligible through their SSI entitlement. Her medical fragility is such that the defects in TennCare's eligibility redetermination and appeal processes place her at risk of irreparable harm through the disruption of vitally necessary medical care that depends on the maintenance of her TennCare coverage.

*Plaintiff Vivian Barnes*

200)    Vivian Barnes is a 74 -year old widow who lives in Cosby, Tennessee with her adult grandson and next door to her daughter and next friend, Glenda Surrett, and her daughter's husband. Ms. Barnes worked for many years as a hotel housekeeper in Gatlinburg until she became disabled with osteoarthritis. In 1994, the Social Security Administration found her disabled, and she started receiving Social Security Disability Insurance (SSDI) and SSI. For more than 25 years, she has remained continuously eligible for Social Security and SSI, and accompanying SSI, for TennCare.

201)    Ms. Barnes has also been eligible for Medicare, and TennCare has paid her Medicare premiums and cost-sharing through the Medicare buy-in process. In addition to osteoarthritis, Ms. Barnes suffers from diabetes, hypertension, heart disease, neuropathy, sleep apnea, and macular degeneration.

202)    In June 2019, Ms. Barnes received two form notices in the same envelope from TennCare. Both notices were dated June 11, 2019. One notice, TN 301.2, informed Ms. Barnes that her application for TennCare had been approved, effective July 1, 2019. The same notice stated that her application for the MSP had been denied, because she was already receiving TennCare. Ms. Barnes had not applied for TennCare or the MSP, since she was already enrolled

47

in TennCare, and there had been no changes in her SSI eligibility upon which her TennCare eligibility was based.

203) The other form notice dated June 11, 2019, TN 304, informed Ms. Barnes that her TennCare coverage would end soon, because she was not in any of the groups listed in the notice. However, Ms. Barnes was receiving SSI, which did put her in an eligible group specified in the notice. The notice contained the eight-item questionnaire that TennCare said it needed answered in order to determine whether Ms. Barnes might still qualify for TennCare. The questionnaire did not ask if she was receiving SSI. Ms. Barnes truthfully completed the questionnaire, and Ms. Surrett faxed it to TennCare as instructed.

204) Following an October 2019 accident in which she suffered a broken ankle, Ms. Barnes was hospitalized for several days, followed by a stay in a rehabilitation facility. When she was ready to be discharged at the end of October, Ms. Barnes' doctor prescribed home health care to continue nursing and therapy services for her in her home. When Ms. Surrett tried to arrange for the services, a provider informed her that her mother no longer had TennCare.

205) Ms. Surrett immediately contacted the TennCare Connect call center, which informed her that her mother's coverage had ended in August. Ms. Surrett asked to appeal but was told that it was too late, because Ms. Barnes had missed a deadline to appeal. Ms. Surrett explained that Ms. Barnes had never received notice of the termination, or of the deadline to appeal, but the TennCare representative refused to accept an appeal.

206) Ms. Surrett contacted the Tennessee Justice Center for help. She accessed her mother's TennCare Connect online account. The account contained a form notice, TN 301, dated July 22, 2019, that TennCare had purportedly mailed on July 19, but that Ms. Barnes had never seen before. The notice informed Ms. Barnes that, based on a reported change in her

48

circumstances, her TennCare coverage was ending on August 12, 2019. The notice explained that coverage was ending because she did not belong to any group, including SSI recipients, that TennCare covers. The notice told her that TennCare had considered all of her facts and all potential categories that TennCare covers. Based on the same reported change in her circumstances, the notice also informed Ms. Barnes that she was approved for QMB coverage, effective August 13, 2019.

207) There had been no changes in Ms. Barnes' circumstances that would have affected her TennCare eligibility and she had not reported any changes to TennCare. The July 22 notice did not disclose what reported change had prompted the decision to terminate her coverage. TennCare's records already documented Ms. Barnes's TennCare eligibility on the basis of his SSI entitlement, and no information was needed from Ms. Barnes.

208) In early November 2019, Ms. Barnes called the Social Security Administration, which assured her that she was still eligible for SSI and that there were no plans to end her SSI benefits. Ms. Surrett then telephoned the TennCare Connect call center and explained that her mother was still receiving SSI and that the Social Security Administration had told her that there were no plans to end her SSI benefits. The TennCare Connect representative told her that Ms. Barnes would need to file a new application for TennCare.

209) Since her accident, Ms. Barnes had been bedfast and sedated with painkillers, and she was unable to compile or submit the information required for a new TennCare application. Ms. Surrett undertook the task of completing the application on her mother's behalf. She stated in the application that her mother was receiving SSI. Although that should have been sufficient to establish Ms. Barnes' TennCare eligibility as adults who receive SSI are supposed to automatically be enrolled in Medicaid, Ms. Surrett could not submit the application until she

49

provided extensive additional financial information. That included detailed information about the amount of her utility bills, homeowner's insurance premiums and telephone bill, none of which information is ever relevant to determining eligibility for any category of TennCare. It took more than a week to compile the required information. Ms. Surrett submitted her mother's application on November 15, 2019.

210) The application asked who lived with Ms. Barnes, and she listed her adult grandson, Ronald C. Elmore, II. Her grandson has lupus and is receiving SSI based on his disability. Ms. Barnes provided this information on the application and stated that her grandson was not applying for coverage, that she was the only applicant. The application also designated Ms. Surrett as her mother's representative.

211) Ms. Barnes received a form notice, TN 301.3, from TennCare dated November 20, 2019. The notice informed her that for her TennCare application to be considered, she needed to submit several categories of documents by December 10, 2019. The notice told her to submit proof that she was eligible for Medicare, even though TennCare already had such proof because it had approved her for QMB status in August and had been paying her Medicare premiums since then. The notice told her to submit proof of her financial resource and listed checking or savings account statements; it also listed a certificate of deposit statement and promissory note, although Ms. Barnes has neither. The notice directed Ms. Barnes to submit an insurance company letter or copy of her life insurance policies, as well as a copy of a "receipt of your tags" or title for her 22-year-old Honda vehicle.

212) Ms. Barnes received another form notice, TN 305.2, in the same envelope and also dated November 20. The notice informed Ms. Barnes that her grandson, Ronald Elmore, had been added to her case, even though her application had stated that he already had SSI and was

50

not seeking coverage, and even though TennCare's own records documented that he was already receiving TennCare as an SSI beneficiary.

213) Since her discharge from the rehabilitation facility at the end of October, Ms. Barnes has had numerous medical needs. Because of her broken ankle, she could only be transported to medical appointments by ambulance. The family initially incurred $1,900 for two ambulance trips, but they were unable to pay for any more, forcing the cancellation of appointments for a sleep study for Ms. Barnes' sleep apnea, and a follow-up exam by her ophthalmic surgeon to evaluate her recovery from cataract surgery performed before her accident.

214) TennCare failed to act on Ms. Barnes's TennCare application by the 45-day period regulatory deadline for processing applications. 42 C.F.R.§ 435.912(c)(3)(ii). On January 3, 2020, Ms. Surrett called TennCare Connect for an update on her mother's application. She was informed that the application was still pending, so she filed a delay appeal. She received a form notice, TN 602.2, dated January 10, 2020, acknowledging receipt of her appeal and telling her that TennCare had not yet decided whether to allow her appeal to go forward to a fair hearing.

215) Ms. Barnes received a form notice, TN 305, dated January 15, 2020, informing that TennCare had made a change to her records based on a reported change in her income. Ms. Barnes had not reported a change in her income, and the only the change was a Social Security cost-of-living adjustment that did not alter the fact that she remains eligible for SSI. The notice told her that her online account would show the amount of the reported income that TennCare was relying on, but the account does not in fact reveal that information. In the same envelope and

51

bearing the same date, Ms. Barnes received another form notice, TN 301.5, informing her that based on a reported change, she was approved for the continuation of QMB coverage.

216) Ms. Barnes received a form TennCare notice, TN 600.3, dated January 17, 2020. The notice stated that her delay appeal was closed, because TennCare had made a decision on her delayed application, and she would receive a separate notice telling her what that decision was. As of a letter dated March 2, 2020, in Ms. Barnes' TennCare Connect online account, TennCare approved Ms. Barnes for QMB and denied her for TennCare coverage.

217) During the first week of February 2020, Ms. Barnes received in the mail from TennCare a copy of an IRS 1095-b notice that TennCare has submitted to the IRS reporting that Ms. Barnes' TennCare coverage had ended in August.

218) Since well before TennCare sent the June 11, 2019 notices that began the process that has left her without TennCare coverage, Ms. Barnes' eligibility for SSI has not only been available to TennCare from its own files and through the records it receives from the Social Security Administration, but from TDHS records. She has been receiving and continues to receive SNAP benefits based on a calculation of SSI and Social Security income confirmed by TDHS.

219) Ms. Barnes has been harmed and remains at risk of future harm because TennCare is unable to reliably maintain the coverage of individuals, like her, who are eligible through their SSI entitlement. Her medical fragility is such that the defects in TennCare's eligibility redetermination and appeal processes place her at risk of irreparable harm through the disruption of vitally necessary medical care that depends on the maintenance of her TennCare coverage.

52

*Plaintiff Carlissa Caudill*

220)    Carlissa Caudill is a 56-year-old woman who lives in Russellville, Tennessee. She sustained serious neurological and orthopedic injuries in a childhood accident and again in a 1996 automobile accident. Despite chronic pain and impaired mobility resulting from the accident, she struggled to keep working until a doctor told her she should no longer do so. Ms. Caudill also has chronic obstructive pulmonary disease (COPD) and recurrent pneumonia.

221)    Since 2006, Ms. Caudill has received SSI without interruption based on her satisfaction of the Social Security Administration's stringent disability standards. Her receipt of SSI has made her automatically eligible for TennCare, as well.

222)    Although still eligible for SSI, Ms. Caudill received a form pre-termination notice and questionnaire, TN 304, from TennCare dated May 29, 2019. This notice stated that her coverage would be ending soon and requested that she fill out the questionnaire and send it to TennCare by June 19, 2019. Ms. Caudill completed the questionnaire and sent it to TennCare by mail.

223)    The questionnaire is two pages long and consists of eight questions, each to be answered with a yes or no. If a member answers "no" to all questions, TennCare will determine that the member is ineligible for TennCare. None of the questions asks whether the member receives or has received SSI.

224)    On June 13, 2019, Ms. Caudill telephoned TennCare Connect and filed an appeal challenging TennCare's determination that she was no longer eligible. She also learned that TennCare still did not receive her completed and mailed pre-termination questionnaire. TennCare reports to have received the completed pre-termination questionnaire on June 24, 2019.

53

225)    Ms. Caudill received a notice, TN 602.2, dated June 19, 2019, from TennCare stating that her appeal was untimely, and therefore she would not receive continuation of benefits. Ms. Caudill later received a notice, TN 602.2, dated July 31, 2019, acknowledging that her appeal had been timely and granting continuation of benefits.

226)    Ms. Caudill's TennCare Connect account shows that TennCare purportedly sent a form notice, TN 608, dated July 31, 2019. The notice asked for more information from her in support of her appeal and requested that she tell TennCare which covered group she believes she fits into. Ms. Caudill did not receive this letter and therefore did not respond.

227)    TennCare ignored readily available documentation from the Social Security Administration confirming her ongoing eligibility for SSI.

228)    Ms. Caudill received another form termination notice, TN 301.2, from TennCare dated August 15, 2019. The notice informed her that her coverage was ending on September 4, 2019 because she was "not in a group covered by TennCare or CoverKids." The notice added, "Remember, when we make our decision, we look at all of your facts, all of our program rules, and each kind of group we have." After receiving the notice, Ms. Caudill filed a second appeal on August 19, 2019.

229)    In a form notice, TN 600.3, dated September 6, 2019, TennCare informed Ms. Caudill that it was closing her first appeal because she had not provided additional information in response to the demand that she had never received.

230)    Ms. Caudill received two denial notices, TN 301.3, dated September 10, 2019, and October 2, 2019. The notices, which were identical but for their dates, reiterated that she had been considered for all possible eligibility groups but was not eligible for coverage because she was not in a group covered by TennCare.

231) Stymied in her persistent efforts to maintain her TennCare coverage, Ms. Caudill contacted the Tennessee Justice Center for help. On October 27, 2019, TJC submitted a letter to TennCare Connect and to TennCare's general counsel explaining TennCare's error regarding Ms. Caudill's termination of coverage.

232) Ms. Caudill received a notice, TN 301.4, dated November 8, 2019, stating she was covered by TennCare and had ongoing coverage since January 1, 2019. TennCare offered no explanation as to how its automated eligibility system could have terminated Ms. Caudill's coverage, despite her continued SSI eligibility and repeated efforts to appeal.

