**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | |
|---|---|
| A.M.C., by her next friend, C.D.C.,et al., | |
| Plaintiffs, | Civil Action No.3:20-cv-00240 |
| v. | Class Action |
| STEPHEN SMITH, in his official capacity as Deputy Commissioner of Finance and Administration and Director of the Division of TennCare, | Judge Crenshaw<br>Magistrate Newbern |
| Defendant. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
OR IN THE ALTERNATIVE CLASS DISCOVERY**</u>

Date: March 27, 2020

Michele Johnson TN BPR 16756
Gordon Bonnyman, Jr. TN BPR 2419
Catherine Millas Kaiman, FL Bar 117779
Vanessa Zapata, TN BPR 37873
Laura Revolinski, TN BPR 37277
TENNESSEE JUSTICE CENTER
211 7th Avenue North, Suite 100
Nashville, Tennessee 37219
Phone: (615) 255-0331
FAX: (615) 255-0354
gbonnyman@tnjustice.org
ckaiman@tnjustice.org

Jane Perkins (*pro hac vice pending*)
Elizabeth Edwards (*pro hac vice pending*)
Sarah Grusin (*pro hac vice pending*)
National Health Law Program
200 N. Greensboro St., Ste. D-13
Carrboro, NC 27510
(919) 968-6308
perkins@healthlaw.org
edwards@healthlaw.org

*Attorneys for Plaintiffs*

## Table **of** Contents

PRELIMINARY STATEMENT ..................................................................................................1

THE PROPOSED PLAINTIFF CLASS AND DISABILITY SUBCLASS ...................................2

FACTUAL BACKGROUND ...................................................................................................3

I.      The Federal Medicaid Program ...................................................................................3

II.     TennCare's Redetermination Process ...........................................................................5

III.    TennCare's Redetermination of Plaintiffs' Coverage....................................................7

LEGAL STANDARD ...........................................................................................................12

ARGUMENT ........................................................................................................................13

I.      The Proposed Plaintiff Class and Disability Subclass Satisfy the Requirements of
        Rule 23(a) ................................................................................................................13

        A.      Numerosity ...............................................................................................13

        B.      Commonality.............................................................................................16

        C.      Typicality..................................................................................................21

        D.      Adequacy of Representation ......................................................................23

II.     The Proposed Plaintiff Class and Disability Subclass Satisfy the Requirements of
        Rule 23(b)................................................................................................................23

III.    In the Alternative, the Court Should Allow Plaintiffs to Conduct Class Discovery..........25

CONCLUSION......................................................................................................................25

# Table of Authorities

**Cases**

*Atkins v. Rivera*,
    477 U.S. 154 (1986).............................................................................................3

*Barry v. Corrigan*,
    79 F. Supp. 3d 712 (E.D. Mich. 2015)..........................................................18

*Beattie v. CenturyTel, Inc.*,
    511 F.3d 554 (6th Cir. 2007)..........................................................................12

*Brooklyn Center for Independence of the Disabled v. Bloomberg*,
    290 F.R.D. 409 (S.D.N.Y. 2012)...................................................................21

*Brown v. Giuliani*,
    158 F.R.D. 251 (E.D.N.Y. 1994) ...................................................................18

*Caballero by Tong v. Senior Health Partners, Inc.*,
    No. 16 CV 0326 (CLP), 2018 WL 4210136 (E.D.N.Y. Sept. 4, 2018) ..............18

*Carr v. Wilson-Coker*,
    203 F.R.D. 66 (D. Conn. 2001) .....................................................................22

*Castillo v. Envoy Corp.*,
    206 F.R.D. 464 (M.D. Tenn. 2002).................................................................13

*City of Goodlettsville v. Priceline.com, Inc.*,
    267 F.R.D. 523 (M.D. Tenn. 2010)................................................................13

*Cole v. City of Memphis*,
    839 F.3d 530 (6th Cir. 2016).........................................................................24

*Crippen v. Kheder*,
    741 F.2d 102 (6th Cir. 1984)...........................................................................4

*Daffin v. Ford Motor Co.*,
    458 F.3d 549 (6th Cir. 2006).........................................................................13

*Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*,
    239 F.R.D. 9 (D.D.C. 2007) ..........................................................................18

*Dodson v. CoreCivic*,
    No. 3:17-cv-00048, 2018 WL 4776081 (M.D. Tenn. Oct. 3, 2018) ...................24

*Dozier v. Haveman*,
    No. 2:14-CV-12455, 2014 WL 5483008 (E.D. Mich. 2014) ................. 18, 19, 22

iii

*French v. Essentially Yours Indus., Inc.*,
  1:07-CV-817, 2008 WL 2788511 (W.D. Mich. July 16, 2008) .........................................16

*General Telephone Company of the Southwest v. Falcon*,
  457 U.S. 147 (1982).............................................................................................................22

*Gooch v. Life Inv'rs Ins. Co. of Am.*,
  672 F.3d 402 (6th Cir. 2012) ..............................................................................................24

*Graham v. Parker*,
  No. 3–16–cv–01954, 2017 WL 1737871 (M.D. Tenn. May 4, 2017) ...............................24

*Hamby v. Neel*,
  368 F.3d 549 (6th Cir. 2004) ................................................................................................5

*Henrietta D. v. Giuliani*,
  No. 95 CV 0641 (SJ), 1996 WL 633382 (E.D. N.Y. Oct. 25, 1996)..................................25

*In re Am. Med. Sys., Inc.*,
  75 F.3d 1069 (6th Cir. 1996) ......................................................................... 12, 13, 14, 17

*In re D.C.*,
  792 F.3d 96 (D.C. Cir. 2015)..............................................................................................17

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*,
  722 F.3d 838 (6th Cir. 2013) .................................................................................. 13, 17, 21

*K.W. ex rel. D.W. v. Armstrong*,
  298 F.R.D. 479 (D. Idaho 2014) .........................................................................................17

*K.W. ex rel. D.W. v. Armstrong*,
  789 F.3d 962 (9th Cir. 2015) ..............................................................................................17

*M.K.B. v. Eggleston*,
  445 F. Supp. 2d 400 (S.D.N.Y. 2006).................................................................................18

*Mays v. Tenn. Valley Auth.*,
  274 F.R.D. 614 (E.D. Tenn. May 10, 2011) .......................................................................16

*McDonald v. Heckler*,
  612 F. Supp. 293 (D. Mass. 1985) ......................................................................................16

*Miller v. Mackey Int'l.*,
  452 F.2d 424 (5th Cir. 1971) ..............................................................................................12

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  132 S. Ct. 2566 (2012)...........................................................................................................3

iv

*Powers v. Hamilton County Public Defender Comm'n*,
    501 F.3d 592 (6th Cir. 2007) ...................................................................17

*Price v. Medicaid Director*,
    310 F.R.D. 345 (S.D. Ohio 2015) ............................................................18

*Raymond v. Rowland*,
    220 F.R.D. 173 (D. Conn. 2004) ..............................................................25

*Reynolds v. Giuliani*,
    118 F. Supp. 2d 352 (S.D.N.Y. 2000) .....................................................18

*Rikos v. Proctor & Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015) ...................................................................13

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) .....................................................................16

*Roman v. Korson*,
    152 F.R.D. 101 (W.D. Mich. 1993) .........................................................13

*Rutherford v. City of Cleveland*,
    137 F.3d 905 (6th Cir. 1998) ...................................................................23

*S.R., by & through Rosenbauer v. Pennsylvania Dep't of Human Servs.*,
    325 F.R.D. 103 (M.D. Pa. 2018) .............................................................18

