# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

A.M.C., et al.,                              )
                                             )
      Plaintiffs,                            )
                                             )
v.                                           )    No. 3:20-cv-00240
                                             )
STEPHEN SMITH,                               )
                                             )
      Defendant.                             )

## MEMORANDUM OPINION AND ORDER

Plaintiffs are current and former enrollees in TennCare, which is Tennessee's Medicaid program. Defendant is Tennessee's Director of the Division of TennCare. Plaintiffs allege TennCare's policies and practices violate the Medicaid Act, the Fourteenth Amendment, and the Americans with Disabilities Act ("ADA"), resulting in unlawful terminations of enrollees' health insurance coverage. They have filed for class certification (Doc. No. 140) and for a preliminary injunction (Doc. No. 141).

The Court will grant the certification motion in part. Plaintiffs seek to represent a large, diverse class. It contains over 100,000 individuals who have allegedly suffered a variety of injuries. Some issues Plaintiffs raise are well-suited for collective litigation. Others are not. Fortunately, the Federal Rules of Civil Procedure ("Rules") account for such scenarios. They give courts discretion to trim and refine collective actions such that dysfunctional elements do not contaminate otherwise functional classes. The Court will exercise this discretion.

As for the injunction request: the Court cannot grant it. Plaintiffs have not established irreparable harm. True, TennCare wrongfully disenrolled some of them. But it has reinstated their coverage, revised its eligibility determination system, and ceased making new disenrollments.

## I. BACKGROUND

### A. Medicaid and TennCare

Medicaid "provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults and people with disabilities." www.medicaid.gov/medicaid/index.html (last visited August 5, 2022). It is "administered by states, according to federal requirements" and "is funded jointly by states and the federal government." Id. Medicaid is overseen at the federal level by the Centers for Medicare and Medicaid Services. (Doc. No. 142-2 ¶ 1). At the state level, in Tennessee, TennCare is responsible for administering the health benefits of Medicaid recipients. (Id.). Kimberly Hagan is the Director of Member Services for TennCare. (Id.). She has submitted numerous declarations in this matter. (Doc. Nos. 29-2, 76, 139-2, 142-2, 163, 166, 218, 222).

### B. Eligibility and Redetermination

To be eligible for health coverage under Medicaid and TennCare, individuals must meet certain criteria. (Doc. No. 142-2 ¶ 5). First, they must meet "residency and citizenship" prerequisites. (Id.). Second, they must satisfy "categorial eligibility" requirements. (Id.). That is, they must be "within a category of persons who are eligible for Medicaid (for example, children, caretaker relatives, pregnant women, and the disabled)." (Id.). "If an individual satisfies the categorical eligibility requirements, TennCare must then determine whether she meets the income standard applicable to her eligibility category." (Id.). "In some categories, individuals are also reviewed against a resource/asset standard as well." (Id.).

Every year, TennCare must reevaluate its enrollees' eligibility in a process known as "redetermination." Tenn. Comp. R. & Regs. 1200-13-20-.09. If TennCare finds an enrollee is no longer eligible, it will terminate the enrollee's coverage. See id.

2

The redetermination process proceeds in several steps.  Id.  At the start, TennCare reviews an enrollee's case to determine whether it can verify eligibility without input from the enrollee.  Id.  If it cannot, TennCare issues a "renewal packet" to the enrollee.  Id.  The enrollee has 40 days to return the completed packet to TennCare.  Id.  Next, TennCare uses the packet to complete redetermination.  Id.  As necessary, it may send additional requests for information to the enrollee.  Id.  Enrollees must respond to these requests within 20 days.  Id.  If enrollees do not respond as required, or if TennCare determines the enrollee is not eligible for coverage, then TennCare will send the enrollee a notice of decision ("NOD") informing them their coverage will be terminated in 20 days.  Id.

After TennCare terminates coverage, enrollees have multiple options.  They may still provide the renewal packet, or additional information requested by TennCare, for "up to ninety (90) days."  Id.  This is known as the "reconsideration period."  Id.  Renewal packets or additional information received during the reconsideration period "will be processed without requiring a new application."  Id.  Further, "[i]ndividuals terminated for failure to respond and subsequently determined eligible" during the reconsideration period "will have eligibility reinstated as of the date of termination."  Id.

Alternatively, enrollees may appeal a termination decision.  Id.  They have 40 days from the date of the NOD to do so, "unless good cause can be shown as to why the appeal or request for a hearing could not be filed within the required time limit."  Id. § 1200-13-19-.06.  TennCare regulations define "good cause" as "a reason based on circumstances outside the party's control and despite the party's reasonable efforts."[1]  Id. § 1200-13-19-.02.

---

[1] As discussed below, Plaintiffs assert that enrollees are entitled to hearings to determine whether good cause is present.  (Doc. No. 141-1 at 23).

3

Once appeals are filed, TennCare regulations provide for hearings on the appeals in certain circumstances.  Id. § 1200-13-19-.05.  It screens appeals to determine whether "the appellant has established a valid factual dispute relating to the appeal."  Id.  If TennCare determines there is no valid factual dispute, then it "will immediately provide the appellant with a notice informing him that he must provide additional information as identified in the notice."  Id.  If the appellant does not adequately respond, then "the appeal will be dismissed without the opportunity for a fair hearing."  Id.  TennCare must "[o]rdinarily" take "final administrative action" on an appeal within 90 days of it being filed.  42 C.F.R. § 431.244.

Notably, redetermination is not the only time TennCare reevaluates enrollees' eligibility. It also does so when it "receives a report of a change of information that could affect eligibility." (Doc. No. 142-2 ¶ 59).  For example: if the Social Security Administration ("SSA") reports that an enrollee is no longer receiving Supplemental Security Income ("SSI")—which makes enrollees automatically eligible for TennCare—that might trigger an eligibility reevaluation.  (Id. ¶¶ 35(a), 59).  If TennCare cannot reverify the enrollees' eligibility, it sends the enrollee a "preterm notice." (Id. ¶ 59).  The notice will inform the enrollee that they "may not qualify" for coverage anymore and will ask the enrollee to answer questions to help TennCare determine whether that is the case. (Id.).  If the enrollee does not respond with information showing they are entitled to coverage, or fails to respond at all, an NOD will issue explaining the enrollee is losing coverage.  (Id.).

C.    TEDS and the Disenrollment Moratorium

To assist in the foregoing processes, TennCare worked with multiple vendors to design the TennCare Eligibility Determination System ("TEDS").  (Id. ¶ 9).  The design took several years. (Id.).  On March 19, 2019, TennCare implemented TEDS.  (Doc. No. 202 ¶ 77).  TEDS now processes "all applications, annual renewals, and reverifications of eligibility prompted by change

4

information." (Doc. No. 142-2 ¶ 9). It also creates notices, such as NODs, for TennCare enrollees. (Id.). NODs are "generated from a template." (Doc. No. 166 ¶ 51). However, there are many "potential variations" that the template can produce. (Id.). For example, an NOD might tell some enrollees they are losing coverage because they "asked to end [their] coverage," whereas it might tell others TennCare could not "verify that [they] are a U.S. citizen," and it might tell others they "did not respond when [TennCare] told [them] it was time to renew [their] benefits." (Doc. No. 142-7).

TEDS' launch involved several errors. (Doc. No. 142-2 ¶ 35). For instance, TEDS misidentified certain individuals "as not currently receiving SSI" and "thus no longer automatically eligible for Medicaid." (Id.). TEDS also had a programming defect related to the appeals process. (Id.). And it experienced problems converting information from TennCare's previous information management system, interChange. (Id.). (The way the two databases store information differs; sometimes, multiple cases from interChange had to be merged into one case on TEDS, which uses a family case-based system. (Id.)). In some instances, these issues resulted in mistaken disenrollments. Infra Section III.B. TennCare has worked to correct these issues and restore coverage to those impacted. Id.

Roughly a year after TEDS launched, on March 18, 2020, TennCare placed a moratorium on disenrollments in response to the COVID-19 pandemic. (Doc. No. 166 ¶ 83(c)(i)). Under the moratorium, TennCare does not disenroll anyone unless they have other health insurance, move out of the state, request disenrollment, or are deceased. (Doc. No. 179 at 40–41).

D.  TennCare's Legal Obligations

TennCare has several legal obligations to enrollees that are pertinent to this case. First of all, TennCare must administer benefits within the boundaries set by the Medicaid Act and its

implementing regulations. Hughes v. McCarthy, 734 F.3d 473, 475 (6th Cir. 2013). These regulations require that TennCare "consider all bases of eligibility" for an enrollee before "making a determination of ineligibility." 42 C.F.R. § 435.916. In the event TennCare terminates an enrollee's coverage, it must first provide "timely and adequate written notice." Id. § 435.917. Such notice must include a "clear statement of the specific reasons" and the "specific regulations" that support termination. Id. § 431.210. It also must include an explanation of the "individual's right to request a local evidentiary hearing if one is available" and "the circumstances under which Medicaid is continued if a hearing is requested." Id. Moreover, TennCare has to "maintain[] a hearing system" for individuals who appeal terminations. Id.; 42 U.S.C. § 1396a ("A State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing . . . to any individual whose claim for medical assistance . . . is denied or is not acted upon with reasonable promptness."). The hearing system "must meet the due process standards set forth in Goldberg v. Kelly, 397 U.S. 254 (1970)." 42 C.F.R. § 431.205.

