**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| A.M.C., by her next friend, C.D.C., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 3:20-cv-00240 |
| | Chief District Judge Crenshaw |
| STEPHEN SMITH, in his official capacity as Deputy Commissioner of Finance and Administration and Director of the Division of TennCare, | Magistrate Judge Newbern |
| Defendant. | |

**DECLARATION OF KIMBERLY HAGAN IN SUPPORT
OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Kimberly Hagan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      My name is Kimberly Hagan. I am the Director of Member Services for the Division of TennCare, which is the single state Medicaid agency that in partnership with the Centers for Medicare and Medicaid Services ("CMS") oversees the Tennessee state Medicaid program known as TennCare. I have submitted several declarations in this matter previously (Docs. 63, 76, 139-2, 163, 166, 218, 222), which I incorporate herein by reference, and will not be restating my prior testimony unless necessary to explain one of the issues discussed herein.

**I.      Lifting of the Moratorium on Disenrollments and Restarting the Annual Eligibility Renewal Process**

2.      Beginning April 1, 2023, TennCare restarted its Annual Renewal Process after a several year moratorium put in place in response to the COVID-19 public health emergency. Leading up to the restart of the Annual Renewal Process, TennCare worked closely with CMS to be sure that TennCare's process complied with all applicable federal statutes and regulations, and

that TennCare would be operating its Annual Renewal Process in a manner that reduced the number of individuals terminated from TennCare for procedural reasons such as failing to respond to a Renewal Packet. TennCare has done this in part by taking advantage of the various waivers and temporary flexibility strategies and permitted by CMS during the unwinding period. These temporary waivers are discussed in paragraphs 3 and 4 below. The temporary flexibility strategies are discussed in paragraph 5 below.

3.     TennCare has thus far sought and obtained approval for nine (9) Section 1902(e)(14)(A) waivers from CMS. *See COVID-19 PHE Unwinding Section 1902(e)(14)(A) Waiver Approvals*, MEDICAID.GOV, https://bit.ly/3JOdtI2 (last visited July 6, 2023) and *TennCare Renewals-Information for Partners, Phase I: Plan*, DIV. OF TENNCARE, https://bit.ly/3D0g3H9 (last visited July 6, 2023). These waivers include:

a)  redetermining MAGI and non-MAGI enrollees as eligible for Medicaid through an *ex parte* review (a process that looks at data sources without requiring any input from the enrollee) if their SNAP or TANF gross income is below applicable Medicaid limits despite the differences in household composition and income-counting rules between the programs;

b)  redetermining individuals as eligible for Medicaid through an *ex parte* review when no income data is returned from data sources for individuals who were previously enrolled or whose coverage was renewed based on a verified attestation of zero-dollar income;

c)  redetermining individuals as eligible for Medicaid through an *ex parte* review when no income data is returned from data sources for individuals who were previously enrolled or whose coverage was renewed based on verified income at or below 100% of the federal poverty level ("FPL");

d) assuming there has been no change in the types of resources that are verified through the Asset Verification System ("AVS") when either 1) no information is returned through AVS or 2) the AVS response is not returned within a reasonable timeframe, and then using this resource verification to complete an *ex parte* renewal without any further verification of assets required by the enrollee;

e) partnering with the TennCare MCOs to update member contact information even when the enrollee has not provided their updated contact information to TennCare as required by law;

f) utilizing United States Postal Service returned mail to update member contact information even when an enrollee has not provided their updated contact information to TennCare as required by law;

g) extending the permissible timeframe to take final administrative action on fair hearing requests (normally 90 days) for appellants with continuation of benefits ("COB") and automatically granting COB to any appellant who normally would not qualify if hearings are going to go beyond 90 days.

4.     CMS, on June 2, 2023, identified some additional waivers and/or flexibility strategies that it would permit states to adopt, *see Available State Strategies to Minimize Terminations for Procedural Reasons During the COVID-19 Unwinding Period*, MEDICAID.GOV (June 2023), https://bit.ly/43fjCDK, and TennCare is in the process of considering which of those additional flexibilities may be beneficial in Tennessee.

5.     Other strategies permitted, and indeed encouraged, by CMS that TennCare has adopted include:

a) spreading renewals for all populations out over 12 months rather than attempting to complete all annual renewals in a shorter timeframe;

b) not placing all individuals most likely ineligible for TennCare on the front-end of the year-long renewal process;

c) partnering with stakeholders on the ground, such as advocacy groups, providers, and professional associations, to engage more directly with Medicaid and CHIP families about the renewal process;

d) conducting outreach to enrollees through multiple forums and formats (*e.g.*, mail, email, social media, phone, text) to let enrollees know that renewals have restarted and to encourage them to update their addresses with TennCare and return their Renewal Packets;

e) mailing a notice in October and November of 2022 to all TennCare enrollees, except for active SSI, children in DCS custody, and individuals with presumptive coverage, to test our addresses and work undeliverable mail tasks to update addresses before renewals began. Through this process, we updated over 85,000 addresses;

f) sending a "Pre-Renewal Notice" to everyone who was not able to be auto-renewed through the *ex parte* process to let them know a Renewal Packet will be mailed to them. *See* Pre-Renewal Notice attached hereto as Exhibit 1. This notice alerts enrollees to be on the lookout for the Renewal Packet so they will respond to that packet in a timely manner. It also alerts enrollees to contact TennCare Connect (TennCare's call center) if they do not receive their packet in the mail as expected and informs them how to go online to view their packet if it did not come in the mail.

6.      Based on our close work with CMS over the years and CMS's certification of TEDS, we have been informed that, at this point, Tennessee is one of only 16 states to not be placed under a mitigation plan by CMS as a result of deficiencies in the state's eligibility processes.

