**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

|  |  |
|---|---|
| A.M.C., by her next friend, C.D.C., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 3:20-cv-00240<br>Chief District Judge Crenshaw<br>Magistrate Judge Newbern |
| STEPHEN SMITH, in his official capacity as Deputy Commissioner of Finance and Administration and Director of the Division of TennCare, | |
| Defendant. | |

## DEFENDANT'S POST-TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...........................................................................................iii

INTRODUCTION ........................................................................................................1

ADDITIONAL FINDINGS OF FACT .........................................................................2

    I.     Plaintiffs' Witnesses .......................................................................................2

    II.    TennCare's Witnesses ..................................................................................17

CONCLUSIONS OF LAW..........................................................................................19

    I.   TennCare Is Entitled to Judgment on Each Certified Issue. ...............................19

        A.  TennCare Considers All Categories and Bases of Eligibility.................................19

        B.  TennCare Does Not Systematically Fail to Provide
            Fair Hearings at Any Time. .......................................................................21

        C.  TennCare's Valid Factual Dispute Policy Is Lawful. ............................................22

        D.  TennCare's Policy of Denying Good Cause Exceptions or Hearings
            Based Only on Allegations of Nonreceipt of a Notice Is Lawful. .........................24

        E.  TennCare's Process for Providing Fair Hearings Within 90 Days
            Is Lawful. .................................................................................................28

        F.  Plaintiffs Have Failed to Prove TennCare's Notices Are Misleading. ..................29

            1.  The Citation Formerly Included in NODs Was Lawful and
                the Issue Is Now Moot. ......................................................................31

            2.  The Prior Language, Included in Some NODs, Describing the
                VFD Process Was Lawful and the Issue Is Now Moot.......................33

            3.  The NODs' Language Instructing Enrollees to Describe
                the Reasons They Want to Appeal and the Facts Supporting
                Appeal is Lawful................................................................................34

            4.  TennCare's Notices Accurately Describe Its Process for
                Considering Eligibility. ......................................................................35

            5.  The NODs' Omission of an Explanation Why Recipients
                Do Not Qualify for Every Other Medicaid Category is Lawful. .........36

6. The NODs' Omission of Information Regarding the Good Cause Exception and Good Cause Hearings Is Lawful. ...........37

7. The NODs' Omission of Information Regarding the 90-Day Reconsideration Period Is Lawful. .......................................38

G. TennCare Complies with the ADA. ......................................................39

1. Blanck's Expert Testimony Is Not Reliable. .......................................40

2. TennCare Has a System to Grant Requests for Reasonable Accommodations for Disabled Persons. ...............................42

3. TennCare Provides Adequate In-Person Assistance for Disabled Persons. ...........................................................45

II. Trial Has Demonstrated This Court Lacks Jurisdiction. ...................................46

A. No Plaintiff Has Standing to Seek Declaratory or Injunctive Relief. ...................46

B. The Court Should Decertify the Class. .................................................48

III. Plaintiffs Are Not Entitled to an Injunction. .....................................................50

CONCLUSION ...........................................................................................50

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Ability Ctr. of Greater Toledo v. City of Sandusky*,
    385 F.3d 901 (6th Cir. 2004) ...................................................................................43

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ...........................................................33

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...........................................48

*Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015) ...................................43

*Arch of Ky., Inc. v. Dir., Off. Workers' Compensation Programs*,
    556 F.3d 472 (6th Cir. 2009) ...................................................................................25

*Ba v. Holder*, 561 F.3d 604 (6th Cir. 2009) .............................................................27

*Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207 (6th Cir. 1997) .................................48

*Benton v. Rhodes*, 586 F.2d 1 (6th Cir. 1978) ..........................................................23

*Cabrera-Ramos v. Gonzales*, 233 F. App'x 449 (6th Cir. 2007) ...........................39

*Cahoo v. SAS Inst., Inc.*,
    No. 21-1407, 2023 WL 4014172 (6th Cir. June 15, 2023) ....................................32

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ..............................................49

*Caswell v. City of Detroit Hous Comm'n*,
    418 F.3d 615 (6th Cir. 2005) ......................................................................28, 29, 30

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ....................................................47

*Clay v. Ford Motor Co.*, 215 F.3d 663 (6th Cir. 2000) ............................................40

*Codd v. Velger*, 429 U.S. 624 (1977) ........................................................................24

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ...................................................................................41

*Cotten v. Davis*, 215 F. App'x 464 (6th Cir. 2007) ..................................................29

*Cunningham v. Railroad Retirement Board*,
    392 F.3d 567 (3d Cir. 2004) ...............................................................................25, 26

*Day v. Shalala*, 23 F.3d 1052 (6th Cir. 1994) ..........................................................30

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ..................................................35, 36

*Dunlap v. City of Sandy*,
    846 F. App'x 511 (9th Cir. 2021) (mem.) ...............................................................43

*Edelman v. Jordan*, 415 U.S. 651 (1974) .................................................................30

*Flaim v. Med. Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005) .....................................24

*Garrett v. Puett*, 557 F. Supp. 9 (M.D. Tenn. 1982) ................................................33

*Garrett v. Puett*, 707 F.2d 930 (6th Cir. 1983) ........................................................33

*Gaston v. Bellingrath Gardens & Home, Inc.*,
   167 F.3d 1361 (11th Cir. 1999) ................................................................44

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ........................................................30

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002)............................................29, 33

*Grier v. Goetz*, 402 F. Supp. 2d 876 (M.D. Tenn. 2005)................................23

*Halpern v. Wake Forest Univ. Health Scis.*,
   669 F.3d 454 (4th Cir. 2012) ....................................................................44

*Hamby v. Neel*, 368 F.3d 549 (6th Cir. 2004)........................................30, 32, 34, 36

*Hilmes v. Sec'y of HHS*, 983 F.2d 67 (6th Cir. 1993)...................................26

*Hindel v. Husted*, 875 F.3d 344 (6th Cir. 2017) ....................................42, 43

*In re Am. Med. Sys. Inc.*, 75 F.3d 1069 (6th Cir. 1996)............................48, 49

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) ...........40, 41

*Johnson v. City of Detroit*, 446 F.3d 614 (6th Cir. 2006)........................28, 33

*Jones v. Flowers*, 547 U.S. 220 (2006)....................................................27, 37

*Joshi v. Ashcroft*, 389 F.3d 732 (7th Cir. 2004)...........................................27

*Kaltenberger v. Ohio Coll. of Podiatric Med.*,
   162 F.3d 432 (6th Cir. 1998)................................................................43, 44

*Lockard v. Gen. Motors Corp.*, 52 F. App'x 782 (6th Cir. 2002).................43

*Marble v. Tennessee*, 767 F. App'x 647 (6th Cir. 2019) ...............................44

*Mathews v. Eldridge*, 424 U.S. 319 (1976)..................................26, 27, 29, 35, 37

*Mole v. Buckhorn Rubber Prods., Inc.*,
   165 F.3d 1212 (8th Cir. 1999) ...................................................................43

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ......................50

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ................30

*O'Brien v. Ed Donnelly Enterprises, Inc.*,
   575 F.3d 567 (6th Cir. 2009) ....................................................................49

*O'Shea v. Littleton*, 414 U.S. 488 (1974)......................................................47

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)................................43

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979)......................23, 24

*Reigh v. Schleigh*, 784 F.2d 1191 (4th Cir. 1986)....................................36, 37

*Rodriguez ex rel. Corella v. Chen*, 985 F. Supp. 1189 (D. Ariz. 1996) .....32, 33

*Rolen v. Barnhart*, 273 F.3d 1189 (9th Cir. 2001)........................................39

*Rosen v. Goetz*, 410 F.3d 919 (6th Cir. 2005)........................................22, 23, 35

*Rosen v. Tenn. Comm'r of Fin. and Admin.*, 288 F.3d 918 (6th Cir. 2002)....................46

iv

*Shelby Advocs. for Valid Elections v. Hargett*,
    947 F.3d 977 (6th Cir. 2020) ....................................................................................46, 47

*Singh v. Garland*,
    No. 21-3812, 2022 WL 4283249 (6th Cir. Sept. 16, 2022) ............................................27

*Tate v. Hartsville/Trousdale Cnty.*,
    No. 3:09-0201, 2010 WL 4822270 (M.D. Tenn. Nov. 22, 2010).....................................49

*Thomas v. City of Memphis*, 996 F.3d 318 (6th Cir. 2021) .................................................30, 31

*Ward v. McDonald*, 762 F.3d 24 (D.C. Cir. 2014).............................................................42, 43

*Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084 (6th Cir. 2016) .................................................48

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012) .................................................48

## Statutes, Rules, and Regulations

42 U.S.C.
    § 12132......................................................................................................................42
    § 1396a(a)(3)........................................................................................................21, 28

28 C.F.R.
    § 35.130(b)...............................................................................................................39
    § 35.130(b)(7)(i).......................................................................................................42

42 C.F.R.
    § 431.244(f)(1).........................................................................................................28
    § 431.244(f)(4)(i)......................................................................................................28
    § 435.916(a)(3)(iii)....................................................................................................38
    § 457.340(g).............................................................................................................38
    § 457.343................................................................................................................38

FED. R. CIV. P. 23(c)(1)(C)...............................................................................................48

FED. R. CIV. P. 56 .........................................................................................................24

TENN. COMP. R. & REGS. 1200-13-19-.02(20) ....................................................................24

TENN. COMP. R. & REGS. 1200-13-19-.05(2) .......................................................................22

TENN. COMP. R. & REGS. 1200-13-19-.05(3) .......................................................................22

TENN. COMP. R. & REGS. 1200-13-19-.06(3) .......................................................................24

## Other Authorities

*CMS State Medicaid Manual*, CMS.GOV,
    *available at* https://go.cms.gov/3Mhci5K (last visited Mar. 7, 2024) ...............................23

# INTRODUCTION

TennCare serves approximately 1.7 million Tennesseans. Administering this program is the work of a large state agency filled with public servants who work hard to assist the people of Tennessee and ensure that everyone who is eligible for Medicaid is provided with adequate health coverage. Plaintiffs brought this case, alleging violations of the Due Process clause, the Medicaid Act, and the Americans with Disabilities Act, broadly claiming that TennCare fails to carry out that mission in just about every way possible. Among other things, Plaintiffs claimed that TennCare systematically fails to correctly determine Medicaid eligibility, that it fails to provide fair hearings at any time, and that it lacks any system for providing reasonable accommodations to disabled persons attempting to access the program.

After substantial discovery aimed at substantiating those claims and others, and with their suit narrowed to encompass only certain issues that were plausibly amenable to class-wide resolution, at trial Plaintiffs presented evidence from fewer than half of their class representatives and put forward no evidence at all on many of the certified issues. The evidence that Plaintiffs did put forward only substantiated what the State has been saying since this case began: there are no systemic flaws in TennCare's eligibility system that have not been promptly fixed when identified. Errors are inevitable, but TennCare has a wide range of robust protections against them. It investigates and corrects errors as they are discovered, fills in any gaps in coverage that may have occurred as a result, and implements program-wide changes to ensure that the same error does not happen twice.

Although this is a class action, the Plaintiffs who presented evidence at trial were very different from one another. They had different types of TennCare eligibility and experienced different problems, which were resolved in different ways. The one thing they all undisputedly had

1

in common was that, once the problem in their case was discovered, TennCare took the problem seriously, investigated it, took appropriate corrective action, and when necessary, implemented permanent fixes to the program. On this record, the Court must find that TennCare's policies, practices, and procedures comply with due process, the Medicaid Act, and the Americans with Disabilities Act.

## ADDITIONAL FINDINGS OF FACT[1]

### I.    Plaintiffs' Witnesses

922.    The only class representatives who testified were Carlissa Caudill, Dijuana Davis, Michael Hill (through his next friend Kimberly Noe), Johnny Walker (through his next friend Heath Stevens), William Monroe, Jeffrey King, and Samantha Turner.

923.    The only disability subclass representatives who testified were Carlissa Caudill, Michael Hill (through his next friend Kimberly Noe), Johnny Walker (through his next friend Heath Stevens), and William Monroe.

924.    Plaintiffs submitted no testimony or any other evidence proving the claims of the following class representatives: Avalynn M. Carper, Kai Acuff, Skai F. Anders, Vivian Barnes, Rhonda Cleveland, Susan L. Cooper, Charles E. Fultz, Mason P. Lester, Elijah I. Love, Allana Person, Linda Rebeaud, the Redding family, the Roche family, and Kerry A. Vaughn.[2]

---

[1] The following findings of fact are in addition to those TennCare submitted pretrial. *See* Doc. 386 (Nov. 13, 2023). All findings of fact are referred to herein as "PFOF".