233) TennCare is Ms. Caudill's only health coverage, and her only means of obtaining the ongoing medical care she needs. Ms. Caudill remains at risk of harm because TennCare is unable to reliably maintain the coverage of individuals, like her, who are eligible through their SSI entitlement. That inability, and the state's failure to reliably and fairly administer a TennCare eligibility appeal process in compliance with federal law, leave her at risk of the further loss at any time of her TennCare coverage, and of irreparable harm resulting from the disruption of her medical care.

*Plaintiff Rhonda Cleveland*

234) Plaintiff Rhonda Cleveland is a 61-year-old widow who lives in Jefferson County, Tennessee. For many years, Ms. Cleveland worked as a real estate agent and florist before becoming disabled by a combination of chronic conditions, including severe pulmonary disease, arthritis, and depression. She first became eligible for TennCare in 2013, when she started receiving SSI based on disability.

235) When her husband died in July 2019, Ms. Cleveland applied for and began receiving a monthly Social Security Widow's benefit in August. The benefit was in an amount

55

that, although still below the poverty level, was sufficient to make her financially ineligible for SSI benefits. The current amount of her Social Security Widow's benefit is $896.00 each month.

236)     When notified by the Social Security Administration that Ms. Cleveland's SSI eligibility was ending, TennCare should have considered her for Medicaid eligibility in all other categories. The state had access to Social Security Administration records that documented her eligibility for continued coverage in the Social Security Widow category.

237)     Instead of approving her, however, TennCare sent Ms. Cleveland a form notice, TN 304, dated November 14, 2019, indicating that  her coverage was going to end because "[she was] no longer getting SSI checks." The notice directed her to complete the standard questionnaire with eight questions because TennCare said it needed the information to determine whether she remained eligible in another category. Although TennCare already had information documenting Ms. Cleveland's continued eligibility in the Social Security Widow category, the notice said that if she failed to respond by December 4, 2019, TennCare would terminate her coverage

238)     Ms. Cleveland called TennCare Connect and completed the questionnaire by phone on November 20, 2019. None of the questions elicited information that would enable a person to identify herself as eligible in the Disabled Widow/er category. During the phone call, however, Ms. Cleveland volunteered to the TennCare representative that her husband had recently passed away and that she was receiving Social Security Widow's benefits.

239)     Ms. Cleveland received a form Notice of Decision, TN 301.4, dated December 5, 2019, informing her that her TennCare coverage would end December 30, 2019. The notice assured her that TennCare had reviewed her facts and considered her for all categories of eligibility. The notice specifically included a reference to the category for "people who used to

56

get SSI checks," and told her she did not qualify for any category. Not only did TennCare have information documenting her eligibility for Social Security, but it was aware that she was a person with disabilities for whom demands for unnecessary information would be particularly burdensome.

240)   The notice informed Ms. Cleveland that she had until December 30, 2019, to request continuation of benefits, and until January 18, 2020, to file an appeal. On January 8, 2020, Ms. Cleveland contacted the TennCare Connect call center and told the agent that she wanted to appeal and keep her coverage until a decision was made regarding her eligibility in the Disabled Widow category. The TennCare representative she spoke with told Ms. Cleveland  that she could appeal TennCare's decision, but that she had missed the December 30th deadline to request continuation of coverage pending appeal.

241)   Ms. Cleveland explained to the TennCare representative that she was distraught with grief, anxiety, and depression, that she was struggling to  keep track of all the paperwork and deadlines, and that she had misunderstood the notice and thought that she had until January 18 to maintain her coverage.  She expressed fear of not being able to regain coverage, and explained to the TennCare representative that without it, she could not afford her lifesaving medications, some of which cost up to $700 each.

242)   The December notice nor the representative informed Ms. Cleveland that she could ask for a good cause exception to the deadline for requesting continuation of benefits. The representative took her appeal and told Ms. Cleveland that the appeal could take up to 90 days, but that any medical bills incurred in that period would be retroactively covered if she won the appeal.

57

243) In a form notice, TN 602.2, dated January 10, 2020, TennCare acknowledged receiving Ms. Cleveland's appeal. The notice informed Ms. Cleveland that it would decide whether she would be allowed to have a fair hearing. She heard nothing more about the appeal or whether she would be allowed to have a hearing.

244) Ms. Cleveland borrowed money from family and friends to buy her medicines, and her anxiety worsened as she waited to hear whether TennCare would allow her to appeal. Ms. Cleveland reached out to the Tennessee Justice Center for help. TJC helped Ms. Cleveland access her TennCare Connect account and Social Security information online. TJC then compiled the relevant documents and wrote a letter to TennCare on March 10, 2020, to support Ms. Cleveland's January 8 appeal.

245) As of March 15, Ms. Cleveland's TennCare Connect online account indicated that her TennCare coverage was restored, retroactive to December 31, 2019.

246) Although Ms. Cleveland had her TennCare coverage reinstated, she remains at risk of harm due to subject to TennCare's redetermination of her eligibility at least annually. As long as TennCare remains incapable of redetermining eligibility reliably, limiting administrative hurdles that are especially difficult for individuals with disabilities to overcome, and administering a fair and effective appeal process, Ms. Cleveland will remain at risk of the loss of her TennCare coverage and irreparable harm to her health from the resulting disruption of her medical care.

*Plaintiff S.L.C.*

247) S.L.C. is 46 years old and lives in Nashville. When she was 5 years old, she contracted viral encephalitis which resulted in brain damage and a severe seizure disorder. Until recently, she lived with her parents, who are now in their eighties.

58

248)    S.L.C.'s intellectual and developmental disabilities qualified her for SSI, which she received until 1999, when her father, C.B.C. retired. She then began receiving Social Security Disability Insurance ("SSDI") based on his Social Security earnings record. The amount of her SSDI exceeded SSI's income eligibility limit, and so her SSI benefits ended.

249)    Since the termination of her SSI benefits, S.L.C. has remained continuously eligible for TennCare in the DAC category. *See* ¶ 47(a).

250)    S.L.C. is enrolled in TennCare's ECF CHOICES program, which provides long-term services and supports to individuals with intellectual and developmental disabilities who are living in the community. S.L.C. is currently enrolled in ECF CHOICES Group 6, which provides a Community Living Supports home which she shares with two other ECF CHOICES enrollees. She has worked part-time for a local hair salon for more than 20 years.

251)    S.L.C.'s eligibility for ECF CHOICES enables her to live independently while still getting care from residential support staff. The program provides transportation when her parents are not available to take her back and forth to her job. She also can get other support for her job if she needs assistance.

252)    ECF CHOICES has a long waiting list, and people on the waitlist typically wait for years before they receive services, if they ever do. If S.L.C. loses her TennCare she may lose her enrollment in ECF CHOICES. This means loss of support for her residential placement, transportation to her employment, job supports, and other services. In that event, even if her TennCare is restored, she may have to rejoin the thousands who are on the waitlist for a slot in the ECF CHOICES program.

253)    S.L.C. received a form TennCare pre-termination notice and questionnaire, TN 304, dated August 12, 2019, informing her that her coverage would end soon. The notice stated

that her TennCare coverage was being terminated, because she [is] not in a group covered by TennCare or CoverKids...Some of those groups include….people who used to get SSI checks…or people who need long-term services or supports." TennCare's own records document that she used to get SSI and that she needs, and is receiving, long-term services and supports because of her intellectual disability.

254)   The August 12, TN 304, notice was accompanied by the two-page questionnaire with eight questions which, if all answered "no", would result in a determination that the person is ineligible for TennCare. None of the questions asks whether the respondent received SSI in the past or is currently receiving long term services and supports.

255)   S.L.C.'s father, C.B.C., filled in this form on her behalf. He correctly answered "no" to each question, and timely sent it back to TennCare.

256)   TennCare sent S.L.C. a form notice, TN 301.3, dated September 11, 2019, notifying her that her TennCare Medicaid coverage would terminate on October 1, 2019.

257)   On September 16, 2019, C.B.C. timely filed an appeal with TennCare Connect over the phone and requested a continuation of his daughter's benefits pending appeal.

258)   TennCare then sent form notice, TN 602.2, dated September 19, 2019 which acknowledged receipt of her appeal but did not confirm whether she was granted a continuation of her benefits.

259)   Worried that he had not heard anything about the appeal after the stated termination date, C.B.C. contacted the Tennessee Justice Center. On October 29, 2019, TJC sent a letter on S.L.C.'s behalf to TennCare Connect and the TennCare appeals unit. This letter explained in detail why S.L.C. remains eligible for TennCare in the DAC category.

60

260)    On December 6, 2019, TennCare then called TJC to inform them that TennCare agreed that S.L.C. was eligible for TennCare under the DAC category and they resolved her appeal and approved her for TennCare with no gap in coverage.

261)    C.B.C. and TJC then received form notice, TN 301.4, dated December 3, 2019, which stated that S.L.C. was approved for "continued coverage."

262)    Though S.L.C.'s coverage has been reinstated, C.B.C. has yet to receive information regarding why her coverage was terminated, in light of her ongoing eligibility. So long as TennCare remains unable to reliably maintain coverage for individuals receiving DAC benefits, or to reliably administer a fair eligibility appeal process, S.L.C. will be at risk of losing coverage. Given her medical fragility and reliance on ECF CHOICES for housing and supportive services, any disruption of her coverage could result in irreparable injury to her health.

*Plaintiff D.D. and Family*

263)    D.D. is a 39-year-old woman who lives in Nashville, Tennessee, with her five children. D.D. first became eligible for TennCare through the MAGI category about 18 years ago, when she was pregnant with her first child. After D.D. completed her Master in Plant Sciences, she relocated from Nashville to Cleveland, Tennessee to work for the USDA as a Loan Officer Trainee/Assistant. During this time, D.D. had private insurance through her job at USDA and retained her TennCare as a secondary insurance for herself and her children. In August 2017, D.D. moved back to Nashville and TennCare became D.D. and her family's only health insurance, while she worked as a hairstylist and as an independent contractor. From September 2019 to November 2019, D.D. worked as a stower at an Amazon warehouse. D.D. left this job when she learned she was pregnant because this position requires intense physical labor.

61

264)     D.D. has been and remains eligible for TennCare under the MAGI category of parent/caretaker relative. D.D.'s children are also eligible for TennCare. D.D. and her family are also eligible for and receive SNAP and D.D. also receives WIC.

265)     TennCare has been essential to maintain the health and wellbeing of D.D. and her five children. Two of D.D.'s children are diagnosed with attention deficit hyperactivity disorder and one child is diagnosed with Bipolar Disorder, D.D. and three of her children also have health needs related to allergies and asthma. D.D. also has severe anemia and receives infusions for treatment.

266)     In August 2019, D.D took her 17-year-old daughter, T.E.W. to the emergency room when she believed her daughter was possibly suffering from appendicitis and learned that her daughter had been terminated from TennCare. D.D. received no notice, despite being at the same address she had previously reported to TennCare for at least five years, and having no issues receiving mail from other senders, including the WIC and SNAP programs. She immediately called the TennCare Connect call center. The TennCare representative told her that that the entire family had lost their TennCare coverage. When D.D. requested an appeal, she was told it was too late to appeal and she could only reapply for the family. D.D. reapplied immediately over the phone.

267)     A few days later, D.D. called TennCare Connect again with the goal of appealing her family's termination because she wanted to make sure that TennCare knew that they had made a mistake and did not want to just reapply as an operator had previously told her. Initially, TennCare refused to assist her because they could not verify her address.

268)     D.D. then learned that TennCare had a wrong address for her household and that her family's renewal packet had been sent to a strange address that was not D.D.'s address. D.D.

62

also never received any notices about the family's TennCare termination, as they were sent to the incorrect address on file. D.D. successfully filed an appeal over the phone with TennCare Connect, however she was told it was too late to receive continuation of benefits.

269)    While she was without coverage, D.D. had to go to the emergency room for an ear infection, as she could not see her primary care physician without TennCare.

270)    Because of her loss of coverage, D.D. was forced to cancel her tubal ligation and endometrial ablation surgery scheduled for August 29, 2019.

271)    About a month after learning that her TennCare was terminated, D.D. contacted the Tennessee Justice Center, which helped her create an online TennCare Connect account on October 4, 2019. When D.D. linked her account to her social security number, three people she had never heard of appeared on her case. Not one person in her actual household showed on her account. When D.D. viewed the letters section of the account, the letters listed showed they were purportedly being sent to a strange address, but all pertained to her family. D.D. had never received any of these letters.

272)    When TJC checked D.D.'s account on October 7, 2019, the strange names were gone and no one was listed under the "my coverage" tab of TennCare Connect, which identifies all members covered in the individual's household.