*Senter v. Gen. Motors Corp.*,
    532 F.2d 511 (6th Cir. 1976) ..............................................................13, 24

*Sprague v. Gen. Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) ...........................................................12, 17, 22

*Stout v. J.D. Byrider*,
    228 F.3d 709 (6th Cir. 2000) ...................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ........................................................................16, 22

*Weathers v. Peters Realty Corp.*,
    499 F.2d 1197 (6th Cir. 1974) .................................................................12

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ............................................................. passim

*Youngblood v. Linebarger Googan Blair & Sampson, LLP*,
    No. 10-2304, 2012 U.S. Dist. LEXIS 142792 (W.D. Tenn. Sept. 20, 2012) ..............14, 15

v

## Statutes

42 U.S.C. § 12131 ................................................................................................................3

42 U.S.C. § 1396 ...................................................................................................... 3, 4, 5, 19

## Rules

42 C.F.R. § 431.205 .............................................................................................................5

42 C.F.R. § 431.244 .............................................................................................................5

42 C.F.R. § 431.916 .............................................................................................................4

42 C.F.R. § 435.905 ..........................................................................................................4, 5

42 C.F.R. § 435.907 .............................................................................................................4

42 C.F.R. § 435.908 .............................................................................................................4

42 C.F.R. § 435.916 ..........................................................................................................4, 5

42 C.F.R. § 435.930 .............................................................................................................4

42 C.F.R. § 435.948 .............................................................................................................4

Fed. R. Civ. P. 23 .......................................................................................................... passim

## Treatises

5 *Newberg on Class Actions*, § 23.04 (3d ed. 1992) .......................................................22

Tenn. Pub. Acts of 1968, Chapter 551 ...............................................................................3

Pursuant to Federal Rule of Civil Procedure 23, K.A., J.Y., S.F.A., C.A., Vivian Barnes, A.M.C., C.D.C., Carlissa Caudill, Rhonda Cleveland, S.L.C., C.B.C., D.D., T.E.W. D.D., S.D.W., Y.A.D., Z.M.D, X.M.D., Charles E. Fultz, Mary Fultz, Michael S. Hill, Kimberly Noe, J.S.K., J.C.K., M.S.K., D.C.S., E.I.L., J.N.L., William C. Monroe, Linda Rebeaud, James Rebeaud, D.R., J.Z., M.X.C., J.C., M.A.C., T.J.T., S.L.T., A.L.T., J.L.T., Kerry A. Vaughn, Johnny L. Walker and Paige Walker (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for class certification. This motion is opposed by the Defendant through its counsel, Ms. Carolyn Reed, and Defendants will seek additional time to respond.

## PRELIMINARY STATEMENT

This lawsuit challenges Tennessee's practice of systematically and wrongfully depriving poor children and adults of vitally necessary Medicaid coverage in violation of the Medicaid Act, the Americans with Disabilities Act, and the Constitution of the United States. Tennesseans can qualify for Tennessee's Medicaid program, known as TennCare, under nearly twenty different categories of eligibility and enrollees' entitlement to coverage is reevaluated and renewed (or "re-determined") on an annual basis. Since March 19, 2019, TennCare's eligibility and redetermination system (called "TEDS") has utterly failed to accurately evaluate eligibility and properly notify TennCare enrollees when and why their coverage is being terminated or to provide them with a fair hearing to reestablish their eligibility.

Plaintiffs, like thousands of other Tennessee residents, had their TennCare coverage terminated unfairly and did not receive fair notice or a hearing. A defective redetermination process was the common source of this harm because, among other things, it (i) failed to consider whether plaintiffs fit within the entire universe of eligibility categories that would maintain their coverage, (ii) provided inaccurate and insufficient information to plaintiffs regarding why their coverage were being terminated, and (iii) failed to provide a process whereby residents could fairly and promptly receive a hearing to challenge their termination.

1

Worse, the TennCare redetermination process visits greater harm upon individuals with disabilities, who are often unable to promptly advocate for themselves and are in particular need of the coverage TennCare should be providing to them. TennCare's redetermination system screens out people with disabilities who should be eligible because it does not evaluate enrollees' eligibility in several disability-based eligibility categories prior to termination. Moreover, TennCare uses processes that impede enrollee's ability get the assistance necessary to navigate the complex redetermination process. These failures violate not only the Medicaid Act and the Due Process Clause of the Fourteenth Amendment, but also the Americans with Disabilities Act that requires public entities (such as TennCare) to employ measures specifically for the benefit of individuals with disabilities.

Plaintiffs seek injunctive and declaratory relief to remedy these harms to the thousands of individuals who have lost coverage in the last year, and who will continue to suffer as long as TennCare's redetermination process continues to erroneously deprive Medicaid coverage without adequate notice or opportunity for a hearing. Because this relief will equally benefit all TennCare enrollees who lose coverage across the state as a result of faults in TEDS and TennCare's policies and practices, class certification is appropriate and should be granted. To the extent that the Court is skeptical of plaintiffs' ability to satisfy Rule 23 on the present record, plaintiffs request that the Court grant limited discovery for the purposes of class certification and leave to amend this motion.

## THE PROPOSED PLAINTIFF CLASS AND DISABILITY SUBCLASS

Plaintiffs seek certification of one class and one subclass: the Plaintiff Class and the Disability Subclass.

The Plaintiff Class asserts claims under the Medicaid Act and Due Process Clause. The Plaintiff Class will be represented by all of the Plaintiffs named above. The proposed definition of the Plaintiff Class is:

All individuals who meet the eligibility criteria for TennCare cover-
age and who, since March 19, 2019, have been or will be disenrolled
from TennCare. The class excludes individuals, and the parents and
legal guardians of individuals, whose termination is due to a re-
quested withdrawal from the TennCare program.

In addition, some members of the Plaintiff Class assert claims under the Americans with

Disabilities Act. Plaintiffs S.L.C., Charles E. Fultz, Michael S. Hill, William C. Monroe, Linda

Rebeaud and Johnny Walker seek to represent this Disability Subclass. The proposed definition of

the Disability Subclass is:

Plaintiff Class members who are "qualified individuals with a disa-
bility" as defined in 42 U.S.C. § 12131(2).

## FACTUAL BACKGROUND

### I.       The Federal Medicaid Program

The federal Medicaid program is "designed to provide medical assistance to persons whose

income and resources are insufficient to meet the costs of necessary care and services." *Atkins v.*

*Rivera*, 477 U.S. 154, 156 (1986). Though Medicaid participation is voluntary, states who elect to

accept federal Medicaid funds must comply with requirements imposed by federal law. *Nat'l*

*Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2581 (2012); *Atkins*, 477 U.S. at 157. Tennessee

has participated in Medicaid continuously since 1968, *see* Tenn. Pub. Acts of 1968, Chapter 551,

and presently operates a demonstration program called TennCare. Every "State plan for medical

assistance must" establish or designate "a single State agency to administer or to supervise the

administration of the plan . . . ." 42 U.S.C. § 1396a(a)(5).

To enroll in Medicaid, individuals must meet specific eligibility criteria. First, they must

meet "categorical eligibility" requirements by showing that they are aged, blind, disabled or preg-

nant, or that they are children or parents of dependent children. 42 U.S.C. §§ 1396a(a)(10)(A). They

must also show that their income is below certain limits, which vary depending on the categorical

eligibility group to which they belong. *Id.*; *see also* 42 U.S.C. § 1396a(e)(14) (describing income

3

eligibility based on modified adjusted gross income). A few categorical eligibility groups must meet additional limits on the amount of resources, or assets an individual may own. *See, e.g.*, 42 U.S.C. §§ 1396a(a)(10)(A)(ii)(XV), (XVI); 1396a(r).