Relatedly, TennCare has obligations under the Fourteenth Amendment. The Fourteenth Amendment protects individuals from deprivations of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Enrollees "have a legitimate claim of entitlement to TennCare coverage" that invokes this protection. Hamby v. Neel, 368 F.3d 549, 559 (6th Cir. 2004). Accordingly, before terminating an enrollee's coverage, TennCare must provide enrollees with "adequate notice" and a "meaningful" opportunity to be heard. Id. at 560.

Finally, TennCare must comply with the ADA. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

6

E.     Plaintiffs' Claims

Plaintiffs were all disenrolled from TennCare after it implemented TEDS in March 2019 (though, by now, TennCare has restored coverage to all but one of them).   Infra Section III.B.1 n.13.   They allege their terminations stemmed from TennCare policies and practices that are unlawful under the Medicaid Act, the Fourteenth Amendment, and the ADA.   Plaintiffs seek declaratory and injunctive relief regarding those policies and practices.

As noted, Plaintiffs have moved for class certification.   (Doc. No. 140).   They seek certification of one primary class (the "class"), as well as a "disability subclass" and a "reinstatement subclass."   (Doc. No. 225 at 6 (citing Doc. No. 202 ¶¶ 477–79)).   Plaintiffs define the class as "all individuals who meet the eligibility criteria for TennCare coverage and who, since March 19, 2019, have been or will be disenrolled from TennCare."[2]   (Doc. No. 202 ¶ 477).   Their definition "excludes individuals, and the parents and legal guardians of individuals, who requested withdrawal from the TennCare program."   (Id.).   Next, Plaintiffs define the disability subclass as members of the class "who are 'qualified individuals with a disability' as defined in 42 U.S.C. § 12131(2)."   (Id. ¶ 478).   Finally, Plaintiffs define the reinstatement subclass as members of the class "who were involuntarily disenrolled from TennCare between March 19, 2019 and March 18, 2020, and are . . . not currently enrolled."   (Id. ¶ 479).

Plaintiffs' motion for preliminary injunction incorporates the class definition.   (Doc. No. 141).   Plaintiffs ask the Court to "prospectively reinstate TennCare coverage" for all members of

---

[2]  Plaintiffs note that "[f]or purposes of the class definition, individuals are eligible by federal law 'until they are found to be ineligible,' after consideration of 'all bases of eligibility.'" (Doc. No. 140-1 at 18).   "In other words," they say, "the class is made up of all individuals who have lost (or will lose) TennCare coverage since March 19, 2019."   (Id.).   In recognition of this point, and in the interest of clarity, the Court will tweak Plaintiffs' proposed definition in certifying the class. Powers v. Hamilton Cnty. Pub. Def. Comm'n, 501 F.3d 592, 619 (6th Cir. 2007) (noting "district courts have broad discretion to modify class definitions").

the class. (Id.). They also ask the Court to "prohibit[] Defendant from involuntarily terminating any [class member's] TennCare coverage until the person receives notice and an opportunity for a fair hearing that complies with due process."[3] (Id.).

Plaintiffs' motions for class certification and a preliminary injunction have been fully briefed. (Doc. Nos. 140-1, 141-1, 164, 165, 169, 170). Post-briefing, the Court held a hearing concerning the motions. (Doc. No. 179). Based on issues raised in the hearing, the parties submitted supplemental briefs. (Doc. Nos. 221, 225, 226, 228). The motions are now ripe for consideration.

## II. LEGAL STANDARD

### A. Class Certification

Rule 23 governs class certification. Fed. R. Civ. P. 23. Rule 23(a) bars certification unless "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Id.

If a class satisfies Rule 23(a), it must fall into one of the categories in Rule 23(b).[4] Id. The category under which Plaintiffs seek certification is in Rule 23(b)(2). That is for classes in which "the party opposing the class has acted or refused to act on grounds that apply generally to

---

[3] This language tracks Defendant's existing legal duties. Although the Court is not granting an injunction, that of course does not relieve Defendant of such duties.

[4] Some classes must meet requirements beyond those in Rule 23(a) and Rule 23(b). As the parties note, some classes must be defined in such a manner that an individual's membership in the class can be "ascertained without case-by-case determinations." Cole v. City of Memphis, 839 F.3d 530, 540 (6th Cir. 2016). However, the Court need not address this requirement because it does not apply to this type of class action. Id. at 542 ("The decisions of other federal courts and the purpose of Rule 23(b)(2) persuade us that ascertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief.").

the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Id. "A class action under Rule 23(b)(2) is referred to as a 'mandatory' class action because class members do not have an automatic right to notice or a right to opt out of the class." Romberio v. UnumProvident Corp., 385 F. App'x 423, 432 (6th Cir. 2009). This raises special concerns. After all, "unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action." Id. at 433 (citation and quotation omitted). Hence, mandatory classes must be sufficiently cohesive. Id. They must also pursue an indivisible remedy. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 360 (2011).

Rule 23(c)(4) is also relevant here. It permits courts to certify classes "with respect to particular issues," as opposed to all issues a class might seek to litigate. Fed. R. Civ. P. 23.

Notably, Rule 23 "does not set forth a mere pleading standard." Dukes, 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." Id. Certification is proper only if a court determines Rule 23 is satisfied after a "rigorous analysis." Id. (citation and quotation omitted).

This does not mean plaintiffs must prove their compliance with Rule 23 by a preponderance of the evidence. Although some circuits have adopted the preponderance standard at the certification stage, the Sixth Circuit has not. Gooch v. Life Invs. Ins. Co. of Am., 672 F.3d 402, 418 n.8 (6th Cir. 2012). Instead, it applies the "rigorous analysis" standard from Dukes without modification. Id. ("The Sixth Circuit uses the 'rigorous analysis' requirement . . . We see no reason to superimpose a more specific standard than the Supreme Court[.]"); see also Bond v. Antero Res. Corp., 328 F.R.D. 187, 191 (S.D. Ohio 2018) ("Absent further guidance from the

9

Sixth Circuit, the Court applies the rigorous analysis requirement here.").

Under that standard, courts may certify a class "where an adequate statement of the basic facts demonstrates that each of Rule 23's requirements are met." Woodall v. Wayne Cnty., Michigan, No. 20-1705, 2021 WL 5298537, at *3 (6th Cir. Nov. 15, 2021) (citation and quotation omitted). They may review "information other than that which is in the pleadings" in their analyses, though certification may be appropriate "based on the pleadings alone where they set forth sufficient facts." Id.

B.    Preliminary Injunction

Next, the injunction standards. "A district court must consider four factors when determining whether to grant or deny a preliminary injunction: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., 274 F.3d 377, 400 (6th Cir. 2001).

Generally, these "four considerations are factors to be balanced, not prerequisites that must be met." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (citation and quotation omitted). However, the irreparable injury factor is "indispensable." D.T. v. Sumner Cty. Sch., 942 F.3d 324, 327 (6th Cir. 2019). An irreparable injury must be "certain and immediate." Id. (citation and quotation omitted); Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). And it must be an injury "money damages" cannot fix. D.T., 942 F.3d at 327. Depending on the circumstances, loss of health insurance benefits may count as irreparable harm. City of Pontiac Retired Emps. Ass'n v. Schimmel, 751 F.3d 427, 432–33 (6th Cir. 2014) (noting the "district court failed to consider that a reduction in health care

10

benefits can cause irreparable harm" and remanding to the district court to "consider whether injunctive relief is proper"); Morgan v. Fletcher, 518 F.2d 236, 240 (5th Cir. 1975) (plaintiff losing medical insurance did not face irreparable injury where the need for benefits was speculative). So can a constitutional right being "threatened or impaired." Gale v. O'Donohue, 751 F. App'x 876, 884 (6th Cir. 2018). But the threat must be "forward-looking." Id. That "a plaintiff has alleged a past constitutional injury," alone, will not justify a preliminary injunction. Id. at 884–85; see also Conn v. Deskins, 199 F. Supp. 3d 1172, 1175 (E.D. Ky. 2016) (plaintiff failed to show irreparable injury because "[i]f his due process rights were violated, it was in the past").

Ultimately, a preliminary injunction is an "extraordinary remedy." Winter, 555 U.S. at 22. Plaintiffs must make a "clear showing" that they are entitled to one. Id. Certainly, "scant evidence" will not support an injunction. Patel v. AR Grp. Tennessee, LLC, No. 3:20-CV-00052, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020) (quoting Libertarian Party of Ohio v. Husted, 751 F.3d 403, 417 (6th Cir. 2014)).

## III. ANALYSIS

### A. Class Certification Is Warranted.

The Court will certify the class. It satisfies Rule 23(a) and Rule 23(b), subject to a caveat: collective litigation is only appropriate regarding particular issues under Rule 23(c).

#### 1. The Class Meets Rule 23(a)'s Requirements.

The class fulfills Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.

*First*, the class is sufficiently numerous. "This court has observed that as few as forty class members may satisfy the numerosity requirement." Snead v. CoreCivic of Tennessee, LLC, No. 3:17-CV-0949, 2018 WL 3157283, at *11 (M.D. Tenn. June 27, 2018). The class far exceeds

11

that benchmark; it contains over 100,000 people.  (Doc. No. 166 ¶ 24(d)).  Indeed, Defendant does not contest numerosity.