## II.    Tennessee's Renewal Process is Accessible to Individuals with Disabilities

7.      In addition to the waivers and strategies discussed above to reduce the number of procedural terminations from TennCare with the restart of the Annual Renewal Process, TennCare has designed its entire renewal process to be accessible to all individuals, including but not limited to those with disabilities. The following are just some of the features that make the renewal process accessible and easier to navigate by individuals with disabilities as well as others:

a)  Unlike in the past, for example during the redetermination process challenged but ultimately upheld by the Sixth Circuit in *Rosen v. Goetz*, No. 3:98-0627, TennCare no longer requires enrollees going through renewal to come in-person to a Department of Human Services ("DHS") county office for an interview in order to complete the renewal process. The current renewal process allows Renewal Packets to be submitted over the phone, online, via mail or fax, in addition to being submitted in-person at a DHS office;

b)  Of course, if an individual needs in-person assistance with completing the Renewal Packet, for example they need help setting up a TennCare Connect account, or they need help entering the data online, or help filling in the Renewal Packet by hand, or assistance in contacting TennCare Connect to submit the Renewal Packet orally, etc., they can go to any DHS County office to receive assistance. DHS County offices are also generally available to enrollees who need access to an online computer or phone to contact TennCare Connect and complete their Renewal Packet because they do not have that access at home. DHS also is available to fax or scan information to TennCare for enrollees;

5

c) Enrollees who need in-person assistance in their homes with completing the Renewal Packet can get that assistance from one of State's Area Agencies on Aging and Disability ("AAAD"). Referrals are made to the AAADs on behalf of enrollees requiring in-person assistance, and enrollees are provided the numbers to the AAADs to request such assistance directly;

d) For certain groups of disabled enrollees, their providers, MCOs, AAADs, or advocates can actually submit their Renewal Packets for them;

e) For TennCare's Long Term Services and Supports ("LTSS") population, all of whom are in the Disability Subclass, an enrollee going through renewal will receive assistance with the process from either a care coordinator, an Independent Support Coordinator, the Department of Intellectual and Development Disabilities ("DIDD"), or through the nursing homes or intermediate care facilities in which they reside. This assistance includes completing the Renewal Packet for the enrollee if necessary;

f) Enrollees can now upload documents, such as requested verifications, directly to TennCare via the online member portal or through a mobile application on a smartphone in addition to the traditional methods of mailing, faxing, or submitting documents in person at a DHS County office;

g) Enrollees can view the eligibility notices TennCare has sent to them through the member portal on TennCare Connect or through the mobile app on their phone;

h) With the implementation of TEDS, TennCare is now able to conduct much more extensive verifications of necessary information such as income and resources by leveraging third-party databases. *See* Ex. A to Hagan Decl., CMS Approved Eligibility Verification Plan, Doc. 166-1 (Jan. 4, 2022); *see also* Hagan Decl., Doc. 166 at ¶ 40 (Jan. 4, 2022). The ability

to access and utilize these third-party databases alleviates the need for many enrollees to provide this information as part of the Annual Renewal Process and enables TennCare to automatically renew the eligibility for significantly more enrollees without ever having to issue a Renewal Packet;

i) Disabled individuals receiving Supplemental Security Income ("SSI") are automatically eligible for TennCare. These enrollees make up the over-whelming majority of the Disability Subclass, and they have their eligibility auto-renewed through an *ex parte* process without having to submit any additional information to TennCare as part of Annual Renewal. Indeed, four of the Disability Subclass Plaintiffs (S.F.A., Barnes, Caudill, and Walker) receive SSI and have been or will be auto-renewed for TennCare coverage this year with no need to submit anything to TennCare;

j) Unlike in the past, the current Renewal Packet is pre-populated with information already known about an enrollee and does not include questions about information already verified or known to TennCare that is not subject to change making the Renewal Packet easier to fill-out and far less complicated than in the past;

k) Unlike in the past, such as during the *Rosen* redetermination process, enrollees now have 40 days (inclusive of mail time) to return their Renewal Packets (which as noted above can be returned over the phone or online in addition to by mail or fax or in-person), where as during *Rosen*, the entirely paper process provided for a 30 day (inclusive of mail time) deadline;

l) TennCare maintains a contract with the Tennessee Community Services Agency ("TNCSA") to provide advocacy services, specifically including services to individuals

with cognitive or mental disabilities, including helping them to navigate the renewal process;

m) Every notice is sent with a "Special Help" flyer that provides information on some places individuals can contact if they have questions or need assistance. *See* Special Help Flyer attached hereto as Exhibit 2.

n) All TennCare notices include a section asking recipients if they "need help with this letter because you have a health problem, learning problem or a disability? Or do you need help in another language?" and directing them to call TennCare Connect. *See e.g.* Notice of Decision ("NOD") Template attached hereto as Exhibit 3 at TC-AMC-0000662873. All notices further inform recipients that if they have a mental illness and need help with the letter to contact the TennCare Advocacy Program and provide that toll free number. *Id.*

8.     As mentioned above, TennCare is also engaging in an extensive outreach campaign related to the Annual Renewal Process with a specific emphasis on identified groups of disabled enrollees.