[2] While the parties initially submitted stipulations for some of these individuals, TennCare did so with the understanding that they would testify and could be cross-examined to provide the Court with a complete understanding of their cases, which is not provided in the stipulations. Because Plaintiffs chose not to introduce testimony to fill in the gaps, the Court should not rely on any stipulations relating to these non-testifying individuals. This approach is consistent with the Court's ruling during trial that a call recording involving a non-testifying witness (Ms. Cleveland, a named Plaintiff) was inadmissible. 11/16 Tr. 226:1–227:12.

925. Plaintiffs offered testimony from three parents of enrollees or former enrollees who have never been members of the Plaintiff class, Donna Guyton, William Gavigan, and Andrea Riley.

926. Plaintiffs presented no testimony at all on several certified issues. No witness testified that they received a Notice of Decision ("NOD") and were misled by, or detrimentally relied on, the legal citation related to their termination reason. No witness testified that they were misled by, or detrimentally relied on, language describing the Valid Factual Dispute ("VFD") policy. No witness testified that they decided not to appeal because the NODs do not include a description of TennCare's "good cause" policy or the "90-day reconsideration period." No witness testified that they experienced a deprivation of their coverage because TennCare took more than 90 days to resolve an appeal. No witness testified that TennCare systematically failed to consider them for any category of eligibility. And no witness testified that they requested a reasonable accommodation because of their disability, did not receive it, and lost eligibility as a result.

<u>Donna Guyton (on behalf of son Patrick)</u>

927. In 2023, worker error caused Patrick to be misclassified as eligible in the Pickle category instead of the Disabled Adult Child ("DAC") Category, and he was sent a pretermination notice and eventually a termination NOD. 11/20 Tr. 54:2–11. Patrick never lost coverage and the error was discovered and corrected through the appeals process. 11/17 Tr. 205:2–11; Doc. 389 ¶ 439 ("Jt. Stips.")[3].

928. Plaintiffs stated that Guyton would present testimony relevant to the issues of whether TennCare considers all categories of eligibility (including disability-related categories)

---

[3] Citations to Jt. Stips. throughout this brief include both Doc. 388, admitted at trial as JX43 (initial stipulations, ¶¶ 1–127), and Doc. 389 (additional stipulations, ¶¶ 128–452) (Nov. 14, 2023), admitted at trial as JX44.

3

when making eligibility determinations, whether the NODs' language instructing individuals to describe the reasons they want to appeal and the facts supporting the appeal is lawful, and whether TennCare's VFD policy is lawful. Pls.' Trial Br. at 1, Doc. 384 (Nov. 9, 2023) ("Pls.' Br.").

929.     Patrick's case does not demonstrate that TennCare fails to screen for any category of eligibility. After checking for all categories, TennCare initially concluded erroneously that Patrick was not eligible based on worker error that was discovered and corrected through the appeals process. 11/20 Tr. 54:2–55:12.

930.     Guyton filed two appeals on Patrick's behalf relevant to the certified issues in this case. The first was filed *before* TennCare had issued a termination notice, and TennCare responded to the appeal by issuing a VFD Additional Information ("AI") notice. Jt. Stips. ¶¶ 434–435. Guyton testified that she did not respond to this notice, because she believed she had already told TennCare everything relevant to the appeal. 11/14 Tr. 75:1–11.

931.     Guyton filed a second appeal after Patrick received an NOD terminating his coverage (but he was granted continuation of benefits ("COB"), so the termination never occurred). Jt. Stips. ¶¶ 437–439. Guyton did not testify at all about the application of the VFD policy relevant to this appeal and the appeal was resolved without a hearing in Patrick's favor. 11/14 Tr. 86:1–13; Jt. Stips. ¶ 440.

### Carlissa Caudill

932.     Caudill was terminated despite receiving Supplemental Security Income ("SSI") due to a problem with the data that TennCare received from the Social Security Administration ("SSA"). 11/17 Tr. 44:12–45:4, 94:6–109:9; PFOF ¶ 495.

933.     Plaintiffs stated that Caudill would present testimony relevant to the issues of whether TennCare considers all categories of eligibility (including disability-related categories) when making eligibility determinations, whether the NODs' omission of an explanation for why a

4

recipient does not qualify for every category of Medicaid eligibility is lawful, whether the NODs' language instructing individuals to describe the reasons they want to appeal and the facts supporting the appeal is lawful, whether TennCare's VFD policy is lawful, whether language TennCare formerly used in some NODs to describe that policy is lawful, whether TennCare's policy of denying a good cause exception or hearing based on bare allegations of nonreceipt is lawful, and whether TennCare fails to provide fair hearings. Pls.' Br. at 3.

934.    Caudill offered no testimony at all about the majority of these issues. Her testimony only touched on TennCare's VFD process and TennCare's consideration of all categories of eligibility. While Caudill's testimony arguably expressed her confusion as to why she was terminated from TennCare, she never explicitly testified about any confusion over the NOD she received or why the language in the NOD telling her that her coverage was ending because she is not in a group covered by TennCare that specifically referenced people who are getting SSI, *see* DX180 at 4, was insufficient or confusing.

935.    Caudill received a VFD AI, Jt. Stips. ¶ 158 and testified that "every time they did send me requests [for additional information], I did reply back with the information they asked for." 11/14 Tr. 121:16–21. In response to the question "what mistakes you feel were made," however, Caudill stated, "I need lung care treatment." 11/14 Tr. 124:8–15. When asked if there was anything else, beyond her health issues, that Caudill wanted to inform TennCare of with respect to her appeal, Caudill said no. 11/14 Tr. 125:5–126:4.

936.    In short, when asked to explain the basis for her appeal, Caudill told TennCare why she needed her coverage, but she did not indicate that she disagreed with TennCare's determination that she was not in a group covered by TennCare because she was receiving SSI. 11/17 Tr. 45:1–

5

18; *see also* DX180 at 4 (informing Caudill that "reasons you can have a fair hearing may include: You are in one of the groups covered by TennCare").

937. When Caudill eventually told TennCare that she was, in fact, receiving SSI, TennCare recognized the allegation as a VFD, investigated the issue, and reinstated her coverage. DX182; 11/17 Tr. 102:2–6.

938. While TennCare was mistaken in determining that Caudill was no longer receiving SSI, and thus not eligible for TennCare, the unrebutted testimony from Hagan shows that, in fact, TennCare *did* consider the SSI category, but erroneously concluded Caudill was not eligible based on bad SSA data. 11/17 Tr. 104:17–105:4.

## The Turner Family

939. Plaintiffs stated that Turner would testify to whether TennCare's VFD policy is lawful, whether TennCare's policy of denying a good cause exception or hearing based on bare allegations of nonreceipt is lawful, whether TennCare's NODs' omission of information about the good cause policy is lawful, and whether TennCare systematically fails to provide fair hearings. Pls.' Br. at 5–6; Pls.' PFOF ¶ 19, Doc. 381 (Nov. 9, 2023) ("Pls.' PFOF").

940. TennCare erroneously terminated coverage for two of the Turner children—Jackson and Annaleigh—because at the time a programming defect in TEDS caused it to not automatically grant Transitional Medicaid to some children when authorizing it for their parents. 11/17 Tr. 181:15–20; PFOF ¶ 309. TennCare reenrolled the children upon learning of the error and backfilled their coverage in February 2020, before this lawsuit was filed. Jt. Stips. ¶¶ 330–331.

941. As Hagan testified, TennCare found only nine other children who were affected by this programming defect. 11/17 Tr. 181:24–182:5. TennCare reached out to each of those families to see if they wanted to reinstate coverage. 11/17 Tr. 182:3–5. TennCare fixed this programming defect in February 2020. 11/17 Tr. 182:8–9.

6

942. While Turner claims the family never received notice that her children's coverage would terminate, TennCare mailed that notice to her family's address of record. Jt. Stips. ¶ 303.

943. After learning that the children's coverage had been terminated, Turner called TennCare Connect on June 18, 2019, and filed appeals on their behalf. Jt. Stips. ¶ 310.

944. Both children were sent VFD AI notices asking them to tell TennCare what mistake they were saying TennCare made, informing them they were terminated because they did not provide information that was requested by the May 26, 2019, deadline, and asking them to tell TennCare if they did in fact send that information in or if they did not get the request for that information. Jt. Stips. ¶¶ 312–313.

945. While Turner had told TennCare on the earlier June 18, 2019, call that she had not received the AI notice requesting information by May 26, 2019, Jt. Stips. ¶ 310, it is undisputed that the Turners did not respond to the VFD AI notice and reallege that they had not received the earlier notice or submitted any information in response. Jt. Stips. ¶ 315.

946. Turner did not testify to the issues of whether the NODs' omission of information about the good cause policy is lawful or whether TennCare systematically denies hearings to those who appeal.

<u>The Davis Family</u>

947. Dijuana Davis and some of her children lost coverage when their eligibility data was converted into TEDS from TennCare's legacy system with a worker data entry error that caused their case to be merged with another family's. As a result, TennCare sent notices to an address the Davis family had never lived at and they did not receive actual notice of their termination from TennCare. Jt. Stips. ¶¶ 174–177.

7

948.     Unrebutted testimony from Hagan demonstrated that this error occurred only once and this is "truly a single unique case." 11/17 Tr. 125:25–126:2. Indeed, neither Davis, nor any other witness testified that this error had occurred with anyone else.

949.     Plaintiffs stated that Davis would present testimony relevant to the issues of whether the NODs' omission of information regarding the "good cause" exception or "good cause" hearings is lawful, whether the State's policy of denying good cause exceptions or hearings based on allegations of non-receipt of a notice is lawful, and whether TennCare lacks a system for granting fair hearings at any time. Pls.' Br. at 4.

950.     Davis did not testify at all to the lack of language regarding the "good cause" exception in NODs; indeed, the crux of her testimony was that she never received an NOD at all because it was sent to the wrong address. Nor did she testify regarding the provision of fair hearings.

951.     After filing an appeal late and noting that she had not received her notices because they were sent to the wrong address, TennCare reviewed Davis's casefile and granted her a good cause exception and COB based on her non-receipt of the notices. 11/17 Tr. 127:13–128:20; Jt. Stips. ¶¶ 180–181.

### William Gavigan (testifying on behalf of daughter Jeanne Gavigan)

952.     Jeanne has been continuously enrolled in ECF CHOICES after she shifted from eligibility in the SSI category to the Institutional Medicaid ("IM") category. PFOF ¶¶ 782–786. Jeanne has never lost her Medicaid eligibility. PFOF ¶ 819; 11/14 Tr. 208:12–17.

953.     Plaintiffs stated that Gavigan would present testimony relevant to the issues of whether TennCare's VFD policy is lawful, whether TennCare systematically fails to provide fair hearings, and whether the NODs' omission of an explanation of why recipients do/do not qualify for other Medicaid categories is unlawful. Pls.' Br. at 7–8; Pls.' PFOF at 3–4.

8

954. Gavigan did not testify that TennCare fails to provide fair hearings or that the NODs' omission of an explanation of why recipients do/do not qualify for other Medicaid categories is unlawful.

955. TennCare explained in a notice that while Jeanne has been approved for ongoing TennCare Medicaid coverage, her Medicare Savings Plan benefits were ending because she was over the $1,288 income threshold. 11/14 Tr. 219:18–220:6. Jeanne's income was in fact over that amount, and Gavigan did not contest that fact or mention Jeanne's income when he appealed. 11/14 Tr. 220:16–24.

956. While Gavigan included information about why his daughter should qualify as a DAC in his appeal, she was not in that category (nor did Gavigan prefer her to be), so this fact and any associated legal argument was irrelevant to the appeal. PFOF ¶¶ 810–811; 11/14 Tr. 220:25–221:21.

### Kimberly Noe (on behalf of brother Michael Hill)

957. Hill was mistakenly disenrolled from TennCare because, during the conversion of his eligibility data into TEDS, he was converted as eligible in the Pickle, not the DAC category. Jt. Stips. ¶ 191.

958. Plaintiffs stated that Noe would present testimony relevant to the issues of whether TennCare considers all categories of eligibility (including disability-related categories specifically) before terminating an enrollees' coverage, whether TennCare fails to provide fair hearings at any time, whether TennCare is required to or fails to provide fair hearings within 90 days, the NODs' omission of information regarding every category of TennCare eligibility, and whether TennCare provides reasonable accommodations to persons with disabilities. Pls.' Br. at 9; Pls.' PFOF at 3, 12–13.