273)    On October 14, 2019, a client advocate from TJC called TennCare Connect and the TennCare Connect operator explained that she also saw the letters for D.D.'s family, but that they had been sent to the wrong address. The TennCare Connect operator also mentioned that "A.D.," a woman whom the operator identified to D.D. by her full name, had called in May 2019 to say that she was receiving information for the wrong family. The operator then was able to look into "A.D.'s" account and saw letters addressed to D.D.'s family requesting more

63

information. The operator asked if D.D. had submitted the additional information, and the TJC advocate explained that D.D. had never received those letters and therefore had never provided the requested information.

274) TennCare officials are aware that the agency has frequently sent enrollee mail, including redetermination packets, to wrong addresses. Yet, when it does not get a response, TennCare assumes that it sent packets or other notices to the right address, and it does not check against its other records. Had it done so, TennCare would have found its error and the family would not have been terminated, because state SNAP and WIC records for the family had their correct address.

275) The TJC advocate asked the operator to resend the TennCare requests for additional information. The TennCare operator explained, she could only resend them through the "A.D." family account and they would regenerate to the wrong address again. The operator explained that she could not email or mail them to the correct address. As D.D.'s family's appeal from August was still pending, TJC requested that D.D. and her children be granted continuation of benefits and that all information regarding the household and each member's appeal be sent to D.D.'s correct address.

276) On October 18, 2019, D.D.'s TennCare Connect online account had been changed again to correctly include each family member. But the account incorrectly showed that each person had been approved for continuation of benefits coverage since August 27, 2019, although in fact they had remained without continuation of benefits coverage until the phone call just four days earlier.

277) D.D. rescheduled her tubal litigation and endometrial ablation surgery upon learning that she had continuation of benefits. By that time, it was too late. When she went to the

hospital to get blood drawn prior to her rescheduled tubal ligation surgery, she learned that she was pregnant, therefore requiring the surgery to be canceled yet again.

278)     In a TennCare form notice, TN 301.4, dated November 26, 2019, D.D. and four of her children were approved for TennCare. However, one of D.D.'s sons, Y.A.D., showed his TennCare coverage ended on November 22, 2019—four days before this letter's date. Y.A.D. had received no previous notice that his TennCare Coverage would be ending, or that he could appeal and maintain his coverage pending a hearing. The notice stated that the purported reason his coverage was terminated was that he was receiving TennCare in another case.

279)     On December 4, 2019, a TJC representative called TennCare Connect to inquire about Y.A.D.'s coverage. The TennCare Connect operator acknowledged seeing the letter in the online account indicating that Y.A.D. was denied on his mother's case, but the operator also said that the computer showed he was approved for coverage. The operator said that the account was not reflecting what was indicated in the TennCare computer system, which was likely the result of a glitch in the system. The operator filed an "escalation" requesting review by supervisory personnel, which could be expected to take 7-10 business days to resolve.

280)     On December 13, 2019, TJC checked D.D.'s TennCare Connect online account and saw that while D.D. and four of her five children were shown to be approved for ongoing TennCare coverage, Y.A.D. was still denied. D.D. had heard nothing regarding either the September appeal filed on Treasure's behalf, or the October appeal filed on behalf of the entire family.

281)     On December 30, 2019, TJC spoke to TennCare Connect to inquire about Y.A.D. The operator said that Y.A.D. was approved on a different TennCare Connect case and that his

65

MCO was United. The operator confirmed that Y.A.D.'s renewal packet would be sent to D.D.'s correct address.

282) TJC called TennCare Connect on January 3, 2020, to try and resolve the issues with the disconnected household files between D.D. and Y.A.D. The operator pulled up all the TennCare Connect cases for the family and worked with a supervisor. The operator explained that when D.D.'s family was correctly moved to their own account separate from the "A.D." family, Y.A.D.'s record was not moved. The operator advised that to bring the child onto the right case, yet another appeal should be filed explaining what happened and asking that his coverage be moved to the correct case. The representative filed this second appeal for Y.A.D. over the phone.

283) D.D.'s family suffered many health-related problems during the time that they were denied TennCare coverage. Additionally, there was no reason provided as to why D.D.'s family account was linked to "A.D.", as D.D. has never met nor heard of "A.D."

284) D.D.'s TennCare Connect online account indicates that a form notice, TN 301.6, dated March 6, 2020, was purportedly mailed to D.D. informing her that Y.A.D. was approved for TennCare coverage beginning on August 28, 2019, and that his appeal had been closed. As of March 17, 2020, D.D. has not received that or any other explanation as to why it took more than six months for her entire family's TennCare Coverage to be correctly resolved, or why she never heard of any action being taken to process her first two appeals.

285) D.D. and her family must undergo TennCare's redetermination of eligibility at least annually and are subject to additional redeterminations at any time, such as the one that resulted in D.D.'s family's recent loss of coverage without any notice or the ability to maintain coverage during an appeal. D.D. and her children's medical conditions are such that the defects

in TennCare's eligibility redetermination and appeal processes place them at risk of irreparable harm through the disruption of vitally necessary medical care that depends on the maintenance of their TennCare coverage.

*Plaintiff Charles E. Fultz*

286)    Charles E. Fultz is a 74-year-old former furniture plant worker. He has been disabled since 1994, when an illness left him with severe cognitive impairments. Mr. Fultz is now terminally ill with advanced chronic obstructive pulmonary disease (COPD) and reliant on costly medications, oxygen, and a ventilator. His wife, Mary Fultz, has cared for him since he became disabled and now manages his affairs.

287)    In 1994, Mr. Fultz started receiving SSI, and with it came TennCare coverage. In 1995, he was approved for SSDI. The SSDI income made him financially ineligible for SSI, and his SSI benefits were terminated that same year. Mr. and Mrs. Fultz's only income for many years has been the Social Security pensions they both receive, which currently total $1,753.

288)    Although ineligible for SSI, Mr. Fultz has remained eligible for TennCare under the Pickle Amendment, which protects the Medicaid coverage of certain Social Security beneficiaries who previously received SSI. *See supra* ¶ 47. When determining his eligibility for TennCare, the state is required to disregard any Social Security cost-of-living adjustments Mr. Fultz and his spouse have received since 1995, when he last received both SSI and Social Security. When those adjustments are disregarded, the couple's countable income is less than the current SSI income ceiling of $1,195 per month for a couple, making him eligible for TennCare.

289)    For twenty-five years, Mr. Fultz received TennCare without incident. On June 10, 2019, Mr. Fultz received two form notices in the same envelope. The first notice, Form TN 301.2, informed him that his application for TennCare was approved but that his application for

67

MSP was denied. Mr. Fultz had not filed an application, as the notices asserted. There had been no changes in his circumstances that would have affected his continued eligibility for TennCare or an MSP.

290)     The second June 10, 2019 notice, Form TN 304, informed Mr. Fultz that his TennCare coverage would end soon and that TennCare needed more information to determine if he was eligible for other health coverage.

291)     The second notice included the eight-item questionnaire. The form offered the option of contacting the TennCare Connect call center and providing the answers over the phone. Since Mr. Fultz is incapable of managing his own affairs, Mrs. Fultz phoned the call center. She answered the questions. Neither the form nor the call center representative asked if Mr. Fultz had ever received SSI. The TennCare representative assured Mrs. Fultz that there was nothing more that she needed to do to protect her husband's TennCare coverage.

292)     On July 3, 2019, Mr. Fultz received another form TN 301.2 notice. The notice told him he was approved for SLMB, an MSP. The notice simultaneously terminated him from TennCare because of changes that TennCare said he had reported. Mr. Fultz had not, in fact, reported any changes, nor had there been any changes that would have affected his TennCare eligibility.

293)     Unlike TennCare, which provides comprehensive health coverage and "Medicare buy-in", *see supra* ¶46, SLMB only pays Mr. Fultz's Part B Medicare premium. The termination of his TennCare and QMB coverage leaves Mr. and Mrs. Fultz unable to pay the substantial medical expenses that Medicare does not cover.

294)     Unable to resolve her husband's coverage by phone, Mrs. Fultz sought in-person assistance. Soon after receiving the July 3, 2019 notice, Mrs. Fultz drove to the Social Security

Administration office in Morristown to request help responding to the notice. That office told her that they could not help, so she went to the local Department of Human Services office. She took the notice with her and told a TDHS representative that Mr. Fultz was disabled and very sick, and that he needed his health coverage more than ever. She said she needed someone to help her in person. The TDHS representative said they no longer had anything to do with TennCare and could not help. They did not refer her to any place or mechanism to access in-person assistance.

295)     Mrs. Fultz called Legal Aid of East Tennessee and asked for help. On August 9, 2019, Mr. Fultz's attorney at Legal Aid of East Tennessee faxed a letter to TennCare Connect timely appealing the termination of Mr. Fultz's TennCare and explaining that he remained eligible pursuant to the Pickle Amendment.

296)     Also on August 9, 2019, a Tennessee Justice Center representative and Mrs. Fultz telephoned TennCare Connect together on Mr. Fultz's behalf. The TennCare representative confirmed that Mr. Fultz had been approved for ongoing TennCare coverage, effective July 1, 2019, but had been terminated July 23, 2019. The representative said that the redetermination of Mr. Fultz's eligibility had been triggered by a report of a change in his income. In fact, there had been no change in his income, and he remains eligible for TennCare under the Pickle Amendment.

297)     On August 19, 2019, Mr. Fultz received another TennCare form letter, TN 305, which stated that TennCare had changed his income but did not say what the change was. The letter instructed him to, "log into your TennCare Connect account online or by using your mobile app. Or you can call us. . .."

298)     Mrs. Fultz does not have a cell phone or a computer and does not know how to use a computer or the Internet. The TJC client advocate accessed Mr. Fultz's TennCare Connect

69

online account, but it contained no information regarding the alleged income change referred to in the form letters Mr. Fultz had received.

299) Mrs. Fultz called TennCare Connect on August 21, 2019 seeking information about the income change referred to in the August 13 notice. The TennCare representative could not tell Ms. Fultz what her husband's income was according to TennCare's records but told Mrs. Fultz that yet another notice had been mailed to her on August 20, and to read that letter.

300) The August 20, 2019 form letter, TN 301.2, simply repeated the information in the July 3 form letter, that Mr. Fultz had been approved for SLMB coverage but denied TennCare. The letter told him he could appeal the decision, ignoring his Legal Aid lawyer's submission of an appeal on August 9.

301) Mrs. Fultz appealed again on August 27, 2019 and received a form letter from TennCare acknowledging receipt of the appeal. A few days later, however, Mr. Fultz received a form notice, TN 600, denying the appeal without a hearing. Despite filing the appeal seven days after receiving the denial notice, the appeal notice said that the appeal had been rejected because it had been received more than 40 days after TennCare had notified him of his right to appeal.

302) In redetermining Mr. Fultz's eligibility, TennCare ignored information in its own records documenting his eligibility under the Pickle Amendment. Moreover, when TennCare demanded further information for purposes of redetermining his eligibility, it did not ask whether he had received SSI in the past. Without considering that information, TennCare cannot determine whether an individual is eligible for any of the categories, including the Pickle Amendment, that covers former SSI recipients. Even when Mr. Fultz's Legal Aid attorney explicitly explained in the August 9 appeal letter that Mr. Fultz was eligible under the Pickle

70

Amendment, TennCare refused to consider his eligibility in that category, and summarily dismissed the appeal without a hearing.

303)　　Although TennCare terminates coverage without considering an individual's eligibility in all categories, including the Pickle Amendment category, the Form TN 301.2 termination notice that Mr. Fultz received falsely assures those found ineligible, "[r]emember, when we make our decision, we look at all of your facts, all of our program rules, and each kind of group we have."

304)　　Mr. Fultz has been harmed, and is at risk of further irreparable harm, from the state's failure to consider his eligibility for all potential sources of TennCare coverage, including the Pickle Amendment. Additionally, TennCare failed to provide an appeal prior to terminating Mr. Fultz's coverage, summarily dismissed his timely request for a hearing, and failed to provide accurate, accessible notice of his rights and responsibilities to maintain his TennCare coverage. Mr. Fultz has been harmed, and is at risk of further irreparable harm, as a result of the state's utilization of methods of administering the TennCare redetermination process, that tend to screen out people with disabilities and defeat their ability to maintain their coverage.

*Plaintiff Michael Hill*

305)　　Plaintiff Michael S. Hill is 46 years old and lives in Morristown, Tennessee with his mother. He was born with autism and did not speak until he was 6 years old. He has been able to develop limited life skills. However, his cognitive impairments are such that he requires assistance with essential activities of daily living (e.g., bathing, taking medication). His mother who is now 75 years old, served as his caregiver until recently, when she was disabled by strokes. The two have lived alone in the same house since 1989.

71

306)     Mr. Hill has received Medicaid benefits since birth. He started receiving SSI in 1978.  In 2002, he began receiving Social Security benefits on his father's Social Security account, and the amount of those benefits made him ineligible for SSI. Though no longer receiving SSI, he remained eligible for TennCare Medicaid as a DAC. *See supra* ¶ 47(a). He continued to receive coverage without problems until 2019.