Federal regulations require that Medicaid eligibility for all beneficiaries be reevaluated, or "redetermined" every 12 months. 42 C.F.R. § 435.916. States must redetermine eligibility *without* requiring information from an individual if the state possesses or can access reliable information in its own or federal records. 42 C.F.R. §§ 435.916(a)(2), (b), 435.948; *Crippen v. Kheder*, 741 F.2d 102 (6th Cir. 1984). Furthermore, before Medicaid coverage is terminated, the state must determine the beneficiary to be ineligible under all Medicaid categories. 42 C.F.R. §§ 435.930(b), 431.916(f)(1). Therefore, states are prohibited from burdening individual Medicaid enrollees to justify their eligibility on an annual basis if the state already has relevant household income information in its own records. These include, for example, the Tennessee Department of Human Services' eligibility files for the Supplemental Nutrition Assistance Program (SNAP), the eligibility records of the Tennessee Department of Health's Women, Infants and Children (WIC) program, and state unemployment insurance records. The state is also obligated to use data available to it from a federal data hub, such as federal social security records and immigration files, that confirm that individuals still meet the requirements of any of the various eligibility categories.

If the state cannot renew eligibility based on available information, then it must provide the individual with a renewal form using plain language that is accessible to persons with disabilities. 42 C.F.R. §§ 435.905(b) and 435.916(g). The renewal form must be pre-populated with any information already available to the state, and the form may only ask for information necessary for the determination of eligibility. 42 C.F.R. §§ 435.916(a)(3), (e), 435.907(a). The state must accept the renewal information in person, online, by phone or by mail and must provide in-person assistance to individuals, including those with disabilities, who need help completing the redetermination process. 42 C.F.R. §§ 435.905, 435.908(a), 435.916.

4

States must timely notify individuals of its decision regarding eligibility. The notice must be provided in plain language and in a way that is accessible to individuals with disabilities. 42 C.F.R. §§ 435.905(b), 435.916(a)(3)(i)(C), 435.916(g). In addition, if the state terminates coverage as a result of the individual's failure to submit the renewal form or other information, the state must timely reconsider eligibility based on any information submitted within 90 days of the termination, without requiring a new application. 42 C.F.R. § 435.916(a)(3)(C)(iii).

The Medicaid statute also requires that the State "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3). This hearing and appeal process must satisfy the requirements of federal regulations and the Due Process Clause of the Constitution. 42 C.F.R. § 431.205; *Hamby v. Neel*, 368 F.3d 549, 559-60 (6th Cir. 2004). Within 90 days of an individual timely requesting an appeal, the state must provide the fair hearing and render a new decision. 42 C.F.R. § 431.244.

## II.    TennCare's Redetermination Process

Until 2014, individuals applied for TennCare in person at a Tennessee Department of Human Services office in the county where they lived, and a trained case manager helped them to compile and submit eligibility information and documentation. Compl. ¶ 67. In January 2014, the state transferred these functions from TDHS to TennCare. *Id.* ¶ 68. TennCare planned to use a computer system, TEDS, to perform the eligibility and redetermination process starting in 2014. *Id.* ¶ 69. But the system was not operable and, as part of federally approved mitigation plans, TennCare suspended all redeterminations from January 2014 through October 2015. *Id.* ¶ 70.

When TennCare restarted redeterminations, the process was plagued with errors. According to data provided by the state to the Plaintiffs' counsel in response to a request under the Tennessee Open Records Act, nearly a quarter million children, or 84.2% of the children considered

5

by Tennessee's Phase 3 redetermination process in 2017-2018, lost their coverage. Of those children terminated, more than two thirds (67.1%) were terminated because their parents or guardians allegedly failed to respond to requests for information. Compl. ¶ 76. In many instances, the failure to respond was actually due to the state's failure to notify the family that they needed to supply information. In other cases, families did respond but lost their coverage anyway because the state failed to process their responses. The state terminated coverage for failure to respond, regardless of whether documents available to the state already established the families' continuing eligibility.

Despite the state's assurances of TEDS' accuracy and reliability, systemic defects in the eligibility redetermination process continue to cause eligible enrollees to lose their TennCare coverage. TennCare's redetermination process is uniformly flawed because it does not consider whether enrollees are eligible under all categories. Compl. ¶¶ 87-91, 107. The particular failure to consider eligibility for categories of Medicaid coverage based on disability has the effect of screening out people with disabilities from receiving coverage to which they are entitled. *Id.* ¶¶ 87-91, 286-304, 371-92. TEDS also fails to use information collected by the state and federal governments regarding individuals' income, age, and disabilities that is at the agency's fingertips. *Id.* ¶¶ 81-83. The standardized notices generated by TEDS are inaccurate and misleading, request unnecessary and burdensome information, and fail to inform families of what they should do to maintain their TennCare coverage. *Id.* ¶¶ 84-92, 103-10. Moreover, TennCare has no reliable way of tracking whether notices were actually sent, or were sent to the correct address. *Id.* ¶¶ 93-97. And even when individuals receive and respond to requests for information, TennCare's record management system does not appropriately process what is sent. *Id.* ¶¶ 98-102. As a result, the TEDS system records a failure to respond to the request and subsequently terminates coverage for these people who did, in fact, attempt to comply. *Id.* ¶¶ 100.

Nor does TennCare have a system for providing in-person assistance to individuals whose coverage is being redetermined. *See Id.* ¶¶ 67-68. This is particularly harmful to individuals with

disabilities who require accommodations to comply with program requirements for additional information in order to retain their eligibility for coverage. *Id.* ¶¶ 122-29.

After wrongfully terminating enrollees' coverage, TennCare does not properly process or respond to requests from enrollees who want to appeal the result of the redetermination process and maintain their coverage pending the appeal. *Id.* ¶¶ 111-21. TennCare does not provide fair hearings before denying appeals. *Id.* Individuals are thus often left with no recourse for challenging the wrongful termination and no coverage when they attempt to access vital medical care.

These systemic flaws have caused Plaintiffs, the Plaintiff Class, and the Disability Subclass to lose Medicaid coverage to which they are entitled.

## III.    TennCare's Redetermination of Plaintiffs' Coverage

Named plaintiffs and proposed class representatives have all lost TennCare coverage under the TEDS system. Some of their stories are told in detail here to illustrate Defendant's harm to the proposed Plaintiff Class and Disability Subclass.

**Plaintiff A.M.C.**, is a three-year-old child with who lives with her mother, C.D.C. A.M.C. suffers from epilepsy and relies on daily and emergency medication. Compl. ¶ 133. In 2018, C.D.C. discovered that A.M.C. had lost her TennCare coverage when their pharmacy would not fill A.M.C.'s prescriptions. *Id.* ¶ 135-36. Within days, A.M.C. had a seizure and was hospitalized; only at this point did C.D.C. obtain help from a case-worker at the hospital to re-apply for TennCare coverage for A.M.C. *Id.* ¶ 137. The same thing happened again in September 2019, when C.D.C. learned that A.M.C.'s coverage was terminated only upon trying to obtain emergency medication from the pharmacy. *Id.* ¶ 139.