*Second*, the class satisfies the commonality requirement.  Under that requirement, Plaintiffs must show their claims "depend upon a common contention" that "is capable of classwide resolution."  Dukes, 564 U.S. at 350; see also J.M. v. Crittenden, 337 F.R.D. 434, 449 (N.D. Ga. 2019); Dozier v. Haveman, No. 2:14-CV-12455, 2014 WL 5483008, at *22 (E.D. Mich. Oct. 29, 2014).  Put differently: courts look for "a common issue the resolution of which will *advance* the litigation."  Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998) (emphasis added).  There "need be only a single issue common to all members of the class" to demonstrate commonality.  In re Am. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir. 1996) (citation and quotation omitted).   And "[v]ariations in the circumstances of class members are acceptable, as long as they have at least one issue in common."  Bacon v. Honda of Am. Mfg., Inc., 370 F.3d 565, 570 (6th Cir. 2004).

Here, Plaintiffs' claims depend on common contentions capable of classwide resolution. As discussed, the Medicaid Act and constitutional due process require TennCare to provide adequate notice and an opportunity to be heard before terminating an enrollee's coverage. Hamby, 368 F.3d at 560; 42 C.F.R. § 435.917.  Moreover, under Medicaid regulations, TennCare must include the "specific regulations" that support its termination decisions in NODs.  42 C.F.R. § 431.210.  The record shows TennCare's NODs all include the same regulatory citation, regardless of the reason a member is terminated: "Tenn.Comp.R&R 1200-13-20."  (Doc. No. 142-7; see also Doc. Nos. 63-2, 142-23, 142-24, 142-25, 142-26, 142-27, 142-28, 142-29).  This citation is to a 95-page document that "governs the processes for determining financial and categorical eligibility for the TennCare and CoverKids programs."  Rules of the Dep't of Finance

12

and Admin. Div. of TennCare, Chapter 1200-13-20, TennCare Technical and Financial Eligibility, https://publications.tnsosfiles.com/rules/1200/1200-13/1200-13-20.20210518.pdf. The NODs do not explain how to access this document. (E.g., Doc. Nos. 142-23, 142-24, 142-25, 142-26, 142-27, 142-28, 142-29). Nor do they cite the subpart of the document ostensibly applicable to the NOD recipient. (Id.; see also Doc. Nos. 63-2, 142-7). Accordingly, a question common to the class is whether the stock citation in Defendant's NODs violates Defendant's obligations under the Medicaid Act and the Fourteenth Amendment. Resolving this question will advance the litigation. See Rodriguez By & Through Corella v. Chen, 985 F. Supp. 1189, 1195–96 (D. Ariz. 1996) (holding termination notices "fail[ed] to comply in letter and in spirit with procedural due process and the applicable Medicaid provisions" where their legal citations were to "lengthy general descriptions of program eligibility rules," did not provide "the applicable provision as applied to the particular case," and did not explain "where a copy of the cited legal authority c[ould] be located and reviewed").

There are other questions tied to the NODs that satisfy commonality for similar reasons. Class litigation can determine whether the following violate Defendant's obligations under the Medicaid Act and the Fourteenth Amendment: the NODs' uniform omission of information concerning the good cause exception and good cause hearings[5]; the NODs' uniform omission of information about the 90-day reconsideration period; the NODs' uniform language instructing class members to describe the reasons they want to appeal and the facts supporting appeal[6]; and

---

[5] Related, common questions are whether due process or the Medicaid Act require the good cause exception or good cause hearings at all, and whether TennCare provides such hearings.

[6] Plaintiffs allege this language incorporates the valid factual dispute policy into the NODs and renders them misleading by implying "it [is] not sufficient to merely request a fair hearing" to obtain one, which Plaintiffs argue is contrary to the law. (Doc. No. 225 at 15). Accordingly, another common question is whether TennCare's valid factual dispute policy is lawful.

13

the NODs' omission of an explanation as to why its recipients do not qualify "for other Medicaid categories." (Doc. No. 169 at 3). Finding answers to these questions will advance the litigation. See Hamby, 368 F.3d at 562 (finding notices "constitutionally inadequate" where they did not advise plaintiffs of "the consequences of re-applying after a denial [of TennCare coverage] instead of appealing such decision"). They also closely resemble a question another court in this circuit has found satisfied commonality. Dozier, 2014 WL 5483008, at *22 (question regarding whether notices with certain uniform language were "inadequate under the Medicaid Act, its implementing regulations, and the Due Process Clause" was common to the class).

There are also questions common to the class that are not tied to the NODs. One is whether Defendant considers all categories of eligibility before terminating enrollees' coverage.[7] See J.M., 337 F.R.D. at 449 (question regarding whether Defendants "consider[ed] Plaintiffs for all classes of assistance when Defendants made the ex parte determination[s] of ineligibility" for healthcare coverage was common to class). Answering this question clearly will advance the litigation. One of Plaintiffs' claims is that TennCare fails its duty to "consider all bases of eligibility" for enrollees before "making a determination of ineligibility." 42 C.F.R. § 435.916. Plus, answering this question (and the others described by the Court) may produce additional common questions. E.g., whether injunctive or declaratory relief is appropriate and, if so, what type. The class meets the commonality requirement.

*Third*, the class fulfills the typicality requirement. "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the

---

[7] While this question is not tied to the NODs per se, a related question the class may litigate does concern the NODs (namely, whether TennCare's NODs unlawfully misled recipients to think TennCare had considered all bases of eligibility, all program rules, and all facts for their recipients). (See Doc. No. 142-5 at 15).

14

class." Sprague, 133 F.3d at 399. Typicality "determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." Beattie v. CenturyTel, Inc., 511 F.3d 554, 561 (6th Cir. 2007) (citation and quotation omitted). Here, although not all injuries Plaintiffs suffered were uniform, the "relevant injur[ies]" are the ones "plaintiffs seek to remedy through declaratory and injunctive relief." Nat'l Fed'n of Blind of California v. Uber Techs., Inc., No. 14-CV-04086 NC, 2016 WL 9000699, at *6 (N.D. Cal. July 13, 2016); see also Beattie, 511 F.3d at 561 ("[F]or the district court to conclude that the typicality requirement is satisfied, 'a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law.'") (citation omitted). Concerning those injuries, as go the claims of the named Plaintiffs, so will go the claims of the broader class. For example: if the stock language in, and uniform omissions from, Plaintiffs' NODs were unlawful, then they were unlawful for the remainder of the class as well. Typicality is satisfied.

*Fourth*, the class meets the adequacy requirement. This requirement concerns both Plaintiffs and their attorneys. Beattie, 511 F.3d at 563.

To start, Plaintiffs will adequately represent the interests of the class. Named plaintiffs are adequate representatives, generally, where they "possess the same interest and suffer the same injury as the class members." Id. at 562 (citation and quotation omitted). The "adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 625 (1997). Here, all Plaintiffs have allegedly suffered the same injury in the form of termination of benefits without adequate notice and subject to an unlawful process. They have the same interests moving forward; namely, they wish for any unlawful TennCare processes to be remedied (such that they can either obtain

15

reinstatement or, if already reinstated, avoid future terminations unaccompanied by lawful procedures). There is no indication anywhere in the record that Plaintiffs and unnamed class members have conflicts of interest. Plaintiffs are adequate class representatives.

Further, Plaintiffs' attorneys are adequate. They include attorneys from the Tennessee Justice Center and the National Health Law Program. (Doc. Nos. 5-2, 5-3). They have extensive experience in class action cases, including many involving Medicaid and other publicly funded health insurance programs. (Id.). The Court does not doubt, and Defendant does not contest, that Plaintiffs' attorneys are "qualified, experienced and generally able to conduct the litigation." Beattie, 511 F.3d at 562 (citation and quotation omitted).

> 2. *The Class Meets Rule 23(b)(2)'s Requirements.*

Rule 23(b)(2) permits certification of the class. Defendant "has acted or refused to act on grounds that apply generally to the class," the class seeks an indivisible remedy, and the class is cohesive. Fed. R. Civ. P. 23; Dukes, 564 U.S. at 360; Romberio, 385 F. App'x at 433.

Defendant has acted on grounds that apply generally to the class. Defendant included, or omitted, information uniformly in the NODs it sent to class members, as discussed. (Doc. Nos. 63-2, 142-7, 142-23, 142-24, 142-25, 142-26, 142-27, 142-28, 142-29). Further, Defendant's alleged practice of failing to consider all eligibility categories before terminating a member's coverage applies generally to the class, if such a practice exists. Such matters are prime candidates for injunctive classes. Courts "routinely grant class action status under Rule 23(b)(2) in cases 'alleging systemic administrative failures of government entities.'" Vazquez Perez v. Decker, No. 18-CV-10683 (AJN), 2020 WL 7028637, at *9 (S.D.N.Y. Nov. 30, 2020) (citation omitted).

Next, Plaintiffs seek indivisible relief. The "indivisibility" requirement incorporates the

16

"notion that the [defendant's] conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Dukes, 564 U.S. at 360 (citation and quotation omitted). Defendant's conduct meets that standard. Consider the NODs' stock regulatory citations: they are either sufficient for all class members or for none of them.[8] If Plaintiffs prevail on this issue, the Court could craft "a single injunction or declaratory judgment" addressing it classwide. Dukes, 564 U.S. at 360. For example, it might declare the regulatory citations unlawful and order TennCare to provide more specific ones.[9] See N.B. v. Hamos, 26 F. Supp. 3d 756, 775 (N.D. Ill. 2014) (certifying a Rule 23(b)(2) class where injunctive or declaratory relief could be fashioned "in the form of requiring modifications to the allegedly unlawful policies at issue"). Of course, "it would be premature to define the precise contours of the remedy at this early stage; the plaintiffs will first have to establish their entitlement to injunctive relief." Id. But it "suffices to conclude that an injunction or declaration could be fashioned that would provide relief to each member of the class." Id. Indivisibility is present.