a) Managed Care Organizations ("MCOs") are provided data on all of their enrollees who will be receiving a Renewal Packet each month so they may conduct outreach as described in my prior Declaration. *See* Doc. 166 at ¶ 43. In addition, the information the MCOs receive includes an identification of those enrollees actively receiving services through a Community Mental Health Center ("CMHC") so that the CMHCs can provide outreach and assistance to those individuals who likely have a cognitive or mental impairment and are going through renewal. These providers are highly incentivized to make sure that the individuals they are treating maintain their TennCare coverage because the CMHCs provide services whether paid for by TennCare or not, so maintaining the TennCare

insurance payments as reliable payer is extremely important to the CMHCs. The Renewal Packets further inform enrollees that assistance with renewal is available from their local CMHC. *See* Renewal Packet Template attached hereto as Exhibit 4 at TC-AMC-0000663308. MCO care coordinators can also complete renewals through the TennCare Connect portal for their members who receive care coordination services from the MCO;

b) MCOs are provided similar lists for all enrollees who failed to return their Renewal Packets so that additional attempts at outreach and assistance can be made before benefits are terminated, and lists are provided yet again when a member's coverage ends for failure to respond to provide a third opportunity for outreach and assistance;

c) TennCare has a contract with Rural Health Association of Tennessee to provide outreach and assistance to enrollees going through renewal with a specific focus on enrollees receiving MSP only coverage as they will not be part of the MCO outreach efforts. *See Grant Contract*, TN.GOV (2023–2025), https://bit.ly/3JOaDmq. Rural Health has the capacity to provide assistance to approximately 10,000 individuals a year and is conducting in-person events across Tennessee and enrollees can also schedule appointments to receive in-person assistance;

d) Prior to the restart of the Annual Renewal Process, TennCare engaged in an extensive community outreach campaign with providers and professional associations to make them aware that renewals were restarting and to provide tools they could use to inform the populations they serve about the Renewal Process. *See e.g. TennCare Renewals-Information for Partners, Phase III: Renew*, DIV. OF TENNCARE, https://bit.ly/3XDoCBd (last visited July 6, 2023).

9.     Enrollees going through the Renewal Process who wish to request assistance generally or reasonable accommodations specifically have multiple avenues for doing so. The primary method for contacting TennCare and requesting some form of assistance is through a call to TennCare's call center, TennCare Connect. Representatives from TennCare Connect can provide assistance that includes, but is not limited to, explaining notices to enrollees, explaining what information may need to be submitted, providing the deadlines by which actions must be taken, reading notices out-loud if necessary, engaging interpreter support if necessary, making referrals for in-person assistance and/or providing the numbers for an enrollee's local AAAD to request in-person assistance, actually completing the renewal over the phone, and escalating a request if the enrollee is seeking a form of assistance or reasonable accommodation that TennCare Connect cannot provide (e.g., a request to have a notice provided in an alternative format or the extension of a deadline). Requests for reasonable accommodations that TennCare Connect is unable to fulfill are routed from TennCare Connect to Talley Olson, TennCare's Director of the Office of Civil Rights Compliance. However, TennCare staff and contractors are instructed, when they are able to provide the sort of assistance being requested, to provide such assistance promptly themselves.

10.    Although TennCare Connect is the primary avenue through which requests for assistance or reasonable accommodations are made, there is no wrong door for making such requests. For example, when the Renewal Unit in the Eligibility Operations Group ("EOG") at TennCare is processing returned Renewal Packets, requests for more time to submit required information are routinely granted. Similarly, if in working an appeal, the Appeals Operation Group ("AOG") becomes aware that an enrollee needs some type of assistance, that assistance is routinely

provided. If it is the sort of assistance that AOG cannot provide on its own, for example providing a Notice of Hearing in braille, the request will be sent to Talley Olson for resolution.

11.     Further evidence that TennCare's renewal process is accessible by individuals with disabilities is that one of the Disability Subclass representatives (Vaughn) has already gone through the Annual Renewal Process this year and had her eligibility successfully renewed. And as noted above four subclass representatives (S.F.A., Barnes, Caudill, and Walker) receive SSI and have been or will be auto-renewed for TennCare coverage this year with no need to submit anything to TennCare.

12.     I have reviewed Professor Blanck's report that Plaintiffs submitted in this matter, and none of the technical features of a reasonable accommodation system that he contends a Medicaid agency must have, such as tracking every type of disability one of TennCare's enrollees may have and using claims and encounter data to identify possible disabilities, are requirements imposed by CMS. When CMS reviewed the TEDS design documentation and certified TEDS as compliant with Medicaid requirements, at no time did CMS require TennCare to track the types of disabilities its enrollees might have or track reasonable accommodations or mitigating measures or auxiliary aides provided to enrollees. Further, CMS has closely monitored the restart of the renewal process and has not identified loss of coverage by individuals with disabilities as a point of concern.

## III.     TennCare Considers All Categories of Eligibility Prior to Termination

13.     TEDS was specifically designed to be sure that it could accurately determine all categories of Medicaid eligibility in Tennessee, including those related to disability, and to issue appropriate notices regarding those eligibility determinations. TEDS' ability to do so had to be demonstrated to CMS, and CMS certified TEDS and has paid hundreds of millions of dollars for

its design and continued implementation based on its finding that TEDS does in fact consider all categories of eligibility. The Annual Renewal Process is no exception to the general functioning of TEDS, which considers all categories of eligibility when processing an individual's eligibility for TennCare, TennCare Standard, CoverKids, or MSP, except that TEDS will almost always have more information about an individual at the time of renewal than TEDS had at the time of application.

14.     For renewals specifically, TEDS first determines through an *ex parte* process that utilizes current information in TEDS and information that can be verified by approved third-party data sources, whether an individual can be found eligible in their current eligibility category or in another eligibility category. If TEDS cannot automatically renew an individual's eligibility, it will issue a Renewal Packet containing questions necessary to gather information to see if an individual may otherwise qualify for TennCare, TennCare Standard, CoverKids, or the Medicare Savings Program ("MSP"). *See* Exhibit 4 (Renewal Packet).