9

959. Noe testified that Hill has never requested a reasonable accommodation. 11/15 Tr. 42:22–24. Furthermore, Noe is not disabled and intends to continue to help Hill navigate TennCare. 11/15 Tr. 42:7–15. Hill's TennCare eligibility was recently reverified without him or Noe having to take any action at all. 11/15 Tr. 42:16–18; Jt. Stips. ¶ 213.

960. Noe offered no testimony at all regarding the lack of an explanation regarding other categories of eligibility in the NODs. Nor did she testify that Hill was denied an eligibility hearing or that TennCare systematically fails to provide fair hearings. In fact, Hill was scheduled for a hearing, Jt. Stips. ¶ 202, but that hearing was not necessary because TennCare corrected the error in Hill's case and resolved his appeal in his favor without a hearing, Jt. Stips. ¶ 207.

961. Noe did not testify that TennCare failed to consider Hill for every category of eligibility, including disability-related categories. The unrebutted testimony of Hagan demonstrates that TennCare did consider him for all categories but erroneously determined he was ineligible because an error during the conversion of his eligibility data misclassified him as not a DAC, so it appeared that he exceeded the income level for TennCare eligibility. 11/17 Tr. 135:5–136:3.

962. TennCare identified nine other cases affected by the same error that Hill experienced and corrected all such cases. 11/17 Tr. 136:4–137:24.

<u>Keith Cottle (testifying on behalf of daughter Journey Cottle)</u>

963. Plaintiffs stated that Cottle would offer testimony relevant to the issues of whether TennCare's policy of denying "good cause" based on bare allegations of nonreceipt of a notice is lawful and whether TennCare systematically fails to provide fair hearings at any time. Pls.' Br. at 11.

10

964. Journey's coverage was terminated after Cottle did not respond to a notice mailed to the Cottle's address of record and no appeal was filed. Jt. Stips. ¶¶ 387–391. Cottle testified that he did not respond to the notice because it was not delivered to him and that his address sometimes gets confused with another address. 11/15 Tr. 72:14–73:1, 83:12–25.

965. Upon learning that Journey lost coverage, Cottle reapplied for benefits for her on June 26, 2023. Jt. Stips. ¶ 393. This was after the deadline for filing a timely appeal. 11/17 Tr. 23:17–20.

966. TennCare wants enrollees who were disenrolled to get back on the program as fast as possible, which is why TennCare sometimes encourages reapplication. This is especially true if the deadline for an appeal has passed because there is no guarantee that a late appeal would be taken and many applications are processed in a day. 11/17 Tr. 26:11–22, 29:16–20. If an individual nonetheless says "I want to appeal," the representative will absolutely take a late appeal. 11/17 Tr. 30:8–12.

967. When taking an appeal, TennCare Connect operators ask, "Did you have a problem receiving your notices?" 11/17 Tr. 24:3–5; 11/20 Tr. 149:20–150:1. Because Cottle did not file an appeal, he was not asked this question. 11/17 Tr. 23:10–11. If Cottle *had* filed an appeal and explained that his address gets confused with another, Hagan testified that it is "very likely" TennCare would have granted good cause for the late filing. 11/17 Tr. 34:4–8. About 95% of late appeals are found to have good cause. 11/17 Tr. 34:6–8. But again, Cottle did not file an appeal on which good cause could have been granted.

968. Cottle offered no testimony regarding the provision of fair hearings to appellants who appeal.

969. Journey's coverage was reinstated on August 3, 2023. Jt. Stips. ¶¶ 401–402.

11

970.     Children such as Journey whose coverage is reinstated receive retroactive coverage backdated to 90 days before the start date of their coverage if there are outstanding medical bills during that time. 11/17 Tr. 28:21–24.

<u>Andrea Riley (testifying on behalf of son Joshua Riley)</u>

971.     Joshua has been continuously enrolled in TennCare since July 1, 2018, and in the ECF CHOICES program since August 10, 2018. Jt. Stips. ¶¶ 444–445. At no point has Joshua been disenrolled, and he has never had any break in coverage. Jt. Stips. ¶ 444.

972.     Plaintiffs stated that Riley would offer testimony relevant to the issues of whether TennCare lacks a system for granting reasonable accommodations to disabled enrollees, whether TennCare's policy of denying "good cause" based on bare allegations of nonreceipt of a notice is lawful, and whether TennCare offers adequate in-person assistance to disabled enrollees. Pls.' Br. at 12.

973.     Riley did not testify to any of the issues Plaintiffs said she would and her testimony about errors she saw on Joshua's TennCare portal is not probative of any certified issue.

974.     While Riley testified that she saw an incorrect home address on Joshua's TennCare online portal, this pertained to his prior SSI eligibility case that TennCare kept open during the public health emergency. 11/17 Tr. 80:13–81:22. Joshua's mailing address was correct in TennCare's system, and the incorrect home address showing in the portal did not affect any of the notices sent to Riley on her son's behalf. 11/15 Tr. 142:23–143:17; 11/17 Tr. 81:9–13. Further, TennCare has since changed its system to show only a beneficiary's Institutional Medicaid (or other eligibility category) if an older SSI case is closed or should be closed. 11/17 Tr. 81:4–8.

975.     While Riley saw a typo in her son's TennCare portal that placed a dollar sign in front of the correct number of hours per week that he worked, TennCare corrected that typo once

it learned of it. 11/17 Tr. 81:25–82:3. It in no way affected Joshua's TennCare coverage. 11/15 Tr. 144:8–10.

976.    Riley never called TennCare about her concerns, or to identify any other issues with TennCare's online portal. 11/15 Tr. 147:7–148:9.

<u>The King Family</u>

977.    Plaintiffs stated that King would offer testimony relevant to whether TennCare's policy of denying "good cause" based on bare allegations of nonreceipt of a notice is lawful, whether the NODs' omission of information about the good cause policy is lawful, and whether TennCare systematically fails to grant fair hearings at any time. Pls.' Br. at 13; Pls.' PFOF ¶ 21.

978.    The Kings' renewal packet was sent to their address of record. 11/15 Tr. 151:19– 23; DX260. However, when that packet was sent, the Kings had moved without informing TennCare of their new address, as TennCare's notices explain to enrollees is required by state law. 11/15 Tr. 152:1, 167:19–168:6.

979.    While King said that the family never received the notice telling them their coverage would terminate for failure to respond to the renewal packet, it was also mailed to their address of record, where the Kings have received other mail from TennCare. 11/15 Tr. 169:17–20; DX261.

980.    King did not testify that TennCare fails to provide hearings at any time. In fact, the appeals process worked as intended for the Kings. 11/20 Tr. 131:5–10. After learning they had lost coverage, Ms. King called TennCare to file an appeal for her husband and children, which TennCare accepted. Jt. Stips. ¶ 221. The Appeals team then reviewed the case, processed the renewal packet response that had been submitted, approved Mr. King, Madison, and Daniel for coverage, and backdated coverage before this lawsuit was filed. Jt. Stips. ¶ 222.

13

981. King offered no testimony about whether the NODs' omission of information about the good cause policy is lawful.

<u>Heath Stevens (on behalf of friend Johnny Walker)</u>

982. Walker experienced a loss of coverage due to the same SSI-related data issue that impacted Caudill. 11/17 Tr. 104:17–23.

983. Plaintiffs stated that Stevens would present testimony relevant to the issues of whether TennCare lacks a system to grant requests for reasonable accommodations for disabled persons and whether TennCare provides adequate "in-person assistance" for disabled persons. Pls.' Br. at 16.

984. Walker is a qualified individual with a disability. He has difficulty concentrating, completing paperwork, and walking because of a head injury. He is, however, able to make his own doctor appointments and drive. 11/15 Tr. 182:25–183:21.

985. Stevens and Walker's sister help Walker with his daily life, including navigating the TennCare system. 11/15 Tr. 184:1–14

986. Stevens never testified that Walker or anyone else on his behalf had ever requested a reasonable accommodation from TennCare on account of Walker's disability. 11/15 Tr. 193:6–7.

987. Stevens never testified at all regarding the provision of in-person assistance.

988. Stevens had no personal knowledge regarding why Walker lost his coverage or about the appeal Walker filed when he lost his coverage. 11/15 Tr. 193:13–23.

<u>Faith Grace</u>

989. Grace has autonomic dysfunction, Ehlers-Danlos syndrome, and other health conditions. 11/16 Tr. 74:15–22. TennCare pays her Medicare Part B Premiums, but she is not on TennCare Medicaid. 11/16 Tr. 102:6–9.

14

990.     As already detailed, Grace lost her QI coverage when she failed to submit requested verifications of financial resources, income, vehicles, and bank statements. PFOF ¶¶ 820–830.

991.     Plaintiffs stated that Grace would present testimony relevant to the issues of whether TennCare lacks a system to grant requests for reasonable accommodations for disabled persons and whether TennCare provides adequate in-person assistance for disabled persons. Pls.' Br. at 14.

992.     Grace did not testify that she asked for an accommodation and was denied one. In fact, TennCare granted Grace's request for more time to submit her information. Jt. Stips. ¶ 424.

993.     Grace also did not specifically ask TennCare for in-person assistance with returning her information. 11/16 Tr. 110:7–118:15.

994.     Talley Olson, TennCare's Director of Civil Rights Compliance thought Grace might benefit from in-person assistance after reviewing her calls. 11/16 Tr. 187:15–16. Olson then forwarded Grace's information to TennCare's Response Unit, asking them to refer her to her local AAAD for in-person assistance. 11/16 Tr. 187:17–18. Today, Olson makes that referral for in-person assistance to the AAAD directly via email. 11/16 Tr. 218:4–219:6. Olson also now stays in touch with the AAAD until the issue related to the referral is resolved. 11/16 Tr. 218:16–17.

995.     Olson sent Grace a letter dated July 7, 2023, informing Grace that a referral had been made to a AAAD on her behalf who could help her submit her documents. Jt. Stips. ¶ 426. That letter also informed Grace that if she needed help in the future, she could call her AAAD. 11/16 Tr. 188:22–24. Grace received that letter on or before July 31, 2023, which prompted her to call Olson on July 31, 2023. 11/16 Tr. 98:16–99:5; Jt. Stips. ¶ 427. This call was not recorded. 11/16 Tr. 212:5–7.

996.    Due to her disabilities, Grace struggles with her memory. 11/16 Tr. 79:8–22. Grace's memory of her July 31, 2023, call to Olson is not reliable and is contradicted by both her own testimony and Olson's. For example, Grace testified that Olson did not help her, but rather transferred her. 11/16 Tr. 104:14–19. But Olson testified that she could not have transferred Grace because Grace called her on her work cell phone, the number listed in the letter Olson sent, which does not have the ability to transfer calls. 11/16 Tr. 214:8–10. Olson also testified that she never told Grace that she could not help her. 11/16 Tr. 214:5–7. Grace even contradicted her own negative account of the July 31, 2023, call with Olson by stating that Olson was kind and helpful to her. 11/16 Tr. 105:8–10.

997.    After the July 31, 2023, call with Olson, Grace did not reach back out to Olson to inform her that she was still having trouble submitting her information to TennCare. 11/16 Tr. 105:18–106:1.

998.    After Grace submitted the information TennCare requested on October 3, 2023, her QI coverage was reinstated and the gap in her coverage filled retroactively. Jt. Stips. ¶ 415. Grace received a refund for the benefits amounts that had been deducted from her Social Security check during the period when she was without QI coverage. 11/16 Tr. 102:13–16.

<u>William Monroe</u>

999.    Monroe is a qualified individual with a disability who has had QMB coverage since at least 2013 and has had Medicaid coverage in the Pickle category since April 8, 2020. Jt. Stips. ¶¶ 239, 268; Monroe Trial Dep. Tr. 6:16–7:2 (Dec. 12, 2023) ("Monroe Tr.").

1000.    Plaintiffs stated that Monroe would present testimony related to the issues of whether TennCare screens for all categories of eligibility, whether TennCare fails to screen for disability-related categories specifically, whether the NODs are inadequate because they omit explanations for why an individual does not qualify for every category of TennCare eligibility,

16

whether TennCare lacks a system for granting reasonable accommodations, and whether TennCare provides adequate in-person assistance to enrollees. Pls.' Br. at 18.

1001.   Monroe offered no testimony regarding TennCare's consideration of all categories of eligibility, no testimony regarding the provision of reasonable accommodations, and no testimony regarding the provision of in-person assistance.