307)     Mr. Hill received a form notice, TN 305, dated January 30, 2019, indicating that TennCare had made a change to his income reporting.  A week later, he received a second notice, TN 245, dated February 6, 2019, indicating that TennCare would stop paying for Mr. Hill's prescription drugs on March 9, 2019.

308)     Mr. Hill's sister, Kimberly H. Noe, took over primary caregiving responsibilities for him after their mother's disability. On February 18, 2019, she filed a timely appeal by phone on his behalf and requested continuation of benefits pending appeal.

309)     On February 21, 2019, a TennCare Connect representative telephoned Ms. Noe and, despite Ms. Noe's pending appeal request, told her that she needed to submit a new Medicare Savings Plan application for her brother's prescription drug coverage to continue. Ms. Noe did as was instructed and submitted a new MSP application to TennCare.

310)     Mr. Hill never received a hearing or decision on the appeal his sister filed on February 18, 2019.

311)     On May 28, 2019, Mr. Hill received a TennCare notice, TN 301, dated May 23, 2019. The letter informed him that he had been denied eligibility for MSP, and that his TennCare coverage was ending June 12, 2019, because his income exceeded the SSI eligibility limit.

312)     Ms. Noe called TennCare Connect on May 28 to file a second timely eligibility appeal and request continuation of benefits. The TennCare operator she spoke with told Ms. Noe

that Mr. Hill was in "SSI Passalong Pickle, Title 19 Medicaid," and the system showed no type of TennCare after June 12, 2019.

313)    Since her first appeal on her brother's behalf had been ignored, Ms. Noe contacted the Tennessee Justice Center for help. On June 7, 2019, TJC wrote a letter to the TennCare appeals unit, supplementing Ms. Noe's May 28 appeal. The letter explained how Mr. Hill met the eligibility criteria as a DAC and requested that he be reviewed for that category. TJC confirmed, in a phone call to TennCare Connect, that all documents were received and being processed on July 3, 2019.

314)    On July 26, 2019, Mr. Hill received another notice, TN 305, dated July 22, 2019, indicating that TennCare had received information regarding a change in his income. His mother immediately called TennCare Connect about the notice but could not get any information about the purported change in his income.

315)    Mr. Hill received a notice on August 2, 2019, informing him that his case was being sent to a hearing. However, he never received a hearing or any further information concerning the disposition of the appeal request.

316)    On September 5, 2019, TJC helped Ms. Noe access her brother's online TennCare Connect. The account indicated that Mr. Hill's TennCare coverage had been reinstated with an effective date of July 18, 2019. TennCare is supposed to pay Medicare premiums and cost-sharing through the Medicare buy-in for Medicare beneficiaries, like Mr. Hill, who are enrolled in TennCare. *See supra* ¶ 53. Despite the TennCare Connect online account indicating that Mr. Hill was enrolled in TennCare, TennCare stopped paying his Medicare premiums without notice, and the premiums were deducted from Mr. Hill's Social Security benefits. In October 2019, Mr.

73

Hill received a notice from the Social Security Administration confirming that TennCare had stopped paying his Medicare premiums that month.

317) On October 2, 2019, Mr. Hill received another TennCare form notice, TN 301.3, dated September 27, 2019. Instead of providing advance notice of the termination of his TennCare, the notice informed Mr. Hill that TennCare had terminated his coverage retroactively to July 18, the date on which it had previously been approved. Ignoring TennCare's own records of more than two decades that documented Mr. Hill's eligibility as a DAC, and ignoring also TJC's letter explaining in detail how he remained eligible in the DAC category, the notice said that Mr. Hill was ineligible because his Social Security income exceeded the SSI income limit. The letter affirmatively represented that TennCare had considered all possible categories of eligibility, which was false.

318) TennCare issued a second notice, also TN 301.3, on September 27, 2019. That notice stated that Mr. Hill was denied eligibility for the Medicare Savings Program, because their records showed that he was not receiving Medicare Part A. In fact, Mr. Hill was always enrolled in Medicare and remained eligible for Medicare coverage, facts that were available to TennCare from its federal sources, and that his family had documented by sending a copy of his Medicare card to TennCare Connect.

319) On October 16, 2019, TJC filed a third eligibility appeal on Mr. Hill's behalf and requested continuation of benefits pending appeal. TJC confirmed receipt of the appeal on October 18, 2019, in a phone call with the TennCare appeals unit. During the call, the appeals clerk informed the advocate that the appeal prompted TennCare to reopen Ms. Noe's appeal from May and send the case for review.

74

320)     A TennCare representative called the family on October 24, 2019 and explained that Mr. Hill's coverage had been reinstated until the appeal had been heard and a decision made. The representative also said the family would receive a letter explaining the circumstances.

321)     Since October 2019, the family has received no further correspondence regarding any of Mr. Hill's three TennCare eligibility appeals. However, they did receive a notice from the Social Security Administration, indicating TennCare would pay his Medicare premiums "beginning October 2004." The 90-day federal regulatory deadline for disposition of an appeal has long since passed, and it is unclear what the exact status of Mr. Hill's coverage is at this time.

322)     Mr. Hill has been harmed, and is at risk of further irreparable harm, from the state's failure to consider his eligibility for all potential sources of TennCare coverage, including the DAC category. Additionally, TennCare failed to provide notice and hearing prior to terminating Mr. Hill's  coverage, refusal to continue benefits pending appeal, summarily dismissed his timely request for a hearing, and failed to provide accurate, accessible notice of his rights and responsibilities to maintain his TennCare coverage. Mr. Hill has been harmed, and is at risk of further irreparable harm, as a result of the state's utilization of methods of administering the TennCare redetermination process, that tend to screen out people with disabilities and defeat their ability to maintain their coverage.

*Plaintiff J.S.K. and Family*

323)     Plaintiff J.S.K. is 38 years old.  He lives in Dekalb County, Tennessee, with his wife, J.C.K., and their three children, D.C.S. (age 13), M.S.K. (age 17), and M.N.S. (age 16). J.C.K. and M.S.K. receive SSI, which is the only household income for the family and

75

J.S.K., D.S., and M.S.K. are eligible for TennCare under the MAGI category. Thus, everyone has been and is currently eligible for TennCare Medicaid.

324)     On August 26, 2019, the family received a renewal packet, TN 401, in the mail. The letter dated July 11, 2019, indicated the family had until August 20 to return the packet to TennCare for redetermination. Since the deadline to return the information had already passed when the family received the notice, J.C.K. called TennCare immediately upon receiving the notice.

325)     During the call, J.C.K. explained to a TennCare representative that they had received the notice after the deadline to return the information for redetermination. The TennCare representative told her the problem was that she had not filed a change of address form.

326)     J.C.K. thought it was odd that TennCare alleged to have the wrong address on file, as they provided address updates to the post office and TDHS soon after moving in October 2018. Moreover, because the family had received documents from their MCOs after moving, they were unaware of any address issues with TennCare.

327)     Regardless of any claims of an address issue, the TennCare representative J.C.K. spoke with informed her that it would not be a problem for J.C.K. to complete the renewal over the phone. So, she provided the information during the August 26 call and thought everything was resolved.

328)     However, on September 24, 2019, the family went to the pharmacy and learned that J.S.K., D.C.S., and M.S.K. had lost their coverage. Again, J.C.K. called TennCare immediately to figure out why TennCare had terminated their coverage. Despite J.C.K. providing the renewal information a month prior, TennCare failed to process the renewal before

76

terminating J.S.K., D.C.S., and M.S.K. on September 17. Therefore, J.C.K. filed an appeal for her husband and children during the same call.

329)    J.S.K. then called TJC for help on October 10, 2019. On October 25, TJC called TennCare on behalf of the family to check the status of their appeal. The TennCare representative on the call informed the advocate that "the family should be re-approved from the 9/24 appeal, but [they were] still waiting on a final decision from the state."

330)    During another call by a TJC advocate on November 4, 2019, a TennCare representative reviewed the case and suggested that the family reapply if there were not medical bills. When the advocate explained that the family had outstanding bills, the representative said they should get reapproved. She also said that she did not understand why this was taking so long to review, but if there is a medical emergency or anything to call right away.

331)    On yet another call with the TennCare appeals unit on November 13, 2019, the TennCare representative explained the renewal information was under review, but there was no definite timeframe for a resolution.

332)    After several more calls to the TennCare appeals unit and receiving no substantive updates, the family found a Notice of Decision in their TennCare Connect account on December 23, 2019. The notice, dated December 18, 2019, showed that J.S.K., D.C.S., and M.S.K. were approved.

333)    Although coverage has been restored, J.S.K. and his children have been harmed, and are at risk of further irreparable harm, by state's failure to provide notice and hearing prior to terminating the coverage, failure to provide accurate, accessible notice of their rights and responsibilities, and refusal to continue benefits pending an appeal.

*Plaintiff E.I.L.*

334)    E.I.L. lives with his mother, J.N.L., and three siblings in Nashville, Tennessee.
E.I.L. was born in June 2019. When E.I.L. was born his mother and his siblings were enrolled in
TennCare.

335)    Because his mother was covered by TennCare when he was born, E.I.L. was
deemed by law to be covered from his date of birth. *See supra* ¶ 41. TriStar Centennial Women's
Hospital, where E.I.L. was born, notified TennCare of E.I.L.'s birth.

336)    In January 2020, J.N.L. took E.I.L.to the family's primary care provider to receive
his six-month checkup and immunizations. The provider's office informed her that they would
not be providing services because she had an outstanding bill from July 2019, when she had
taken E.I.L. to the same office for his one-month appointment. TennCare had terminated his
deemed coverage without notice to J.N.L. and refused to pay the provider for that one-month
visit. J.N.L. could not afford to pay the bill, and E.I.L. had to forego the six-month checkup.

337)    J.N.L. promptly contacted the TennCare Connect call center on January 14, 2020
and learned that E.I.L.'s TennCare start date was July 30, 2019. J.N.L. responded that she never
received any notices from TennCare and submitted an effective date appeal over the phone. One
week later, TennCare closed the appeal without a hearing, informing J.N.L. in a form notice, TN
600.3, that, "[i]t's too late to appeal this problem."

338)    After the appeal was closed, J.N.L. contacted Tennessee Justice Center, which
helped her access her online account in TennCare Connect. The account contains copies of
notices that TennCare purportedly sent to J.N.L. from August 2019 through December 2019, but
that she never received. The notices for J.N.L. were directed to J.N.L.'s mother's address. J.N.L.
has not lived with her mother, E.I.L.'s grandmother, for over five years. The notices were also

78

addressed to an unknown individual at 2221 Murphy Avenue, Nashville, TN 37203. That is the address of TriStar Centennial Women's Hospital where E.I.L. was born.

339)    J.N.L.'s mother has not received any of the notices shown in J.N.L.'s TennCare Connect account but has continually received TennCare notices for J.N.L.'s eldest son. J.N.L. has attempted several times to correct this by calling the TennCare Connect call center.

340)    One of the notices that J.N.L. found in her online account is a TennCare letter, TN 305, dated August 8, 2019, stating that her address had been updated to reflect her correct current address. TennCare nevertheless addressed the notice not to that correct address but to J.N.L.'s mother's address and to the unknown person at TriStar Centennial Women's Hospital. Neither J.N.L. nor her mother received the notice.

341)    A TennCare Notice of Decision, TN 301.2, dated August 8, 2019, was also in the online account. That notice was purportedly sent to J.N.L.'s mother's address and to the unknown individual at TriStar. J.N.L.'s mother did not receive this notice. The form stated that E.I.L. was enrolled in TennCare with an effective date of July 30, 2019, which is over a month after he was born. This notice gave a deadline of September 17, 2019 to appeal the start date.

342)    The online TennCare Connect account contains copies of two more notices, including a redetermination packet, TN 401, that was purportedly sent to J.N.L.'s mother's address and to TriStar. J.N.L.'s mother never received either notice.

343)    It was not until January 2020, that TennCare began to send notices to J.N.L.'s correct current residence.

344)    On February 28, 2020 TJC faxed a letter to TennCare Connect and to TennCare appeals unit explaining why E.I.L.'s appeal should not have been closed and requesting that it be

79

reopened. Meanwhile, J.N.L.'s provider stated that the bill incurred in July for E.I.L.'s one-month checkup had been sent to collection.

345)     On March 9, 2020, J.N.L. and TJC received TennCare's Notice of Decision, TN 301.6, dated March 5, 2020. This notice stated that E.I.L. and the other members of his household were approved for "continued coverage."

346)     On March 13, 2020, a TennCare attorney contacted TJC and stated that J.N.L.'s appeal was reopened and E.I.L.'s TennCare coverage was backdated to the date of his birth in June 2019. The TennCare attorney said that J.N.L. would have to file another appeal in order for TennCare to cover the bills she incurred during the period when E.I.L.'s coverage was terminated.