C.D.C. completed numerous TennCare applications, including a renewal packet for herself and A.M.C. in early 2019, as well as new applications for A.M.C. in August and September 2019. *Id.* ¶¶ 138, 143, 150. C.D.C. told TennCare she was not receiving notices of their repeated terminations of A.M.C.'s coverage, repeatedly requested appeals, and asked that A.M.C.'s benefits be

7

continued during those appeals. *Id.* ¶ 142-43. C.D.C. also regularly followed up with TennCare and was given a variety of inconsistent answers, including that A.M.C. was not eligible for coverage in any eligibility group and that C.D.C. had missed the deadline for continuing coverage. *Id.* Only after C.D.C. obtained help from the Houston County Health Department, C.D.C. to create an online account did she discover several notices that had purportedly been mailed to her, but which she never received. *Id.* ¶ 147-48.

After contacting TJC for help in February 2020, C.D.C. ultimately received two form notices approving A.M.C. for coverage from October 22, 2018 through November 17, 2019 and another approving coverage starting December 1, 2019. *Id.* ¶ 153-54. There was no explanation for the two-week gap in coverage. *Id.* ¶ 154. C.D.C. filed an appeal to correct the gap and is still awaiting a response. *Id.* ¶ 156. Meanwhile, the bills C.D.C. incurred during A.M.C.'s gap in coverage have been sent to collections. *Id.* ¶ 155.

**Plaintiff S.F.A.** is a one-year old child with spina bifida and hydrocephalus, which requires a shunt to drain fluid from her brain. *Id.* ¶ 177. She requires an MRI every month and, if her shunt malfunctions, immediate surgery to prevent brain damage or death. *Id.* In February 2019, S.F.A.'s mother, C.M.A. called the TennCare call center to report a new address and explain that her husband had changed jobs but that they were separating and he was no longer in the household. *Id.* ¶ 179. S.F.A. received a notice acknowledging the changes on April 15, 2019. *Id.* ¶ 180. TennCare then terminated S.F.A.'s coverage on July 23, 2019, and C.M.A. received no notice. *Id.* ¶¶ 181-82. C.M.A. only discovered the termination when S.F.A.'s healthcare provider called to cancel S.F.A.'s monthly MRI. *Id.* C.M.A. immediately called TennCare, explained she had not received a notice, requested an appeal and to continue S.F.A.'s benefits due to her urgent medical needs. *Id.* ¶ 182. TennCare lodged the appeal but did not continue S.F.A.'s benefits and never provided a fair hearing. *Id.* ¶ 183.

In August 2019, with help from TJC, C.M.A. created an online account, which showed six

8

notices purportedly sent to her, only one of which—the April 15, 2019 confirmation of change of address—she received. *Id.* ¶ 186-87. Another notice asked for updated information, to which C.M.A. could not respond until in September and October 2019, through TJC. *Id.* ¶ 189-90. TennCare did not reinstate coverage or provide a fair hearing.

In November 2019, S.F.A. was approved for Supplemental Security Income (SSI), making her automatically entitled to Medicaid through a second eligibility category. *Id.* ¶ 191. On November 8, 2019, 127 days after filing the first appeal, TennCare reinstated C.M.A.'s coverage. *Id.* ¶ 192. But on January 28, 2020, TennCare again terminated S.F.A.'s coverage without notice. *Id.* ¶ 193. TJC filed an appeal on S.F.A.'s behalf. *Id.* ¶ 195. TennCare later sent TJC a copy of a notice purportedly sent December 13, 2019 indicating that S.F.A.'s coverage in the SSI category would start January 4, 2020. *Id.* ¶ 196. That notice was never received and even TennCare's online records system does not reflect that it was sent. *Id.*

**Plaintiff Vivian Barnes**, a 74-year old widow, has been receiving TennCare for over 25 years because she is SSI-eligible. *Id.* ¶ 200. Although SSI eligibility has never changed, in June 2019, Ms. Barnes received two conflicting form notices from TennCare: one said that her application for TennCare was approved and that her application for the Medicare Savings Program (MSP) had been denied, the other said her TennCare coverage would end soon. *Id.* ¶ 202. The second notice also directed her to complete a questionnaire, which she promptly did. *Id.* ¶ 203. The questionnaire did not ask if she was receiving SSI. *Id.* TennCare terminated Ms. Barnes's coverage on August 12, 2019. *Id.* ¶ 206. Ms. Barnes received no notice of this, instead finding out from her medical provider in October 2019. *Id.* ¶ 204.

Ms. Barnes's daughter immediately contacted the TennCare call center to request an appeal. *Id.* ¶ 205. TennCare refused to lodge the appeal, stating that she had missed the deadline. *Id.* With TJC's help, Ms. Barnes's daughter later discovered in Ms. Barnes's online account a form

notice dated July 22, 2019 that had purportedly been mailed to Ms. Barnes, warning that her coverage would end August 12, 2019 due to an unidentified reported change in circumstances. *Id.* ¶ 206-07. In November 2019, Ms. Barnes's daughter again called TennCare, and was directed her to file a new application, which she submitted on November 15. *Id.* ¶ 208–10. Although SSI eligibility is sufficient to establish TennCare eligibility, TennCare requested detailed information about Ms. Barne's expenses, such as phone and utility bills, homeowner's insurance premiums, and life insurance policies. *Id.* ¶ 209. TennCare also requested proof that Ms. Barnes is Medicare-eligible, despite the fact that TennCare has been paying Ms. Barnes's Medicare premiums for years. *Id.* ¶ 211. Her daughter filed a delay-appeal when TennCare did not act on Ms. Barnes' application within 45 days. *Id.* ¶ 214. TennCare acknowledged the appeal, but sent a notice stating that TennCare had not yet decided whether to allow her appeal to go forward to a fair hearing. *Id*. Ms. Barnes never received a fair hearing.

TennCare sent a notice January 17, 2020 closing the appeal because it had decided her application, but it did not state what the decision was. *Id.* ¶ 216. Ms. Barnes later received a notice dated March 2, 2020 stating that TennCare approved her application for QMB, which provides only limited benefits, and denied her TennCare application. *Id.*

**Plaintiff K.A.,** an infant, was denied coverage for a period immediately following his birth in September 2019 through mid-October. *Id.* ¶ 160–63. His mother, J.Y. never received notice that TennCare had denied his coverage, finding out instead when she was confronted with a bill for $700 for an earlier appointment when she took K.A. to his doctor. *Id.* ¶ 164. J.Y. promptly appealed the denial by calling TennCare, but TennCare never processed the appeal. *Id.* ¶ 165. She called TennCare repeatedly over the next couple months, and in December 2019, was eventually told by a TennCare operator to submit a new application. *Id.* ¶ 166.

TennCare then terminated K.A.'s coverage altogether, which J.Y. learned when she took

10

K.A. to the emergency room on December 27, 2019. *Id.* ¶ 168. TennCare later sent a notice approving K.A.'s coverage retroactive to December 19, 2019, but still had not fixed the gap between September and October 2019. *Id.* ¶ 170. The notice did not explain why TennCare continued to deny coverage for that time period. *Id.* J.Y. attempted to file another appeal in January 2020, but has never received a hearing. *Id.* ¶ 172.

On March 2, 2020, J.Y. received a notice reinstating K.A.'s coverage back to September 20, 2019. *Id.* ¶ 174. J.Y. still owes $700 for K.A.'s pediatrician appointment. *Id.* ¶¶ 174–75.