Further, cohesion is satisfied. Cohesion concerns "the homogeneity of the interests of the

---

[8] Defendant asserts that "in order to establish a due process claim based upon a constitutionally defective or inadequate notice, an individual must establish that he relied upon that notice to his detriment." (Doc. No. 221 at 22). Accordingly, he argues, even if Defendant's NODs are inadequate, class-wide relief will not be appropriate. (Id. at 22 n.5). This argument relates to the merits of Plaintiffs' claims or to the contours of the injunctive relief that may be necessary if Plaintiffs ultimately succeed on one of the certified issues. Either way, Defendant's concern need not be resolved at this stage. Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013); N.B. v. Hamos, 26 F. Supp. 3d at 775.

[9] Plaintiffs suggest that requiring reinstatement for all class members until they are given adequate pre-termination notice would be the appropriate injunctive remedy. (Doc. No. 228 at 6 ("Plaintiffs raise several common deficiencies that support reinstatement as a matter of law to every class or subclass member.")). Maybe. Maybe not. It "bears noting . . . that the Court is not endorsing the broad remedial language" advanced by Plaintiffs. N.B., 26 F. Supp. 3d at 775. However, that a potential injunction might "be more narrow, and more specific, than the general order the plaintiffs outline" does not prevent certification. Id.

17

members of the class." <u>Romberio</u>, 385 F. App'x at 432–33 (citation omitted).   To be cohesive, "unitary adjudication of the claims" must be possible without "individualized determinations." <u>Id.</u>  As Defendant recognizes, indivisibility and cohesion go "hand-in-hand."   (Doc. No. 164 at 28).  Plaintiffs' class is cohesive for the same reasons the relief they seek is indivisible: either Defendant's notices and practices violate his legal obligations to all class members or to none.

         3.      *The Class Is Only Certified With Respect to Particular Issues Under Rule 23(c)(4).*

     Although the Court is certifying the class to resolve the common questions outlined in Section III.A.1,[10] it is not certifying the class with respect to all issues raised by Plaintiffs.   Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); <u>see also</u> <u>Powers v. Hamilton Cnty. Pub. Def. Comm'n</u>, 501 F.3d 592, 619 (6th Cir. 2007) (district courts "must be vigilant to ensure that a certified class is properly constituted").   Plaintiffs seek to resolve "[w]hether TennCare's template notices provide sufficiently detailed and clear statements of the reasoning supporting the agency's termination

---

[10] The Court will also permit the class to litigate the lawfulness of TennCare's prior use of language, in some NODs, telling recipients they could only get a hearing if they thought TennCare made a "mistake about a fact."   (<u>See</u> Doc. No. 213 at 1).   And the Court will allow collective litigation over whether TennCare's policy of denying good cause exceptions or hearings based on "allegations of non-receipt" of a notice is lawful (Doc. No. 166 ¶ 72(c)); whether TennCare "systematically fails to provide fair hearings at any time" (Doc. No. 140-1 at 22); and whether TennCare is required to provide fair hearings within 90 days of an appeal and, if so, whether it fails to do so (<u>id.</u>).   These issues may not have impacted all class members in the past, but "[a]ll of the class members need not be aggrieved by . . . [the] defendant's conduct in order for some of them to seek relief under Rule 23(b)(2)."   <u>Gooch v. Life Invs. Ins. Co. of Am.</u>, 672 F.3d 402, 428 (6th Cir. 2012) (citation omitted).   "What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class."   <u>Id.</u>   Besides, all Plaintiffs seek to prevent any future harm they might suffer at the hands of Defendant's allegedly unlawful policies (such as during annual redetermination).   A final note: where the Court phrases questions in present tense (e.g., "whether Defendant *considers* all categories of eligibility before terminating enrollees' coverage"), that does not preclude the class (or the subclass defined below) from litigating the past-tense version of the same questions (e.g., "whether Defendant *considered* all categories of eligibility for class members before terminating their coverage"), or vice versa.

decisions." (Doc. No. 140-1 at 21). Although this question resembles one certified by the Court concerning the NODs' regulatory citations, there are important differences. Whereas all class members received the same generic regulatory citation in their NODs, the NODs did not all list the same reasons for termination. (Doc. No. 142-7). There are many reasons for termination that can be listed in an NOD. (Id.). In fact, it appears there are at least 50, which vary in their length and specificity. (Id.). So, TennCare has not acted "on a ground that is applicable to the entire class" regarding the NODs' reasons for termination. Gooch, 672 F.3d at 428. The Court would have to make "individualized determinations" among class members' NODs to resolve the broad question of whether they provide sufficiently clear and detailed reasons supporting termination. Romberio, 385 F. App'x at 432. This issue is not suitable for collective litigation under Rule 23(b)(2).[11] Id.

### 4. The Court Will Certify a Disability Subclass.

The Court will certify a disability subclass, as requested. However, it will only do so with respect to particular issues. The subclass meets the requirements of Rule 23.

*First*, the subclass is sufficiently numerous. "When the exact size of the class is unknown, but 'general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.'" Youngblood v. Linebarger Googan Blair & Sampson, LLP, No. 10-2304, 2012 WL 4597990, at *5 (W.D. Tenn. Sept. 30, 2012) (citation omitted). Here, given the number of individuals in the class (over 100,000) and the number of disability-related eligibility categories,

---

[11] Theoretically, a group of enrollees who all received the same reason (among the 50-plus choices) supporting their termination might be able to litigate as a class. Romberio, 385 F. App'x at 430 (describing a Fifth Circuit case in which the necessity for individualized determinations was mitigated because the "class could be divided into sub-classes"). But that is not a question before the Court. Plaintiffs have asked for one class and two subclasses, none of which can collectively litigate whether the NODs they received included sufficiently detailed and clear statements of the reasons for their recipients' terminations.

19

common sense indicates the subclass is large. Plus, Defendant does not contest numerosity. That requirement is satisfied.

*Second*, the subclass shares common issues. Plaintiffs contend Defendant "lacks any system to grant requests for reasonable accommodations" for disabled persons navigating TennCare.[12] (Doc. No. 169 at 2). They also claim Defendant "fail[s] to evaluate disability-related eligibility categories" in termination decisions. (Doc. No. 140-1 at 26). Whether these contentions are true are capable of "classwide resolution." Dukes, 564 U.S. at 350. Put simply: TennCare either has a system to grant accommodation requests, or it does not; it either evaluates disability-related eligibility categories pre-termination, or it does not. Moreover, whether Plaintiffs' contentions, if true, violate the ADA are additional common questions whose resolution "will advance the litigation." Sprague, 133 F.3d at 397; see 42 U.S.C.A. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."); 28 C.F.R. § 35.130 ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

*Third*, the subclass meets the typicality requirement. The alleged "injury to the named plaintiff[s] and the conduct affecting the class," Beattie, 511 F.3d at 561, are identical here. Named and unnamed subclass members alike complain of termination of benefits by an agency lacking systems for checking disability-related eligibility and granting accommodation requests.

---

[12] A related, common issue Plaintiffs raise is whether TennCare provides adequate "in-person assistance" for disabled persons (and, if not, whether that violates the ADA). (Doc. No. 140-1 at 24).

20

Regarding whether Defendant *actually* lacks such systems (and if so, whether that is lawful): as "goes the claim of the named plaintiff[s]," so will "go the claims of the [sub]class." <u>Sprague</u>, 133 F.3d at 399; <u>see also</u> <u>Beattie</u>, 511 F.3d at 561.

*Fourth*, the subclass is adequate. Its members allegedly suffered the same injury and share the same interest—all seek a TennCare system that upholds their ADA rights. Moreover, the record shows no conflicts of interest. And the subclass's attorneys are adequate for the reasons previously discussed.

*Fifth*, the subclass falls within Rule 23(b)(2). Defendant has allegedly "refused to act on grounds that apply generally to the class" by failing to implement a system to grant reasonable accommodation requests and screen for disability eligibility categories. Fed. R. Civ. P. 23(b)(2). Plus, if Plaintiffs succeed the Court could provide class-wide injunctive relief. For example, it could declare Defendant's omissions unlawful under the ADA or issue an injunction requiring Defendant to remedy those omissions.

Notably, although the Court is certifying a disability subclass regarding the above issues under Rule 23(c)(4), it is not certifying the subclass on all issues raised by Plaintiffs. Plaintiffs claim members of the disability subclass have been injured by TennCare because it "sends incomprehensible notices" and "issues unduly burdensome requests for information that is irrelevant or already available to the state." (Doc. No. 140-1 at 24; <u>see also</u> <u>id.</u> ("[A]nswering the common factual question of whether Defendant's notices are unnecessarily complex or difficult to understand, and whether this disparately impedes the ability of persons with disabilities to effectively and timely respond will significantly advance the claims of the Disability Subclass.")). Notices are not uniform. (Doc. No. 142-7.) As for the information requests: Plaintiffs have not shown all subclass members are subject to the same ones or even the same types (their brief does

not define the requests to which it refers).   (Doc. No. 140-1 at 24).   The Court will not permit collective litigation concerning these matters for the same reasons it will not permit collective action concerning the NODs' reasons for termination.   <u>Supra</u> Section III.A.3.

5.     *The Court Will Not Certify the Reinstatement Subclass.*

The Court will not certify the reinstatement subclass.   The issues raised on behalf of that subclass (<u>see</u> Doc. Nos. 225, 228) are either incorporated in those certified for the class or are not appropriate for class treatment, as outlined above.