15.     Once the required information on the Renewal Packet has been submitted and entered into TEDS, the "business rules" programmed into TEDS to assess eligibility for Medicaid, TennCare Standard, CoverKids, and MSP will evaluate an individual for eligibility in every available category by running through what is called the "COE Hierarchy." The current hierarchy is attached hereto as Exhibit 5. TEDS starts at the top of the hierarchy and works its way down through each category until it finds one into which the enrollee "groups." "Grouping" into a category means that the enrollee meets the basic criteria for inclusion in that category (*e.g.*, pregnant, receiving social security, under age 19, etc.) before assessing income and resources (if applicable). For example, an enrollee would not "group" into any of the Institutional Medicaid categories if they are not in an institution, receiving home and community based services

("HCBS"), or seeking to receive HCBS. Another example would be that an enrollee would not "group" into a Child MAGI category if they are over the age of 19. Only if an enrollee groups into a category will TEDS then assesses whether they meet the income limits, resource limits (if any), and other requirements (if any) for that category.

16.    Confirmation that TennCare does in fact consider all categories of eligibility is the fact that we have members enrolled in every category available in Tennessee. *See* Enrollment Statistics attached hereto as Exhibit 6. Further, we have found enrollees eligible in all categories of eligibility since the restart of the Annual Renewal Process in April 2023. *See* Renewal Statistics attached hereto as Exhibit 7.

17.    In my prior declarations, I explained many of the improvements made to TEDS since it first went operational statewide to make sure that no category gets overlooked due to a system or worker error in an individual case. A non-exhaustive list of improvements TennCare has made through its contractor Deloitte to TEDS since implementation to reduce eligibility determination errors include:

a)  Automatically sending information to the Social Security Administration ("SSA") on a daily basis through the State Data Exchange ("SDX") to confirm an enrollee's SSI pay status whenever TennCare receives data on the SDX indicating an enrollee is no longer an active SSI cash recipient but data from other SSA sources such as the SOLQ indicate the member is still receiving SSI cash. *See* Doc. 166 at ¶ 24(e). This would have prevented the issue that occurred in the cases of Plaintiffs Barnes, Caudill, and Walker;

b)  Designing TEDS to require, with some targeted exceptions, an eligibility worker to review an enrollee who has any type of social security income (this is based on information TennCare already has or is provided by the enrollee in the Renewal Packet) for all SSI-

related categories (Pickle, DAC, and W/WW) before an eligibility determination can be authorized. *See* Doc. 166 at ¶ 50;

c) Updating TEDS with an enhancement to enable TEDS to update the SSI-related detail screen of enrollees with a "Pickle" indicator whenever data received from SSA on the SDX provides an SSI Term date and other information that would allow TEDS to systematically review an enrollee for Pickle eligibility instead of creating a "Pickle Task" for manual review. *See id.* at ¶ 83(d);

d) Updating TEDS to address an issue where the latest social security income record from the SSA's SDX file was not loading properly, causing it to appear that the enrollee did not qualify for the W/WW eligibility category because the enrollee did not appear to be receiving any social security income. *See id.* at ¶ 83(i);

e) Updating the "Pickle Task" logic in TEDS to ensure that a previous review for Pickle eligibility by an eligibility worker will not prevent the system from creating a new Pickle review task at a later time to reduce the possibility of a worker missing potential Pickle eligibility. *See id.* at ¶ 83(k);

f) Modifying TEDS to require it to load DAC and W/WW indicators from the SDX file onto an enrollee's SSI detail screen in TEDS even in cases where the enrollee is not currently receiving SSI Medicaid so when that enrollee goes through the Annual Renewal Process in the future TEDS or a worker will be sure to evaluate them this SSI-related category of eligibility. *See id.* at ¶ 83(l);

TennCare continues to contract with Deloitte to maintain TEDS and perform regular updates and enhancements to the system.

18. While we likely can never eliminate worker or system design errors entirely (although the enhancements just described and many others that have been implemented or are in

process reduce the possibility of worker error and design errors tremendously), I can say with absolute certainty that TEDS evaluates enrollees for all categories of eligibility and does so reliably.

19. It is important to differentiate between failing to consider a category at all and making a mistake as to whether an enrollee is eligible in that category. For example, I previously explained the problem experienced at the time of conversion of eligibility data into TEDS (a one-time, not to be replicated event) that led to the erroneous finding that three of the named Plaintiffs (Barnes, Caudill, and Walker) were no longer receiving SSI benefits and thus were no longer eligible for Medicaid. *See* Doc. 166 at ¶ 24. As I explained, the error that led to the erroneous eligibility determinations in these cases has long since been corrected both in their individual cases and in the case of all similarly situated individuals who experienced the same issues because of faulty data on the SDX sent from the Social Security Administration ("SSA") to TennCare. *See id.* While TennCare made an erroneous eligibility determination in those relatively small number of cases (all of whom were afforded appeal rights to challenge that mistake), at the same time, TennCare successfully converted the eligibility of hundreds of thousands of other individuals receiving SSI, and successfully found thousands of other individuals who are no longer eligible for SSI, eligible in other eligibility categories. *See id*. In short, it is important not to conflate mistakes made in individual cases with a systemic failure to consider and determine eligibility in a category entirely as those named Plaintiffs' cases demonstrate.