1002.   Monroe offered no testimony regarding the content of the NODs, which he admitted he could not read. Monroe Tr. 10:20–11:7, 16:1–5.

1003.   Monroe once requested additional time to provide information to TennCare on account of his disability and he was in fact granted that time. Jt. Stips. ¶ 251; DX317; DX318.

## II.   TennCare's Witnesses

### Katie Evans (Director of TennCare's LTSS Division)

1004.   The LTSS Division serves about 40,000 disabled and/or elderly enrollees. 11/14 Tr. 225:10–25, 252:5–7. It administers many programs serving different groups of disabled enrollees, all of which is detailed elsewhere. Jt. Stips. ¶¶ 20–22; 11/14 Tr. 250:1–251:13.

1005.   Only a small number of TennCare enrollees choose to request in-person assistance from the AAADs, and this number has declined since the COVID-19 pandemic. 11/14 Tr. 260:19–261:15, 280:23–282:3. It is generally faster to get assistance via phone. 11/14 Tr. 261:8–9.

1006.   TennCare recently started requiring the AAADs to report other forms of assistance, such as phone assistance to enrollees, in response to AAAD feedback that their reports on in-person assistance did not accurately reflect all that they were doing. 11/14 Tr. 263:19–264:17.

1007.   The LTSS Division monitors how the renewal process is going for its members. 11/14 Tr. 275:4–21. Whenever an issue is brought to their attention, the Division checks to ensure that it is not indicative of any systemic issue. 11/14 Tr. 275:11–21.

17

<u>Talley Olson (TennCare's Director of Civil Rights Compliance)</u>

1008.  Olson testified that TennCare has a system for granting both reasonable accommodations and mitigating measures to enrollees navigating the eligibility renewal process. PFOF ¶¶ 375–389.

1009.  A reasonable accommodation request requires a change to TennCare's rules or procedures for the enrollee to participate in the program. 11/16 Tr. 153:15–17, 157:17–158:2.

1010.  Mitigating measures are more routine forms of assistance that help enrollees— including disabled individuals—do what they need to do. 11/16 153:13–154:24, 175:7–18. Examples include granting requests for more time, assisting with language or communication services, providing in-person assistance, and explaining the meaning of a notice to someone with a cognitive impairment. 11/16 Tr. 153:20–21, 171:21–172:5.

1011.  Many mitigating measures can be implemented by call center workers and other TennCare employees without Olson's intervention. 11/16 Tr. 152:15–17, 172:22–173:9.

1012.  TennCare's notices inform enrollees that they have a right to get help and provide multiple contacts. PFOF ¶¶ 73–76. TennCare's notices also include a page, written by Olson, with an email address and phone number whose voicemail she monitors that enrollees can use to obtain assistance. 11/16 Tr. 201:4–202:17.

<u>Kimberly Hagan (Director of TennCare Member Services)</u>

1013.  Hagan, who has over 23 years of experience with TennCare eligibility and appeals processes, testified credibly and without dispute regarding the design and implementation of TEDS, TennCare's eligibility policies and processes, and the ways in which the TennCare system is designed to provide assistance to all enrollees including those with disabilities.

1014.  Hagan testified that TennCare's "90-day reconsideration" policy refers to the practice of providing enrollees going through annual renewal with a 90-day grace period,

18

following the date of termination, to return their Renewal Packets or additional information needed to determine eligibility. 11/17 Tr. 167:23–168:5. If the missing information is received within 90 days, that information will be reviewed, and if it shows that an individual is eligible for coverage, coverage will be reinstated and backdated to fill in the gap. 11/17 Tr. 167:23–168:5.

<u>Chris Holt (Director of TennCare's Appeals Operation Group)</u>

1015.  Christopher Holt testified credibly regarding TennCare's appeals process, including the operation of the VFD policy, the provision of fair hearings, TennCare's policies for resolving appeals in a timely manner, and the application of the good cause policy, as more fully described in the State's pretrial findings of fact. *See generally* Holt Trial Dep. Tr., Doc. 395-1 (Dec. 7, 2023) ("Holt Tr.").

## CONCLUSIONS OF LAW

### I.  TennCare Is Entitled to Judgment on Each Certified Issue.

#### A.  TennCare Considers All Categories and Bases of Eligibility.

The Court certified for class resolution the issues of "whether Defendant considers all categories of eligibility before terminating enrollees' coverage" and whether TennCare "fails to evaluate disability-related eligibility categories in termination decisions." Mem. Op. at 14, 20, Doc. 234 (Aug. 9, 2022) ("Op.") (cleaned up). The uncontroverted evidence at trial demonstrates that TennCare considers all categories of eligibility, including disability-related categories. TEDS is designed to consider and screen for all categories of eligibility when making eligibility determinations, and it does so reliably. 11/17 Tr. 104:24–105:4, 178:8–23; PFOF ¶¶ 173–176. TEDS follows "business rules" and a "category of eligibility (COE) hierarchy" in which it systematically tests enrollees for each type of benefits, beginning with the most generous and running through the least. 11/17 Tr. 84:19–86:22; JX31; DX684; PFOF ¶¶ 177–181. As proof that

it assesses applicants and enrollees in every category, TennCare *has* enrollees in every category of eligibility that exists in Tennessee. Jt. Stips. ¶ 54; DX683; PFOF ¶ 177.

To the extent TEDS has, in the past, occasionally failed to accurately assess eligibility in an individual case or a small number of similar cases, it has not been due to a failure of TEDS' process for reviewing every category of eligibility. Instead, such errors arose from other isolated factors such as TEDS receiving inaccurate data, worker error, or some other systems defect (that did not prevent it from assessing every category of eligibility). 11/17 Tr. 179:3–19. For example, in the cases of Caudill and Walker, it was *not* the case that they were disenrolled because TEDS failed to screen for SSI eligibility (an eligibility determination that is done by the SSA not TennCare in any event); rather, TEDS incorrectly determined—based on bad data from SSA—that Caudill and Walker were no longer receiving SSI and thus no longer eligible in that category. 11/17 Tr. 104:17–105:14; PFOF ¶ 225. In keeping with TennCare's practice of "identifying and remedying" errors of which it becomes aware, Op. at 27, once it discovered that bad SSA data was potentially responsible for an error in its eligibility determinations, TennCare set up a process for double checking SSA's data going forward and corrected all cases impacted by the bad data previously received. 11/17 Tr. 105:15–107:17; PFOF ¶¶ 226–228.

As for worker errors and other systems defects, TennCare has systems for preventing or minimizing them as well. TennCare monitors TEDS and its workers' actions through quality control processes and periodic review of each worker's case load (called the "case reads" process), and it conducts quality control audits, the results of which are reported to CMS. 11/17 Tr. 196:3–202:22; PFOF ¶¶ 187–206. These processes themselves sometimes alert TennCare to broader issues within TEDS. 11/17 Tr. 202:23–25; PFOF ¶ 198. Finally, where TennCare discovers system errors from whatever source, it corrects the system error and all impacted cases. For instance, when

20

TennCare discovered TEDS was not appropriately determining Transitional Medicaid eligibility for some children, like Jackson and Annaleigh Turner, TennCare changed TEDS' programming to ensure that it was properly evaluating that category as well. 11/17 Tr. 180:23–182:18; PFOF ¶¶ 214–216.

### B. TennCare Does Not Systematically Fail to Provide Fair Hearings at Any Time.

The Court certified the issue of "whether TennCare systematically fails to provide fair hearings at any time." Op. at 18 n.10 (quotation marks omitted). The Medicaid Act requires TennCare to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3). TennCare complies with this regulation by ensuring that every individual who appeals a denial has an opportunity to have a fair hearing. It does not systematically fail to provide fair hearings. Indeed, there are just four situations in which a filed appeal will not go to hearing: when the appeal is (1) withdrawn, (2) found to be untimely or otherwise procedurally improper, (3) lacking a VFD, or (4) resolved in favor of the appellant prior to hearing. Holt Tr. 51:7–14; PFOF ¶ 324. All other appeals go to hearing. And it is permissible for TennCare not to provide a fair hearing under these four circumstances. The Medicaid Act requires an "opportunity for a fair hearing" and due process requires a hearing before a final deprivation—and those requirements are met even if an individual withdraws their appeal, fails to file in time to take advantage of the opportunity, wins their appeal before reaching the hearing stage or, as discussed below, cannot present TennCare with a VFD that could result in their appeal being resolved in their favor.

21

### C. TennCare's Valid Factual Dispute Policy Is Lawful.

The Court certified the issue of "whether TennCare's valid factual dispute policy is lawful." Op. at 13 n.6. This policy, as set forth in TENN. COMP. R. & REGS. 1200-13-19-.05(2) and (3), complies with the Due Process Clause and the Medicaid Act. The VFD policy provides that an appellant will not receive a fair hearing unless she alleges a factual mistake in determining eligibility (including a mistake in applying the law to appellant's facts) that, if resolved in favor of the appellant, would entitle the appellant to relief. Holt Tr. 39:13–18; PFOF ¶ 286.

Unless they can be resolved first, all filed appeals will be reviewed by the "legal review" unit of TennCare's appeals group to determine whether a VFD is present. Holt Tr. 39:10–18; PFOF ¶¶ 147–150. In performing that review, TennCare's workers are solely trying to determine whether the appellant has alleged a factual dispute that *if true*, would permit them to win their appeal; they are not attempting to judge the merits or to determine whether an appellant is *likely* to be successful. Holt Tr. 39:19–23; PFOF ¶ 286. Among other things, the assertion that an appellant did not receive a notice raises a VFD entitling an individual to a hearing. Holt Tr. 41:16–44:3; PFOF ¶¶ 289–90. The VFD policy functions to weed out appeals that challenge what the law is, not appeals that challenge the application of law to facts (as in a case where, for example, an appellant claims TennCare miscalculated his resources). *See* Holt Tr. 41:25–42:8; PFOF ¶ 294. In other words, the VFD policy only eliminates appeals where the appellants only contention is that the law, properly applied, should be different than it is. *See* Holt Tr. 42:7–8; PFOF ¶ 293. Such claims are outside the authority of TennCare to approve and so a hearing on such an issue would be a waste of both TennCare's and the appellants' time and resources.

In keeping with the commonsense proposition that TennCare should not provide hearings where a hearing would be futile, the Sixth Circuit has upheld TennCare's policy of denying hearings "to beneficiaries who have failed to raise a 'valid factual dispute' about their eligibility

22

for coverage." *Rosen v. Goetz*, 410 F.3d 919, 926 (6th Cir. 2005); *see also id.* (holding that "this approach plausibly interprets the language of the regulations"). In so holding, the Sixth Circuit explained that TennCare's interpretation of the regulations in question is plausible and adheres to precedent holding that hearings are not required for challenges to "matters of law and policy" but only to *factual disputes*. *Id.*; *see also Benton v. Rhodes*, 586 F.2d 1, 3 (6th Cir. 1978).

The Sixth Circuit also found it persuasive that "CMS, the agency that authored and promulgated the regulations, has approved the State's policies as fully compliant with its regulations, a determination to which [courts] owe 'substantial deference.'" *Rosen*, 410 F.3d at 927 (citation omitted). The VFD policy in place today is the same one that was in place in *Rosen* and approved by CMS. In its Medicaid Manual, CMS has confirmed that states "do not have to grant a hearing if the sole issue being appealed is a State or Federal law or policy." *CMS State Medicaid Manual*, § 2902.3, CMS.GOV, *available at* https://go.cms.gov/3Mhci5K (last visited Mar. 7, 2024). Elsewhere, CMS explained that state Medicaid programs should, when a hearing is requested, "[d]etermine whether the appeal involves issues of law or policy, or issues of fact or judgment. The decision will affect whether a hearing is granted . . . . The distinction between issues of fact or judgment and issues of State law or agency policy will not usually be difficult to make." *Id.* § 2902.4. The reason that no hearing need be provided in these situations is straightforward— it would do no good. In these cases, "the agency is not in a position to rule in favor of the appellant without a change in agency policy or, in some instances, in State law." *Id.*

Like the Sixth Circuit, this Court has upheld TennCare's VFD policy, noting that "the Sixth Circuit definitively rejected Plaintiffs' argument that the State must hold a hearing . . . if the only issue is one of law or policy." *Grier v. Goetz*, 402 F. Supp. 2d 876, 921 (M.D. Tenn. 2005). And Plaintiffs are bound by *Grier* because all members of the class in this case were members of the

*Grier* class. *See id.* at 881; *see also Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979) (collateral estoppel protects party from relitigating the same issue against the same party).