347)     E.I.L. remains at risk of the future loss of TennCare coverage, so long as TennCare remains incapable of reliably maintaining the coverage of infants who are deemed eligible until during their first year of life and until TennCare has accurately assessed their eligibility for continued coverage beyond their first birthday. Moreover, for as long as he remains eligible for TennCare, the prospect of eligibility redeterminations at least annually leaves E.I.L. at risk of wrongfully losing his coverage. In the event of another erroneous termination of E.I.L.'s coverage without adequate notice, the state's failure to reliably administer a fair and effective appeal process leaves him without effective recourse.

*Plaintiff William C. Monroe*

348)     William C. Monroe is 69 years old and lives in Finley, Tennessee. Mr. Monroe worked for several decades as a building contractor until 2011, when he was disabled by a series of heart attacks. Mr. Monroe began receiving SSI at this time, and last received SSI in 2012, at which point he began receiving Social Security Disability Insurance. In addition to heart disease,

80

Mr. Monroe has a hearing impairment and spinal stenosis, which impairs his mobility and severely limits his use of his hands.

349)    Mr. Monroe's only source of income is his monthly Social Security check. Since 2013, he has been enrolled in the MSP as a QMB. *See* ¶ 44(a), above.

350)    Mr. Monroe receives his mail at a post office box and because of his lack of mobility and inability to use his hands, he cannot handle his own affairs without in-person assistance. Mr. Monroe's sister helped him with his mail and TennCare paperwork until her death in the spring of 2019. Mr. Monroe sometimes received help with his mail from his home health nurse, until his home health care stopped.

351)    Mr. Monroe received a form notice, TN 301.3, dated August 28, 2019 from TennCare. The notice stated his QMB benefits were ending because Mr. Monroe had not responded to an earlier TennCare notice that it was time to renew his coverage. The notice stated that his QMB coverage would end on September 17, 2019, unless he submitted the missing information or appealed by that date.

352)    Mr. Monroe contacted TJC for help, and on September 11, 2019, a TJC advocate helped Mr. Monroe access his TennCare Connect online account to check for notices from TennCare. The account reflected that a form renewal letter, TN 401, was purportedly sent on July 11, 2019 to Mr. Monroe, but he never received such a notice.   On September 12, 2019, the TJC advocate filed an appeal on Mr. Monroe's behalf, requesting the continuation of his QMB coverage.

353)    Mr. Monroe has difficulties communicating by phone due to his hearing impairment and unreliable cell service in his rural community. The TJC advocate was able to call TennCare in a 3-way call with Mr. Monroe in Dyer County on September 16, 2019 to assist in

81

completing Mr. Monroe's renewal. The TJC advocate in Nashville tried for several days to obtain in-person assistance for Mr. Monroe to gather the additional information requested by TennCare. The advocate finally managed with difficulty to obtain the necessary information and submitted all the renewal information on Mr. Monroe's behalf by October 22, 2019. The information submitted indicated that Mr. Monroe needed in-home services.

354) TennCare referred the information to the Northwest Area Agency on Aging and Disability, with which TennCare contracts to assess the functional limitations of applicants for the CHOICES program, which covers nursing home and home and community-based services. An Area Agency representative made a visit to Mr. Monroe's home to assess his functional limitations. Mr. Monroe described his health problems and functional impairments and asked for help qualifying for TennCare. The Area Agency representative determined that Mr. Monroe was not sufficiently impaired to need nursing home care and therefore would not qualify for CHOICES. There was no assessment of Mr. Monroe's eligibility for any other category of TennCare coverage.

355) The information submitted to TennCare by his TJC advocate showed that Mr. Monroe's income was not only less than the QMB limit but was low enough to qualify him for full TennCare coverage under the Pickle Amendment.

356) Despite Mr. Monroe's timely appeal and request for a continuation of his QMB benefits, and the submission of the requested documentation of his eligibility before the September 17 deadline, the state terminated his QMB coverage. He received a letter from the Social Security Administration dated September 30, 2019, informing him that his Medicare premiums were being deducted from his Social Security check beginning in October.

82

357) Mr. Monroe's only means of support is his Social Security income. With the premiums taken out, as they were in October, Mr. Monroe was unable to pay his rent and feared that he would be evicted.

358) TennCare issued a notice, TN 301.4, on October 29, 2019, closing Mr. Monroe's appeal and telling him that he would receive a separate notice informing him why the appeal had been closed, but he never did.

359) The October 29th notice told Mr. Monroe that he was approved for QMB. However, the notice stated that he was denied TennCare. It told him that TennCare had considered all categories and he was ineligible in any of them. Although Mr. Monroe's advocate had already appealed on September 12, 2019 and had submitted evidence of his TennCare eligibility, the notice closed that appeal and told him that, if he disagreed with the denial of TennCare, he would have to appeal again.

360) When TennCare informed Mr. Monroe that it had approved him for QMB, it did not arrange for reimbursement of the Medicare premium wrongfully withheld from his October Social Security check and did so only in response to his TJC advocate's repeated requests.

361) TennCare issued another form notice, TN 301.4, dated November 4, 2019. The notice told him that it had made a change in response to receipt of a reported change, but it did not disclose what the change was. The notice again said he was approved for QMB but denied for TennCare. This time the explanation for the denial was that:

> You applied to get nursing home Medicaid in the institutional category. But to get TennCare Medicaid this way, you must have an approved PAE (Pre Admission Evaluation). Our records show that you don't have an approved PAE. [Tenn.Comp.R&R 1200-13-20].

The notice assured him that TennCare had considered him for all coverages.

362) Mr. Monroe remains without the TennCare coverage for which he is eligible

83

under the Pickle Amendment. Even the continuation of his QMB coverage is uncertain, as it will be subject to the eligibility renewal process at least annually, and at any additional times of the state's choosing. Due to his disabilities, which have been documented by TennCare's representative, he is unable to complete the process without in-person assistance, but TennCare has no procedure for providing such assistance. Even if Mr. Monroe is able with the help of others to timely complete the process, uncorrected defects in the state's redetermination process will continue to deny him TennCare and threaten to again disrupt his QMB coverage. The appeal process remains unable to reliably maintain coverage pending appeal, or to afford him a fair hearing. Mr. Monroe therefore continues to suffer harm, for which he has no adequate remedy other than the relief he requests from this court.

*Plaintiff Linda M. Rebeaud*

363)     Linda M. Rebeaud is 61 years old. She lives in Waynesboro with her husband. She has been continuously eligible for TennCare in the Breast or Cervical Cancer ("BCC") category since she started receiving treatment for breast cancer in 2013. Tenn. Comp. R. & Regs. 1200-13-20-.08(7)(b). In addition to cancer, Ms. Rebeaud has been diagnosed with and receives treatment for depression and an anxiety disorder.

364)     In early June 2019, Ms. Rebeaud received a TennCare renewal notice, TN-315, dated May 31, 2019. The notice informed her that it was time to confirm her continued eligibility in the BCC category, which requires that the enrollee still be receiving active treatment for breast or cervical cancer. The renewal notice directs the enrollee to fill out part of the form, then take the form to her treating physician to document her ongoing need for treatment. The notice told her to complete and return the form by August 31, 2019 in order to retain her TennCare coverage.

84

365) Within a few days of receiving the BCC renewal notice, Ms. Rebeaud received another TennCare letter, dated June 3, 2019. The second notice, TN 304, included the pre-termination eight-item questionnaire to be returned to TennCare by June 23, 2019. The questionnaire included a question that asked whether she needed treatment for breast or cervical cancer. Ms. Rebeaud had been through the BCC renewal process in previous years, and she knew that the form for that purpose was the renewal form tailored to BCC coverage, which she had received a few days earlier. She also knew that she had until August 31 to return the BCC renewal packet, before her coverage would be terminated. She therefore disregarded the deadline contained in the second notice and prioritized getting her physician to complete the BCC form.

366) Ms. Rebeaud returned the completed BCC Renewal to TennCare on July 2, 2019, well before the August 31 deadline. She then completed and returned the pre-termination questionnaire on July 10, 2019.

367) Ms. Rebeaud then received a TennCare notice, TN 301, informing her that her coverage was terminated, effective July 16, 2019. The notice stated as the reason: "[y]ou're not getting treatment for breast or cervical cancer. [Tenn. Comp. R& R 1200-13-20]. We sent you a letter asking for more facts but you didn't send us what we needed. So we did not have enough information to decide if you qualify. [Tenn. Comp. R & R 1200-13-20]."

368) Termination of her coverage and the prospect of her cancer treatments being discontinued terrified Ms. Rebeaud, deepening her existing anxiety and depression. After being at a loss for what to do for several weeks, Ms. Rebeaud talked to a financial counselor at Maury Regional Medical Center, where she had been receiving cancer treatments. The counselor encouraged her to start over by going to the local health department to submit a new application

85

for BCC coverage. Ms. Rebeaud did so, and the health department re-enrolled her in TennCare on August 12, 2019.

369)    However, Ms. Rebeaud was left with a gap in coverage between her termination on July 16 and her re-enrollment on August 12. She was referred to TJC, which on September 20 filed an appeal seeking a change in the effective date of her coverage. Ms. Rebeaud's TJC advocate documented her compliance with the May 31st renewal notice requirements, the effective date was corrected, and the appeal dismissed.

370)    Although Ms. Rebeaud has regained her TennCare coverage, she remains at risk of irreparable harm due to systemic defects in TennCare's eligibility renewal process, and the uncertainty of the appeal process. She will have to undergo eligibility renewal at least annually. That automated process cannot reliably track which renewal forms to use for BCC coverage and cannot accurately track when enrollees document their continued eligibility. Ms. Rebeaud also faces the risk of being screened out by a renewal process that refuses to provide in-person assistance with the complex renewal process, which she needs because of her diagnosed anxiety and depression.

*Plaintiff D.R. and Family*

371)    D.R. is 24 years old. She lives in Memphis with her four children, J.Z., (age 8), M.X.C. (age 6), J.C. (age 1) and M.A.C. born in August 2019. D.R has been eligible for TennCare since before J.Z. was born, and each of her children has been eligible since birth. Despite the fact that they all belong to the same household and have continuously shared MAGI eligibility for Medicaid, the state has repeatedly suspended or terminated various household members' coverage over the past three years. TennCare representatives have been unable to account for these disruptions.

86

372)     J.Z. who has been diagnosed with autism spectrum disorder and attention deficit/hyperactivity disorder (ADHD), was the first member of the household to lose TennCare coverage. In the summer of 2017, D.R. discovered at J.Z.'s neurologist's office that J.Z.'s coverage had been terminated. She had not received any notice of the termination. She had to cancel J.Z.'s appointment, which took several months to obtain, because she could not pay the $300 that the doctor's office requested.

373)     D.R. immediately phoned the TennCare call center. She was told by the TennCare representative that the state had sent renewal packets for J.Z., but D.R. received neither the packets nor any notice from TennCare that Juan was losing his coverage. The family had lived at the same address since enrolling in TennCare years earlier and had no difficulty receiving other official mail.

374)     When J.Z.'s coverage was terminated in 2017, D.R. and M.X.C. retained their TennCare Coverage, even though they were part of the same household, with the same income, as J.Z. The household was eligible for and receiving SNAP assistance at the time and the state's SNAP records would have documented the MAGI eligibility of the entire household, including Juan.

375)     D.R. requested an appeal on J.Z.'s behalf.  She received repeated requests that she re-submit the same information she had previously submitted, in order to be allowed to receive a hearing. She participated in a telephonic hearing without legal representation or other assistance. TennCare rules recognize define "good cause" as a legally sufficient reason for an omission or an untimely action "based on circumstances outside the party's control and despite the party's reasonable efforts." Tenn. Comp. R. & Regs. § 1200-13-19-.02(2). Nevertheless, J.Z.'s eligibility

87

appeal was denied on the grounds that his mother had not returned renewal packets that she had never received.

376) For two years, D.R unsuccessfully tried to re-enroll J.Z. She called United Healthcare, the TennCare MCO to which the other family members were assigned, and was told that their records showed J.Z. as still eligible, but when doctors or pharmacists tried to bill for his care, they were told that J.Z. was not covered.

377) More recently, United Healthcare has told D.R. that J.Z.'s coverage was shown in the state's record as active from January 1, 2018 through April 4, 2018 and from February 8, 2019 through April 25, 2019. D.R. received no termination notices, and the state has not given any explanation for the coverage lapses.

378) D.R. suffers from several chronic health conditions, including migraines, asthma, depression and high blood pressure, and attention deficit hyperactivity disorder, all of which are exacerbated by stress and, in turn, increase her anxiety. She could not understand some of the terminology related to establishing J.Z.'s TennCare eligibility, and assistance available by phone was not sufficient to enable her to navigate the processes required to restore his coverage. D.R. gave up trying to get J.Z.'s coverage back for several months.