These experiences are consistent among the named Plaintiffs. Other named plaintiffs, including D.D. and Family, Michael Hill, J.S.K. and Family, E.I.L., William Monroe, D.R. and Family, T.J.T. and Family, have likewise had their coverage terminated without any notice whatsoever. Compl. ¶¶ 263–85, 305–62. The notices that Plaintiffs did receive regarding their terminations included insufficient explanation of supposed changes in circumstances prompting termination, when in fact, there were none, and inaccurate statements that TennCare considered all categories of eligibility. *See* Compl. ¶¶ 289–92, 300–03 (Charles Fultz); 253–58 (S.L.C.); 307–18 (Mr. Hill); 350–51, 358–61 (William Monroe); 364–67 (Linda M. Rebeaud); 394, 399–409 (T.J.T. and Family); 413–17 (Kerry Vaughn); 421–31 (Johnny Walker). Plaintiffs have repeatedly discovered discrepancies between the notices they actually received and the notices TennCare purportedly sent to them. *See, e.g.*, Compl. ¶¶ 186 (S.F.A.); 206 (Barnes); 284 (D.D. and Family); 338–42 (E.I.L.); 352 (Monroe).

Plaintiffs whose eligibility is based on current or past receipt of SSI or other Social Security benefits, including Carlissa Caudill, Rhonda Cleveland, S.L.C., Charles Fultz, and Johnny Walker, have received the same questionnaire as Ms. Barnes, which does not ask about receipt of SSI. Compl. ¶¶ 203 (Barnes); 222–23 (Caudill); 237–38 (Cleveland); 253–55 (S.L.C.); 291 (Fult); 421–25 (Walker). Moreover, TennCare has ignored the information in its own files, or available federal

11

databases, showing that Plaintiffs Carlissa Caudill, Rhonda Cleveland S.L.C., Charles Fultz, Michael Hill, William Monroe, Kerry Vaughn, and Johnny Walker receive benefits from the Social Security Administration and/or Medicare and are therefore eligible for TennCare coverage. Compl. ¶¶ 221, 227 (Caudill); 235–39 (Cleveland); 248, 253 (S.L.C.); 288, 302 (Fultz); 306, 316–18 (Hill); 355–56 (Monroe); 412–416 (Vaughn); 425 (Walker). Instead, TennCare has requested this proof, which it already has, from Plaintiffs. *Id. See also* Compl. ¶¶ 372–74 (D.R. and family denied benefits though SNAP eligibility information is available to TennCare). Plaintiffs Carlissa Caudill, Rhonda Cleveland, D.D. and Family, Michael Hill, D.R. and Family, T.J.T. and Family, and Johnny Walker, have been denied continued benefits pending appeal. Compl. ¶¶ 225 (Caudill); 240 (Cleveland); 275–76 (D.D. and Family); 308–20 (Hill); 388 (D.R. and Family); 401 (T.J.T. and Family); 426–27 (Walker). And finally none of the named Plaintiffs have received a fair hearing after requesting one. *E.g.*, Compl. ¶¶ 156 (A.M.C.); 174 (K.A.); 192 (S.F.A.); 205, 214 (Barnes); 228–29 (Caudill); 243 (Cleveland); 301–02 (Fultz); 310, 315 (Hill); 333 (J.S.K. and Family); 337 (E.I.L.); 358 (Monroe); 404–06 (T.J.T and Family); 415–18 (Vaughn); 428 (Walker).

## **LEGAL STANDARD**

The District Court may certify a class if Plaintiffs satisfy the requirements of Rule 23(a) and at least one of the three criteria for certification under Rule 23(b). Fed. R. Civ. P. 23; *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998); *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir. 1996). Class certification is a procedural question, distinct from the merits of the case. *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1201 (6th Cir. 1974). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id*. (quoting *Miller v. Mackey Int'l.*, 452 F.2d 424, 427 (5th Cir. 1971)). While the party seeking class certification bears the burden of proof, *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 560 (6th Cir. 2007), the Sixth Circuit has cautioned that the class certification stage is not "a dress rehearsal

12

for the trial on the merits." *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 851-51 (6th Cir. 2013); *see also Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015); *Castillo v. Envoy Corp.*, 206 F.R.D. 464, 468 (M.D. Tenn. 2002) ("[C]ourts cannot make a preliminary inquiry into the merits of the proposed class action."). Moreover, "[i]n ruling on a class action a judge may consider reasonable inferences drawn from facts before him at that stage of the proceedings." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012) (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 (6th Cir. 1976)).

<u>**ARGUMENT**</u>

I.    **The Proposed Plaintiff Class and Disability Subclass Satisfy the Requirements of Rule 23(a)**

Rule 23(a) provides any member of a class may sue on behalf of all members if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). For the reasons explained below, both the Plaintiff Class and the Disability Subclass satisfy all of these requirements.

A.    **Numerosity**

There is "no strict numerical test for determining impracticability of joinder." *Am. Med. Sys., Inc.*, 75 F. 3d at 1079 . Rather, "substantial" numbers are satisfactory. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). Courts certify classes with "as few as 18 to 25 members," *Roman v. Korson*, 152 F.R.D. 101, 105 (W.D. Mich. 1993) , and when the number of members reaches 40, there is a "presumption that joinder is impracticable." *City of Goodlettsville v. Price-line.com, Inc.*, 267 F.R.D. 523, 529 (M.D. Tenn. 2010) ; *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012) ("this circuit had found a class of 35 to be sufficient to meet

the numerosity requirement") (citing *In re Am. Med. Sys.*, 75 F.3d at 1076). The numerosity re-

quirement is still met even "[w]hen the exact size of the class is unknown, but 'general knowledge

and common sense indicate that it is large.'" *Youngblood v. Linebarger Googan Blair & Sampson,*

*LLP*, No. 10-2304, 2012 U.S. Dist. LEXIS 142792, at *14 (W.D. Tenn. Sept. 20, 2012).

Both the Plaintiff Class and Disability Subclass easily meet the numerosity requirement.

The precise size is unknown by Plaintiffs but is substantial. According to monthly enrollment re-

ports published by TennCare, there were net declines in enrollment from the prior month in Au-

gust, October, November, and December 2019 and February 2020, 10,866.[1] Since these reports

represent total enrollment, after accounting for individuals who gained coverage during the same

month, the total number of enrollees who lost coverage during that period is significantly larger

than 10,866.[2] Although TennCare collects the information, it does not publicize how many indi-

viduals were disenrolled each month, let alone how many requested to end their TennCare cover-

age versus how many were involuntarily terminated. But even assuming that half of all individuals

who disenrolled, did so voluntarily, at least 5,000 individuals were involuntarily disenrolled from

TennCare in the past year.[3] If only 2% of that group are nevertheless eligible to receive benefits

---

[1] *Enrollment Data*, TennCare, https://www.tn.gov/tenncare/information-statistics/enrollment-data.html (last visited Mar. 17, 2020).

[2] Likewise, in months where there was a net increase in total enrollment, common sense suggests that at least some individuals lost coverage. In those months, however, the number of new enrollees was greater than the number of individuals who lost coverage.

[3] Assuming that half of individuals requested to end their TennCare coverage is likely significantly too high. A recent audit by the Tennessee Comptroller reviewed the cases of children whose TennCare coverage was terminated between January 1, 2016 and May 31, 2019 and concluded that just 14% of individuals voluntarily requested to be removed. Applying the 14% ratio of voluntary terminations to the net enrollment declines between March 2019 and February 2020, the number of individuals who lost coverage voluntarily is 1,524, leaving 9,362 enrollees involuntarily terminated. The audit also reported that approximately 65% of children who lost coverage either did not respond to the renewal packet or failed to provide information requested by TennCare. Data obtained by Plaintiffs' counsel similarly revealed the 67% of the children had lost coverage for failure to respond. Compl. ¶ 76. As evidence by Plaintiffs T.J.T. and Family, Kerry Vaughn,

(and are therefore members of the Plaintiff Class), there would be 100 class members. The class is therefore sufficiently numerous that joinder of them all individually would be impractical. *See, e.g. Young*, 693 F.3d at 541-42 (certifying class "rang[ing] between 270 and 9,000"). At a minimum, "general knowledge and common sense indicate[s]" that the number of people who were involuntarily disenrolled "is large." *Youngblood*, 2012 U.S. Dist. LEXIS 142792, at *14.