B.     <u>A Preliminary Injunction Is Not Warranted.</u>

Plaintiffs have not shown they are entitled to a preliminary injunction.   They attack a wide variety of TennCare's policies, practices, and alleged errors.   However, several considerations prevent Plaintiffs from converting their attacks into a showing of irreparable harm.   To start, TennCare has a disenrollment moratorium in place.   So, there is no immediate danger of new, erroneous coverage terminations.   Moreover, TennCare has corrected the errors that led to its previous, mistaken disenrollments.   And it has reinstated the coverage of impacted class members. Finally, though Plaintiffs allege past constitutional harms, they do not show current or ongoing impairments of their constitutional rights.   All this means there is neither a risk of impending irreparable injury nor a need for immediate injunctive relief, as outlined below.

1.     *TennCare's Past SSI Misidentifications Do Not Show a Danger of Irreparable Harm.*

Plaintiffs aver Defendant misidentified some class members as "not currently receiving SSI" and wrongfully terminated their coverage.   (Doc. No. 141-1 at 16).   They use certain named Plaintiffs as examples.   (<u>Id.</u> at 17).   They also note Defendant disenrolled 2,773 other class members for "not currently receiving SSI," implying some may have been wrongfully disenrolled. (<u>Id.</u>).   None of this shows any class members are likely to suffer irreparable injury.

22

First of all, the named Plaintiffs disenrolled from SSI categories are not in danger. They have all had their coverage reinstated.[13] Hence, they are seeking redress for a past harm, which is not an adequate basis for a preliminary injunction. Gale, 751 F. App'x at 884–85; Sharpe v. Cureton, 319 F.3d 259, 274 (6th Cir. 2003).

Similarly, the 2,773 disenrolled class members are not at risk. "TennCare worked with SSA officials to develop a process . . . through which TennCare sent information on . . . *all* of the 2,773 individuals who were disenrolled to SSA to confirm those individuals' SSI payment status."[14] (Doc. No. 166 ¶ 24(c)). TennCare identified a small number of individuals within that group who had been wrongfully disenrolled and "promptly reinstated their coverage." (Id.).

---

[13] Indeed, regardless of category, all named Plaintiffs are currently covered except for Allana Person. (Doc. No. 141-1 at 28; Doc. No. 160 at 8; Doc. No. 222 ¶ 13). And she has not shown likely irreparable harm. If her constitutional rights were violated, "it was in the past." Conn, 199 F. Supp. 3d at 1175. As for other potential injuries: the amended complaint notes she has "a Bicornuate Uterus" and "eczema." (Doc. No. 202 ¶¶ 392–93). It does not describe any symptoms her Bicornuate Uterus will cause. (Id.). It does say she has "discomfort" from the eczema. (Id. ¶ 393). But she is using "over-the-counter creams to alleviate [her] discomfort." (Id.). The Court is sympathetic to Ms. Person and certainly does not wish to downplay her conditions, but this does not demonstrate irreparable harm. See Rhinehart v. Scutt, 509 F. App'x 510, 510, 514 (6th Cir. 2013) (inmate seeking appointment with liver specialist to get "a treatment plan for his liver disease" did not face irreparable harm where he was receiving "some medical care" and the "seriousness of his condition" did not require immediate relief); Morgan, 518 F.2d at 240 (plaintiff who "would lose her medical insurance benefits" and was in an "overwrought condition" after employment termination did not show irreparable harm where upcoming need for coverage was "conjectural only"); Mertz ex rel. Mertz v. Houstoun, 155 F. Supp. 2d 415, 418, 428 (E.D. Pa. 2001) (plaintiff in nursing home asking court to "enjoin defendant from denying Medicaid benefits" did not demonstrate irreparable harm where she faced no immediate "prospect of expulsion from her nursing home"). Further, it is not clear Ms. Person is entitled to coverage. She has not given TennCare documentation about her father's income, which is required to determine her eligibility. (Doc. No. 222 ¶ 13). This counsels against an injunction. Matrangolo v. Velez, No. CIV.A. 13-6289 MAS, 2014 WL 2446122, at *3 (D.N.J. May 30, 2014) (denying request to enjoin defendant from denying Medicaid benefits where "Plaintiff's own conduct ha[d] hindered the Medicaid application process").

[14] "[E]ligibility for the SSI Medicaid category of eligibility is exclusively determined by the official information received from SSA." (Doc. No. 166 ¶ 10).

23

Finally, there is no "certain and immediate" danger of irreparable injury to any other class members based on past SSI misidentifications. Memphis A. Philip Randolph Inst. v. Hargett, 978 F.3d 378, 391 (6th Cir. 2020) (quoting D.T., 942 F.3d at 327). Defendant found and addressed the errors that led to those misidentifications, making future, similar mistakes unlikely. (Doc. No. 166 ¶¶ 19–24). Besides, there is a disenrollment moratorium in effect. (Id. ¶ 37).

In sum: Plaintiffs' contention that Defendant wrongfully disenrolled class members for "not currently receiving SSI" does not support Plaintiffs' irreparable harm argument.[15]

> 2. *TennCare's Past Case Merger Issues Do Not Demonstrate Irreparable Harm Is Imminent.*

Next, Plaintiffs contend Defendant "failed to consider all available eligibility information for members whose case files Defendant mangled through the state's case-merger process." (Doc. No. 141-1 at 18). As evidence of Defendant's errors, Plaintiffs note that 17 of them experienced merge-related issues. (Id. at 20). They also assert Defendant terminated over 2,900 class members based on such issues since this case began. (Id.). These claims do not show irreparable harm is likely.

Beginning with the named Plaintiffs: they are not at risk of irreparable harm. Their case-merger issues are a past harm. After they experienced those issues, they have all had their coverage reinstated. Supra Section III.B.1 n.13.

As for the 2,900 class members who were terminated: they are not in danger either. The "terminations were temporary; every one of them was identified by TennCare and coverage was

---

[15] Plaintiffs' more specific argument (that Defendant misclassified members in three particular SSI-related categories: Widow/Widower, Disabled Adult Child, and Pickle) also does not establish irreparable harm. Defendant has already identified the sources of these past alleged errors and remedied them. (Doc. No. 166 ¶ 83(i), (k)–(l)). Further, anyone impacted by these alleged errors has likely been reinstated. (Id. ¶ 24(c)).

24

reinstated without any gap in coverage." (Doc. No. 166 ¶ 83). Indeed, "in many instances the period before reinstatement was so short that the members likely never knew of the unintentional termination." (Id.). And "these individuals did not need to file an appeal or otherwise take any steps to have the issue with their eligibility corrected." (Id.).

Additionally, Defendant's prior case-merge issues do not indicate other, unknown class members are likely to suffer irreparable injury. TennCare has "identified and corrected any cases impacted by [the] sort of 'case merge' issues" that Plaintiffs have identified. (Id.; see also id. ¶ 27(c)). It has also "worked with its vendor Deloitte to implement a 'case merge' tool in TEDS" to help prevent merge errors leading to erroneous terminations. (Id. ¶ 83). Finally, TennCare runs "daily reports" that identify cases with potential merge errors and "automatically correct[s] any . . . that are found." (Id.).

      3.    *TennCare's "Conversion Status" Policy Does Not Indicate Class Members Face Irreparable Harm Absent an Injunction.*

Plaintiffs also take issue with Defendant's "conversion status" policy. (Doc. No. 170 at 3). This policy does not create a risk of irreparable harm.

The conversion status policy relates to TennCare's conversion of data into TEDS. (Doc. No. 166 ¶ 23). "TennCare performed a 'benefits match' process on converted cases to confirm that TEDS placed members in the same or a higher eligibility category as they had in interChange." (Id.). If the "'benefits match' resulted in the member being immediately selected for disenrollment because TEDS did not identify them as eligible in the same or higher category, TennCare marked those converted cases as being in a 'conversion status.'" (Id.). "For cases in a 'conversion status,' automated eligibility rules that would normally run and could *negatively* impact a member's eligibility status *do not apply*." (Id. (emphasis added)). Cases remain in conversion status "until either the member makes contact with TennCare to report a change or the

25

member gets selected for annual redetermination." (Id.).

If anything, the conversion status policy lessens the likelihood a class member will suffer irreparable harm. TennCare implemented the policy "[i]n order to limit eligibility errors arising from the conversion of data into TEDS." (Id.). It seems logically geared toward that goal.

Plaintiffs argue, to the contrary, that in "many cases" the conversion status policy resulted in class members' "termination without an assessment of individual eligibility or any notice whatsoever." (Doc. No. 170 at 3 (citing Doc. Nos. 1, 166)). They also claim "Defendant has done nothing to restore coverage" to impacted individuals. (Id.). However, the documents Plaintiffs cite do not support these propositions.

The first document Plaintiffs cite is a declaration by Ms. Hagan. (Id. (citing Doc. No. 166 ¶¶ 19–23, 25–27, 80–81)). In the cited paragraphs, she describes the conversion status policy and certain errors that arose in the conversion process. (Doc. No. 166 ¶¶ 19–23, 25–27, 80–81). The errors did not stem from the conversion status policy; rather, they resulted from the conversion process itself. (Id. ¶ 25). Regardless, as Ms. Hagan explains, TennCare identified and corrected the errors. (Id.). And it reinstated coverage for those affected. (Id.). This does not support Plaintiffs' argument that the conversion status policy has harmed, or will harm, anyone.