20. To the extent that Plaintiffs are arguing not that TennCare fails to consider every category of eligibility, but that TennCare does not do so reliably, I can attest that I am not aware of any current, systemic issues that would support such an argument. I do not dispute that errors in how TEDS functions have been identified and corrected in the past, but in all such cases we 1)

identify the issue, 2) identify an appropriate long-term fix for the issue, 3) identify any cases impacted by the issue and take appropriate corrective action, and 4) implement any short-term fixes necessary, such as running daily or weekly reports to identify impacted cases so that they can be corrected manually or through a data fix until a permanent fix is put in place. To the extent any issues with TEDS' ability to correctly determine eligibility in any category arise in the future, TennCare will continue to follow this same approach it has consistently followed in the past since the implementation of TEDS.

21.    For example, TennCare very recently has undertaken an extensive effort to ensure that TennCare enrollees going through redetermination are not inadvertently overlooked for eligibility in an SSI-related category by making sure that all available historic-SSI data has been loaded into TEDS and is accessible by TEDS and by eligibility workers in conducting eligibility determinations. The potential for missing historic-SSI data to adversely impact the review of eligibility in an SSI-related category came to light recently based on certain exhibits used during the depositions of TennCare employees in March and April of this year. Specifically, emails from a TennCare Appeals Group employee named Ryan Head from July 2021 indicated that Mr. Head, in the course of resolving several appeals, raised a concern that TennCare had missed finding these appellants eligible for Medicaid in an SSI-related category because of an alleged decision to not convert historic-SSI data into TEDS.

22.    I did not recall these 2021 emails when they were introduced at deposition, so I immediately began investigating what happened in 2021 to determine whether there was an ongoing potential concern that a failure to convert historic-SSI data from TennCare's Medicaid Management Information System ("MMIS") known as interChange into TEDS may have in the past or could presently be leading to incorrect eligibility determinations for the SSI-related

categories of eligibility. What I learned from my investigation is that in 2021 when Mr. Head first raised this issue, I and TennCare took the steps I would have expected to be taken at that time: 1) confirm whether Mr. Head was correct in his assumption that historic-SSI data had not been converted into TEDS (that assumption proved largely incorrect), 2) obtained specific case examples from Mr. Head, and 3) confirmed what the specific issues were in the cases Mr. Head had identified to see if they presented a potential systemic issue. *See* Email Bates Numbered TC-AMC-EMAIL-0096700 to 703 attached hereto as Exhibit 8; Email Bates Numbered TC-AMC-EMAIL-0096670 to 699 attached hereto as Exhibit 9; and Email Bates Numbered TC-AMC-0000651816 to 817 attached hereto as Exhibit 10.

23.     As the emails cited above indicate, I was told in 2021 that historic-SSI data had been converted into TEDS, which was certainly my expectation and recollection. *See id.* Although, as discussed below, I have now learned that not *all* historic-SSI data was converted, this confirmation in 2021 that historic-SSI data had been converted reassured me at that time. And the analysis of the cases Mr. Head had identified concluded that the "issue was not caused due to SDX data for two cases provided," and found worker error in the third case. *See* Ex. 10 at TC-AMC-0000651816. For these reasons, I believed at that time in 2021 that there was no systemic issue to be concerned about and that no further action was required.

24.     More recently, not recalling what investigation had been done in 2021, I took steps very similar to what I had done in 2021. I escalated the issue to Deloitte another time to confirm we had in fact converted historic-SSI data into TEDS, and I asked Mr. Head for some additional case examples. This time, with new examples, I learned that while the vast majority of historic-SSI data was converted into TEDS as I had been told in 2021, historic records that were unlinked

to a specific individual in interChange were not converted. Upon learning of this fact, I took several steps.

a.    First, I directed the relevant state employees and contractors for interChange and TEDS to convert this unlinked historic-SSI interChange data into TEDS, link it to the relevant individual case files in TEDS, and to do this for all individuals whether they currently have eligibility or not, whether the individual ever had eligibility in TEDS or not, whether the individual is currently receiving any type of social security income or not, and regardless of whether the individual is identified as deceased in the system or not. All of the previously unconverted historic-SSI data was converted into TEDS by May 13, 2023. This means that going forward, and most relevant for current purposes, during the ongoing annual renewal process, if an individual is currently receiving social security income and may qualify for eligibility in an SSI-related category this historic-SSI data will be available to enable correct eligibility determinations.

b.    Second, to help ensure correct screening for eligibility in an SSI-related category until the issue of non-converted data could be addressed, on April 13, 2023, I rescinded a prior directive to eligibility staff to stop using interChange to look up SSI information and to rely instead on TEDS. Instructions in this regard were issued to all staff. *See* TEDS Engagement Email and attached Job Aid attached hereto as Exhibit 11. (This prior directive to cease relying on interChange had been issued because once the conversion into TEDS took place, interChange no longer receives SDX data and is no longer being updated with the most current SSI information available).

c.    Third, because the annual renewal process restarted on April 1, 2023 before the conversion of all historic-SSI data into TEDS, I had my staff review all renewal cases potentially impacted by the lack of converted SSI-historic data for any individual that was found ineligible

for TennCare on renewal to be sure that eligibility in an SSI-related category had not been overlooked because of missing historic-SSI data in TEDS. We initially identified 48 cases that required further review, but only 8 of the 48 cases grouped for potential Pickle eligibility. In those 8 cases, all 8 were correctly found to be over-income for the Pickle category. In sum, this review confirmed that no one was incorrectly denied Pickle eligibility as part of the restarted Annual Renewal Process because of missing historic-SSI data. This, of course, will not be an issue going forward because the historic-SSI data is now available in TEDS. And, as always, if an individual believes that TennCare has made a mistake, that individual can file an appeal.

d.    Fourth, I instructed my staff to undertake a review of all individuals not currently enrolled in TennCare, who are currently receiving social security income, and who experienced a termination of their Medicaid benefits since being converted into TEDS to make sure that the failure to convert the unlinked historic-SSI data did not cause an incorrect eligibility determination for an SSI-related category between the time of conversion and the present. After reviewing 521 cases that fit the above criteria, we found 126 cases in which the lack of all historic-SSI data in TEDS *may* have caused an incorrect eligibility determination regarding SSI-related eligibility in the past. Each of those individuals has had their Medicaid coverage reinstated on a going-forward basis until they can complete the Annual Renewal Process. We also found 138 cases in which further information is required in order to complete a Pickle eligibility determination. We have issued Additional Information notices to each of those individuals and if they respond with the requested information and if that information shows the individual is eligible, they too will be reenrolled in TennCare on a going-forward basis until they can complete the Annual Renewal Process.