Furthermore, the requirement of a VFD is by no means a unique feature of TennCare procedures. The Sixth Circuit's decisions in *Rosen* and *Benton* were in line with other decisions that make clear that due process does not require the provision of a hearing if the hearing could not help the appellant. *See, e.g.*, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 642–43 (6th Cir. 2005). As the Supreme Court has explained in another context, "if [a] hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing [on the case]." *Codd v. Velger*, 429 U.S. 624, 627 (1977). Indeed, under Plaintiffs' theory, this Court violates due process every time it refuses to provide a litigant with a trial after concluding that there is no "genuine" dispute over a "material" issue of fact. *But see* FED. R. CIV. P. 56.

### D. TennCare's Policy of Denying Good Cause Exceptions or Hearings Based Only on Allegations of Nonreceipt of a Notice Is Lawful.

The Court certified the issues of "whether due process or the Medicaid Act require the good cause exception or good cause hearings at all, and whether TennCare provides such hearings," Op. at 13 n.5, and "whether TennCare's policy of denying good cause exceptions or hearings based on 'allegations of non-receipt' of a notice is lawful," *id.* at 18 n.10. TennCare, in its discretion, provides reprieve from its ordinary appeal deadlines if "good cause can be shown as to why the appeal or request for a hearing could not be filed within the required time limit." TENN. COMP. R. & REGS. 1200-13-19-.06(3). "Good cause" is defined as "a legally sufficient reason," meaning "a reason based on circumstances outside the party's control and despite the party's reasonable efforts." TENN. COMP. R. & REGS. 1200-13-19-.02(20).

All untimely appeals are reviewed for good cause before they are closed. Holt Tr. 29:1–11; PFOF ¶¶ 136–137. A legal review team that has been trained to err on the side of the appellant looks for any evidence of returned mail, any attempt to update an address, or any allegations of circumstances justifying a missed deadline (e.g., car wreck, hospitalization, illness). Holt Tr. 34:5–35:7; DX686; PFOF ¶¶ 137–138. If an appeal is closed as untimely, the appellant is told in a closure notice that they can still submit information about potential good cause and TennCare will then consider that appeal for good cause a second time. Holt Tr. 34:5–35:7; DX686; PFOF ¶ 144. If an appellant disagrees with the decision to close an appeal as untimely, she may petition for review in the Chancery Court. DX686; PFOF ¶ 142.

TennCare does not ever provide hearings on whether "good cause" was present to justify altering appeals deadlines. Holt Tr. 33:24–34:7; PFOF ¶ 139. Because the "good cause" exception is solely a creation of TennCare's regulations, it is not required by the Medicaid Act or federal regulation, and thus no law requires TennCare to hold a hearing on whether "good cause" exists. 11/17 Tr. 131:3–10; PFOF ¶¶ 268–270. Due process likewise does not require TennCare to provide a hearing on whether "good cause" exists. "[D]ue process generally does not entitle parties to an evidentiary hearing where the [agency] has properly determined that a default summary judgment is appropriate due to a party's failure to file a timely response." *Arch. of Ky., Inc. v. Dir., Off. Workers' Comp. Programs*, 556 F.3d 472, 478 (6th Cir. 2009) (cleaned up). Courts have repeatedly rejected the contention that due process requires an agency to provide a hearing on whether good cause exists to reopen a case or appeal following a missed deadline. For example, in *Cunningham v. Railroad Retirement Board*, the Third Circuit rejected a petitioner's claim that due process required good cause hearings for "*pro se* claimants [who] are otherwise unable to argue persuasively and present evidence in favor of their good cause explanations." 392 F.2d 567, 576

(3d Cir. 2004). The Court noted the petitioner had "cited [no] authority to this Court under which an oral hearing in connection with the evaluation of a motion to reopen a claim for benefits was found to be constitutionally required as a matter of due process," and it was,

> troubled by the implication of [petitioner's] position, which would require the Board to provide an oral hearing each time a *pro se* claimant sought to show good cause to reopen an untimely appeal. Such hearings would be a significant strain on the [agency]'s resources, yet it is not entirely clear . . . what additional value would be gained.

*Id.* at 576–77 (citing *Mathews v. Eldridge*, 424 U.S. 319, 347 (1976), for the proposition that "the administrative burden" must be considered when "striking the appropriate due process balance").

Indeed, it would be contrary to the class's interests to require TennCare to provide a hearing on whether good cause exists. If administration of the policy is made so much more costly, TennCare may decide that it is no longer worth *providing* a good cause exception at all. 11/17 Tr. 130:21–131:17; PFOF ¶¶ 140–141. Moreover, a mandatory hearing would require individuals to substantiate claims of good cause at a hearing. As it currently stands, enrollees are provided "ample opportunity to present [their] reasons for filing the [appeal] . . . late" in writing, *Hilmes v. Sec'y of HHS*, 983 F.2d 67, 70 (6th Cir. 1993), and their allegations are accepted at face value, Holt Tr. 34:3–17; PFOF ¶ 140. Why Plaintiffs seek to swap this system for a more onerous one, or one that may be too expensive to maintain at all, is unclear.

The *only* situation in which allegations are not accepted as adequate to substantiate a claim for "good cause" is where an appellant alleges they filed their appeal late because they did not receive a notice. In this one circumstance, unless TennCare's records substantiate the claim in some way (by showing mail was returned, or the individual had recently updated their address), TennCare will not grant good cause unless the individual can offer some additional explanation as to how they failed to receive actual notice, despite TennCare having mailed it successfully to the proper address. Holt Tr. 34:22–35:23; PFOF ¶ 138. The simple reason for this policy is that it is

26

well known that mail is ordinarily delivered as addressed, 11/17 Tr. 32:20–22, TennCare enrollees have a responsibility to keep the program apprised of address changes (as explained to them in TennCare's notices), 11/15 Tr. 172:9–173:9; PX73, and it is exceedingly common for individuals who have missed a deadline to claim they did not receive notice, Holt Tr. 35:2–15; PFOF ¶ 309.

This too complies with due process. Notice is "constitutionally sufficient if it was reasonably calculated to reach the intended recipient when sent." *Jones v. Flowers*, 547 U.S. 220, 226 (2006). Courts have recognized "the commonsensical proposition that a bare, uncorroborated, self-serving denial of receipt, even if sworn, is weak evidence." *Joshi v. Ashcroft*, 389 F.3d 732, 735 (7th Cir. 2004). Indeed, the Sixth Circuit has already rejected the proposition that an individual could overcome the presumption that mail was delivered with this sort of self-serving allegation. *Singh v. Garland*, No. 21-3812, 2022 WL 4283249, at *5 (6th Cir. Sept. 16, 2022) (citing *Ba v. Holder*, 561 F.3d 604, 607 (6th Cir. 2009)) ("Most mail reaches its destination . . . Indeed, we have already suggested that an immigrant generally cannot rebut the presumption of receipt merely by testifying, 'I never received any notice of the hearing.'").

Here, the allegations TennCare disregards are not even sworn affidavits. To require TennCare to credit such evidence in the face of every indication that its notices were properly mailed and delivered, would violate Sixth Circuit precedent and would effectively unravel the system of deadlines that keeps the program functioning. Appellants who have additional evidence of nonreceipt are able to present that evidence to TennCare without a hearing, so "the probable value, if any, of additional procedural safeguards" on the existence of good cause is nil. *Mathews*, 424 U.S. at 343.

Furthermore, Plaintiffs have failed to demonstrate *any* instance in which an individual was harmed by TennCare's good cause policies, including its policy of denying good cause based on

bare allegations of non-receipt. In the case of Dijuana Davis, she *was* granted good cause based on an allegation of nonreceipt because her claim was corroborated by TennCare's records. 11/17 Tr. 23:6–9; PFOF ¶ 531. And while Cottle testified that his mail had been regularly misdelivered, he never filed an appeal with TennCare for which he could have been granted good cause. PFOF ¶ 967. But Hagan testified that if he had, it was likely he would have been granted good cause based on the plausibility of his allegations. 11/17 Tr. 34:4–8; PFOF ¶ 967.

### E. TennCare's Process for Providing Fair Hearings Within 90 Days Is Lawful.

The Court certified the question of "whether TennCare is required to provide fair hearings within 90 days of an appeal and, if so, whether it fails to do so." Op. at 18 n.10. As an initial matter, TennCare is not required to hold hearings in every case within 90 days of the filing of an appeal. There is nothing in the Medicaid Act that specifies how quickly hearings must be held; it requires only that hearings must be provided "with reasonable promptness." 42 U.S.C. § 1396a(a)(3). The implementing regulations for the Medicaid Act *do* prescribe a 90-day time limit for appeals. *See* 42 C.F.R. § 431.244(f)(1). That deadline does not apply, however, if the appellant "requests a delay or fails to take a required action" or if "[t]here is an administrative or other emergency beyond the agency's control." 42 C.F.R. § 431.244(f)(4)(i). Indeed, the deadline does not apply *at all* today, because, as part of the restarted renewal process, TennCare has received a waiver from CMS that explicitly permits it to allow appeals to go beyond 90 days if it provides continuation of benefits to those appellants. Jt. Stips. ¶¶ 93, 96; PFOF ¶ 162(g).

Even if that regulation stood for the proposition that TennCare is obligated to resolve all appeals within 90 days (and it does not), that would not support Plaintiffs' claim here, since federal regulations cannot create rights enforceable by Plaintiffs through a Section 1983 action like this one. *Johnson v. City of Detroit*, 446 F.3d 614, 628–29 (6th Cir. 2006). Such rights must be found in a statute, and that statute must confer the right "in 'clear and unambiguous terms.'" *Caswell v.*

28

*City of Detroit Hous. Comm'n*, 418 F.3d 615, 619 (6th Cir. 2005) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002)). The only statute Plaintiffs have ever cited to support *all* of their Medicaid Act claims, including this one, is the fair hearing provision of 42 U.S.C. § 1396a(a)(3), but that provision does not "unambiguously" create a right to a hearing within 90 days.

Due process similarly does not require a hearing to be held within 90 days of filing an appeal. In any appeal that takes more than 90 days to resolve, the appellant is automatically granted continuation of benefits to ensure they are not prejudiced by the delay. Jt. Stips. ¶ 96; PFOF ¶ 341. The Supreme Court "consistently has held that some form of hearing is required before an individual is *finally deprived* of a property interest." *Matthews*, 424 U.S. at 333. If an individual's appeal has not been resolved, and they have been granted continuation of benefits (as many appellants are immediately and as *every* appellant is if their case takes more than 90 days to resolve) then they have not even been *initially* deprived of their benefits, and the due process requirement of a hearing is not triggered. *Cf. Cotten v. Davis*, 215 F. App'x 464, 467 (6th Cir. 2007) (prisoner did not have a due process right to a parole revocation hearing when warrant for his violation had not been executed).

Finally, *even if* the Court finds that either due process or the Medicaid Act requires a hearing to be held within 90 days, Plaintiffs presented no evidence at trial of anyone who experienced a deprivation of their TennCare coverage because TennCare took more than 90 days to resolve their appeal, let alone someone who will encounter that problem in the future. PFOF ¶ 926.

### F. Plaintiffs Have Failed to Prove TennCare's Notices Are Misleading.

The Court certified several issues regarding the adequacy of TennCare's eligibility notices. Each issue is discussed individually below, but a few things are true across the board. *First*, as with the alleged 90-day deadline for processing appeals, the requirements that Plaintiffs wish to

29

enforce, to the extent they are related to the Medicaid Act at all, are all found in federal *regulation*, not federal statute. As such, they cannot form the basis for a claim under Section 1983. *See Caswell*, 418 F.3d at 620.

*Second*, Plaintiffs have produced no evidence at trial that *any* Plaintiff or class member has been harmed by any of the alleged "defects" in TennCare's notices. To violate due process, a notice must be misleading *and have injured someone* who "detrimentally relied on the inadequate . . . notice." *Day v. Shalala*, 23 F.3d 1052, 1066 (6th Cir. 1994). Because Plaintiffs have not produced any evidence that any Plaintiff detrimentally relied upon any of the challenged notice language, the Court should grant judgment in the State's favor on each claim. PFOF ¶ 926

*Third*, even if Plaintiffs *had* found an individual who could support a prima facie claim to deprivation of due process, the claim still fails. To satisfy due process, "notice [must be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). "[A] recipient [must] have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend." *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). A notice is adequate if it accurately informs a person of the basis for their termination and permits them to adequately prepare for an appeal hearing. *Hamby v. Neel*, 368 F.3d 549, 562 (6th Cir. 2004). TennCare's notices satisfy this standard for each certified issue.