379) In 2018, D.R. again called United Healthcare seeking to enroll J.Z. in TennCare and was referred to the federal Marketplace ("FFM"). She tried to apply but could not figure out how to complete the process.

380) After being unable on her own to successfully reapply for TennCare for J.Z., D.R. went to the Shelby County TDHS office to seek in-person assistance. She explained that she had been trying to get TennCare coverage for her son who was sick and that she was unable to do so without help. She explained that she had been unable to get J.Z.'s coverage back, and that she

88

needed someone to please help her because she was anxious about it and felt like she was having an anxiety/panic attack because she felt like no one would help her. When told that TDHS did not handle TennCare anymore and could not help her, she became emotionally distraught. Instead of offering assistance, TDHS staff told her to calm down or she would be removed. D.R. left the office without receiving any help or being told where she could get the type of in-person assistance that she needed.

381) After J.Z. lost his care, D.R. struggled to pay for his medications out of pocket and was only able to seek care for him when he was acutely ill. She owes medical bills of $360 for J.Z.'s doctor visits in 2019 alone.

382) When D.R. renewed her efforts to regain TennCare coverage for J.Z., she was told to apply on his behalf through the FFM, which she did on February 8, 2019. She and her other children were still enrolled at that time, so she applied only for J.Z.

383) D.R. was referred to the Tennessee Justice Center, and on April 26, 2019, a TJC client advocate called TennCare Connect with D.R. to check the status of J.Z.'s application. The TennCare representative who answered said the application was still pending. D.R. asked to file a delay appeal and provided updated household information requested by the TennCare representative.

384) On June 12, 2019, during a call to TennCare Connect concerning the coverage of other household members, D.R. was told by the call center representative that there was no record on file of an application for J.Z. She submitted a new application on his behalf, but J.Z. remained without coverage.

385)    In May 2019, D.R. received notices that coverage was going to be terminated for herself and for J.C., who has serious medical needs, including developmental delays, that require medical appointments, prescriptions, and other care. D.R. was pregnant with a high-risk pregnancy that required close monitoring and ongoing prenatal care.

386)    A TJC client advocate called TennCare Connect with D.R. on June 12, 2019. The TennCare representative acknowledged that there was no record of renewal notices having been sent to D.R. or to J.C. The representative then asked D.R. for information about who was in the household. After providing the requested information, D.R. requested an eligibility appeal, and for continuation of benefits for herself and J.C. pending appeal.

387)    The following week, D.R. discovered during a physician visit that, despite her timely request for continuation of benefits pending appeal, J.C.s and her coverage had been terminated.

388)    A TJC client advocate called TennCare's appeals unit on June 25, 2019 to ask about the status of the appeal and check on the status of D.R.'s case and find out why D.R.'s and J.C.'s coverage had been terminated. Although D.R. had previously authorized the release of eligibility information to TJC regarding all members of her family, that information was not in J.C.'s record. After D.R. reauthorized release of information to TJC, the TennCare representative said that somehow J.C. and M.X.C. were identified as being in a separate household. The TennCare representative said the eligibility appeal was on file, but there was no indication that benefits should be continued pending the appeal's disposition.

389)    On June 28, 2019, TJC wrote to TennCare General Counsel regarding D.R.'s family's coverage. The letter described the family's experience and the state's failure to provide

continuation of coverage pending appeal and asked for immediate reinstatement. On July 8, 2019, D.R., J.C. and J.Z. were reinstated pending a September appeal hearing, and for the first time in two years, the entire household had TennCare coverage.

390)    Following further correspondence with TJC, TennCare approved the entire household's eligibility and closed the appeal. But TennCare offered no explanation as to how they had been terminated without notice, why the household had been split and relevant information had only been linked to some family members, or how the state had failed to honor the request for continuation of benefits pending appeal.

391)    D.R. and her children have all been eligible for TennCare throughout the extended saga of their disrupted coverage. Although M.X.C. has maintained her coverage and other family members' coverage has been restored, the whole family remains subject to the state's eligibility redetermination process at least once a year. They will therefore still be at risk of wrongful loss of coverage, because the systemic problems that have wrongfully denied them coverage remain uncorrected. Without TennCare coverage, D.R. cannot afford essential medical care for herself and her children, subjecting them to the risk of irreparable harm.

392)    D.R. and her children have been harmed, and are at risk of further harm, from the state's failure to issue notice and information regarding appeal rights prior to terminating coverage; termination of coverage despite timely appeals and requests for continuation of coverage, and closure of appeals without hearings. D.R. and her children are harmed by the state's implementation of methods of administration of the TennCare eligibility redetermination process that screen out individuals with disabilities, like D.R.'s, that make it unnecessarily difficult to maintain their coverage, and by the state's refusal to reasonably accommodate

91

individuals with disabilities as needed to complete the eligibility redetermination process and exercise their rights to due process.

*Plaintiff T.J.T. and Family*

393)     T.J.T., 29, and his wife S.L.T., 28, live in Tullahoma, Tennessee. They have three children, J.L.T. (age 4), A.L.T. (age 2), and F.T. (age 10 months). Although they have moved twice in the past two years, S.L.T. has updated TennCare with the family's address changes. She has also kept TDHS and the health department updated with address changes, as the family received WIC benefits since J.L.T.'s birth in 2015 and SNAP benefits periodically, most recently as July-August 2019.

394)     S.L.T. recalls receiving a notice from TennCare in January 2019, indicating that she, T.J.T., and A.L.T. were losing their TennCare coverage. Immediately upon receiving the notice, she called TennCare to update the address.

395)     During the call, the TennCare agent S.L.T. spoke with informed her that J.L.T. was not included in the notice because his Social Security number and address were incorrect in the system. S.L.T. updated J.L.T.'s information and confirmed that his coverage was active. The TennCare agent assured S.L.T. this was a simple oversight, the issues would be corrected, and all family members were under the same case with the current address.

396)     In addition to updating his information during the call, S.L.T. responded to TennCare's requests for copies of J.L.T.'s Social Security card and birth certificate by having staff at the Manchester DHS office and health department fax copies of the documents to TennCare multiple times.

92

397)	However, in March 2019, when the S.L.T. attempted to take J.L.T. for a regularly scheduled doctor's visit, she was informed that J.L.T. did not have active coverage. Again, S.L.T. immediately called TennCare to resolve this issue.

398)	During this call, a TennCare representative informed the family that J.L.T. was one of the many enrollees who were incidentally "purged" due to a system error. In fact, the representative revealed that J.L.T. had been without coverage since June 2018. Yet, the family had received no prior notice of J.L.T.'s termination—despite updating his information only a month before this discovery.

399)	In May 2019, the family received two notices dated May 6, 2019. One letter, TN 305, addressed to T.J.T., indicated that (1) a change was made to his income, and (2) F.T. was added to his case. The other letter, TN 303, requested additional information by May 26, 2019. The information requested included income information for T.J.T., S.L.T., and citizenship information for J.L.T.

400)	Despite faxing this requested information to TennCare multiple times, the family received a Notice of Decision, TN 301, dated June 7, 2019, indicating that J.L.T. was denied coverage for failing to provide the requested information needed for a determination. Additionally—although there were no previous requests for information regarding A.L.T.'s coverage—the notice indicated her coverage was going to end on June 27, 2019, for the same reason.

401)	On June 18, 2019, S.L.T. called TennCare to file appeals for J.L.T. and A.L.T. The family then received letters, TN 602, dated June 24, 2019, for J.L.T. and A.L.T. acknowledging their appeals. The notices stated:

> You appealed after your coverage ended or your benefits changed. We're still looking at your appeal. If your coverage has ended, you will not keep coverage during your appeal.

> If your benefits changed, you will keep the new benefits while we look at your appeal. But if we decide you qualify, you will get the same type of coverage you had before.

(emphasis in original).

402)     In August 2019, the family received another appeal confirmation, TN 602, for A.L.T. This notice, dated July 31, 2019, stated: "You appealed before your coverage ended or your benefits changed. So, you will keep your coverage during your appeal." (emphasis in original).

403)     Later in August, the family received form TennCare notices, TN 608, dated August 1, 2019, requesting additional information regarding the alleged mistakes TennCare made when denying J.T. and terminating A.L.T. The notices seemingly alluded to the request for additional information, TN 303, the family received in May, as indicated by the following included language:

> TennCare sent you a letter on 05/06/19 requesting information from you and that you had until 05/26/19 to send it back. The letter provided a list of the information needed to continue processing your application and also provided ways to return the information. You were denied because we did not receive the information by 05/26/19. Please tell us if you sent the information or did not get the request.

404)     Again, the family tried to respond promptly to the request and submitted the information before the August 21 deadline. However, when they called to follow up on the status of the appeals on August, TennCare informed them that the appeals were closed for a lack of response. TennCare was also, once again, requesting income information for T.J.T. and S.L.T.

405)     During this call on August 30, 2019, two TennCare Connect representatives, Katie and Laquinta, advised T.J.T. and S.L.T. to write a letter to the TennCare appeals unit.

406)     On September 3, 2019, T.J.T. and S.L.T. emailed the TennCare appeals unit describing the series of denials and requests they had experienced while trying to maintain coverage for their children.

407)     After not receiving a response from TennCare, the family called TJC for help on September 16, 2019. TJC assisted them with setting up a TennCare Connect account. TJC then advised the family to reapply, as that might be the fastest way to get J.L.T. and A.L.T. covered.

408)     S.T. submitted another application on September 30, 2019. Following that the only correspondence from TennCare were additional requests in November for F.T.'s SSN and income. TJC instructed S.L.T. to submit the requested information in the TennCare Connect account this time, which she did.

409)     On January 8, 2019, the family received a Notice of Decision, indicating A.L.T.'s coverage would begin on February 1, 2019. Not only is this the wrong effective date for A.L.T., based on the September 30, 2019 application date, but J.L.T. was not approved until February 20, 2020, after a letter was written to TennCare's General on February 18, 2020.

410)     T.J.T. and his family have been harmed, and are at risk of further harm, from the state's failure to issue notice and information regarding appeal rights prior to terminating coverage; termination of coverage despite timely appeals and requests for continuation of coverage, and closure of appeals without hearings.

*Plaintiff Kerry A. Vaughn*

411)     Kerry A. Vaughn is 50 years old and lives in Nashville, Tennessee. Ms. Vaughn was born with cerebral palsy, a disabling condition that requires the use of a wheelchair. Ms. Vaughn began receiving SSI as a child and, with it, Tennessee's Medicaid coverage. TennCare covers her Medicare premiums and cost-sharing, pays for her medical supplies and maintenance of her port-a-cath, and provides her transportation to and from medical appointments.

412)     When Ms. Vaughn's father moved into a retirement home in 2008, she began receiving Social Security Disability Insurance ("SSDI") based on his Social Security earnings

95

record. When he died in 2014, this amount increased. The amount of her SSDI benefits exceeded the income eligibility limit for SSI, but she has remained eligible for TennCare in the DAC category. *See supra* ¶ 54(a).

413)     In a letter dated October 25, 2017, the Tennessee Health Care Finance and Administration Eligibility Appeals Unit informed Ms. Vaughn that her TennCare would end because her Social Security benefits exceeded the SSI income limit. TJC sent a letter on Ms. Vaughn's behalf to the TennCare appeals unit in November 2017 describing the DAC eligibility category and detailing why Ms. Vaughn was eligible in that category. TennCare then corrected its mistake and reenrolled Ms. Vaughn in TennCare.

414)     In a letter, TN 301, dated May 10, 2019, TennCare informed Ms. Vaughn that her coverage would end May 30, 2019. Once again, TennCare's stated reason was that her Social Security benefits exceeded the SSI income limit.

415)     Ms. Vaughn filed a timely appeal over the phone and was granted continuation of benefits.

416)     On June 4, 2019, TJC sent a supporting letter for Ms. Vaughn's appeal to TennCare Connect by fax. This letter again explained in detail that Ms. Vaughn is eligible for TennCare through the DAC category.

417)     In a notice dated July 29, 2019, the appeals unit acknowledged receipt of the appeal and informed Ms. Vaughn that she would receive a fair hearing.

418)     It has been over nine months since Ms. Vaughn filed her appeal. She has yet to receive a hearing, much less a correction of the wrongful termination of her coverage.

419)     Even if Ms. Vaughn regains her TennCare coverage, she remains subject to TennCare's redetermination of her eligibility at least annually. As long as TennCare remains

96

incapable of reliably redetermining eligibility, continues to terminate people without considering whether they are eligible for DAC or other disability-linked categories, places administrative hurdles in the way that are especially difficult for individuals with disabilities to overcome, and fails to reliably administer a fair and effective appeal process, Ms. Vaughn will remain at risk of the loss of her TennCare coverage and irreparable harm to her health from the resulting disruption of her medical care.