The same is true of the Disability Subclass. A similar TennCare report documented net enrollment among eligibility categories that are based on disability (but excluding anyone who is also eligible for Medicare).[4] That report showed a net decline of 3,414 enrollees.[5] Applying the 65% ratio from the Comptrollers audit, *see supra* note 3, for people who failed to return a redetermination packet or provide missing information, to this group, the number of individuals who were disenrolled is 2,219. As with the Plaintiff Class, any reductions documented in the report are net of new enrollments, meaning the number of disenrolled individuals is larger. Moreover, the report does not cover all eligibility categories: it excludes individuals who are receiving Medicare, and not all individuals who have a disability are entitled to Medicaid coverage on the basis of their disability. For instance, the Tennessee General Assembly's Fiscal Review Committee estimated

---

D.R. and Family, the problems with sending and receiving during the redetermination process have continued before and after the implementation of TEDS in March 2019. Applying the lowest number, the 65% ratio, to the net number of individuals who lost coverage, the number of individuals who lost coverage for failure to respond to the renewal packet or provide requested information between March 2019 and February 2020 is still 7,076. Thus, inferences from available data and common sense establish that the number of people in the Plaintiff Class "is large." *Youngblood*, 2012 U.S. Dist. LEXIS 142792, at *14.

[4] The "EG1 Disabled" group includes including individuals receiving SSI (but not Medicare) and individuals enrolled in the CHOICES program *See* TennCare II Medicaid Section 1115 Demonstration, Special Terms and Conditions, 56, ¶ 56(a)(i) (Dec. 2016), *available at*: https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads /tn/tn-tenncare-ii-ca.pdf (Special Terms and Conditions begin on page 10 of the PDF).

[5] Source: *TennCare II, Section 1115 Quarterly Report (For the Period April-June 2019), 2 (Aug.* 2019), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/ByTopics/Waivers/ 1115/downloads/tn/TennCare-II/tn-tenncare-ii-qtrly-rpt-apr-jun-2019.pdf (Table 2).

in a February 2018 report that 11.2% of adults under age 65 who receive TennCare coverage on the basis of being caretaker relatives of minor children are themselves disabled.[6]

Finally, other considerations weigh in favor of class certification. "[I]n determining whether joinder is impracticable [courts should consider] judicial economy, the geographical dispersion of class members, the ease of identifying putative class members, and the practicality with which individual putative class members could sue on their own." *Mays v. Tenn. Valley Auth.*, 274 F.R.D. 614, 631 (E.D. Tenn. May 10, 2011). The court "may make common sense assumptions in examining the numerosity requirement." *French v. Essentially Yours Indus., Inc.*, 1:07-CV-817, 2008 WL 2788511, at *3 (W.D. Mich. July 16, 2008). Here, the class spans the geographic scope of Tennessee, complicating joinder. Furthermore, class members are seeking TennCare coverage and injunctive relief because they have low incomes, making individual suits cost-prohibitive. *See Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993); *McDonald v. Heckler*, 612 F. Supp. 293, 300 (D. Mass. 1985) ("These individuals claim to be disabled and of low income. It is therefore impracticable for these persons to bring individual lawsuits challenging the Secretary's policies."), *modified on other grounds*, 795 F.2d 1118 (1st Cir. 1986).

## B. Commonality

Commonality exists when there are "questions of law or fact common to the class," *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012), and can be satisfied by demonstrating "that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). The class must thus share a "common contention," the truth or falsity of which will "resolve an issue that is central to the validity of one of the claims in one stroke." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013).

---

[6] Tenn. General Assembly, Fiscal Review Comm., Fiscal Note HB 1551- SB 1728, 2 (Feb. 12, 2018) http://www.capitol.tn.gov/Bills/110/Fiscal/HB1551.pdf.

16

"What we are looking for is a common issue the resolution of which will advance the litigation." *Sprague*, 133 F. 3d at 397.

Commonality "is satisfied if there is a single factual *or* legal question common to the entire class." *Powers v. Hamilton County Public Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (emphasis added); *In re Whirlpool Corp.*, 722 F.3d at 853 (holding that a single common question will suffice). Nor are factual discrepancies fatal to a showing of commonality, particularly for classes to be certified under Rule 23(b)(2) which does not require that common issues predominate over individual ones. *See Am. Med. Sys., Inc.*, 75 F.3d at 1080.

Members of both the Plaintiff Class and the Disability Subclass have suffered the same injury in the form of losing their Medicaid coverage despite being eligible for the program. In addition, the source of this injury is the same: TennCare's process for redetermining eligibility. Resolving whether TEDS is administered properly and complies with federal requirements or whether it is systemically flawed in a way that unlawfully deprives people of their Medicaid coverage without affording them due process will have an identical impact on all the class members' claims. *See, e.g.*, *In re D.C.*, 792 F.3d 96, 100 (D.C. Cir. 2015) (approving class of Medicaid beneficiaries presenting common questions of whether the District "fail[s] to offer sufficient discharge planning" or "fail[s] to inform and provide [nursing facility residents] with meaningful choices of community-based long-term care," because those questions "could represent the sort of systemic failure that might constitute a policy or practice affecting all members of the class in the manner *Wal–Mart* requires for certification."); *K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 486 (D. Idaho 2014), *aff'd sub nom.*, 789 F.3d 962 (9th Cir. 2015) ("Plaintiffs challenge IDHW's generic method for making budget decisions, the forms IDHW uses to notify people of those decisions, and IDHW's system for handling budget appeals. These system-wide challenges avoid the type of individualized inquiries that destroy commonality."); *Caballero by Tong v. Senior Health*

17

*Partners, Inc.*, No. 16 CV 0326 (CLP), 2018 WL 4210136, at \*6 (E.D.N.Y. Sept. 4, 2018) (commonality satisfied by question whether defendant's "practices have systematically injured class members by providing them with inadequate care in violation of their rights under the Medicaid Act, the ADA, the Rehabilitation Act, due process,"); *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 412 (S.D.N.Y. 2006); *Reynolds v. Giuliani*, 118 F. Supp. 2d 352, 389 (S.D.N.Y. 2000).

Another legal question common to both classes is whether injunctive and declaratory relief are appropriate to remedy Plaintiffs' injuries. *See S.R., by & through Rosenbauer v. Pennsylvania Dep't of Human Servs.*, 325 F.R.D. 103, 109 (M.D. Pa. 2018) (the putative class seeks declaratory and injunctive relief to address systemic deficiencies); *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 239 F.R.D. 9, 26 (D.D.C. 2007) (noting class actions seeking injunctive or declaratory relief by their very nature present common questions of law and fact.).