The second document Plaintiffs cite fares no better. It is the original complaint they filed.[16] (Doc. No. 170 at 3 (citing Doc. No. 1 ¶¶ 97, 133–59, 247–85, 305–22, 371–92, 411–19)). The parts of the complaint Plaintiffs cite are descriptions of certain named Plaintiffs' cases. (Doc. No. 1 ¶¶ 97, 133–59, 247–85, 305–22, 371–92, 411–19). None of the descriptions mention the conversion status policy. (Id.). And all Plaintiffs from the descriptions have had their coverage reinstated. Supra Section III.B.1 n.13.

---

[16] It has subsequently been amended. (Doc. No. 202).

26

Certainly, Plaintiffs have not shown that irreparable harm is likely based on the conversion status policy.   <u>Winter</u>, 555 U.S. at 22.

<blockquote>
4.    *TennCare's Past Income Miscalculations Do Not Create a Risk of Impending Irreparable Harm.*
</blockquote>

Plaintiffs allege Defendant "erroneously" disenrolled class members "based on a mistaken finding that their income exceeded a categorical coverage limit."  (Doc. No. 141-1 at 21, 22). They note Plaintiffs Michael Hill and Kerry Vaughn were disenrolled for this reason, as well as over 400 class members since March 19, 2020.   (<u>Id.</u> at 22 (citing Doc. No. 142-15)).

None of these individuals face irreparable harm because they all have had their coverage reinstated.  (Doc. No. 142-15).  Plus, their erroneous terminations do not show others face irreparable injury.  That Defendant found the 400 individuals and reinstated their coverage indicates Defendant has a process for identifying and remedying income miscalculations.   Indeed, that is what the record cited by Plaintiffs suggests.  (Doc. No. 141-1 at 22 (citing Doc. No. 142-2 ¶ 25(e)).   To wit: Defendant screened other cases for the specific issues experienced by Mr. Hill and Ms. Vaughn, found nine similar cases involving incorrect disenrollments, and reinstated coverage for those cases.  (Doc. No. 142-2 ¶ 25(e)).

Plaintiffs speculate that the number of erroneous terminations involving income miscalculations before March 19, 2020 "is likely much higher, since terminations all but stopped during the pandemic."  (Doc. No. 141-1 at 22).   However, even if this is the case, the Court has no reason to doubt Defendant has identified and remedied any such errors, as it did for the individuals described above.  Defendant's past income miscalculations do not demonstrate the class is in jeopardy of irreparable injury.

5.    *TennCare's Alleged Misrepresentations of Appeal Rights Do Not Show Anyone Is in Danger of Irreparable Harm.*

Plaintiffs claim Defendant's NODs were "misleading" regarding post-termination rights. (Doc. No. 141-1 at 23).   They only identify one person—Plaintiff Carlissa Caudill—allegedly impacted.   (Id. at 23–24).   Ms. Caudill is not in danger of irreparable harm because her coverage has been reinstated.   (Doc. No. 142-2 ¶ 127).

Moreover, examining Ms. Caudill's case does not demonstrate there is "certain and immediate" danger of irreparable injury to any other class member.   Hargett, 978 F.3d at 391. Plaintiffs contend the following NOD statement is misleading: "If you don't think we made a mistake about a fact, you can't have a fair hearing."[17]   (Doc. No. 141-1 at 23).   They aver this "omits members' right to challenge not only 'matters of fact' but also the state's 'application of law.'"   (Id. (citation omitted)).   They cite to Ms. Caudill's case, stating: "Defendant admits to erroneously terminating Plaintiff Caudill's coverage and dismissing her appeal without a hearing despite Defendant's mistake of fact concerning her SSI."   (Id. (citing Doc. No. 142-2 ¶¶ 125–27)).

However, this mistake of fact *by Defendant* does not suggest *Ms. Caudill* was misled with respect to her appeal rights.[18]   If anything, the record suggests the opposite.   Ms. Caudill appealed TennCare's decision after she received the NOD, meaning she knew she had the right to appeal.   (Doc. No. 142-2 ¶ 124).   It seems any similarly situated class members would do the same.   Accordingly, Ms. Caudill's case is not evidence that any class members are in danger of

---

[17]  The Court raised concerns about this language at the motion hearing in this matter.   After the hearing, TennCare quite helpfully "voluntarily modified its NOD Template to amend that language."   (Doc. No. 213).

[18] Notably, Defendant has remedied the errors made in Ms. Caudill's case for her and for similarly situated class members.   (Doc. No. 142-2 ¶¶ 35(a), 35(e), 123, 125–28; Doc. No. 166 ¶ 83(a)).

irreparable injury.

Plaintiffs' remaining arguments about Defendant's allegedly misleading NODs also do not convince the Court irreparable injuries are imminent. Plaintiffs complain the NODs fail to inform recipients about the good cause exception. (Doc. No. 141-1 at 23–24). But they have not identified anyone who should have received a good cause exception and lacks coverage.[19] (Id.). True, it is possible some class member might wrongfully be without coverage right now *if* they were incorrectly found ineligible and *if* they failed to timely file an appeal and *if* that was due to a rare issue warranting a good cause exception and *if* they did not thereafter seek healthcare coverage (such as through a new TennCare application). But "all those 'ifs' rule out the 'certain and immediate' harm needed for a preliminary injunction." D.T., 942 F.3d at 327.

Plaintiffs' argument that the NODs fail to inform recipients about the 90-day reconsideration period, similarly, points only to "speculative or theoretical" harm. Hargett, 978 F.3d at 391. Plaintiffs have identified no one facing irreparable harm because of this omission.[20] (Doc. No. 141-1 at 24–25). And it is difficult to imagine such an individual exists. The

---

[19] Plaintiffs imply in a supplemental brief that four named Plaintiffs should have been offered a good cause exception when they contacted TennCare. (Doc. No. 225 at 13 (citing Doc. No. 142-2 ¶ 71(c); Doc. No. 202 ¶¶ 146, 209, 245–46, 470–72)). This may or may not be true. (Compare Doc. No. 142-2 ¶ 71(c) (noting "good cause exceptions are limited to extraordinary circumstances" and "[m]ere allegations of non-receipt [of notice] without more . . . do not automatically qualify an appellant for a good cause exception"), with Doc. No. 202 ¶¶ 146, 209 (describing two cases in which Plaintiffs alleged non-receipt of notice to TennCare), ¶¶ 245–46, 470–72 (describing one case in which a Plaintiff had been unable to respond to a TennCare notice because of his disability and another case in which a Plaintiff's untimeliness stemmed from grief and depression, among other things)). Regardless, all four Plaintiffs have coverage now. Supra Section III.B.1 n.13.

[20] They state only that "[e]ven when members timely submitted requested information within the ninety-day window, as Defendant admits Plaintiffs Linda Rebeaud and Johnny Walker did, Defendant nonetheless failed to reinstate their coverage as required by law." (Doc. No. 141-1 at 24). But Defendant *did* eventually reinstate both Plaintiffs' coverage and put in place measures to ensure they do not erroneously lose coverage again. (Doc. No. 142-2 ¶¶ 179–80, 201–206).

reconsideration period permits enrollees who return renewal packets within 90 days of termination to have eligibility reinstated to the date of termination. Tenn. Comp. R. & Regs. 1200-13-20-.09. Conversely, if the renewal packets are "returned after the 90-day reconsideration period," they "will be treated as new applications." (Doc. No. 166 ¶ 58). So, in either event, an eligible enrollee will have coverage reinstated (and certainly should have had coverage reinstated by now, given the length of the moratorium).

Further, Plaintiffs' attacks on the NODs' alleged allusions to the valid factual dispute policy do not prove irreparable harm. (See Doc. No. 225 at 15). Plaintiffs say the NODs "instructed members that, if they wanted to appeal their termination, it was not sufficient to merely request a fair hearing." (Id.). "Rather, the NODs instructed members that they must state '[t]he reason why you want to appeal - tell us as many facts as you can,' and provide '[a]ny proof that shows why you think we made a mistake.'" (Id.). Plaintiffs claim "[t]hat demand was likely to deter appeals, since the notices' omission of crucial facts about TennCare's reasons left members ill-equipped to explain, much less submit proof, why TennCare had made a mistake." (Id.). However, the record shows no class member without coverage as a result of this language from the NODs. Any harm this language might cause is entirely theoretical, given the moratorium in place, Defendant's extensive efforts to remedy past, mistaken disenrollments, and Plaintiffs' ongoing health insurance coverage.

6. *TennCare's Alleged Failures to Collect Information Do Not Demonstrate Irreparable Injury Will Occur Absent an Injunction.*

Plaintiffs contend that Defendant "failed to collect necessary information for seven of 25 categories of TennCare coverage." (Doc. No. 170 at 4 & n.2). But Plaintiffs offer "scant evidence" to support this proposition and fail to show irreparable harm based on it. Patel, 2020 WL 5849346, at *4.

30

To begin with, many of the citations Plaintiffs offer to show Defendant failed to collect information do not support that claim. (E.g., Doc. No. 142-2 ¶ 14 & n.8 (describing how TEDS "prevents worker error" related to the Pickle Amendment eligibility category), ¶ 59(f) (describing the questions the preterm notice will ask "once the COVID-19 moratorium lifts"), ¶ 59(h) (stating TennCare added a question to its preterm notice questionnaire "in response to Plaintiffs' concern that SSI-related categories can be overlooked" while noting it "did not previously ask this question because the ACA discourages States from seeking information from members if it is available from another source such as SSA")).