25.     While any potential for the lack of converted historic-SSI data to impact an enrollee's eligibility determination on renewal has now been addressed, it is important to understand that the prior lack of all historic-SSI data in TEDS did not necessarily mean that an enrollee was not considered for SSI-related categories of eligibility. First, the enrollee would have had to fall within the subgroup of individuals who had relevant historic data that was not converted and all other means of obtaining that historic data failed. Second, that enrollee would have to currently be receiving social security income for this potential error to even have the potential to apply in their case. Third, the fact that TennCare may have made an error in determining some enrollees ineligible for an SSI-related category based on the missing data does not mean that TennCare failed to consider those categories of eligibility altogether. Despite our best efforts to eliminate any errors in our eligibility determinations, mistakes do happen. This is the reason we have an appeals process so that mistakes can be identified and corrected.

## IV.     **TennCare's Updates to Notices**

26.     Since I last submitted declarations to the Court, TennCare has also made significant improvements to its eligibility notices. One such improvement is that we have updated all of the legal citations in our Notices of Decision to provide specific cites to the portion or portions of TennCare's eligibility rules, the federal regulations, or TennCare's waiver that support a given action or decision. *See* Exhibit 3 (NOD Template) and Business Reference Table, Tab "EDPOLICYCITATIONS" attached hereto as Exhibit 12. It had always been TennCare's intention to update the legal citations in its NODs to more specific citations once TennCare's eligibility rules were finalized. Those rules were in flux and still being finalized when TEDS was first being implemented, and we had a concern that if we built specific citations to the Rules into our notices that the citations could actually be incorrect and misleading when the notices issued because they

may refer someone to the wrong subsection of the rules. When the Court expressed concern about the prior NODs citation to a 95-page eligibility rule, however, TennCare made updating the legal citations in the NOD, a priority.

27.     The process of updating the NOD, particularly when it comes to updating legal citations, is fairly complex and requires input from multiple different departments within TennCare. The policy unit, which identifies the specific relevant legal citations for the myriad of situations an NOD must be able to address, had to identify each change to a citation that needed to be made and map that legal citation to the relevant termination/denial reason that could be populated in a NOD. Legal input was required to verify the policy unit's identification of legal authorities and to be sure legal sources were cited correctly and uniformly. The unit within TennCare that makes sure all notices are written in easy to understand language at a sixth grade or below reading level had to be consulted to be sure the proposed changes to the NOD did make violate any readability standards. And, TennCare's vendor Deloitte had to be involved to both put the requested changes in effect through updated programming and to test to confirm that the code changes and notice output from TEDS were working as intended and the NODs were being generated in the correct format and with the appropriate new legal citations. Of course, all changes had to approved by me and others in leadership within TennCare before they could be made. All told, this was a several month process. The majority of the updated legal citations went into effect in December of 2022. Going forward, it will be easier to update a legal citation in the NOD or other notices should the need arise, for example if an additional subsection of a rule is created. But TennCare would have no reason going forward to undo the improvements made to its notices or to revert back to the prior use of more generic legal citations. Such a change would require the

same effort as putting the new citations in place, and there would simply be no reason for TennCare to do so. I can attest that TennCare has no plans to undo these notice improvements.

28. Another aspect of TennCare's notices that is important for the Court to understand is how specific content gets included in a notice, particularly in the NOD. All notices start from a template that contains content specific to that type of notice. Language that will always appear in a notice is designated by a reference to "<Trigger Condition: Always>" that appears in blue on the template. For example, in an NOD, the following language is always included in the notice "If you don't qualify for a kind of coverage, we will tell you why. If your coverage changes or is ending, we will tell you when and why. Each part of this letter tells you more about our decision." *See* Exhibit 3 at TC-AMC-0000662842. Other language will only appear in a notice template if specific conditions are triggered to make inclusion of that language in the notice appropriate. For example, in an NOD, language about an approval for health coverage will only appear when an individual has been approved for coverage. This is designated in blue text in the NOD template under "<Trigger Condition: Approved for Health Coverage>." Likewise, language about a denial of coverage or a termination from existing coverage will only appear when an individual has been found to not qualify for TennCare. What the specific denial and/or termination reasons in the notice will be is entirely dependent on the reasons for the denial and/or termination.

29. As I explain above, TEDS uses a COE hierarchy to assess whether an individual is eligible for coverage in each of the eligibility categories available in Tennessee. If TEDS goes through the entire eligibility hierarchy and an individual has not grouped into any category, TEDS will have considered that individual for all categories of eligibility, but the NOD sent to that individual will have denial and/or termination language that explains that the individual did not group, which reads as follows:

You're not in a group covered by TennCare or CoverKids. You must be in a group we cover and be under the income limit for that group. Some of those groups include: children, pregnant women, caretaker relatives of minor children, people who are getting Social Security and who used to get SSI checks, people who need treatment for breast or cervical cancer, people who need long-term services or supports, or people who've been in the hospital for at least 30 days and meet the rules for aged, blind, disabled, a child, or pregnant.