*Fourth*, the first two of these issues concern old NOD language that TennCare no longer uses. Those issues are moot. Plaintiffs can only seek prospective relief against TennCare, *see Edelman v. Jordan*, 415 U.S. 651, 677 (1974), and in such a case, where the defendant has voluntarily ceased the activity challenged by Plaintiffs, the case is considered moot if "(1) there is no reasonable expectation that the alleged violation will recur; and (2) interim relief or events have

completely and irrevocably eradicated the effects of the alleged violation." *Thomas v. City of Memphis*, 996 F.3d 318, 324 (6th Cir. 2021). Although proving mootness is ordinarily a "heavy burden," that burden is lessened "when it is the government that has voluntarily ceased its conduct," thus "provid[ing] a secure foundation for a dismissal based on mootness so long as the change appears genuine." *Id.* (cleaned up).

In *Thomas*, that secure foundation existed by dint of the fact that the policy change in question had been "formally promulgated and approved by [a senior official] who provided a sworn declaration that [it] would remain in place going forward," and the agency would have to go through the same process again if it wished to change the policy further, the change in policy is treated more seriously by the court. 996 F.3d at 325–26. In particular, the *Thomas* court placed significant importance on the sworn testimony from a government official. *Id.* at 326–27. As will be shown below, both changes to TennCare's notices were accomplished in the same way as the change in *Thomas* and were similarly attested to at trial. For each, Plaintiffs have submitted nothing "that would suggest [TennCare] is likely to return to its old ways[.]" *Id.* at 327. As such, the possibility of reversion "is merely theoretical, and the theoretical possibility of reversion to an allegedly unconstitutional policy is simply not sufficient to warrant an exception to mootness in this case." *Id.* at 327–28; *cf.* Op. at 24 (denying preliminary injunction because TennCare had changed challenged practices and policies and reversion to former ones was unlikely).

### 1. The Citation Formerly Included in NODs Was Lawful and the Issue Is Now Moot.

The Court certified the issue of "whether the stock citation in Defendant's NODs violates Defendant's obligations under the Medicaid Act and the Fourteenth Amendment." Op. at 13. When Plaintiffs filed this case, a NOD terminating or denying coverage cited the entire set of regulations that prescribe the technical and financial eligibility criteria for coverage in all categories without

31

specifically identifying the precise regulation supporting the termination decision. *See* Op. at 12. After that regulatory cite, every NOD included a short explanation of precisely why an individual was ineligible. 11/20 Tr. 13:3–15:1; JX15; PFOF ¶ 247. For instance, in the case of an individual who was over an income limit, the notice went on to state: "The monthly income limit for the kind of <coverage> you could get is <$xxx.xx>. Our records show your monthly income is over this limit." JX15 at 1.

TennCare included the same citation in every NOD followed by a more specific plain-English explanation of the decision for a simple reason: at the time, the eligibility rules were undergoing significant changes and TennCare believed that including more specific citations risked creating confusion through errors. 11/20 Tr. 15:19–16:7; PFOF ¶ 246. It never intended the citation to be permanent and in December 2022, TennCare altered its notices to provide tailored citations for each specific termination reason. 11/20 Tr. 15:19–16:7; PFOF ¶ 250. As Hagan testified, TennCare's alteration of the notices involved a lengthy, formal process which required her sign-off, and reverting to the old notices would require the same. 11/20 Tr. 16:18–17:8; PFOF ¶¶ 250–256. Because TennCare has no intention of returning to the former citation, 11/20 Tr. 17:5–8, Plaintiffs' claims are moot.

Even if these claims were not moot, TennCare's former citations comply with due process because the former citations, coupled with a plain-English explanation of the termination reason, gave appellants enough information to adequately prepare for an appeal hearing. *Hamby*, 368 F.3d at 562; *see also Cahoo v. SAS Inst., Inc.*, No. 21-1407, 2023 WL 4014172, at *5 (6th Cir. June 15, 2023). In certifying the issue, the Court suggested that *Rodriguez ex rel. Corella v. Chen*, 985 F. Supp. 1189 (D. Ariz. 1996), supported the proposition that the former citations were inadequate. But *Rodriguez* is distinguishable. To the extent *Rodriguez* required *more* detail, like an

individualized income calculation, it is inconsistent with binding precedent. The Sixth Circuit has held that notices stating that "[t]he total income which had to be counted for your family is more than 150% of the Department's need standard so your case must be closed," *Garrett v. Puett*, 557 F. Supp. 9, 12 (M.D. Tenn. 1982), *aff'd* 707 F.2d 930 (6th Cir. 1983), "satisfy due process and statutory requirements," 707 F.2d at 931. The *Garrett* formulation is much less clear than TennCare's (it does not state what the agency thinks the individual's income is, or what the threshold is, in dollar terms). If the *Garrett* notices are adequate, then so are TennCare's.

Nor does *Rodriguez* support the claim that the former citation violates the Medicaid Act. As discussed above, the Medicaid Act says nothing about the types of legal citations that must be included in the NODs. *Rodriguez* found that the citations in Arizona failed to comply with 42 C.F.R. § 210, which requires, *inter alia*, a notice to "contain . . . the specific regulations that support . . . the action." *See* 985 F. Supp. at 1191, 1195. But *Rodriguez* predates the binding Supreme Court and Sixth Circuit precedent clarifying that Section 1983—the basis for Plaintiffs' suit—cannot be used to enforce a federal regulation. *Johnson*, 446 F.3d at 628–29 (discussing impact of *Alexander v. Sandoval*, 532 U.S. 275 (2001), and *Gonzaga*, 536 U.S. 273).

### 2. The Prior Language, Included in Some NODs, Describing the VFD Process Was Lawful and the Issue Is Now Moot.

The Court certified a closely related issue of whether "TennCare's prior use of language, in some NODs, telling recipients they could only get a hearing if they thought TennCare made a 'mistake about a fact,'" is lawful. Op. at 18 n.10. Some NODs used to state: "If you still think we made a mistake about a fact, you can have a fair hearing. If you don't think we made a mistake about a fact, you can't have a fair hearing." Jt. Stips. ¶ 85; PFOF ¶ 299. Just like the stock citation, this issue is moot because TennCare has ceased using the language in question. Those notices now state: "You can have a fair hearing if you still think we made a mistake and, if you're right, you

33

would qualify for our program." Jt. Stips. ¶ 87; PFOF ¶ 284. TennCare made the decision to change this language formally, and it would have to go through the same process to reverse that decision, something that it has no intention of doing. 11/20 Tr. 27:22–23:19; PFOF ¶ 304; *see Thomas*, 996 F.3d at 325–26. Furthermore, TennCare only sent NODs containing the challenged language to 5,238 class members—it was in less than 5% of NODs—and Plaintiffs have not presented evidence of *anyone* in that group who claims to have received a notice containing this language and found it misleading—let alone anyone who was actually injured by it. PFOF ¶¶ 300–301, 926.

In any event, the former language did not violate due process. As explained above, under TennCare's lawful VFD process, an enrollee must have a factual dispute (including a dispute regarding the application of the law to facts) to maintain an appeal; it is not a violation of the Medicaid Act to inform enrollees of that requirement. Nor does it violate due process, which requires that "notice [be] reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Hamby*, 368 F.3d at 560 (quoting *Mullane*, 339 U.S. at 314) (brackets in original). Notice must provide enrollees with an "[effective] opportunity to be heard," *Goldberg*, 397 U.S. at 268. TennCare's notice language does this by informing appellants about the standard against which their request for an appeal hearing will be judged.

### 3. The NODs' Language Instructing Enrollees to Describe the Reasons They Want to Appeal and the Facts Supporting Appeal is Lawful.

The Court certified the question of whether TennCare's uniform statement in all NODs requiring individuals who wish to appeal "to describe the reasons they want to appeal and the facts supporting the appeal" is lawful. Op. at 13. As with the other NOD language, Plaintiffs have presented no evidence at all that anyone has ever been harmed or misled by this language, or detrimentally relied upon it. Just as a litigant in federal appeals court must file a brief explaining

34

*why* she thinks the district court's decision is flawed, appealing enrollees must tell TennCare the reason for their appeal. This requirement is necessary to permit TennCare to adequately assess an individual's appeal. It does not violate due process, which "is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334. Any contrary rule would essentially require TennCare to offer appeal hearings to anyone, regardless of whether they offer the agency *any reason* why they disagree with the decision. Such a system would be less efficient because it would force TennCare to wait until a hearing to find out the basis for an appeal. Such a requirement cannot be squared with the Supreme Court's treatment of due process. The Sixth Circuit has emphasized that in *Mathews* itself, the Supreme Court "upheld 'carefully structured procedures' that permitted the [agency] to disenroll individuals from Social Security's disability benefits program without a hearing." *Rosen*, 410 F.3d at 928–29. Those procedures included instructions, similar to those challenged by plaintiffs, that appealing beneficiaries must submit additional evidence and complete a "detailed questionnaire" that would enable the agency to understand the basis for the appeal. *Id.* at 929.

### 4. TennCare's Notices Accurately Describe Its Process for Considering Eligibility.

The Court certified the issue of "whether TennCare's NODs unlawfully misled recipients to think TennCare had considered all bases of eligibility, all program rules, and all facts for their recipients." Op. at 14 n.7. As explained above, TennCare in fact does consider all bases of eligibility, all its program rules, and all facts it has for enrollees and applicants when determining eligibility. 11/17 Tr. 178:11–24; PFOF ¶¶ 240–243. That TennCare has occasionally made (and corrected) errors in doing so does not render its notices—which state that it checks for eligibility in "each kind of group we have"—misleading or untrue. To hold otherwise would convert any mistake—even entirely singular mistakes—into a due process notice violation. Perfection is not

35

the standard for a due process claim. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one."). Plaintiffs have not identified a single person who claims to have been misled by, or detrimentally relied upon, the statement that TennCare considers all bases of eligibility, all program rules, and all facts before terminating coverage. PFOF ¶¶ 244, 926.

### 5. The NODs' Omission of an Explanation Why Recipients Do Not Qualify for Every Other Medicaid Category is Lawful.

The Court certified the issue of whether "the NODs' omission of an explanation as to why its recipients do not qualify for other Medicaid categories" is unlawful. Op. at 14 (quotations omitted). Although TennCare screens for every category of eligibility, NODs terminating or denying coverage do not explain why, for each of the dozens of categories of eligibility, an individual failed to qualify. 11/20 Tr. 92:18–20; PFOF ¶ 256. For example, the NODs do not tell an adult male why he does not qualify in any child or pregnancy categories. JX31. Instead, when an individual is ineligible for TennCare coverage because they do not belong to any group for which some type of coverage is available, they receive a general statement of denial, along with a description of some of the most common groups that *do* qualify for coverage. 11/20 Tr. 25:8-27:20; JX15; PFOF ¶ 261. If an individual *is* part of a covered group but still not eligible, their NOD will explain why they do not qualify for benefits in each group for which they otherwise may appear qualified, with the reasons they were found ineligible—for example, their income is too high for a given category or they failed to satisfy a procedural requirement (like getting a Pre-Admission Evaluation for institutional coverage). 11/20 Tr. 25:8-27:20; JX15; PFOF ¶ 260.

Due process requires only that a notice inform a person of the basis for their termination in a way that permits them to prepare for an appeal hearing. *Hamby*, 368 F.3d at 562. TennCare's existing notices provide enough detail about why an individual was found ineligible to permit them

36

to appeal, without providing them "a potentially confusing laundry list more likely to confuse than to clarify." *Reigh v. Schleigh*, 784 F.2d 1191, 1195 (4th Cir. 1986) (quotation marks omitted).

### 6. The NODs' Omission of Information Regarding the Good Cause Exception and Good Cause Hearings Is Lawful.

The Court certified the issue of whether "the NODs' uniform omission of information concerning the good cause exception and good cause hearings" is lawful. Op. at 13. Although the NODs do not contain information regarding the good cause exception, TennCare does notify individuals who file untimely appeals of the possibility of receiving a good cause exception from the deadline when it sends them an appeal closure notice. 11/17 Tr. 14:20–22, 38:23–39:15; PFOF ¶ 144. TennCare intentionally omits this information from its NODs because it believes that telling enrollees that there are exceptions to its deadlines in some circumstances could harm enrollees who might then fail to file a timely appeal on the faulty assumption that tardiness will be overlooked. 11/17 Tr. 15:25–18:2; PFOF ¶ 271.