*Plaintiff Johnny Walker*

420) Johnny Walker is a 52-year-old man who lives in Franklin County, Tennessee. When Mr. Walker was 17, he was grievously injured in a train accident that left him with a disabling cognitive impairment that includes short term memory loss. Soon after the accident, he began receiving SSI and, with it, Medicaid coverage. He has continued without interruption to receive SSI since then.

421) TennCare sent Mr. Walker a pre-termination notice and questionnaire, TN 304, dated June 8, 2019. The notice informed Mr. Walker that his TennCare coverage would be ending soon and directed him to fill out the questionnaire and send it back to TennCare.

422) TennCare's records already documented Mr. Walker's TennCare eligibility on the basis of his SSI entitlement, and no information was needed from Mr. Walker. TennCare was also aware that Mr. Walker was receiving SSI on the basis of disability. TennCare's MCO regularly provided electronic reports to TennCare regarding is diagnoses and the treatment he was receiving, from all of which TennCare knew that he would likely be unable to respond to the notice. TennCare nonetheless required him to complete the questionnaire.

423) Mr. Walker could not understand the notice and did not respond.

97

424)    TennCare sent Mr. Walker another notice, TN 301.2, dated July 5, 2019. The notice informed him that his TennCare coverage would end on July 25, 2019 because he had not supplied information that was needed to determine his eligibility.

425)    Had Mr. Walker been able to complete the questionnaire, he would still have been terminated, because the questionnaire did not inquire whether he was receiving SSI, which is the basis for his TennCare eligibility, and because TennCare ignored readily available documentation from the Social Security Administration confirming his ongoing eligibility for SSI.

426)    When friends discovered that Mr. Walker's TennCare coverage was ending, they immediately contacted TennCare Connect on his behalf. They explained that he had been unable to respond to the questionnaire because of his disability. They requested that TennCare Connect resend the pre-termination questionnaire form. A friend, Dorian Heath Stevens, called TennCare Connect on Mr. Walker's behalf on August 20, 2019 and filed an appeal. Mr. Stevens explained the seriousness of Mr. Walker's disability and that, without personal assistance, he is incapable of responding to TennCare notices or demands for information.

427)    Mr. Walker remained without health coverage. In order to control his seizure disorder, he requires medication that costs $341 a month, or nearly half of his entire monthly income of $771 in SSI benefits. Because his health, and potentially even his life, depend on the medication, he struggled to pay for it himself after his TennCare coverage ended in July. He could not afford to continue the medication, however, and was forced to go without it for several weeks, during which he experienced severe dizziness.

428)    In a form notice, TN 600.3, dated September 23, 2019, the TennCare appeals unit notified Mr. Walker that it was closing the eligibility appeal that Mr. Stevens had helped him

file. The notice stated that the appeal was closed because it was received more than 40 days after the date of the notice of termination. The appeals unit did not acknowledge Mr. Walker's disability or his request for help. The unit denied him a hearing although Mr. Stevens had explained that the untimeliness of his appeal was based on "circumstances outside the party's control and despite the party's reasonable efforts," which constituted good cause under TennCare's own rules. Tenn. Comp. R. & Regs. §§ 1200-13-19-.02(2), 1200-13-19-.06(3).

429)    Mr. Stevens contacted TJC, which helped Mr. Walker file a new TennCare application with TennCare Connect on October 4, 2019. TJC sent a letter to TennCare General Counsel on October 10, 2019, explaining Mr. Walker's eligibility for TennCare through the SSI category. The letter also stated that Mr. Walker has a cognitive impairment and needs accommodation in navigating the administrative process.

430)    TJC and Mr. Walker received a form notice, TN 301.4, dated October 9, 2019 denying him TennCare coverage. The notice stated that he was ineligible because he is "not in a group covered by TennCare or CoverKids. Some of those groups include…people who are getting Social Security and or who used to get SSI checks…" There was no acknowledgment that people currently receiving SSI are eligible for TennCare and should therefore appeal if they are denied coverage.

431)    On October 15, 2019, TennCare Connect sent TJC and Mr. Walker a notice of decision, TN 301.4, stating that he had ongoing TennCare coverage and backdated the coverage to the date of termination.

432)    Mr. Walker remains at risk of the future loss of TennCare coverage, so long as TennCare remains incapable of reliably maintaining the coverage of individuals, like Mr. Walker, who are receiving SSI. The risk is compounded by the state's use of an unnecessarily

99

burdensome eligibility redetermination process that Mr. Walker, due to his disabilities, is incapable of completing, and by the state's failure to reasonably accommodate disabilities. In the event of another erroneous termination of his coverage, the state's failure to reliably administer a fair and effective appeal process leaves him without effective recourse. Even temporary interruption of his TennCare coverage subjects Mr. Walker to the threat of irreparable harm to his health and safety, as a result of his inability to afford vitally necessary medical care.

### Plaintiff Class & Subclass

*Definitions of Plaintiff Class and Subclass*

433)     The named Plaintiffs bring this action on behalf of a Plaintiff class of all persons similarly situated. The Plaintiff Class comprises all individuals who meet the eligibility criteria for TennCare coverage and who, since March 19, 2019, have been or will be disenrolled from TennCare. The class excludes individuals, and the parents and legal guardians of individuals, who requested withdrawal from the TennCare program.

434)     Plaintiffs S.F.A., Vivian Barnes, S.L.C., Charles E. Fultz, Michael S. Hill, William C. Monroe, Linda Rebeaud and Johnny Walker assert additional claims on behalf of a subclass, referred to hereafter as the Disability Subclass. The Disability Subclass is defined as: Plaintiff Class members who are "qualified individuals with a disability" as defined in 42 U.S.C. § 12131(2). They seek certification of the subclass in order to assert claims available to persons with disabilities.

*Numerosity*

435)     The Plaintiff Class and Disability Subclass each satisfy the requirement of Fed. R. Civ. P. 23(a)(1), because although the precise size of each is unknown to Plaintiffs, each numbers in the thousands, making joinder impracticable. According to public reports:

100

a)  TennCare monthly reports show declines in enrollment from the prior month in August, October, November, and December 2019 and February 2020, totaling an enrollment decline of 10,886.[3]

b)  Since any reduction in the monthly reports is net of new enrollments, the total number of enrollees who lost their coverage during that period is significantly larger.

c)  TennCare's records include a description of the reason enrollees lost coverage, but that information is not made publicly available in the monthly reports.

d)  An audit of TennCare terminations for children who lost coverage between January 1, 2016 and May 31, 2019 revealed that 14% of individuals voluntarily requested to be removed from TennCare coverage. Of children whose parents or legal guardians did not request to be removed, the largest categories were people who did not respond to the redetermination packet or provide requested information. The audit does not explain why the individual did not respond. The audit reports that approximately 65% of children who lost coverage either did not respond to the renewal packet or failed to provide information requested by TennCare.[4]

---

[3] *Enrollment Data*, TennCare, https://www.tn.gov/tenncare/information-statistics/enrollment-data.html (last visited Mar. 17, 2020).
[4] Tenn. Comptroller, *Performance Audit Report, Special Project: Division of TennCare's Redetermination Process and the Impact on Children's Enrollment*, 9 (Feb. 2020), https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2020/pa19095.pdf (Table 1).

101

e) Applying the 14% ratio of voluntary terminations to the net enrollment declines between March 2019 and February 2020, the number of individuals who lost coverage voluntarily is 1,524, leaving 9,362 enrollees involuntarily terminated.

f) Applying the 65% ratio, the number of individuals who lost coverage for failure to respond to the renewal packet or provide requested information between March 2019 and February 2020 is still 7,076.

436) The Disability Subclass exceeds 2,000 people, making joinder of all its members impracticable. Publicly available data on the numbers of people disenrolled do not break out the number who are people with disabilities. However, people with disabilities comprise a large enough part of the TennCare population that it can be reasonably inferred that the number of people with disabilities who have been disenrolled or are at risk of future disenrollment is too large to permit joinder:

a) TennCare's Quarterly Report for April to June 2019—the most recent quarterly report publicly available—documents a 3,414 net decline in enrollment among "Disabled, Type 1 State Plan eligibles" from the first quarter of 2019 (January-March) and the second quarter (April-June).[5] This group includes Medicaid enrollees of any age who have qualified for Medicaid on the basis of disability but

_____

[5] TennCare II, *Section 1115 Quarterly Report (For the Period April-June 2019)*, 2 (Aug. 2019), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/tn/TennCare-II/tn-tenncare-ii-qtrly-rpt-apr-jun-2019.pdf (Table 2).

who are not eligible for Medicare, including individuals receiving SSI (but not Medicare) and individuals enrolled in the CHOICES program.[6]

b) Since any reduction in the monthly reports is net of new enrollments, the total number of enrollees in this group who lost their coverage during that period is significantly larger.

c) Applying the 14% voluntary disenrollment ratio from the TennCare audit to this group, the number of individuals who voluntarily disenrolled is 478, leaving 2,936 who were involuntarily disenrolled.

d) Applying the 65% ratio, for people who failed to return a redetermination packet or provide missing information, to this group, the number of individuals who were disenrolled is 2,219.

e) In addition, individuals enrolled in other Medicaid eligibility categories may be part of the Disability Subclass. For instance, the Tennessee General Assembly's Fiscal Review Committee estimated in a February 2018 report that 11.2% of adults under age 65 who receive TennCare as caretaker relatives of minor children are themselves disabled.[7] Individuals in these categories who lose coverage without requesting to be removed are also in the Disability Subclass.

---

[6] *See* TennCare II Medicaid Section 1115 Demonstration, Special Terms and Conditions, 56, ¶ 56(a)(i) (Dec. 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/tn/tn-tenncare-ii-ca.pdf (Special Terms and Conditions begin on p. 10 of the PDF); "Declaration of Patti Killingsworth", filed March 15, 2018, Doc. 48, *Roan v. Long*, No. 3:17-cv- 01588 (M.D. Tenn.) https://www.govinfo.gov/content/pkg/PLAW-111publ148/pdf/PLAW-111publ148.pdf.
[7] Tenn. Gen. Assembly Fiscal Rev. Comm., *Fiscal Note HB 1551 – SB 1728*, 2 (Feb. 12, 2018), http://www.capitol.tn.gov/Bills/110/Fiscal/HB1551.pdf .

437)    The Plaintiff Class and Disability Subclass each satisfy the requirement of Fed. R. Civ. P. 23(a)(2). The named Plaintiffs raise claims based on questions of law and fact that are common to the Plaintiff Class and subclass they represent.

<u>Common Issues of Law</u>

438)    Questions of law that are common to the Plaintiff Class as a whole include:

a)    Whether Defendant's failure to provide enrollees accurate, adequate, and timely notice of their rights and responsibilities related to maintaining their TennCare coverage violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1396a(a)(3) and its implementing regulations; and

b)    Whether the Defendant's failure or refusal to provide enrollees a right to pre-deprivation fair hearings to contest the termination of their TennCare coverage violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1396a(a)(3) and its implementing regulations.

c)    Whether Defendant's termination of coverage without considering whether enrollees are eligible for all categories of Medicaid eligibility violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1396a(a)(3) and its implementing regulations.

439)    Questions of federal law that are common to the Disability Subclass include:

a)    Whether the Defendant's methods of administering the TennCare eligibility redetermination process violate the ADA., 42 U.S.C. § 12132, and its

104

implementing regulations, including specifically 28 C.F.R. §§ 35.130(b)(1)(vii), 35.130(b)(3)(ii) and 35.130(b)(8);

b)  Whether the Defendant's methods of administering the TennCare eligibility appeal process violate the ADA, 42 U.S.C. § 12132 and its implementing regulations, including specifically 28 C.F.R. §§ 35.130(b)(1)(vii), 35.130(b)(3)(ii) and 35.130(b)(8);

c)  Whether the Defendant's failure to provide an adequate reasonable-accommodation system for persons with disabilities as necessary to enable them to successfully complete the eligibility redetermination process and preserve their eligibility for TennCare coverage, violates the ADA, 42 U.S.C. § 12132 and its implementing regulations, including specifically 28 C.F.R. § 35.130(b)(7); and

d)  Whether the Defendant's failure to provide an adequate reasonable-accommodation system for persons with disabilities as necessary to afford them effective notice and a fair hearing to appeal the termination of TennCare eligibility, violates the ADA, 42 U.S.C. § 12132 and its implementing regulations, including specifically 28 C.F.R. § 35.135(b)(7).

e)  Whether the Defendant's failure to o provide an adequate reasonable-accommodation system for persons with disabilities as necessary to afford them effective notice and a fair hearing to appeal the termination of TennCare eligibility, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

440)     A question of law common to the Plaintiff Class and Disability Subclass is whether injunctive and declaratory relief are appropriate to remedy each of the violations of which the Plaintiffs complain.