In particular, the legal sufficiency of standard termination notices used by a Medicaid program is a common question uniting the recipients of such notice, especially where, as here, the notices are based on the same template and include the same language. *Dozier v. Haveman*, No. 2:14-CV-12455, 2014 WL 5483008, at \*22 (E.D. Mich. 2014); *see also Price v. Medicaid Director*, 310 F.R.D. 345, 377-78 (S.D. Ohio 2015) (finding commonality satisfied by whether the Medicaid Act and the Due Process Clause required notices "to specify eligibility for retroactive assisted living waiver benefits"), *vacated on other grounds*, 838 F.3d 739, 750 (6th Cir. 2016; *Barry v. Corrigan*, 79 F. Supp. 3d 712, 751 (E.D. Mich. 2015), *aff'd sub nom.*, 834 F.3d 706, 731 (6th Cir. 2016) (holding the "alleged inadequacy of the disqualification notices" under the Due Process Clause and the Food and Nutrition Act was as a common question); *Brown v. Giuliani*, 158 F.R.D. 251, 268 (E.D.N.Y. 1994) (finding commonality satisfied by whether defendants failed to timely process public assistance benefits and change of circumstance grant applications).

*Dozier* is particularly instructive. In that case, plaintiffs challenged termination notices for failing to provide details regarding alternative Medicaid eligibility categories. *Dozier*, No. 2:14-

CV-12455, 2014 WL 5483008, at *1. The court held that commonality was satisfied because the legal question of whether the standard termination notices should have provided information on other eligibility categories would affect the claims of the entire class and thus "substantially advance[ ] the litigation." *Id.* The same is true here: establishing whether the standard notices fail to provide sufficient information concerning the basis for the termination decision, other eligibility categories, or how to maintain coverage and request a fair hearing will substantially advance or hinder the claims of the entire Plaintiff Class and Disability Subclass.

Plaintiffs' common questions of fact also support commonality here. For instance, if the Court finds that TEDS does not accurately track whether notices were actually sent to beneficiaries, that determination would further all class members' claims alleging violation of § 1396(a)(3) of the Medicaid Act and the Due Process Clause for failure to provide accurate notice. Similarly, establishing that TennCare's policies and practices do not require screening for all eligibility categories as required by federal law, and that TennCare's form notices do not solicit information from enrollees that is necessary to screen for all of these categories, would also advance the litigation on behalf of the Plaintiff Class and Disability Subclass as a whole by making it more likely that TennCare has not complied with its obligation to affirmatively find each Class member ineligible for any Medicaid category prior to terminating their coverage.

Plaintiffs further satisfy commonality because they propose "common solutions" to their injuries. In *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012), the Sixth Circuit considered a class of individuals "who were charged local government taxes on their payment of premiums which were either not owed, or were at rates higher than permitted." *Id.* at 538. The Court of Appeals affirmed the commonality holding because the plaintiffs showed that the defendants could have prevented the misassignment by implementing a common solution—geocoding software system. *Id.* Likewise, here, Plaintiffs have identified common solutions to prevent the erroneous terminations Plaintiffs experienced, including checking databases available to TennCare

19

for information already in its files, updating redetermination packets and notices to collect information related to all eligibility categories, and permitting fair hearings without subjecting all appeals to review process that requires each enrollee to demonstrate a "valid factual dispute." Plaintiffs seek declaratory and injunctive relief in the form of requiring the State to appropriately screen enrollees for eligibility in all categories, provide accurate non-misleading notice, and properly track appeals and hearings in compliance with due process. Because the injury sustained by the proposed classes – the wrongful termination of coverage – shares common solutions, both proposed classes satisfy the commonality requirement. *See Young*, 693 F.3d at 543.

The Disability Subclass shares even more common issues of law and fact. Members of the Disability Subclass share the common injury of losing their TennCare coverage as a result of TennCare's redetermination process that tends to screen out qualified persons with disabilities or has the effect of defeating or substantially impairing accomplishment of the objectives of the TennCare program. (Compl. ¶¶ 253 (S.L.C.); 288–304 (Fultz); 311–21 (Hill); 354–62 (Monroe); 363–68 (Rebeaud); 420–30 (Walker). The redetermination process fails to screen for eligibility based on disability, sends incomprehensible notices, fails to provide in-person assistance, and issues unduly burdensome requests for information that is irrelevant or already available to the state.

Again, the use of standard forms in the redetermination process exposes members of the Disability Subclass to common harms that will be resolved by the answers to common legal questions. TennCare's form notices and redetermination packets fail to ask questions necessary to determine whether an individual meets several *disability-based* Medicaid eligibility categories. *Id*. Whether the effect of these standard forms is a tendency to screen out persons with disabilities from Medicaid coverage is a question common to the entire Disability Subclass.

Furthermore, answering the common factual question of whether Defendant's notices are unnecessarily complex or difficult to understand, and whether this disparately impedes the ability of persons with disabilities to effectively and timely respond to requests for information or appeal

the termination of their coverage, will significantly advance the claims of the Disability Subclass. The same is true of a finding regarding whether the State's refusal to provide any in-person assistance further prevents the successful completion of the eligibility redetermination process by persons who, because of their disabilities, need in-person help, and whether its demands that individuals submit information or documentation that is either irrelevant or already available to it are unduly burdensome upon eligible beneficiaries whose disabilities prevent them from understanding the requests or notices.

This common proof of causation that affects every member of the Disability Subclass satisfies the commonality requirement. Like in *Young*, where implementing a certain type of software would have prevented the general harm to the class, here the Disability Subclass alleges that TEDS' redetermination and reenrollment process screens out individuals with disabilities. *See Young*, 693 F.3d at 543. Proving causation of their injuries by TennCare and TEDS will advance the litigation of every member of the class. *See id.* Further, like the Plaintiff Class, Plaintiffs here received standardized redetermination forms, requests for information, and termination letters; whether the language used in those forms is legally adequate to provide due process is common across the Disability Subclass. The same is true of TennCare's failure to provide in-person assistance, which systematically fails to accommodate individuals with disabilities. Regardless of whether each disability is unique, the harm arose from a systemic lack of procedures to accommodate the members of the Disability Subclass. *See In re Whirlpool*, 722 F.3d at 853 (finding commonality satisfied where questions produced "one stroke answers"); *Brooklyn Center for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409 (S.D.N.Y. 2012) (acknowledging class had diverse disabilities but certifying class because systemic failures impacted all class members).

C.     **Typicality**

Typicality requires that a "'sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective

21

nature to the challenged conduct.'" *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (quoting *Sprague*, 133 F.3d at 399). "In government benefit class actions, the typicality requirement is generally satisfied when the representative plaintiff is subject to the same statute, regulation, or policy as class members." *Carr v. Wilson-Coker*, 203 F.R.D. 66, 75 (D. Conn. 2001) (quoting 5 *Newberg on Class Actions*, § 23.04 (3d ed. 1992) (citations omitted)). Commonality and typicality "tend to merge," as both consider whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 564 U.S. at 349 n.5 (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157–58 (1982)).

Typicality is satisfied here for both the Plaintiff Class and the Disability Subclass. All named plaintiffs are members of the Plaintiff Class: if they establish that the standardized notices they received do not satisfy the requirements of the Medicaid Act and Due Process Clause, then the same finding will apply to other class members as well because TennCare sends out the same standardized notices to everyone. *See Dozier*, No. 2:14-CV-12455, 2014 WL 5483008, at *22 (finding typicality where representative plaintiffs had been disenrolled from Medicaid and received the challenged notice). The same is true of claims by the Plaintiff Class that TEDS does not appropriately redetermine eligibility for multiple categories and violates due process by failing to provide fair hearings to appeal termination decisions.