Other citations are related to Plaintiffs' claim that Defendant failed to collect information, but either do not establish it or show no irreparable harm is imminent. (E.g., Doc. No. 166 ¶ 83(g) (describing a TEDS error TennCare discovered, after which it fixed the error and "took all reasonable steps to identify other potentially impacted individuals and corrected their cases")). Plaintiffs include multiple citations to Plaintiff S.L.C.'s case. (Doc. No. 170 at 4 n.2 (citing Doc. No. 1 ¶¶ 254–55; Doc. No. 142-2 ¶¶ 25(d), 133)). S.L.C. is eligible for coverage "in the Institutional Medicaid category," in part, because she is "receiving HCBS [Home and Community Based Services]." (Doc. No. 142-2 ¶ 133). However, "information about her receipt of HCBS was not loaded into TEDS" during the conversion process. (Id. ¶ 25(d)). And a subsequent worker error resulted in S.L.C.'s living arrangement in TEDS being listed as "home" rather than "HCBS." (Id. ¶ 133). As a result, TEDS issued S.L.C. a preterm notice in August 2019. (Id.). S.L.C. responded to the preterm notice, but "she incorrectly answered 'no' to the question . . . 'do you need home care either in a nursing home or at home?'" (Id. ¶ 134). S.L.C. then received an NOD, successfully appealed, and is currently covered. (Id. ¶¶ 134–35). S.L.C.'s case illustrates that mistakes occasionally happen. It does not prove that Defendant, as a matter of practice, fails

(or failed) to collect necessary information for a coverage category.[21]

Similarly, Plaintiffs claim that "Defendant failed to consider eligibility based on receipt of institutional care in a hospital or nursing facility for 30 days or more, adding a question necessary to identify that group only after this case was filed." (Doc. No. 170 at 4 n.2). It is true Defendant added such a question to the preterm notice questionnaire. It reads: "Are you in a medical facility (like a hospital) and have been there at least 30 days? Or are you in a medical facility now and will be there for at least 30 days?" (Doc. No. 166 ¶ 65(a)). But Defendant also had a similar question in the prior version of the questionnaire. It read: "Do you live in a medical facility or nursing home? Or do you need home care either in a nursing home or at home?"[22] (Doc. No. 142-2 ¶ 59(f); Doc. No. 142-8 at 11). So, it does not appear Defendant ignored the institutional eligibility category before,[23] even though Defendant's subsequent preterm notice questionnaire has become more refined. Plus, Plaintiffs have not provided an example of anyone without coverage based on the difference in the language between the two questionnaires.

For the foregoing reasons, Plaintiffs have not shown any class members are in danger of irreparable harm based on their claim that Defendant failed to collect necessary information for seven categories of eligibility.

---

[21] Plaintiffs allege in a supplemental brief that "TennCare did not check its own enrollment records to see if a person was already receiving HCBS unless the individual volunteered information suggesting they were." (Doc. No. 225 at 10 (citing Doc. No. 166 ¶ 57)). They cite to a discussion of renewal packets in one of Ms. Hagan's declarations. (Id.). But the renewal packets do not rely on class members "volunteering" information, as Plaintiffs suggest. Instead, they specifically ask whether recipients are receiving HCBS. (Doc. No. 166-6 at 27).

[22] This question is also included in the newer version of the form. (Doc. No. 166 ¶ 65(a)).

[23] This category requires one to "[b]e in a medical institution at least thirty (30) consecutive days or meet nursing facility level of care," among other things. Tenn. Comp. R. & Regs. 1200-13-20-.08.

*TennCare's Alleged Failures to Provide Information Do Not Establish Impending Irreparable Injury.*

Plaintiffs claim Defendant's notices omitted the specific reasons and legal authorities supporting ineligibility decisions. (Doc. No. 225 at 11). They advance three arguments to support this claim. (Id. at 11–13). None of these arguments, or the associated evidence, support an irreparable harm finding.

*First*, Plaintiffs attack the language used in Plaintiff S.F.A.'s NOD. (Id. at 11). As an initial matter, S.F.A.'s coverage has been restored, so she is not in danger of irreparable harm. (Doc. No. 142-2 ¶ 108).

Moreover, S.F.A.'s case does not show a systemic issue that places others in danger of irreparable harm. The NOD language attacked by Plaintiffs states: "We received a change in your facts so we checked to make sure you still qualify. We reviewed your facts and decided that you don't qualify anymore." (Id. (citing Doc. No. 142-26)). Plaintiffs complain the NOD "does not state what facts TennCare thinks changed or which facts make SFA ineligible." (Id.). However, the notice does state the following under a "Why coverage is ending" heading: "We sent you a letter asking for more facts but you didn't send us what we needed. So we did not have enough information to decide if you qualify." (Doc. No. 142-26 at 5). This appears to be true. According to Ms. Hagan, TennCare had sent S.F.A. a notice "telling her family they needed to verify her father's income."[24] (Doc. No. 142-2 ¶ 104). If other class members received similar combinations of notices, it seems unlikely that would place them in danger of irreparable harm. Rather, it seems such class members would provide TennCare with the requested information to

---

[24] S.F.A.'s mother claims she never received this notice. (Doc. No. 202 ¶ 191). Ms. Hagan avers TennCare sent the notice to an address verified by S.F.A.'s mother (at which she has acknowledged receiving other notices) and states that the notice was not returned as undeliverable. (Doc. No. 142-2 ¶ 104).

restore coverage (assuming eligibility).

*Second*, Plaintiffs complain that when TennCare "determines that someone is ineligible due to excess income," the corresponding NOD "deliberately omits members' income information."[25]  (Doc. No. 225 at 12).   But the NODs do explain "what the income limit is for a specific category and that [the recipient is] over that limit."  (Doc. No. 166 ¶ 56; <u>see also</u> Doc. No. 142-7 at 2).   It seems this would help recipients challenge erroneous income-based terminations.   Regardless, Plaintiffs do not present any reason for the Court to believe Defendant has made such terminations that have yet to be remedied.   <u>Supra</u> Section III.B.4.   Accordingly, Plaintiffs' allegations concerning omissions of income information in NODs do not support an irreparable harm finding.

*Third*, Plaintiffs complain that "instead of providing the 'specific regulations that support' a member's proposed termination, TennCare NODs simply include an obscure reference, in 9-point font, to '[Tenn.Comp.R&Reg. 1200-13-20].'"  (Doc. No. 225 at 12).   Plaintiffs further note that "the NOD's citation is to a 95-page regulatory compendium, with no indication as to which of the myriad rules purportedly supports the termination of coverage or what they would need to show to prove eligibility in a hearing."  (<u>Id.</u> at 12–13).   True.   But Plaintiffs identify no individual who is without coverage due to this language.  (<u>Id.</u>).   And any harm to unknown class members that this language might have caused is too theoretical to show the "'certain and immediate' harm needed for a preliminary injunction."  <u>D.T.</u>, 942 F.3d at 327.

---

[25] According to Ms. Hagan, TennCare does so "[b]ecause the NOD may contain information on multiple individuals and/or multiple eligibility categories," meaning "Plaintiffs' suggestion that detailed income calculations are required in any NOD denying eligibility because a member is over income (as opposed to telling the member what the income limit is for a specific category and that they are over that limit) would render the NODs hopelessly confusing."  (Doc. No. 166 ¶ 56).

34

8. *TEDS' Past Programming Defect Does Not Show Anyone Is at Risk of Irreparable Harm.*

The programming defect identified by Plaintiffs does not indicate any class members face irreparable injury.  (Doc. No. 141-1 at 25).  The defect related to continuation of benefits ("COB").  (Id.).  Where terminated enrollees file in time for it, they receive COB pending the outcome of their appeals.  (Doc. No. 142-2 ¶ 71).  At one point, a TEDS defect "was not allowing appeal workers to update the 'COB timely' field in TEDS, which resulted in COB not being granted in some instances."  (Id. ¶ 35(e)).  However, "TEDS was modified to correct this issue on August 25, 2019."  (Id.).  Plus, all "Plaintiffs who were impacted by this issue," as well as "[a]ll similarly situated" class members, have had their COB pending appeal restored.  (Id.). This does not provide a basis for an irreparable harm finding.

Plaintiffs' contrary argument is not compelling.  They point out that "Defendant continued to deny numerous Plaintiffs COB after August 2019," implying Defendant has not, in fact, remedied the programming defect.  (Doc. No. 141-1 at 25).  But a close look at Plaintiffs' record citations tells a different story.

Plaintiffs cite to a brief denial of COB to Plaintiff Rhonda Cleveland in January 2020. (Doc. No. 141-1 at 25 (citing Doc. No. 142-2 ¶ 131)).  But this denial was not due to the TEDS programming issue that Defendant resolved in August 2019.  (Doc. No. 142-2 ¶ 129).  It was due to a separate programming issue that Defendant resolved in May 2020.  (Id.).

Next, Plaintiffs cite to Defendant's admission that Plaintiff Michael Hill's COB was "inadvertently terminated" in September 2019.  (Doc. No. 141-1 at 25).  Like Ms. Cleveland, Mr. Hill's termination had nothing to do with the programming issue Defendant resolved in August 2019.  (Doc. No. 142-2 ¶¶ 154–56.).  Instead, it was due to a "worker error" that has since been corrected.  (Id.).