*See* Business Reference Table, Tab "EDREASON" at line 21 attached hereto as Exhibit 13.

30. When an individual does not "group," the NOD will not go through each eligibility category and explain why the individual did not group into every category, but instead provides examples, as set forth above, of the types of groups that TennCare covers so the individual can appeal if they think TennCare made a mistake. *Id.* The NOD further tells them the reasons they can have a fair hearing may include: "You are in one of the groups covered by TennCare or CoverKids and you are under the income limit for that group." Designing the NODs this way enables TennCare to provide the most important information to its enrollees in the least complicated way. *Id.*

31. Having the NODs attempt to explain why an individual is not eligible in every possible eligibility category would make the NOD so lengthy as to render it useless in conveying actually relevant information to individuals that they need to understand the action being taken and to potentially file an appeal. Attempting to explain why an individual does not group in any category on a category-by-category basis would require an explanation for 23 different categories of Medicaid eligibility alone (this is in addition to TennCare Standard, Katie Beckett, CoverKids, and MSP categories), most of which are completely irrelevant to most individuals. It makes no sense, for example, to explain to a man why he does not qualify in the pregnancy category or cervical cancer categories, to explain to someone who does not receive social security income why

they do not qualify in the SSI-related categories, or to explain to someone who has never been in foster care why they do not qualify for foster care related categories of eligibility, or to explain to someone with no children why they do not qualify as caretaker relative. In short, the NODs are designed to provide relevant information necessary to enable an individual to determine if a mistake may have been made in their specific case and information on how to appeal that mistake. We have intentionally avoided over complicating and unnecessarily lengthening the NODs by including lots of irrelevant information that is not applicable in most cases.

32.     In the event an individual does groups into one or more categories, then the NOD will provide specific information as to why that individual is not eligible in the categories into which the individual grouped. For example, if an individual could be eligible in the Caretaker Relative category, but is over income for that category, the NOD will inform them that they are not eligible for Medicaid, what the income limit is for the type of Medicaid they could get, and that TennCare has determined their income is above that limit. *See* Ex. 13 at line 9. If an individual groups into the Breast or Cervical Cancer category, but is denied because they did not meet the BCC screening requirement or are not currently receiving treatment, those specific reasons will be provided in the NOD as well. *See id.* at lines 41 and 60.

33.     If an individual is not eligible for Medicaid because of an overarching non-financial reason, such as failing the SSN requirement, *see id.* line 7, or failing the residency requirement, *see id.* line 8, those reasons will also be included in the NOD.

34.     Another update TennCare has made to its notices since the filing of this lawsuit are the changes made to the Valid Factual Dispute ("VFD") language contained in the NODs, which are described in detail in the State's Notice of Filing of June 9, 2022 (Doc. 213) and in my Declaration of July 1, 2022 (Doc. 222). Like with the changes to the legal citations in the NODs,

the changes to the VFD language are permanent, and TennCare has no intention of reverting to the language previously used about which the Court expressed concern.

## V.    TennCare's Appeals Process

### A.  The Good Cause Exception

35.    I have described TennCare's good cause process previously, *see* Hagan Decl., Doc. 63 at ¶¶ 53, 71(c) (May 29, 2020); Doc. 166 at ¶¶53, 72(c), and that process has not changed in any significant way since that time. TennCare continues to be of the view that it would be detrimental to the best interests of its enrollees to inform them about the potential for a good cause exception to the appeals deadlines in the NODs because whether or not TennCare will grant good cause is entirely discretionary on TennCare's part, and an enrollee cannot count on receiving relief from the required deadlines. TennCare's notices, however, do instruct enrollees where to go if they have questions or need help, and if an enrollee files an untimely appeal and is not granted good cause for missing the appeals deadline, the notice closing that appeal does tell the enrollee how to request a good cause exception. *See* Appeal Resolution Notice Template attached hereto as Exhibit 14 at TC-AMC-0000661847.

36.    Plaintiffs argue that any enrollee who claims not to have received a notice from TennCare should be granted a good cause exception to a deadline or a good cause hearing to prove they in fact did not receive a notice. That would create extreme hardship for TennCare and would undermine TennCare's system of deadlines on which the program operates. This is true for several reasons. First, in my many years of experience, enrollees who have missed deadlines frequently allege they did not receive a notice when there is no evidence supporting that claim (*e.g.* there is no undelivered mail, there is no reported change of address, no evidence of attempts to update an address, other notices were delivered without issue). Second, because the allegation of non-receipt

without further proof is so frequent, attempting to provide good cause hearings in all of those cases would overwhelm the appeals system, would require hiring dozens of additional employees to handle just those claims, and would require hiring dozens of new administrative judges to conduct those hearings. Third, while it would be an intense resource drain for TennCare, it is not clear that providing good cause hearings would benefit enrollees because any enrollee that in fact has proof to support a claim for good cause could submit that information at the time they file their appeal or when they receive the notice closing their appeal as untimely that informs them of the good cause exception.

37.     Several of the named Plaintiffs in this case have alleged non-receipt of a notice, but when I or my staff reviewed their case files, including call recordings to TennCare Connect, it was clear they had received the notices and acknowledged as much. This is true for example in the case of Plaintiff Barnes, who Plaintiffs alleged in the Complaint never received her NOD, but for whom there is a call recording (produced to Plaintiffs on July 1, 2020) of her daughter, Glenda Surrett, acknowledging receipt.