As with all the other notice issues, Plaintiffs have presented *no evidence* that any Plaintiff or class member was harmed by the lack of a description of the good cause policy in its notices. PFOF ¶ 926. Indeed, their claim is primarily predicated on the cases of two individuals, Davis and Cottle, who claim not to have received notices at all. And in any event, the notices comply with due process. "[D]ue process requires the government to provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jones*, 547 U.S. at 226. It is "flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334. Here, enrollees learn of the good cause exception with enough time to inform TennCare of good cause before their appeal is finally closed. Due process does not demand more.

### 7. The NODs' Omission of Information Regarding the 90-Day Reconsideration Period Is Lawful.

The Court certified the issue of whether "the NODs' uniform omission of information about the 90-day reconsideration period" is lawful. Op. at 13. As with other issues related to the notices, Plaintiffs have not put forward *any* evidence regarding this language or its effect on Plaintiffs. The 90-day reconsideration period refers to TennCare's practice of providing enrollees going through annual renewal with a 90-day grace period, following the date of termination, to return their Renewal Packets or additional information needed to determine eligibility. 11/17 Tr. 167:23–168:5; PFOF ¶ 1014. While the NODs do not reference the 90-day reconsideration period, they do inform enrollees that if they return their Renewal Packets or additional information prior to termination they will keep their coverage pending review of the late submitted information. Jt. Stips. ¶¶ 41–42; PFOF ¶¶ 279–80. Further, it is TennCare's policy, consistent with federal regulations, that if the missing information is received within 90 days, that information will be reviewed, and if it shows that an individual is eligible for coverage, coverage will be reinstated and backdated to fill in the gap. 11/17 Tr. 167:23–168:5; PFOF ¶ 1014.

TennCare is required to provide a 90-day reconsideration period only as part of the annual renewal process, not when eligibility is being reviewed due to a reported change. *See* 42 C.F.R. §§ 435.916(a)(3)(iii), 457.340(g), 457.343. TennCare does not include information regarding the 90-day reconsideration period in its NODs for the same reason it does not include information about the "good cause" exception. When an NOD goes out, the enrollee has not yet lost coverage and can still abide by ordinary deadlines. TennCare does, however, inform all individuals in the cover letter accompanying their Renewal Packet that it will consider responsive information and make an eligibility determination even if the information is returned after a termination notice is issued. PFOF ¶ 280; Jt. Stips. ¶ 42.

38

For the same reasons that TennCare's practice of not initially informing individuals of the "good cause" exception is constitutionally adequate, TennCare's notice of the deadlines surrounding reconsideration of termination during renewal are constitutionally adequate. *See Cabrera-Ramos v. Gonzales*, 233 F. App'x 449, 455, 457 (6th Cir. 2007); *see also Rolen v. Barnhart*, 273 F.3d 1189, 1191–92 (9th Cir. 2001) (rejecting plaintiff's argument that he was denied due process when a notice advised him of his right to appeal the dismissal of his benefits application but not that "he could have his claim considered on the merits by filing a new application").

### G. TennCare Complies with the ADA.

Plaintiffs assert a claim under 28 U.S.C. § 12133 for violations of the Americans with Disabilities Act ("ADA") and its implementing regulations, 28 C.F.R. § 35.130(b). This Court certified two issues for litigation by the Disability Subclass: (1) whether TennCare provides adequate "in-person assistance" for disabled persons and, if not, whether that violates the ADA, (2) whether TennCare lacks any system to grant requests for reasonable accommodations for disabled persons navigating TennCare. Op. at 18 n.10, 20 n.12.[4]

Plaintiffs have failed to meet their burden of proof for each of these issues. For starters, no class representative testified that he or she was denied access to TennCare because a disability was not reasonably accommodated or did not receive adequate in-person assistance and lost TennCare coverage as a result. Plaintiffs' *only* evidence on this latter issue stems from late-disclosed witness Faith Grace, and Plaintiffs offer no evidence indicating that her experience is indicative of any systemic issue with the provision of in-person assistance. To the contrary, Evans testified

---

[4] The Court also certified the question of whether TennCare evaluates all categories of disability-related eligibility pre-termination. Because this is subsumed within the issue of whether TennCare evaluates individuals for all categories of eligibility, it is fully addressed above.

39

persuasively about the myriad ways TennCare provides its members in-person assistance. Next, Plaintiffs conceded through their proffered expert, Prof. Blanck, that TennCare *does* have a system for granting requests for reasonable accommodations. 11/16 Tr. 32:12–33:6, 34:3–35:12; PFOF ¶ 345. While Prof. Blanck questioned the adequacy of that system, his testimony should be given no weight because it is the product of unreliable methods. *See infra* Part I.G.1. Finally, Plaintiffs failed to identify any enrollee who asked for a reasonable accommodation, did not receive one, and was denied access to TennCare as a result. 11/16 Tr. 39:23–41:18; PFOF ¶¶ 395, 408.

### 1. Blanck's Expert Testimony Is Not Reliable.

TennCare moved pre-trial to exclude Prof. Blanck. *See* Def.'s Mot. in Limine, Doc. 336-1 (Oct. 6, 2023). The Court reserved ruling on that motion while acknowledging that TennCare raised issues going to the weight that Blanck's testimony should receive. *See* PTC Tr. 15:9–15, Doc. 371 (Oct. 26, 2023). Trial reaffirmed everything in TennCare's motion in limine. Most fatally, Blanck's testimony is not the product of reliable principles and methods. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000) (expert evidence may only be admitted that is both "relevant and reliable"); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (expert testimony is only reliable if it is based on sufficient facts and data, is the product of reliable methods, and the expert has applied those methods to the facts of the case).

First, Blanck's triangulation method, which involves "the comparing and the contrasting of sources from different perspectives," 11/16 Tr. 25:15–17; PX118, is not reliable because Blanck *excluded* the perspectives of myriad relevant actors, instead analyzing only the individual cases that Plaintiffs' counsel supplied, 11/16 Tr. 27:1–4; PFOF ¶¶ 348–49. He did not interview any other TennCare enrollees, any TennCare officials, any CMS officials, or any Medicaid officials from other states to obtain different perspectives about TennCare's system for granting reasonable accommodations. 11/16 Tr. 26:13–18, 27:5–19; PFOF ¶ 348. Nor did he review and analyze a

random sample of TennCare enrollee case files, which TennCare would have supplied had he requested them. 11/16 Tr. 26:19–25, 69; PFOF ¶ 349. He also failed to analyze the myriad modes of assistance being provided to the 30,000-plus disabled individuals in TennCare's LTSS Program, 11/16 Tr. 38:10–20, which serves individuals with physical, intellectual, and developmental disabilities, the elderly, and more, 11/14 Tr. 250:16–251:13; PFOF ¶ 1004. Similarly, he entirely ignored the fact that each LTSS member has a care coordinator or MCO who meet with the enrollee regularly and is responsible for ensuring that the enrollee's eligibility is renewed. 11/16 Tr. 38:16–20; 11/14 Tr. 253:8–16; PFOF ¶ 417. He likewise ignored that the largest category of disabled enrollees, those receiving SSI, are exempt from the challenged renewal process. 11/16 Tr. 37:8–11; PFOF ¶ 411. Finally, Blanck only examined a limited period of time around when TEDS first came online. 11/16 Tr. 29:9–22; PFOF ¶ 351. He did not review any data on how many disabled TennCare enrollees successfully renewed their coverage since 2019, 11/16 Tr. 41:25-42:5, surely a probative fact in assessing "perspectives" on the viability of a system. And he has not reviewed any of the disability subclass's recent experiences since the restart of renewals in April 2023. 11/16 Tr. 29:9–22; PFOF ¶ 351. Triangulation is not a reliable method if it sanctions such a blinkered view of the relevant evidence.

Second, Blanck "provide[s] [no] reasoned explanation[]" describing how the triangulation "method" was applied to the facts at issue. *Scrap Metal*, 527 F.3d at 532. Nor could he, because he extrapolated from limited, unrepresentative data to reach unsound program-wide conclusions. He similarly fails to present any "viable arguments," *id.*, as to whether his methodology is "generally accepted" for evaluating the reasonable accommodations policy of a Medicaid benefits agency such as TennCare. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002). Indeed, this is the *first* and *only* time Blanck has applied his triangulation method to a State

41

Medicaid system. 11/16 Tr. 29:23–25; PX118 at 8. And he is not aware of anyone else who has used triangulation to analyze other Medicaid systems. 11/16 Tr. 30:1–4. For all these reasons, this Court should afford Blanck's testimony zero weight.

### 2. TennCare Has a System to Grant Requests for Reasonable Accommodations for Disabled Persons.

Title II of the ADA requires that "no [otherwise] qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In implementing this statute, programs like TennCare are required to afford disabled individuals "reasonable accommodations" (also referred to as "reasonable modifications" of the program), or changes to its "policies, practices, [and] procedures, . . . necessary to avoid discrimination on the basis of disability" and permit them to access the program. 28 C.F.R. § 35.130(b)(7)(i); *see Hindel v. Husted*, 875 F.3d 344, 347 (6th Cir. 2017).

There is no dispute that TennCare has a system for granting reasonable accommodations. Indeed, Blanck "agreed that there are systems in TennCare for providing assistance and offering reasonable accommodations," and noted that evaluating TennCare's system and processes for granting reasonable accommodations "was the main focus of [his] report." PFOF ¶ 345; *see also* 11/17 Tr. 32:12–33:6, 34:3–35:12. TennCare agrees that it has such a system. Those admissions put this certified issue to rest.

Because they do not dispute that a system exists, Plaintiffs attempt to argue that TennCare's system for granting reasonable accommodations is inadequate. As the Court recognized at trial, that is not a certified issue. 11/20 Tr. 180:23–181:15, 183:11–184:13. Rightly so, because certifying a reasonable accommodation class assessing adequacy would almost certainly flout Rule 23's typicality requirement, as the Court recognized. 11/20 Tr. 185:2–8. "Few disabilities are

42

amenable to one-size-fits-all accommodations." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014). Rather, reasonable accommodation questions are individual-specific and rarely appropriate for class-wide resolution. *See, e.g.*, *Hindel*, 875 F.3d at 347; *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015) (noting the "highly fact-specific' balancing of the [government's] interests against the plaintiffs'" that the reasonable accommodation inquiry requires).

If the Court does consider Plaintiffs' reformulation of the certified issue (it should not), Plaintiffs still fail to meet their burden. It is a necessary element of an ADA violation that the plaintiff is "being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Anderson*, 798 F.3d at 357. In other words, a system for granting reasonable accommodations is adequate under the ADA if disabled individuals have "meaningful access to the benefits of [the public] services[.]" *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004). Furthermore, before TennCare can be required to grant a reasonable accommodation, a disabled enrollee (or applicant) must ask for it. *See Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 786 (6th Cir. 2002) (Plaintiff failed to show she requested an accommodation and noting that it was her "burden to propose a reasonable accommodation"); *see also Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1218 (8th Cir. 1999) ("Only [the employee] could accurately identify the need for accommodations specific to her job and workplace."). Requiring disabled individuals to ask for what they need makes sense because "there is no statutory requirement to impose nonmandatory services on disabled individuals who do not desire them." *Dunlap v. City of Sandy*, 846 F. App'x 511, 512 (9th Cir. 2021) (mem.) (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999)).

The enrollee's request for a reasonable accommodation must also be sufficiently specific. It is not enough for an enrollee to simply state that she has a disability or to say, "I need help," or

"I need my healthcare." *See, e.g.*, *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998) (requiring student to ask for a "specific accommodation" and reasoning that the student saying that she has a disability "simply did not impose an obligation to offer accommodations"); *Marble v. Tennessee*, 767 F. App'x 647, 653 (6th Cir. 2019) (request to place disabled child with relatives was not a sufficiently specific request for an accommodation); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465–66 (4th Cir. 2012) (rejecting argument that the ADA requires employers to engage in an "interactive process to identify a reasonable accommodation" when a request was unclear); *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363–64 (11th Cir. 1999) ("[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.").