<u>Common Issues of Fact</u>

441)     Questions of fact common to the Plaintiff Class include:

a)   Whether Defendant, before terminating enrollees' TennCare coverage, considers an enrollees' eligibility in all coverage categories for which they are potentially eligible;

b)   Whether Defendant, in determining whether enrollees remain eligible for TennCare, has in place a system that ensures consideration of all reliable information available in its own files or available from state or federal records, including records of the state's own Supplemental Nutrition Assistance Program ("SNAP," formerly known as "food stamps") and its Women, Infants and Children (WIC) nutrition program;

c)   Whether Defendant's rules, public announcements and template notices misinform enrollees regarding their rights and responsibilities to maintain coverage while they pursue a fair hearing.

d)   Whether the presence of a notice in TEDS is an accurate indication that a notice was sent to an enrollee at the correct address.

e)   Whether Defendant's record management system fails to reliably process information and materials submitted by or on behalf of TennCare enrollees for purposes of establishing or maintaining their coverage.

106

f) Whether Defendant fails to reliably maintain coverage for enrollees who timely appeal the termination of their TennCare coverage and who request the continuation of benefits pending appeal.

g) Whether Defendant subjects TennCare eligibility appeals to a review process that results in the denial of hearings in circumstances other than when the sole issue is a federal or state law requiring an automatic change adversely affecting some or all beneficiaries.

442) Additional questions of fact common to the Disability Subclass include:

a) Whether Defendant's methods of administering the TennCare eligibility redetermination process tend to screen out qualified persons with disabilities or have the effect of defeating or substantially impairing accomplishment of the objectives of the TennCare program by:

i) relying on an eligibility determination system that does not reliably screen for categories of eligibility related to disability status, thereby terminating enrollees who should be eligible under disability-related categories of eligibility; and

ii) employing notices that are unnecessarily complex or difficult to understand, thereby impeding the ability of persons with disabilities to effectively and timely meet the requirements of the redetermination process;

iii) imposing burdensome demands that individuals submit information or documentation that is either irrelevant or already available to the state, and then terminating coverage for eligible individuals who fail to meet such demands, thereby disadvantaging eligible individuals whose disabilities make

107

it difficult or impossible for them to understand and/or respond in a timely and effective manner.

b) Whether Defendant's methods of administering the TennCare appeal process tend to screen out qualified persons with disabilities or have the effect of defeating or substantially impairing accomplishment of the objectives of the TennCare program by demanding that enrollees submit documentation or information in order to justify a fair hearing, resulting in the denial of appeals and an opportunity to prevent or correct the wrongful deprivation of coverage for eligible persons whose disabilities prevent them from meeting Defendant's demands.

c) Whether Defendant has in place a reasonable accommodation system for persons with disabilities to, as necessary, enable them to successfully complete the eligibility redetermination process and preserve their eligibility for TennCare coverage.

d) Whether Defendant is failing to provide an adequate reasonable accommodation system for persons with disabilities as necessary to ensure they receive meaningful notice of their rights and responsibilities affecting their TennCare eligibility, and to receive a fair hearing before termination of their TennCare coverage.

e) Whether Defendant otherwise limits eligible enrollees with disabilities in their enjoyment of the right to receive TennCare coverage.

*Typicality of Claims and Defenses*

443) The Plaintiff Class and Disability Subclass satisfy the requirements of Fed. R. Civ. P. 23(a)(3). The claims of the Plaintiffs are typical of those asserted on behalf of the

108

Plaintiff Class. Because the Plaintiffs and the class challenge a common set of state policies and practices, it is anticipated that Defendant will assert similar defenses as to all of the individual Plaintiffs and class members.

444) The claims of plaintiffs S.L.C., Charles E. Fultz, Michael S. Hill, William C. Monroe, Linda Rebeaud, and Johnny L. Walker are typical of those asserted on behalf of the Disability Subclass. Because those plaintiffs and the subclass challenge a common set of state policies and practices as they affect people with disabilities, it is anticipated that the Defendant will assert similar defenses as to the Disability Subclass and the individual Plaintiffs who represent the Subclass.

### Adequate Representation of Class

445) The Plaintiffs satisfy the requirement of Fed. R. Civ. P. 23(a)(4), because they will fairly and adequately protect the interests of the class and subclass they represent. The Plaintiffs are represented by attorneys from the Tennessee Justice Center and the National Health Law Program. Each firm has extensive experience in complex class action litigation involving health care and civil rights law. Counsel have the resources, expertise and experience to prosecute this action. Counsel know of no conflict among members of the class.

### Appropriateness of Declaratory and Injunctive Relief
### Under Fed. R. Civ. P. 23(b)(2)

446) The Defendant has failed or refused to act and continue to fail or refuse to act on grounds generally applicable to the Plaintiff Class and the Disability Subclass, making declaratory and injunctive relief with respect to the Class and Subclass as whole appropriate and necessary. The systemic nature of the violations complained of here is such that, absent systemic relief designed to protect all Plaintiff Class members, it is impossible to adequately protect the

rights of any single plaintiff. Likewise, the Plaintiffs representing the Disability Subclass cannot adequately protect their own rights without obtaining systemic relief that effectively protects all members of the subclass they represent.

## CLAIMS FOR RELIEF

### First Cause of Action:
### Due Process Provisions of the Medicaid Act, 42 U.S.C. § 1396a(a)(3)

447)    The Medicaid Act requires all state programs to "provide for granting an opportunity for a fair hearing before the state agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3). Implementing regulations require the state to accurately inform enrollees of their rights and responsibilities with respect to their Medicaid eligibility, and to provide enrollees adequate notice and an opportunity for a hearing and timely decision before terminating their coverage.

448)    By the acts and omissions complained of in Paragraphs 1) through 446) above, the Defendant has systematically failed, and continues to fail, to:

    a)  Determine eligibility for Medicaid without substantial risk of erroneous deprivation of Medicaid coverage;

    b)  Provide timely, effective notice of the basis for the agency's decision or enrollees' rights and responsibilities pertaining to their TennCare coverage; or

    c)  Provide an opportunity for a fair hearing and timely corrective action as needed prior to the termination of TennCare coverage, all in violation of 42 U.S.C. § 1396a(a)(3).

110

449)     Relief is sought on this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of their federal statutory rights by persons acting under color of state law.

### Second Cause of Action:
### Procedural Protections under the Due Process Clause

450)     The Due Process Clause of the Fourteenth Amendment of the United States Constitution bars the state from depriving a person of her property, which includes TennCare coverage, without affording the individual advance notice and a fair opportunity to be heard.

451)     By the acts and omissions alleged in Paragraphs 1) - 449), above, the Defendant has deprived, and continues to deprive, the Plaintiffs of due process of law in violation of the Fourteenth Amendment by:

   a) Creating a substantial risk of erroneous deprivation of Medicaid coverage;

   b) Failing to provide timely, effective notice of the basis for the agency's decision or enrollees' rights and responsibilities pertaining to their TennCare coverage; or

   c) Failing to provide an opportunity for a fair hearing and timely corrective action as needed prior to the termination of TennCare coverage, all in violation of 42 U.S.C. § 1396a(a)(3).

Plaintiffs and class members seek relief on this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of their constitutional rights by persons acting under color of state law.

### Third Cause of Action:
### Americans with Disabilities Act

452)     Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

111

services, programs, or activities of a public entity, or be subjected to discrimination by such an entity. 42 U.S.C. § 12132.

453) Plaintiffs, S.F.A., Vivian Barnes, S.L.C., Charles E. Fultz, Michael S. Hill, William C. Monroe, Linda Rebeaud and Johnny Walker are each qualified individuals with a disability, as defined in 42 U.S.C. § 12131(2).

454) Defendant is a "public entity" subject to compliance with Title II of the ADA, as defined in 42 U.S.C. § 12131(1).

455) The ADA and its implementing regulations promulgated by the U.S. Department of Justice pursuant to the Congressional mandate contained in 42 U.S.C. § 12134(a), include requirements that (1) a public entity, in providing any aid, benefit, or service, may not on the basis of disability deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service  or provide such individual with a service or benefit that is not as effective as that provided to others; and (2) a public entity may not subject qualified individuals with a disability to discrimination on the basis of disability or defeat or impair the accomplishments of the public entity's program with respect to an individual with disabilities. 28 C.F.R. § 35.130(a), (b)(1)(i)–(iii).

456) The ADA and implementing regulations further require a public entity to (1) make reasonable modifications in policies, practices, or procedures as necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity; and (2) not impose or apply eligibility criteria that screen out an individual with a disability from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be

necessary for the provision of the service, program, or activity being offered. 28 C.F.R. §
35.130(b)(7)(i), (b)(8).

457)    Title II of the ADA and implementing regulations further mandate that a public
entity may not, directly or through contractual or other arrangements, utilize criteria or methods
of administration: that (i) have the effect of subjecting qualified individuals with disabilities to
discrimination on the basis of disability; or (ii) have the purpose or effect of defeating or
substantially impairing accomplishment of the objectives of the public entity's program with
respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3)(i),(ii).

458)    By the acts and omissions complained of in Paragraphs 1) through 457), above,
the Defendant has implemented processes and methods of administration for the redetermination
of TennCare eligibility, and for the administration of the redetermination and eligibility appeal
process, that systemically:

a)  tend to screen out people with disabilities who are eligible for TennCare from the
program;

b)  tend to screen out qualified persons with disabilities by making it difficult or
impossible for them to maintain their coverage through the eligibility
redetermination process;

c)  tend to screen out qualified persons with disabilities by making it difficult or
impossible to obtain a pre-termination hearing to contest the termination of their
eligibility;

d)  fail to accommodate qualified TennCare enrollees' disabilities in the form of
assistance needed to successfully complete the eligibility redetermination process

113

and maintain their TennCare coverage and to effectively exercise their due process rights to contest the wrongful denial or termination of TennCare coverage; and

e) thereby deny qualified persons with disabilities the ability to receive TennCare services and defeat the objectives of those programs with respect to individuals with disabilities.

459) By those acts and omissions, the Defendant violates the rights of members of the Disability Subclass under the ADA and its implementing regulations, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b). The members of the Disability Subclass are therefore entitled to appropriate relief pursuant to 28 U.S.C. § 12133.

460) By those acts and omissions, the Defendant violates the rights of members of the Disability Subclass under the ADA and its implementing regulations, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b). The members of the Disability Subclass are therefore entitled to appropriate relief pursuant to 28 U.S.C. § 12133.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

C. Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) with respect to the proposed Plaintiff Class and Disability Subclass;

D. Enter a declaratory judgment, in accordance with 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring that the Defendant has violated and continues to violate Plaintiffs' and Plaintiff class members' rights under federal law; and

E. Grant the Plaintiffs injunctive relief:

1. prohibiting the Defendant from terminating TennCare coverage of Plaintiff Class members unless and until the Defendant has considered all potential coverage for

which they may be eligible, and only after giving enrollees advance individualized written notice and an opportunity to appeal.

2. requiring the Defendant to prospectively reinstate TennCare coverage of the Plaintiff Class members until such time as the state determines that enrollees are in fact no longer eligible, based on a redetermination process that reliably complies with the Medicaid Act, Due Process Clause, 42 U.S.C. § 1396a(a)(3) and the ADA; and

F. Retain jurisdiction over this action to ensure Defendant's compliance with the mandates of the Court's Orders;

G. Award reasonable attorneys' fees and costs as provided by 42 U.S.C. §§ 1988 and 12133 and 29 U.S.C. § 794a.; and

H. Order such other, further or additional relief as the Court deems equitable, just and proper.

DATED this 19th day of March, 2020.

Respectfully submitted,

 /s/Catherine Millas Kaiman
*On Behalf of Counsel for Plaintiffs*

Michele Johnson TN BPR 16756
Gordon Bonnyman, Jr. TN BPR 2419
Catherine Millas Kaiman, FL Bar 117779
Vanessa Zapata, TN BPR 37873
Laura Revolinski, TN BPR 37277
TENNESSEE JUSTICE CENTER
211 7th Avenue North, Suite 100
Nashville, Tennessee 37219
Phone: (615) 255-0331
FAX: (615) 255-0354
mjohnson@tnjustice.org
gbonnyman@tnjustice.org
ckaiman@tnjustice.org

115

vzapata@tnjustice.org
lrevolinski@tnjustice.org

Jane Perkins (*pro hac vice pending*)
Elizabeth Edwards (*pro hac vice pending*)
Sarah Grusin (*Pro hac vice pending*)
National Health Law Program
200 N. Greensboro St., Ste. D-13
Carrboro, NC 27510
(919) 968-6308
perkins@healthlaw.org
edwards@healthlaw.org
grusin@healthlaw.org

**Attorneys for Plaintiffs**