The named plaintiffs representing the Disability Subclass also easily meet the typicality requirement. In *Young*, the Sixth Circuit found the named plaintiff's claims typical of the class because the plaintiffs alleged a singular geocoding practice was the source of both the named plaintiff's and the class plaintiffs' tax misassignments. 593 F.3d at 543. Here, named plaintiffs' and class members' ADA claims all stem from TennCare's deficient redetermination packets that they all received, its failure to evaluate disability-related eligibility categories, and failure to provide accommodations making the redetermination process navigable for people like them with

22

disabilities. The Disability Subclass thus meets the typicality requirement.

### D. Adequacy of Representation

The named Plaintiffs will also "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry searches for any conflict of interest between the plaintiffs and the members of the class (sometimes characterized as "the presence of common interests and injury"), and whether there is an adequate assurance of vigorous representation by counsel. *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998).

Here, the interests of Plaintiffs and the Plaintiff Class and Disability Subclass they seek to represent are completely aligned. All members of the Plaintiff Class and Disability Subclass have a common interest in the declaratory and injunctive relief sought in this case because they all lost their TennCare coverage as a result of the flawed TEDS redetermination process. There is no known conflict among the class members, nor is there any common fund or limitation on resources to rectify their injuries. Moreover, Plaintiffs recognize that this lawsuit involves injustices to persons throughout Tennessee, and though they are interested in having their own hardship relieved, they also desire to see a systemic solution that will spare others from having to endure the suffering they have experienced. The proposed class representatives are therefore adequate to represent the interests of absent members of the Plaintiff Class and Disability Subclass.

Plaintiffs are represented by attorneys from the Tennessee Justice Center and the National Health Law Program. Each firm has extensive experience in complex class action litigation involving health care and civil rights law and have been appointed class counsel in a number of cases. *See* Bonnyman Decl.; Perkins Decl. Plaintiffs' counsel are advancing costs for this litigation and have sufficient funds available. Thus, the adequacy of counsel requirement is met.

### II. The Proposed Plaintiff Class and Disability Subclass Satisfy the Requirements of Rule 23(b)

Plaintiffs seek to certify both the Plaintiff Class and the Disability Subclass under Rule

23

23(b)(2) because the Defendants have "acted or refused to act on grounds that apply generally to the class[es], so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Certification of a 23(b)(2) class "is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 428 (6th Cir. 2012); *see also Senter*, 532 F.2d at 525 (explaining that cases where Defendants are charged with "class-wide discrimination[,] are particularly well-suited for 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to a single injunctive remedy.").[7]

Given the systemic nature of the violations alleged here, adequately protecting the rights of any single plaintiff will require broad-based relief. Defendants' failure to provide a lawful redetermination process has affected thousands of Tennesseans who are entitled to benefits. These processes are common and consistent across the entire Plaintiff Class and Disability Subclass. Because plaintiffs' injuries may thus be remedied by a single injunction, Rule 23(b)(2) is satisfied.

As for the Disability Subclass, specifically, courts have certified other 23(b)(2) classes defined as individuals with disabilities who were harmed by a state entity's systematic failure to

---

[7] Ascertainability is not a requirement for certification of a Rule 23(b)(2) class seeking only injunctive and declaratory relief. *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016). *See also Graham v. Parker*, No. 3–16–cv–01954, 2017 WL 1737871, at *2-*3 (M.D. Tenn. May 4, 2017) (holding that a fluid class definition helps the court "insure against the danger of the action becoming moot"); *Dodson v. CoreCivic*, No. 3:17-cv-00048, 2018 WL 4776081, at *2 n. 1 (M.D. Tenn. Oct. 3, 2018) (same). Nonetheless, it will be simple to identify members of both the Plaintiff Class and Disability Subclass because they are defined using "objective criteria" such as the time limitation (coverage terminated "since March 19, 2019"), and whether coverage ended voluntarily or not. *Id.* Similarly, it is easy to determine whether potential Subclass members have a disability based on receipt of SSI or a disability-based Medicaid eligibility category, as well as other information about diagnoses and services received. TennCare's own files hold most, if not all of this information. *See, e.g.*, *Young v. Nationwide Mut. Ins. Co*, 693 F.3d 532, 540 (6th Cir. 2012) (certifying a class despite defendants' assertions that it would "entail a large number of individual determinations" and review of individual files to identify the members of the class).

provide reasonable accommodations. *See, e.g. Raymond v. Rowland*, 220 F.R.D. 173, 180 (D. Conn. 2004) (certifying class of "all disabled individuals who are or will be eligible for subsistence benefits through" various programs "who require reasonable accommodation" which was denied by government's "failure to implement appropriate system-wide procedures and regulations"); *Henrietta D. v. Giuliani*, No. 95 CV 0641 (SJ), 1996 WL 633382, at *16 (E.D. N.Y. Oct. 25, 1996) (certifying class of "all DAS-eligible persons"). Here, the named plaintiffs representing the Disability Subclass cannot adequately protect their own rights without obtaining broad relief ensuring that all disabled and TennCare eligible individuals will be able to effectively navigate the redetermination and fair hearing process. The Disability Subclass meets the requirements of Rule 23(b)(2) therefore because class members were denied TennCare coverage due to a systematic failure to provide accommodations for people with disabilities overall.

### III.     In the Alternative, the Court Should Allow Plaintiffs to Conduct Class Discovery

As demonstrated above, Plaintiffs satisfy their burden under Rule 23 based on the current record. Plaintiffs acknowledge, however, that some information relevant to class certification is exclusively in Defendant's possession. For example, TennCare's records would show how many people were disenrolled from TennCare coverage in the last year, the reason why, and how many people of them re-enrolled.  TennCare could also produce copies of all standardized notices generated by TEDS relevant to this case, and show how (if at all) TEDS obtains information from other state and federal databases to evaluate categorical eligibility, including categories based on disability. Accordingly, Plaintiffs request in the alternative that the Court permit Plaintiffs to conduct discovery in aid of class certification and, if necessary, amend this motion.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should certify the Plaintiff Class and the Disability Subclass under Federal Rule of Civil Procedure 23(a) and 23(b)(2) or in the alternative take the motion under advisement and permit Plaintiffs to conduct class discovery.

25

Date:  March 27, 2020

Respectfully submitted,

/s/ Catherine Millas Kaiman
*On Behalf of Counsel for Plaintiffs*

Michele Johnson TN BPR 16756
Gordon Bonnyman, Jr. TN BPR 2419
Catherine Millas Kaiman, FL Bar 117779
Vanessa Zapata, TN BPR 37873
Laura Revolinski, TN BPR 37277
TENNESSEE JUSTICE CENTER
211 7th Avenue North, Suite 100
Nashville, Tennessee 37219
Phone: (615) 255-0331
FAX: (615) 255-0354
gbonnyman@tnjustice.org
ckaiman@tnjustice.org
lrevolinski@tnjustice.org
vzapata@tnjustice.org


Jane Perkins*
Elizabeth Edwards*
Sarah Grusin*
NATIONAL HEALTH LAW PROGRAM
200 N. Greensboro St., Ste. D-13
Carrboro, NC  27510
Telephone: (919) 968-6308
perkins@healthlaw.org
edwards@healthlaw.org
grusin@healthlaw.org

**Attorneys for Plaintiffs**
*Application for Pro Hac Vice Admission
Forthcoming*


*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via

the Court's electronic filing system on this 27th day of March 2020 on the following counsel for the

Defendant:

 Ms. Carolyn E. Reed
Special Counsel
Office of the Tennessee Attorney General
Health Care Division
P.O. Box 20207
Nashville, Tennessee 37202
Carolyn.Reed@ag.tn.gov

/s/  Catherine Millas Kaiman

Catherine Millas Kaiman , FL Bar 117779