35

Finally, Plaintiffs cite to Defendant's denial of COB to Plaintiffs J.S.K., M.N.S., and D.C.S. in September 2019. (Doc. No. 141-1 at 25 (citing Doc. No. 142-2 ¶ 161)). Once again, an examination of the document cited by Plaintiffs shows these denials had nothing to do with the programming issue Defendant resolved in August 2019. (Doc. No. 142-2 ¶ 161). Instead, the denials stemmed from a "worker error." (Id.). And "TEDS has been updated to identify such worker errors and . . . reinstate benefits" for those impacted. (Id.).

In sum: Plaintiffs have not shown anyone is suffering, or will suffer, irreparable injury as a result of the programming defect they highlight in their brief.

> 9. *TennCare's Alleged Failure to Provide Hearings as Required Does Not Demonstrate Irreparable Harm Is Imminent.*

Next, Plaintiffs claim Defendant unlawfully fails to timely schedule all appeals for hearings and denies hearings to individuals disputing the "application of the law to their facts." (Doc. No. 141-1 at 26). Neither claim shows class members will suffer irreparable harm absent an injunction.

*First*, Plaintiffs argue TennCare does not schedule all appeals for hearings within 90 days of receiving a request for a hearing, as required by federal regulations. (Doc. No. 141-1 at 26). But the record shows TennCare provides COB to those whose timely appeals take longer than 90 days. (Doc. No. 142-2 ¶ 71). So there is no irreparable harm.

Plaintiffs' counterarguments are unpersuasive. They claim some enrollees did not receive COB "because they did not receive the notice required by law, or because TennCare's failure to accommodate their disabilities prevented them from submitting a timely request." (Doc. No. 225 at 20). Plaintiffs cite four cases. (Id.). All of the cases involve class members whose coverage has been restored. Supra Section III.B.1 n.13. And none of the cases demonstrate that TennCare has a broader policy of failing to accommodate disabilities or denying COB where a member did

36

not receive notice (assuming the non-receipt was TennCare's fault). Ms. Cleveland was ineligible for COB because she "misunderstood the notice" she received describing the deadline to request COB and therefore missed the deadline.[26] (Doc. No. 202 ¶ 245). Plaintiff D.D. and her children initially did not receive COB but received it after TennCare learned it had sent letters to the wrong address. (Id. ¶¶ 272–80). Plaintiffs D.R. and J.C. were given COB after TennCare discovered there was "no record of renewal notices having been sent" to them. (Id. ¶¶ 431–33). As for Plaintiff Johnny Walker: he did not timely file because of his disability, but he did receive a preterm notice containing information on ways to get help if he did not understand the notice. (Doc. No. 142-2 ¶ 202). And he also received an NOD stating TennCare could provide assistance if Mr. Walker needed it based on a disability. (Doc. No. 142-28 at 7).

Plaintiffs also attack Defendant's assurance that TennCare offers COB pending appeal as "hollow" because a "programming flaw in TEDS" denied some members COB "despite their timely requests." (Doc. No. 225 at 20). This is the same programming defect previously identified. (Doc. No. 142-2 ¶¶ 35(e), 123). As noted, the defect has been corrected and all impacted individuals have had their COB restored. (Id. ¶ 35(e)).

*Second*, Plaintiffs challenge Defendant's "valid factual dispute" policy. (Doc. No. 141-1 at 27). Under this policy, Defendant screens appeals to determine whether they "allege[] a factual mistake that, if resolved in favor of the appellant, would entitle the appellant to relief." (Doc. No.

---

[26] Ms. Cleveland explained this to a TennCare worker on the phone when describing why she missed the deadline. (Doc. No. 202 ¶ 145). She also said she was "distraught with grief, anxiety, and depression" and "was struggling to keep track of all the paperwork and deadlines." (Id.). This is understandable, given that Ms. Cleveland's husband had passed away six months before the phone call (the Court extends its sympathies to Ms. Cleveland). (Id. ¶ 239). Plaintiffs imply the worker should have told Ms. Cleveland she "could ask for a good cause exception to the deadline for requesting continuation of benefits." (Id. ¶ 246). Perhaps this is true. But if so, it is an example of an individual worker error, not necessarily a broader policy of failing to accommodate enrollees.

37

166 ¶ 72(f)).   If TennCare determines there is no valid factual dispute, it may close the appeal (after giving the appellant a chance to provide additional information).   (Id. ¶ 72(f)–(g)). Plaintiffs argue this policy unlawfully prevents class members from disputing Defendant's "application of the law to their facts."   (Doc. No. 141-1 at 26).

However, information from Defendant contradicts this argument.   Ms. Hagan states that "[a]pplications of facts to law or policy are considered valid factual disputes."   (Doc. No. 166 ¶ 72(g)).   According to her, it is only "assertions that challenge TennCare policy or the law" more generally, such as "claims that non-citizens should be covered," that "are not treated as a valid factual dispute."   (Id.).   The numbers support this narrative, at least in that they show TennCare rarely closes appeals based on the valid factual dispute policy.   Out of 80,855 appeals related to a termination of benefits filed since March 19, 2019, "less than 1 percent . . . have been closed because they failed to identify a factual mistake TennCare had made."   (Doc. No. 142-2 ¶ 71(i)).

Plaintiffs' counterexamples do not undermine this narrative.   They allege Defendant denied Plaintiffs Carlissa Caudill, J.L.T., and A.L.T. appeal requests based on their purported failures to raise valid factual disputes.   (Doc. No. 141-1 at 27).   They imply these denials stemmed from Defendant's refusal to consider disputes over applications of facts to law.   (Id. (citing Doc. No. 142-2 ¶¶ 71(i), 125–27, 193–97)).   But Plaintiffs' record citations do not support this argument.   Instead, they show "all three" Plaintiffs' appeal requests were denied because the Plaintiffs "didn't respond to [a] request for additional information about what mistake they were alleging TennCare made in denying/terminating their coverage."   (Doc. No. 142-2 ¶ 71(i)).

Plaintiffs also rely, in supplemental briefs, on Plaintiff M.P.L.'s case and a declaration from William Gavigan, M.D. (who is not a named Plaintiff).   (See Doc. No. 228 at 3–4; Doc. No. 225 at 16 (citing Doc. Nos. 209–210-8)).   Nothing in Dr. Gavigan's declaration shows that TennCare

does not consider disputes over applications of facts to law. (Doc. No. 210). And Ms. Hagan's response to that declaration indicates the opposite. (Doc. No. 218 ¶ 15 (stating, in relation to the appeal Dr. Gavigan filed on behalf of his daughter: "there was no factual dispute identified and there was no allegation that TennCare had wrongly applied Ms. Gavigan's facts to the law")).

M.P.L.'s case also does not show TennCare refuses to consider disputes over applications of facts to law. M.P.L. is a child. (Doc. No. 202 ¶ 353). He lost coverage because his family did not respond to requests for additional information. (Doc. No. 224 ¶ 11). This occurred because the U.S. Postal Service failed to deliver the requests to the address provided by M.P.L.'s family. (Id. ¶ 14). When M.P.L.'s mother learned he lost coverage, she filed an appeal. (Id. ¶ 23). The appeal was closed as untimely. (Id. ¶ 24). So, it appears TennCare made a mistake about a fact (whether M.P.L. received notices). Perhaps TennCare should have granted a good cause exception and/or permitted M.P.L.'s family to otherwise dispute TennCare's understanding of the facts.[27] But this does not mean TennCare, at the organizational level, refuses to consider disputes over applications of facts to the law.

Finally, Plaintiffs argue again that NODs incorporating the valid factual dispute standard deterred members from submitting appeals. (Doc. No. 141-1 at 27). They have not established irreparable harm based on this argument. Supra Section III.B.5.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Class Certification (Doc. No. 140) is **GRANTED IN PART** and Plaintiffs' Motion for Preliminary Injunction (Doc. No. 141) is

---

[27] Good cause exceptions "may be granted" where TennCare has "evidence of an error related to the mailing of a notice." (Doc. No. 166 ¶ 72(c)).

**DENIED WITHOUT PREJUDICE.**[28]   The Court further orders as follows:

(1) The Court hereby certifies a "Plaintiff Class" consisting of "all individuals who, since March 19, 2019, have been or will be disenrolled from TennCare, excluding individuals, and the parents and legal guardians of individuals, who requested withdrawal from TennCare."   All named Plaintiffs will serve as representatives of the Plaintiff Class.

(2) The Court hereby certifies a "Disability Subclass" consisting of "Plaintiff Class members who are 'qualified individuals with a disability' as defined in 42 U.S.C. § 12131(2)." Plaintiffs S.F.A., Vivian Barnes, Carlissa Caudill, S.L.C., Charles E. Fultz, Michael S. Hill, William C. Monroe, Linda Rebeaud, Kerry A. Vaughn, and Johnny Walker will serve as representatives of the Disability Subclass.

(3) Having considered the requirements of Rule 23(g), the Court hereby appoints Plaintiffs' current counsel to represent both the Plaintiff Class and the Disability Subclass.

(4) The Plaintiff Class and the Disability Subclass shall collectively litigate the particular issues outlined above in this Memorandum Opinion and Order.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[28] The Court is denying this motion "without prejudice" because it recognizes matters related to healthcare may shift over time.  It also recognizes Ms. Person is presently without TennCare coverage.  Although the Court is denying the injunction request without prejudice, Plaintiffs may not refile a motion that is the same, in substance, as the one the Court has resolved in this Memorandum Opinion and Order, and the Court would look unfavorably on any attempt to do so.

Case 3:20-cv-00240   Document 234   Filed 08/09/22   Page 40 of 40 PageID #: 10636