**B.   Provision of Hearings with 90 Days**

38.     As noted previously, TennCare recently obtained approval from CMS for a waiver to the regulatory imposed 90-day deadline for taking final administrative action in an appeal. *See* Letter to Stephen Smith, Director, Div. of TennCare, from Sarah deLone, Director, Children and Adults Health Programs Grp. (June 14, 2023), https://bit.ly/46v0X9Y. This waiver formally adopts the policy that TennCare had implemented prior to the moratorium of resolving appeals without continuation of benefits ("COB") before appeals with COB even if that meant an appeal with COB may go past 90 days. It also formalizes TennCare's policy of granting COB in appeals not

otherwise entitled to them if the appeal is going to go past 90 days without a hearing. *See* Doc. 166 at ¶¶ 70–71.

39.     Since at least January of 2022, when a new COB module was implemented in TEDS, TennCare has not had any termination or coverage ending appeals that have gone beyond 90 days without COB, except for cases in which the appellant has requested a continuation, and no such appeals have gone beyond 90 days without a request for a continuation since August 1, 2022. Going forward, if any one of the following conditions are met, the waiver for complying with the 90-day deadline will go into effect: 1) the State receives more than 900 requests for a fair hearing per day; 2) the State is unable to complete an initial resolution review of all fair hearing requests within 40 days of receipt of a request (this condition is met when the State begins seeing trends (such as not being able to initially review an appeal for COB or timeliness within 5 days of filing) indicating the State is unable to complete an initial resolution review within 40 days); or 3) the State has fair hearing requests in the scheduling queue which were received 70 or more days ago and which cannot be scheduled due to full dockets. This does not include instances when a hearing request has been continued at the appellant's request. Currently, TennCare is meeting the regulatory requirement to take final administrative action in all eligibility appeals by the 90th day, and none of the referenced conditions have arisen.

C. **Provision of a Hearing at Any Time**

40.     With respect to the issue certified by the Court as to whether TennCare systematically fails to provide fair hearings at any time, I can attest that TennCare provides and will be providing thousands of fair hearings as a result of the restart of the Annual Renewal Process. There are only a handful of situations in which a filed appeal will not go to hearing: if the appeal is (1) withdrawn, (2) found to be untimely or otherwise procedurally improper, (3) lacking

a valid factual dispute, or (4) resolved in favor of the appellant prior to hearing. All of these reasons for closing an appeal prior to hearing are long standing practices, and in my experience are normal and accepted functions of any Medicaid eligibility appeals process.

41. As the appeals report attached hereto demonstrates, there have been thousands of appeals that have gone to hearing since appeals first began being processed in TEDS, through October 31, 2022, the date the data for this report was pulled. *See* TEDS Appeal Report (redacted), Exhibit 15.

42. I asked my staff to pull more recent data from 2023, and as of June 27, 2023, there have been 8089 appeals filed related to terminations of eligibility or change of eligibility benefits. Of those 8089 appeals, 4030 have been closed for one of the reasons noted above. Of those 8089 appeals, 3,019 have been resolved in favor of the appellant. Only 75 appeals, less than one percent (.009), have been closed as untimely, and 629 appeals have been closed for no Valid Factual Dispute. There have been 42 requests for good cause exceptions to the filing deadlines, and good cause has been granted 33 times. There have been no appeals over 90 days. Finally, 95 termination appeals have gone to hearing since January 1, 2023 and received an order.

**D. The Valid Factual Dispute Process**

43. TennCare's valid factual dispute ("VFD") policy refers to TennCare's requirement that an appellant challenging an adverse eligibility determination by the State allege a factual mistake that, if resolved in favor of the appellant, would entitle the appellant to relief. This includes a mistake that TennCare may have made in applying the law to the facts of an appellant's case. TennCare considers allegations that an error was made in applying the law to facts to constitute a valid factual dispute. For example, if an enrollee denied for being over the income limit contends that TennCare made an error in determining their household size (which requires a legal

determination of who counts as a household member) and therefore miscalculated their income limit, that would be a valid factual dispute that entitles them to a hearing.

44.     Every NOD that TennCare issues in which there is an adverse eligibility determination includes both a detailed explanation of an individual's appeal rights and deadlines, and targeted examples of the types of factual mistakes an individual can allege on appeal that would fulfill the VFD requirement making it very easy and straightforward for someone to know what to allege. For example, if an enrollee is being terminated because TennCare has determined they are no longer a resident of Tennessee, they will be told: "Reasons you may have a fair hearing may include: You are living in Tennessee. *See* Business Reference Table, Tab "EDREASON," Line 8, Column English Fair Hearing, attached hereto as Exhibit 13.

45.     Having this VFD process is important because it makes no sense to send to hearing an appeal in which there is no VFD because there is no relief that an administrative judge could order that would resolve the appeal favorably for the appellant. Sending such appeals to hearing would waste valuable state resources that could be better spent elsewhere in the appeals process.

I declare under penalty of perjury that the foregoing is true and correct.

Dated July 10, 2023

_____

Kimberly Hagan

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via

the Court's electronic filing system on this 10th day of July, 2023.

Gordon Bonnyman, Jr.
Brant Harrell
Madeline Wiseman
TENNESSEE JUSTICE CENTER
211 7th Avenue N., Ste. 100
Nashville, TN 37219

Elizabeth Edwards
Sarah Grusin
Jane Perkins
NATIONAL HEALTH LAW PROGRAM
200 N. Greensboro St., Ste. D-13
Carrboro, NC 27510

Jennifer M. Selendy
Faith E. Gay
Andrew R. Dunlap
Babak Ghafarzade
Amy Nemetz
David Coon
Bret Matera
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104

Gregory Lee Bass
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001

/s/ Michael W. Kirk
Michael W. Kirk