Plaintiffs fail to meet their burden under these standards. As Plaintiffs' expert conceded, no disability subclass representative has ever been denied meaningful access to TennCare for failure to receive a reasonable accommodation. 11/16 Tr. 39:23–41:18; PFOF ¶¶ 395, 408. Neither Caudill, Hill, Walker, nor Monroe—the only class representatives from the disability subclass who testified—were denied access to TennCare or deprived of their benefits because of their disabilities. PFOF ¶¶ 400–01, 404. Caudill and Walker's issues with their coverage both stemmed from the erroneous data SSA sent to TennCare. PFOF ¶¶ 932, 982. Hill's issue arose because he was placed in the wrong eligibility category, but he was able to timely appeal that mistake, and retain his benefits. Jt. Stips. ¶¶ 191, 199, 206; PFOF ¶ 957. Monroe was never denied coverage and only experienced a brief period when his Medicare premiums were erroneously deducted from his check stemming from a prior system's limitation preventing TennCare from sending more than one transaction per month to CMS, which has since been updated to allow multiple transactions.

44

11/20 Tr. 76:16–77:23; PFOF ¶¶ 609–610. Moreover, Plaintiffs failed to introduce any evidence that Caudill, Hill, Monroe, or non-representative Plaintiff Grace (or their representatives) specifically requested an accommodation that was denied. PFOF ¶¶ 401, 404, 408, 612, 934, 959, 992, 1001. Indeed, for Grace and Monroe, TennCare actually *granted* the accommodation they requested, which was more time to submit documents. PFOF ¶¶ 835, 992, 1003. In other words, Plaintiffs have failed to identify *any* TennCare enrollee who requested an accommodation, was denied, and lacked meaningful access to state provided services as a result. 11/16 Tr. 39:23–41:18; PFOF ¶¶ 390, 408. This legally dooms their claims.

### 3. TennCare Provides Adequate In-Person Assistance for Disabled Persons.

Plaintiffs also argue that TennCare violates the ADA by not providing adequate "in-person assistance" for disabled persons who request it. There is no special requirement to provide in-person assistance, only the general rule that a state must provide reasonable accommodations. Regardless, the undisputed evidence in the record demonstrates that TennCare provides adequate in-person assistance to disabled individuals and does much to ensure that its contractors—including DHS, the Rural Health Association of Tennessee, and the nine AAADs—provide such assistance. 11/14 Tr. 255:2–12, 259:4–260:16; JX033; PFOF ¶¶ 409, 428, 450, 473.

Recall first that enrollees with SSI eligibility (the largest category of disabled enrollees in TennCare) are automatically renewed each year and thus do not require in-person assistance. 11/17 Tr. 75:16–20; PFOF ¶ 411. And as with reasonable accommodations generally, Plaintiffs have not identified a single individual who lost access to TennCare because in-person assistance was not provided.[5] At best Plaintiffs demonstrated that one individual, Faith Grace, may have benefited

---

[5] For this reason, Plaintiffs similarly fail to show that any class representative has Article III standing to challenge TennCare's system of providing reasonable accommodations or its provision of in-person assistance.

from even more assistance than what was provided to her, but the record is completely lacking in any proof that her unique situation and experiences are systemic. To the contrary, the record shows that TennCare provides in-person assistance when necessary. Plaintiffs' expert conceded that in each of the four cases he examined, the disabled individuals "all requested certain types of accommodations and eventually they received the services." 11/16 Tr. 1:6–7; PFOF ¶ 408. For example, Plaintiff Monroe requested and received at-home in-person assistance from the AAAD, which interviewed him and provided a functional assessment related to his request for in-home services. DX317; PFOF ¶ 618. And Plaintiffs Hill (through his next friend Noe), Walker (through his next friend Stevens), and Caudill have never stated that they requested, or even needed, in-person assistance. PFOF ¶¶ 400–01, 404, 934, 959, 987. Again, while Plaintiffs may try to argue that Grace also requested in-person assistance, the evidence introduced at trial does not indicate that she specifically asked for such assistance. PFOF ¶¶ 828; 993. In any event, after reviewing her calls with TennCare Connect, Olson thought she would likely benefit from in-person assistance and made the necessary referrals for her to get such assistance. PFOF ¶ 994.

## II. Trial Has Demonstrated This Court Lacks Jurisdiction.

### A. No Plaintiff Has Standing to Seek Declaratory or Injunctive Relief.

The easiest disposition of this case is also the correct one: this Court lacks jurisdiction because no class representative can show that they are likely to be injured in the future.[6] It is black-letter law that Plaintiffs must show "a present ongoing harm or imminent future harm" to obtain declaratory or injunctive relief. *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 981

---

[6] As already summarized above under the various certified issues, no class representatives have shown that they have Article III standing because any injuries they allegedly suffered were redressed before this lawsuit was filed. *See Rosen v. Tenn. Comm'r of Fin. and Admin.*, 288 F.3d 918, 931 (6th Cir. 2002).

46

(6th Cir. 2020). Indeed, the Supreme Court has repeatedly rejected claims that past occurrences of unlawful conduct create standing to obtain an injunction against the risk of future unlawful conduct. *See O'Shea v. Littleton*, 414 U.S. 488, 495–98 (1974) (allegation of discriminatory prosecution based only on past examples); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983) (allegation, based on plaintiff's past experience, that policy of using constitutionally excessive chokeholds increased risk of experiencing another). In *Hargett*, the Sixth Circuit held that plaintiffs' theories of injury suffer from an "an imminence problem" because they "all boil down to prior system vulnerabilities, previous equipment malfunctions, and past [] mistakes." *Hargett*, 947 F.3d at 981. The Circuit also noted that "nearly all of the plaintiffs' allegations of past harm stem from human error[.]" *Id.* And "fear that individual mistakes will recur, generally speaking, does not create a cognizable imminent risk of harm." *Id.*

The same is true here. No class representative (indeed, no witness) has testified that the issues they experienced with their TennCare are even plausibly—let alone likely— to recur, nor could they so testify. Two class representatives—Caudill and Walker—experienced problems arising from bad data the SSA sent to TennCare when TEDS first came online. PFOF ¶¶ 932, 982. Similarly, Davis and Hill experienced issues stemming from the erroneous conversion of eligibility data into TEDS. PFOF ¶¶ 947, 957. These were all one-time events, and unrebutted testimony from Hagan demonstrates that these issues have been corrected. PFOF ¶¶ 948, 962. Monroe's issue stemmed from TennCare's system's ability to communicate with CMS that has since been remedied, 11/20 Tr. 76:16–77:23; PFOF ¶ 610. Similarly, other issues such as the glitch that affected the Turners has also been fixed. PFOF ¶ 941. Finally, while Cottle, Riley, and Grace are

not class representatives—and thus cannot support Plaintiffs' request for declaratory or injunctive relief, Plaintiffs failed to show that any issues they experienced are likely to recur either.[7]

### B. The Court Should Decertify the Class.

Trial has revealed that the class should be decertified because no class representative has the requisite type of injury, and thus cannot adequately represent the interests of unnamed class members in seeking declaratory and injunctive relief. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) ("[C]lass representative[s] must be part of the class and possess the same interest and suffer the same injury as the class members.").

"[A]n order that grants or denies class certification may be altered or amended before final judgment." FED. R. CIV. P. 23(c)(1)(C). As the Supreme Court has explained, courts are "bound to enforce" Rule 23's certification requirements, even when it means decertifying a class late in the game. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620–28 (1997) (holding that decertification was appropriate even after parties submitted a settlement agreement). This Court "retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment." *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1090 (6th Cir. 2016); *see also Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1214 (6th Cir. 1997) ("[A]s long as the court retains jurisdiction over the case it must continue carefully to scrutinize the adequacy of representation and withdraw certification if such representation is not furnished" (cleaned up)); *In re Am. Med. Sys. Inc.*, 75 F.3d 1069, 1090 (6th Cir. 1996) (directing

---

[7] Cottle's mailing address was also incorrect at one point in TennCare's system, but it did not impact the *relevant* notice sent to him that would have informed him that Journey's coverage was terminating for failure to provide information. 11/15 Tr. 74, 91–93, 98, 99; DX651; PFOF ¶¶ 389, 397. Similarly, Grace conceded that she is now able to access her notices using her TennCare Connect online account, obviating any issues related to getting them by mail. 11/16 Tr. 101–04.

district court to decertify the class and noting that "both Supreme Court and Sixth Circuit precedent require close adherence to the strictures of Rule 23").

The key question is whether there "exist clearly changed circumstances that make continued class action treatment improper." *Tate v. Hartsville/Trousdale Cnty.*, No. 3:09-cv-0201, 2010 WL 4822270, at *2 (M.D. Tenn. Nov. 22, 2010). One such changed circumstance occurs when "the initial basis upon which certification was granted no longer exists, to wit, the existence of an identified suitable class representative to carry the torch." *Id.* Just so here. Trial has conclusively revealed that no class representative has suffered an injury caused by TennCare that is likely to recur in the future.

The Sixth Circuit's decision in *O'Brien v. Ed Donnelly Enterprises, Inc.*, is instructive. There, the Circuit affirmed the district court's post-discovery decertification order when it learned that only a small subset of plaintiffs were injured in the relevant way, and thus could not prove a violation. *See* 575 F.3d 567, 583–84 (6th Cir. 2009) (alleged legal violations were not "widespread even among the plaintiffs, who constituted only a small fraction of the total number of potential collective-action members"), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). And while *O'Brien* involved a collective action under the Fair Labor Standards Act, the Sixth Circuit was careful to explain that the Act contains *less* "stringent criteria for class certification" than Rule 23. *Id.* at 584 (emphasis added). Thus, the same reasoning should apply with even more force in Rule 23 class actions, especially where, as here, *no* named Plaintiff has shown that their injury is likely to recur. *See Tate*, 2010 WL 4822270, at *2 (decertifying class after learning that the class representative "suffered no constitutional injury" and thus "is not in a position to pursue claims on behalf of those who may, in fact, have suffered such injury"). Under these circumstances, decertification is both appropriate and required under Rule 23.

49

### III. Plaintiffs Are Not Entitled to an Injunction.

Regardless of how the Court decides the preceding issues, it cannot grant Plaintiffs an injunction as a result. Injunctive relief may not issue unless the court "determine[s] that an injunction *should* issue under the traditional four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–58 (2010). That means, Plaintiffs must show (1) irreparable injury, (2) that remedies at law are inadequate to compensate for that injury, (3) that an injunction is warranted in light of the balance of hardships between the Plaintiffs and the State, and (4) that an injunction is in the public interest. *Id.* at 156–57. On the record before the Court, an injunction cannot issue because Plaintiffs have not shown irreparable injury or that the extraordinary relief of an injunction is warranted. Indeed, it is telling that at trial, Plaintiffs could not even suggest what sort of injunction might ameliorate the injuries to which they have pointed beyond mass re-enrollment for everyone who was disenrolled during the class period. 11/15 Tr. 212:17–22. On the other side of the ledger, before any injunction issues, the State must be permitted to put on evidence showing the significant costs both to the State fisc and to the people of Tennessee that would result from injunctive relief this Court might fashion. At trial, the Court noted the issue was "premature," and the State believes it should *never* mature into a salient concern, but if it does, the State must be permitted to present evidence on the cost of any injunctive relief. 11/16 Tr. 238:6–14.

## CONCLUSION

The Court should enter judgment in the State's favor on all certified issues.

March 8, 2024                          Respectfully submitted,

Jonathan Skrmetti                      /s/ Michael W. Kirk
Attorney General and Reporter          Michael W. Kirk*
Meredith Bowen TN BPR #34044           Nicole J. Moss*
Assistant Attorney General             William V. Bergstrom*
Matthew Dykstra TN BPR #38237          Kate Hardiman*
OFFICE OF THE ATTORNEY GENERAL         COOPER & KIRK, PLLC
P.O. Box 20207                         1523 New Hampshire Avenue, NW
Nashville, TN  37202                   Washington, D.C. 20036
(615) 741-1366                         (202) 220-9600
meredith.bowen@ag.tn.gov               mkirk@cooperkirk.com
                                       nmoss@cooperkirk.com
                                       *Appearing *pro hac vice*

           *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of March, 2024, a true and exact copy of the foregoing has been forwarded by the Court's Electronic Filing System to:

Gordon Bonnyman, Jr.
Brant Harrell
Michele M. Johnson
Madeline Wiseman
TENNESSEE JUSTICE CENTER
155 Lafayette Street
Nashville, TN 37210

Elizabeth Edwards
Sarah Grusin
Jane Perkins
NATIONAL HEALTH LAW CENTER
200 N. Greensboro St., Ste. D-13
Carrboro, NC 27510

Jennifer M. Selendy
Faith E. Gay
Andrew R. Dunlap
Babak Ghafarzade
David Coon
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104

Gregory Lee Bass
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001

/s/ Michael W. Kirk
Michael W. Kirk