# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| A.M.C., by her next friend, C.D.C., et al., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00240 |
| | ) | |
| STEPHEN SMITH, in his official | ) | |
| capacity as Deputy Commissioner of | ) | |
| Finance and Administration and Director | ) | |
| of the Division of TennCare, | ) | |
| | ) | |
|     Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Poor, disabled, and otherwise disadvantaged Tennesseans should not require luck, perseverance, or zealous lawyering to receive healthcare benefits they are entitled to under the law. To avoid that predicament, current and former enrollees ("Plaintiffs") of TennCare—Tennessee's state-administered Medicaid program—brought this class action against Stephen Smith, TennCare's Director. Plaintiffs allege that TennCare's policies and practices caused thousands of Tennesseans to lose their healthcare coverage. Much of this case revolves around TennCare's computerized Eligibility Determination System, ("TEDS"), and its initial problematic implementation in March 2019, however, Plaintiffs' sprawling claims cover myriad TennCare subdivisions, officials, agents, and contractors and their conduct over the past half-decade. Many in TennCare's leadership and frontlines do admirable, diligent work to ensure TennCare is both easily accessible and navigable to those in need. However, organizations as large as TennCare tend to be unwieldy, and, when improperly handled, have dire consequences for those they effect. After years of litigation, Plaintiffs have proven TennCare violated their rights under the Medicaid

Act, the Due Process Clause of the Fourteenth Amendment, and the Americans with Disabilities Act.

I.        **BACKGROUND AND PROCEDURAL POSTURE**

    A.    <u>Plaintiffs' Class Action Claims</u>

Plaintiffs allege that Tennessee's policies and processes for issuing notice and affording administrative hearings to TennCare members facing loss of coverage deny those members procedural due process under the Medicaid Act, specifically 42 U.S.C. § 1396a(a)(3) and its regulations, and the Due Process Clause.  According to Plaintiffs, TennCare's notices are deficient because they fail to provide members with vital information regarding their procedural rights, including specifically:

- Information about their right to invoke good cause for their failure to satisfy TennCare's eligibility-related demands;

- Information about their right to have their eligibility reconsidered if they submit the required information or documents within 90 days of termination for failure to respond to TennCare requests for such materials; and

- An accurate notice of their statutory and constitutional rights to a fair hearing.

Plaintiffs further contend that TennCare deprives members of the Plaintiff Class, described below, of due process by requiring them to show that their appeals raise "valid factual disputes;" by denying them an opportunity for a fair hearing to show that they have good cause for failing to meet TennCare eligibility or appeal requirements; and by failing to provide hearings and timely decisions on members' appeals.

A subclass of Plaintiffs ("Disability Subclass") separately claim that TennCare has violated and is continuing to violate the Americans with Disabilities Act, ("ADA") 42 U.S.C. § 12132, through policies and processes for TennCare's administration of the redetermination of members' eligibility and the termination of their coverage.  They assert that TennCare's methods of

2

administration tend to screen out people with disabilities who are eligible for TennCare but who, because of the TennCare's methods of administration, are unable to maintain their TennCare coverage. The Disability Subclass Plaintiffs further assert that Defendant's methods of administration impose additional, unequal burdens on enrollees with disabilities to maintain their coverage. They also claim that Defendant has violated and is violating the ADA by failing to maintain an accessible and effective system for granting reasonable accommodation to Disability Subclass members who require assistance, including in-person assistance, to successfully complete the redetermination process.

Last, the Disability Subclass Plaintiffs contend that Defendant has violated the ADA by wrongfully terminating the coverage of Disability Subclass members due to TennCare's systemic failure to consider eligibility in disability-related categories of coverage and by failing to screen for those disability-related categories of coverage that are based on past receipt of Social Security Income ("SSI").

      B.    <u>Relief Requested</u>

Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Plaintiffs seek a declaratory judgment that Defendant violated and continues to violate Plaintiffs' and Plaintiff Class members' rights under federal law. Plaintiffs also request injunctive relief (1) prohibiting Smith from terminating TennCare coverage of Plaintiff Class members unless and until Defendant has considered all potential coverage for which they may be eligible, and only after giving enrollees advance, individualized written notice and a meaningful opportunity to appeal and (2) requiring Smith to prospectively reinstate TennCare coverage to all class members who are currently without such coverage, until such time as Defendant determines that the enrollees are in fact no longer eligible, based on a redetermination process that reliably complies with the Medicaid Act, the Due Process Clause, and the ADA. Plaintiffs' requested injunctive relief also includes a

requirement that Smith, in consultation with a qualified expert, submit for the Court's review a plan for a system that reliably and effectively provides reasonable accommodation to enrollees with disabilities who need assistance to establish and maintain their TennCare eligibility. Plaintiffs further seek ancillary relief including an explanatory notice to disenrolled Class members advising them that there is a state administrative procedure available to have the State determine whether or not they may qualify for past benefits, consistent with <u>Quern v. Jordan</u>, 440 U.S. 332, 349 (1979). If successful on their claims, Plaintiffs request attorneys' fees and costs. Plaintiffs do not seek monetary damages.

C.    <u>Class Certification</u>

On August 9, 2022, the Court issued a Memorandum Opinion and Order (Doc. No. 234) certifying the Plaintiff Class and Disability Subclass, along with fifteen issues well-suited for collective litigation. Specifically, the Court certified a "Plaintiff Class" consisting of "all individuals who, since March 19, 2019, have been or will be disenrolled from TennCare, excluding individuals, and the parents and legal guardians of individuals, who requested withdrawal from TennCare," and it certified a Disability Subclass consisting of "Plaintiff Class members who are 'qualified individuals with a disability' as defined in 42 U.S.C. § 12131(2)." (Doc. No. 234 at 40).

The fifteen certified issues are as follows:

1.  Whether the State considers/considered all categories and bases of eligibility before terminating enrollees' coverage, ("Certified Issue 1");

2.  Whether TennCare Notices of Determination ("NODs") mislead/misled recipients to think that TennCare considers/considered all bases of eligibility, all program rules, and all facts in determining eligibility, ("Certified Issue 2");

3.  Whether the NODs' citation to a 95-page compendium of TennCare regulations, Chapter 1200-13-20, satisfies and/or satisfied the notice requirements of 42 U.S.C. § 1396a(a)(3) and/or the Due Process Clause, ("Certified Issue 3");

4

4. Whether the NODs' omission of an explanation why recipients do/did not qualify for every other Medicaid category violates/violated 42 U.S.C. § 1396a(a)(3) and/or the Due Process Clause, ("Certified Issue 4");

5. Whether Defendant lacks/lacked any system to grant requests for reasonable accommodations for disabled persons navigating TennCare, ("Certified Issue 5");

6. Whether the NODs' omissions of information concerning the good cause exception and good cause hearings violates/violated the Medicaid Act or the Due Process Clause, ("Certified Issue 6");

7. Whether the NODS omission about the 90-day reconsideration period violates/violated the Medicaid Act or the Due Process Clause, ("Certified Issue 7");

8. Whether the NODs' language instructing class members to describe the reasons they want/wanted to appeal and the facts supporting their appeal violates/violated the Medicaid Act or the Due Process Clause, ("Certified Issue 8");

9. Whether the State's Valid Factual Dispute Policy ("VFD Policy") violates/violated the Medicaid Act or the Due Process Clause, ("Certified Issue 9");

10. Whether the prior use of language, in some NODs, telling recipients that they could only get a hearing if they thought TennCare made a "mistake about a fact" violated the Medicaid Act or the Due Process Clause, ("Certified Issue 10");

11. Whether the State's policy of denying good cause exceptions or hearings based on "allegations of non-receipt" of a notice violates/violated the Medicaid Act or the Due Process Clause, ("Certified Issue 11");

12. Whether the State systemically fails/failed to provide fair hearings at any time, ("Certified Issue 12");

13. Whether the State is/was required to provide fair hearings within 90 days of an appeal and, if so, whether it fails/failed to do so, ("Certified Issue 13");

14. Whether the State provides/provided adequate "in-person assistance" for disabled persons and, if not, whether that violates the ADA, ("Certified Issue 14"); and

15. Whether the State fails/failed to evaluate disability-related eligibility categories in making termination decisions and, if so, whether that violates the ADA, ("Certified Issue 15").

D.    Bench Trial

Between November 14, 2023, and November 20, 2023, the Court held a five-day bench trial on Smith's liability,[1] during which it heard testimony from TennCare officials and Plaintiffs or their family members.  The parties also submitted deposition designations in lieu of in-person testimony, as well as hundreds of exhibits.  After closing arguments, the parties filed post-trial briefs and response briefs.  (Doc. Nos. 404–07).  Based on the record before the Court and the parties' arguments, the Court resolves Certified Issues 1, 2, 3, 4, 6, 7, 9, 11, 12, and 15, at least in part, in Plaintiffs' favor.

By a preponderance of the evidence, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).  In summary, the Court finds as follows:

- Certified Issue 1 – the Court concludes that TennCare, through programming errors and design defects in TEDS, failed to consistently consider all eligibility categories when making eligibility determinations by ignoring necessary information in TennCare's—if not TEDS—possession.  Because the categories TennCare constructively closed off to its enrollees included disability related categories, the Court also concludes, in reference to Certified Issue 15, that TennCare violated the ADA.

- Certified Issue 2 – the Court concludes that TennCare's notices stating that it considered all bases of eligibility, all program rules, and all facts in determining eligibility were misleading.

---

[1] The Court reserved decision on whether the State can afford the cost of any injunction until after the Court reached a final determination on Defendant's liability.  (Doc. No. 398 at 237:5–239:8).

6

- Certified Issue 3 – the Court concludes that TennCare violated both the Medicaid Act and Due Process Clause by sending enrollees NODs citing to a 95-page compendium of TennCare regulations to support its termination decisions.

- Certified Issues 6 and 7 – the Court concludes that TennCare violated the Due Process Clause by omitting from its NODs information regarding the Good Cause Policy and 90-day reconsideration period, respectively.

- Certified Issues 9 and 12 – the Court concludes that TennCare's Valid Factual Dispute Policy violates the Medicaid Act and Due Process by foreclosing the opportunity for enrollees to receive fair hearings to which they are entitled.

- Certified Issue 11 – the Court concludes that TennCare's policy of denying good cause exceptions or hearings based on enrollee's allegations of non-receipt violates the Due Process Clause.

- All other Certified Issues and subparts of Certified Issues – the Court concludes that Plaintiffs have not met their burden on issues of either fact or law.

The Court addresses each Certified Issue and the bases for these summary conclusions in depth in its Conclusions of Law.

## II. FINDINGS OF FACT

### A. Overview of TennCare

1. Title XIX of the Social Security Act is popularly known as the Medicaid Act, 42 U.S.C. § 1396, *et seq.* The federal government participates in Medicaid under the aegis of the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), of the Department of Health and Human Services ("HHS"). Each state is at liberty to decide whether to participate in the Medicaid program, and all states do.

State and federal governments share responsibility for funding Medicaid; in Tennessee's case, the state is currently responsible for approximately one-third of the program's funding, with the federal government underwriting the remainder. States administer the program, subject to federal requirements imposed by the Medicaid Act and CMS regulations and policy directives. (JX 43 ¶ 1).

2.      Tennessee has participated in Medicaid since shortly after the program's inception in the 1960s. Since 1994, Tennessee's Medicaid program has operated under a demonstration waiver approved by the Secretary of HHS pursuant to Section 1115 of the Social Security Act, 42 U.S.C. § 1315. The waiver program, known as TennCare, contracts with commercial managed care organizations ("MCOs") to administer the health benefits of the program's enrollees. (Id. ¶ 2).

3.      The Tennessee Department of Finance and Administration is the "single state agency" designated pursuant to 42 U.S.C. § 1396a(a)(5) to administer the TennCare program and its budget. The Department administers TennCare through the Division of TennCare. (Id. ¶ 3).

4.      Defendant Stephen Smith is the Director of the Division of TennCare. (Id. ¶ 4).

5.      **Kimberly Hagan**[2] is the Director of Member Services for TennCare. Her responsibilities include overseeing TennCare's eligibility process, the processing of new applications, covering periodic eligibility redeterminations, and covering eligibility reverifications following a member or system reported change of information. (Doc. No. 398 at 241:11–242:5)

6.      The Medicaid Act authorizes coverage for certain populations (e.g., low-income children and people with disabilities). (JX 43 ¶ 5).

---

[2] For clarity, the names of witnesses called at trial will be initially bolded.

7. TennCare currently serves approximately 1.7 million Tennesseans, including low-income individuals, pregnant women, children, caretaker relatives of young children and older adults, and adults with disabilities. (Id. ¶ 6).

8. The Affordable Care Act ("ACA") established a system of tax credits, effective January 1, 2014, to subsidize the purchase of commercial insurance available through an online federally administered exchange, although people could also apply by telephone or mail. The exchange is known as the Federally Facilitated Marketplace ("FFM"), or by its web address as "healthcare.gov." The ACA also made substantial changes to the Medicaid application and eligibility determination process. (Id. ¶ 7).

9. The ACA collectively refers to Medicaid, premium tax credits and the federally funded Children's Health Insurance Program ("CHIP") as state health subsidy programs. The ACA provides that an application for any of these programs may be submitted to either the FFM or to the State, using a single streamlined application developed by CMS or an alternative streamlined application approved by CMS. (JX 43 ¶ 8).

10. A person who submits a single streamlined application is to be reviewed for any of the state health subsidy programs for which she may be eligible pursuant to 42 U.S.C. § 18083. All applications are initially considered for Medicaid eligibility and are not reviewed for CHIP or premium tax credits until a determination is first made that the applicant does not qualify for Medicaid. (Id. ¶ 9).

11. The ACA introduced a new methodology for calculating income of many Medicaid applicants known as the Modified Adjusted Gross Income ("MAGI") calculation. MAGI is used to calculate income eligibility for children, pregnant women, and parents of dependent children,

who together make up approximately 80% of all TennCare enrollees. These groups are referred to as the "MAGI categories." (Id. ¶ 10).

12.     The new MAGI methodology introduced by the ACA does not apply to Medicaid eligibility categories that are based on age, blindness, or disability. These categories are referred to as the non-MAGI categories. (Id. ¶ 11).

B.     Eligibility for TennCare

13.     To enroll in TennCare, individuals are required to meet specified eligibility criteria. First, they must meet the citizenship requirement and be a resident of Tennessee. Second, they must satisfy "categorical eligibility" requirements by meeting the criteria for at least one of dozens of different eligibility categories (e.g., child, caretaker relative, disabled, elderly, etc.). Third, individuals must show that their income is below certain limits, which vary depending on the categorical eligibility group. Fourth, individuals in some, but not all, categorical eligibility groups have to meet additional limits on the amount of resources, or assets, they own. Finally, individuals seeking to qualify in the Institutional Medicaid category based on their need for long term services and supports, must establish that they require care in a medical institution, like a nursing facility or hospital, or intermediate care facility for individuals with intellectual disabilities or who receive Home and Community-Based Services in their home. (JX 43 ¶ 12).

14.     Those approved by the Social Security Administration ("SSA") to receive cash assistance through the Supplemental Security Income ("SSI") program are eligible for automatic enrollment in TennCare. In Tennessee, SSI eligibility is determined by the SSA. Applications for SSI benefits may be filed at the Social Security office. (Id. ¶ 13).

15.     Infants born to a mother who is enrolled in Medicaid at the time of the child's birth are deemed automatically eligible (no income test) for TennCare. These "deemed infants" remain

eligible for TennCare until their first birthday if they continue to be a Tennessee resident. (Id. ¶ 14).

16. Pregnant women are covered with incomes up to 195% of the FPL with no resource test. (Id. ¶ 15).

17. TennCare provides for the coordination of benefits for Medicaid beneficiaries who are also eligible for Medicare, the federal health insurance program for disabled workers and the elderly. Through what is known as the "Medicare buy-in," TennCare pays the Medicare premiums and cost-sharing for these dually eligible individuals. (Id. ¶ 16).

18. TennCare also administers what is known as the Medicare Savings Programs ("MSPs"). MSPs provide assistance to certain individuals enrolled in Medicare. MSPs help defray the Medicare expenses of beneficiaries with limited income and resources by covering some or all of their Medicare premiums, deductibles, and copayments. The following programs, which are differentiated by their resource and income eligibility criteria and the benefits they provide, together comprise the MSP:

    a) Qualified Medicare Beneficiary ("QMB"), covering individuals with incomes up to 100% FPL, pays Medicare premiums, copayments and deductibles.

    b) Specified Low-Income Beneficiary ("SLMB"), covering individuals with incomes from 100% - 120% FPL, pays Medicare Part B premiums only.

    c) Qualified Individual ("QI"), covering individuals with incomes from 120% - 135% FPL, pays Medicare Part B premiums. Individuals cannot be eligible for Medicaid. at the same time.

d) Qualified Disabled Working Individual ("QDWI"), covering individuals from 135% - 200% FPL, pays Medicare Part A buy-in for individuals who are no longer entitled to premium-free Medicare Part A because they returned to work.

(Id. ¶ 17).

19. Three mandatory categories include coverage for individuals who meet all financial and non-financial eligibility requirements, including currently receiving Social Security benefits and formerly receiving SSI benefits:

a) Disabled Adult Children ("DAC") become "categorically eligible" for TennCare if since July 1987 they became disabled before age 22 and lose SSI either because they start receiving Social Security benefits based on a parent's death or retirement or because they receive an increase in benefits. These DAC beneficiaries' Social Security income is not counted in determining their eligibility, effectively raising the income limit above the federal poverty level for some individuals. 42 U.S.C. § 1383c(c); TennCare R. 1200-13-20-.02(26), 1200-12-20-.08(2).

b) Some former SSI beneficiaries are eligible under the federal Pickle Amendment, Section 503 of Public Law 94-566. These include Social Security beneficiaries who at some time since April 1977 received Social Security and SSI benefits in the same month. They are "categorically eligible" for Medicaid under the Pickle Amendment if they lost SSI but would currently be eligible for SSI if the Social Security Cost of Living Adjustments ("COLAs") received since their SSI termination were disregarded. TennCare refers to this category as "Pickle Passalong."

c) Widow/Widower coverage is available to certain disabled, widowed individuals between the ages of 50 and 65 who since 1984 have lost their SSI but who would

12

still be eligible for SSI if their initial entitlement to, and/or increases in, their Social Security widow/widower benefits were disregarded, and all financial and nonfinancial criteria are met.

(Id. ¶ 18).

20. TennCare covers uninsured individuals under age 65, who are not eligible in any other category of Medicaid, who need active treatment for breast or cervical cancer and who have incomes below 250% of the FPL with no resource test, and who are enrolled in the Center for Disease Control and Prevention's National Breast and Cervical Cancer Early Detection Program. These women apply and are enrolled through their local county health department, which submits their application to TennCare. (Id. ¶ 19).

21. Individuals whose functional limitations require long-term services and supports, such as nursing home care or in-home nursing, can qualify to receive such services through the TennCare CHOICES program, authorized by the terms of TennCare's Section 1115 Waiver, if they are receiving SSI cash benefits or qualify in the Institutional Medicaid category. To qualify in the Institutional Medicaid category, among other requirements, an individual must have limited assets and countable income that does not exceed $2,742.00 per month. In addition to long-term-services and supports, individuals enrolled in CHOICES qualify for full Medicaid coverage. (Id. ¶ 20).

22. Individuals with intellectual or developmental disabilities who require long-term services and supports can qualify to receive such services through TennCare's Employment and Community First ("ECF") CHOICES program, authorized by the terms of TennCare's Section 1115 Waiver, if they are receiving SSI cash benefits or qualify in an ECF CHOICES category, and who receive Home and Community Based Services. To qualify, among other requirements, an

13

individual must have limited assets and meet various countable income standards. In addition to long-services and supports, individuals enrolled in CHOICES qualify for full Medicaid coverage. (Id. ¶ 21).

23. Individuals with intellectual disabilities who require long-term services and supports can qualify to receive home and community-based services through Medicaid waivers administered by the Tennessee Department of Intellectual and Developmental Disabilities (DIDD), authorized by the terms of TennCare's Section 1915(c) Waiver if they are receiving SSI cash benefits or qualify in the Institutional Medicaid category. To qualify, among other requirements, an individual must have limited assets and meet various countable income standards. These individuals qualify for full Medicaid coverage. (Id. ¶ 22).

24. TennCare has enrollees in every category of eligibility available in Tennessee. (Id. ¶ 54).

i. Tennessee Eligibility Determination System ("TEDS")

25. In 2012, the State of Tennessee began the procurement process for designing and building a new eligibility determination system for use by TennCare, the Tennessee Eligibility Determination System, or "TEDS." (JX 43 ¶ 46).

26. When the ACA's new eligibility and enrollment provisions took effect on January 1, 2014, TEDS was not yet operable. The state undertook a multi-year effort, involving numerous contractors, as well as CMS and state personnel, to bring the TEDS system online. (Id. ¶ 47).

27. Deloitte designed and built TEDS following guidance from CMS. (Id. ¶¶ 48, 53).

28. Deloitte still contracts with TennCare to maintain TEDS and to perform regular updates and enhancements to the system. (Id. ¶ 49).

29. Ms. Hagan had the ultimate say in TEDS's design and continues to be the final decisionmaker on updates to TEDS now that it is live. (Doc. No. 399 at 49:13–50:13).

14

30.     TennCare launched TEDS statewide on May 30, 2019.  (JX 43 ¶ 50).

31.     TEDS provides members with access to an online portal, which they can access through an internet browser or smartphone application.  (Id. ¶ 51).

32.     TEDS's enrollee-facing online portal is called TennCare Connect ("Online Portal").  (Id. ¶ 52).

33.     A TennCare contractor, Automated Health Systems ("AHS"), operates a call center also known as TennCare Connect ("Call Center"), which employs approximately 400 workers and that exists to enable Tennesseans to apply for coverage, renew coverage, file eligibility appeals, and update their address and other information over the phone.  (Id. ¶ 61).

34.     The staff at the Call Center are not TennCare employees, and interestingly are not TennCare eligibility specialists, and do not make eligibility decisions.  (Id. ¶ 62).

35.     AHS has had its most recent contract with the State since February 15, 2021.  (Id. ¶ 63).

36.     Calls to the Call Center from March 19, 2019, to July 11, 2021 were answered by representatives from both TennCare contractors, AHS and Keystone Peer Review Organization, depending on the purpose of the call.  (Id. ¶ 64).

37.     AHS has answered and continues to answer calls to the Call Center from July 12, 2021, to present. (Id. ¶ 65).

ii.     Required Redeterminations

38.     Federal law and state policy require TennCare enrollees to undergo renewal, also referred to as "redetermination," of their eligibility every 12 months. (Id. ¶ 24).

39.     Federal law and state policy also requires an enrollee to undergo reverification of their eligibility if that person experiences a change of circumstances, such as a birthday, a move out of state, a change in income or resources, a change in household composition, etc.  (Id. ¶ 25).

15

40.     If information in TEDS or information TennCare is authorized to look at from verified third-party sources shows that a member is eligible, whether in their current category of eligibility or in another, it is TennCare's policy to automatically renew that member's coverage. (Id. ¶ 26).

41.     Tennessee also accepts redetermination information by phone, online, by fax, by mobile app, or by mail, as well as information sent from designated kiosks at DHS county offices or brought in person to a DHS county office to scan and upload or fax to TennCare. Notably, TennCare does not accept redetermination information by e-mail. (Id. ¶ 23).

42.     Tennessee uses a renewal form with some information pre-populated as part of its Annual Renewal process. (Id. ¶ 27).

43.     During the COVID public health emergency ("PHE") moratorium, the required Medicaid annual eligibility renewal process and most disenrollments from Medicaid were suspended from March 18, 2020, until April 1, 2023. (Id. ¶ 55).

44.     Prior to the PHE, TennCare processed approximately 400,000 applications per year, 100,000 annual eligibility renewals per month, and 200,000 eligibility reverifications per month as required by receipt of new information. (Id. ¶ 56).

45.     On April 1, 2023, as a result of President Biden declaring an end to the disenrollment moratorium, TennCare restarted its renewal and reverification processes. (Id. ¶ 57).

46.     On April 1, 2023, there were approximately 1.7 million individuals enrolled in TennCare, (Id. ¶ 59), as compared to the approximately 1.4 million individuals enrolled before the PHE. (Id. ¶ 60).

47. States, including Tennessee, were asked to catch up with all annual renewals within a year of that date. CMS referred to this period as the "unwinding." (Doc. No. 398 at 269:15–270:5).

48. Members in several categories of eligibility do not undergo redetermination. This means that hundreds of thousands of TennCare enrollees are not subject to the unwinding. (Id. at 274:15–280:17).

49. Members can submit renewal packets by mail, by scanning and uploading a paper packet at DHS offices, by submitting the required information online at TennCare Connect from any computer or via the TennCare Connect Mobile App, or via facsimile. Enrollees can also complete a renewal packet over the phone with the Call Center. If additional information is needed, members may be required to submit documentation by uploading, faxing, or mailing it to TennCare. (JX 43 ¶ 28).

50. Members can submit requested verification documents by mail, by scanning and uploading paper copies at DHS offices, online at TennCare Connect from any computer or via the TennCare Connect Mobile App, or via facsimile. (Id. ¶ 29).

51. It is TennCare's policy to enter all information included in a returned Renewal Packet into TEDS. (Id. ¶ 30).

52. If a member returns a Renewal Packet, but more information, such as proof of income, is required to complete the renewal process, TennCare's policy is to send the member a request for Additional Information ("AI"). (Id. ¶ 31).

53. If an enrollee reports or TennCare receives information that an enrollee has experienced a change, for example a change to the composition of the household or its income, that could change the enrollee's continued eligibility for coverage, TennCare is required to reverify

that enrollee's eligibility before their next annual redetermination and may, as part of that reverification process, request additional information. If an enrollee does not respond to requests for additional information, they may be disenrolled. (Id. ¶ 43).

54.     TennCare has a contract with Rural Health Association of Tennessee to provide outreach and assistance to some enrollees going through renewal. Rural Health, which conducts in-person events across Tennessee, has represented to TennCare that it has the capacity to provide assistance to approximately 10,000 individuals a year and is available to schedule appointments with enrollees to receive in-person assistance. Employees of the Rural Health Association of Tennessee are not TennCare eligibility specialists. (Id. ¶ 45).

55.     If a member fails to return a Renewal Packet or any additional requested information, or if they return the Renewal Packet and any requested additional information and they are nevertheless found ineligible, they will receive a Notice of Decision ("NOD") terminating coverage. (Id. ¶ 32).

          iii.     Redeterminations/Renewals Errors Through TEDS

56.     TEDS relies on a series of business rules converted into an algorithm to make eligibility determinations. Since TEDS's launch, TennCare and Deloitte have had to address several defects in those business rules and, in turn, the algorithm, so that TEDS might function as intended. When TEDS makes a wrong eligibility determination about someone entitled to TennCare, that enrollee is deemed ineligible and placed at risk of losing their healthcare coverage. (Doc. No. 398 at 263:22–264:16).

57.     Prior to TEDS, TennCare relied on two systems: Interchange and Accent. Interchange (the Medicaid Management Information System ("MMIS") that housed eligibility data before TEDS) was far more rudimentary than TEDS. And, by all accounts, Accent was antiquated. Neither system could make automated eligibility decisions. From TennCare's perspective, TEDS

18

was a vast improvement over the two legacy systems because it had the capability to capture and analyze eligibility-related data from various sources, including external state and federal agencies, in ways previously unavailable to the State. Because it is automated, TEDS can also make eligibility determinations without human intervention. Often new applications, redeterminations, and renewals can be approved through TEDS overnight. (Id. at 248:20–249:10, 251:13–253:1; Doc. No. 400 at 128:21–25).

58.     When TEDS launched, ingrained systemic errors pervaded eligibility considerations of enrollees whose eligibility hinged on prior or ongoing receipt of SSI. Whether enrollees were considered for Pickle depended on certain criteria that would prompt a specific review for eligibility. But, for several months, TEDS did not consistently load and consider those criteria. Likewise, TennCare did not properly load the indicators corresponding to the DAC and Widow/Widower categories. Because of this, workers would have to go into the interface data to find the relevant indicators until 2020, which they did not consistently do. (Doc. Nos. 398 at 295:9–296:17; 387-2 at 5:10–6:20).

59.     Because of these design defects, TEDS made erroneous eligibility determinations. **Plaintiffs Carlissa Caudill** and **Johnny Walker**'s cases, which are discussed below, are just two examples. (Doc. No. 399 at 102:21–103:1, 107:14–17).

60.     Their experiences and others prompted TennCare to implement a practice referred to as the Reaccretes Process in 2020. The Reaccretes Process entails TennCare asking SSA to reaffirm that enrollees identified as longer receiving SSI did in fact stop receiving SSI before TennCare relies on that information to deny someone coverage. If SSA informs TennCare that SSA provided faulty information, TennCare considers them eligible in the SSI category. If SSA

19

confirms that the person no longer receives SSI, TennCare will begin considering the enrollee for other categories of TennCare eligibility. (Id. at 105:8–107:17).

61. As part of the transition to TEDS, enrollees were reorganized into households, and some enrollees were sorted into the wrong household or dropped from the household to which they belonged and therefore assigned the wrong address. **DiJuana Davis**, whose experience is discussed below, is one such enrollee. TennCare had no way of knowing who it improperly sorted and relied on enrollees to appeal or file a new application to solve the problem. (Id. at 10:5–13:10).

iv. Plaintiffs' Experiences Related to Eligibility and Termination

62. **Donna Guyton** is the mother of Plaintiff Patrick Guyton. (Doc. No. 396 at 55:17–24).

63. Mr. Guyton enrolled in the Tennessee Department of Intellectual and Developmental Disabilities (DIDD) Waiver program, also known as the 1915(c) Waiver program, in 1992. (JX 44 ¶ 429).

64. Due to his disabilities, Mr. Guyton initially qualified for TennCare in the SSI category. He remained eligible in the SSI category until he lost his SSI benefits in April 2020 upon gaining SSDI benefits, also known as a Disabled Adult Child (DAC) benefit, based on his father's work history. (Id. ¶¶ 430–31).

65. He also qualified because he was grandfathered in, based on his enrollment in the DIDD Waiver program. (Doc. No. 396 at 69:21–70:10; 71:11–13).

66. On May 18, 2023, TennCare issued Mr. Guyton a Pre-Termination Notice and Questionnaire, informing Mr. Guyton that his TennCare coverage would soon be ending and asking him to complete the questionnaire. This was in error. A TennCare employee wrongly believed Mr. Guyton belonged in a different eligibility category because the "normal place" to find a DAC indicator in TEDS's interface did not show that indicator. According to Ms. Hagan, the

20

employee should have looked in other places to ensure Mr. Guyton did not qualify as a DAC but failed to do so. (JX 44 ¶ 433; DX 619; Doc. No. 400 at 54:2–8, 57:20–58:1).

67.    **Kimberly Noe** is the sister and caretaker of Plaintiff Michael Hill. (Doc. No. 397 at 16:19–25)

68.    Mr. Hill qualified for TennCare as a DAC. However, when TennCare converted Mr. Hill's data into TEDS on January 19, 2019, TEDS erroneously placed him in the Pickle category instead. Pickle and DAC have different rules for what income is considered, and because it placed him in the Pickle category, TEDS disregarded too little of Mr. Hill's income. TEDS then determined Mr. Hill was over income—and therefore ineligible—for Pickle and began its processes for terminating TennCare coverage. While Mr. Hill was over income for Pickle, TEDS should have recognized that he remained eligible for coverage in the DAC category. (JX 44 ¶¶ 191, 197; Doc. No. 399 at 135:21–136:13).

69.    Plaintiff **Kerry Vaughn** has been eligible for TennCare in the SSI category since at least 2008 when she began receiving SSI. (JX 44 ¶¶ 333–34).

70.    In 2014, the amount of her SSDI benefits increased such that they exceeded the income eligibility limit for SSI. (Id. ¶ 335).

71.    Despite this, Ms. Vaughn remained eligible for TennCare in the DAC category. (Id. ¶ 336).

72.    When TennCare converted her eligibility data into TEDS on January 19, 2019, it erroneously placed her in the Pickle category when she should have been placed in the DAC category. (Id. ¶ 337).

73.     On account of the erroneous conversion, Ms. Vaughn received a NOD informing her that her Medicaid coverage would end as of May 30, 2019, because her income exceeded the SSI monthly limit.  (Id. ¶ 338).

74.     TennCare converted **DiJuana Davis** and her family's eligibility data into TEDS on April 27, 2019. (Id. ¶ 174).

75.     At the time of conversion, TennCare erroneously merged Ms. Davis's family with another family because they both had the same case number in Interchange.  (Id. ¶ 175; Doc. No. 399 at 10:5–13:10).

76.     As a result of this erroneous merger, TEDS did not have accurate address information for Ms. Davis or her family and sent all mailings to an incorrect address. (JX 44 ¶ 176).

77.     Because TennCare sent her mailings to the wrong address, Ms. Davis could not have known of, let alone responded to, TennCare's requests for information.  When TennCare did not receive any response, TEDS erroneously terminated Ms. Davis and her five children's coverage on August 26, 2019.  (Id. ¶ 177).

78.     On August 29, 2019, Ms. Davis called TennCare's Call Center and discovered that TennCare had terminated her entire family's coverage.  (Id. ¶ 178).

79.     Because TennCare terminated her coverage without her notice, Ms. Davis could not undergo an upcoming medically necessary surgery for which she had previously received TennCare's approval. (Doc. No. 396 at 182:17–185:22).[3]

---

[3] Ms. Davis's experience with TennCare also involves issues related to the appeals process.  The Court will address those in next section.

22

80.     **Andrea Riley** is the mother of Joshua Riley, who has autism and ADHD. She is her son's co-power of attorney and responds to all of his paperwork from TennCare because she is unable to do it by himself. (Doc. No. 397 at 117:15–22, 118:16–119:13).

81.     Mr. Riley has been eligible for TennCare since July 1, 2018, and at no point has he been disenrolled; he has never had any break in coverage; and he has never had to have a gap in his coverage filled. (JX 44 ¶ 444).

82.     Mr. Riley, in addition to being eligible for TennCare, is eligible for and enrolled in the ECF CHOICES program and has been since August 10, 2018. (Id. ¶ 445).

83.     Mr. Riley initially had eligibility for TennCare via the SSI category, but, since August 7, 2020, has been eligible for and received TennCare via the Institutional Medicaid ("IM") category. (Id. ¶¶ 446–51).

84.     In July 2023, in response to a TennCare advertisement, Ms. Riley logged onto Mr. Riley's account on TennCare Connect Online Portal to ensure that the listed addresses were complete and accurate. (Doc. No. 397 at 124:11–20).

85.     While navigating Joshua's account, Ms. Riley discovered errors in his listed home address but could not correct the inaccuracies. The Online Portal indicated that she needed to update Joshua's home address with the Social Security Administration.[4] (Id. at 124:11–126:23).

86.     Ms. Riley also attempted to update her son's employment information, but, when she inputted the hours per week Joshua worked, TennCare's portal erroneously added a "$" before the number of hours worked per week. Because Joshua worked 14 hours each week, Ms. Riley worried that TennCare would wrongly indicate that he made fourteen dollars an hour. (Id. at 131:13–133:13).

---

[4] The error in Joshua's home address has since been corrected. (Doc. No. 397 at 139:2–9).

23

87. Ms. Riley also attempted to update Joshua's "communication preferences" to no avail. Rather than take her to a page that allowed her to update those preferences, TennCare's Online Portal erroneously logged her out of the portal completely. Ms. Riley replicated this issue multiple times. (Id. at 133:17–135:24).

88. Ms. Riley also attempted to better understand how to navigate the online portal by watching the "Dashboard Tutorial" but found that certain facets of the tutorial were inaccurate. She was correct, TennCare eventually solved this issue. (Id. at 136:2–139:9).

89. Ms. Riley also attempted and failed to find documents that were submitted to TennCare by fax or mail because the documents that TennCare's portal displayed were not listed chronologically and were labeled using conventions she did not understand or have a glossary to interpret. (Id. at 139:10–21).

90. Ms. Riley also attempted to provide feedback and receive technical assistance through TennCare's portal but had no means of doing either. (Id. at 139:22–140:6).

91. Ms. Riley had previously attempted to solve issues by calling TennCare Connect's Call Center but found it to be a circular automated system that did not allow her to speak to an individual at TennCare capable of addressing her needs. TennCare repeatedly transferred her to the wrong department and the voicemails of other representatives who did not return her calls. (Id. at 140:12–142:1).

92. Because of her experience calling TennCare Connect, Ms. Riley did not call TennCare Connect to resolve the issues she identified with her son's account or request assistance navigating the online portal. (Id. at 147:16–148:9).

C.    TennCare's NODs and the Timeliness of Renewals and Appeals

i.    NODs Generally

93.    A NOD terminating coverage is a critical event for a TennCare enrollee. It tells the enrollee the specific date their healthcare coverage will end and should give the enrollee an accurate explanation and legal citation supporting TennCare's decision. (JX 43 ¶¶ 33–34). But that is not always true.

94.    NODs also tell enrollees that they have appeal rights, explain how to file an appeal, provide the deadline to file an appeal in order to keep benefits pending its resolution (a 20-day deadline), and provide the deadline for appealing on time (a 40-day deadline). (Id. ¶ 76).

95.    Similar to how TEDS relies on business rules in making eligibility terminations, TEDS generates NODs based on a series of if-then statements. When TEDS determines that a given condition is met, it triggers specific language to be added to a template for a particular NOD. (Id. ¶ 67).

96.    Every NOD TennCare sends includes this language, "Before we made our decision we looked at you for different kinds of coverage." (Id. ¶ 72).

97.    They also state: "We looked at the facts we have for you. We use those facts to review you for our coverage groups to decide if you qualify. But you don't qualify." (Id. ¶ 71).

98.    The case-specific changes to the NOD template can be straightforward. For instance, the date listed on any NOD or other communication from TennCare is the date that TennCare sent the notice or communication to the addressee. (Id. ¶ 66).

99.    Others can be more complex. For example, if an enrollee is not eligible for Medicaid because of an overarching non-financial reason, like failing the SSN requirement or failing the state residency requirement, those reasons will also be included in the NOD. (Id. ¶ 36).

25

100.    When the trigger condition "Denied for Health Coverage" is met, NODs include the language: "We looked at the facts we have for you. We use those facts to review you for our coverage groups to decide if you qualify. But you don't qualify."  That condition also triggers the NODs to state: "Remember, we look at the facts we have for you before we make our decision. And we use those facts to review you for our coverage groups." (Id. ¶¶ 73–74).

101.    When the trigger condition "Termed for Health Coverage" is met, NODs include the following language: "Remember, we look at the facts we have for you before we make our decision. And we use those facts to review you for our coverage groups. Things like age, income, and resources can be different between each group. To learn more about the different groups go to [TennCare's homepage]." (Id. ¶ 75).

102.    But NODs are by no means exhaustive.  A NOD will not go through each eligibility category and provide a specific denial reason for every category into which an enrollee did not group.  For example, someone who is not and has never been in foster care will not receive a specific explanation for why they do not qualify for foster care coverage.  (Id. ¶ 35).

103.    During this litigation, TennCare made changes to the language of the NODs to brings its NODs into compliance with the law.  (Id. ¶ 67).

104.    Relevant to Certified Issue 3, all termination NODs TennCare sent out prior to December 2022 contained a citation to a 95-page compendium of TennCare eligibility rules (the "Stock Citation") in lieu of a specific legal citation supporting TennCare's decision to deny coverage.  (Doc. Nos. 398 at 300:14–302:19; 400 at 17:9–21:10).

105.    Ms. Hagan admitted that federal law obligated TennCare to provide a specific citation for its eligibility determinations but explained that it could not include them when TEDS launched because TennCare was "completely rewriting the rules." (Doc. No. 400 at 19:13–20:16).

26

106.     But for over three years after the eligibility rules were finalized, TennCare still did not replace the illegal Stock Citation.  (Id. at 19:5–18).

107.     TennCare deliberately decided to not replace the Stock Citation during this period. As Ms. Hagan put it, "there were other system changes that [TennCare] felt were critical that we had to focus on first."  (Id. at 20:2–16).

108.     Over 179,000 enrollees received a NOD containing the Stock Citation.  (Doc. Nos. 398 at 302:3–303:8; 399 at 6:16–7:3).

ii.     90-day Termination Reconsideration Period

109.     If an enrollee sends in their Renewal Packet or requested additional information late but within 90 days of their termination date, TennCare must review their case and—if the late submissions demonstrate that the member is eligible—backdate the enrollee's coverage to fill the gap created by their termination.[5]  (JX 43 ¶ 37).

110.     However, neither the renewal packets nor the NODs include information to the enrollee regarding the 90-day reconsideration period. (Id. ¶¶ 31, 40).

111.     The only allusion to the 90-day reconsideration period is found in the cover letter accompanying the Renewal Packet, which in relevant part states:

> Even if you get a letter that says when your coverage will end you can still send in your packet and proof. If we get your packet and proof, we'll use it to see if you qualify for coverage. Then we'll send you a letter that says if you qualify or not. If you think we made the wrong decision, the letter will also say how to appeal our decision. What if we get your packet before your coverage ends but we need more facts or proof from you to decide? We'll send you a letter that says what's missing. You'll only have 20 days from the date on that letter to give us the facts or proof we need. What if you don't return the facts or proof we need within those 20 days? You may not be able to keep your coverage. We'll use the facts and papers you have given us to decide (even if you've only given us your Renewal Packet). So don't wait! Try to give us all your facts and proof when you send us your packet.

---

[5] The 90-day reconsideration period does not apply to QMB coverage, as TennCare has no authority to backdate such coverage.  (JX 43 ¶¶ 37–38).

27

(Id. ¶ 42).

112. Although this language explains TennCare's related policy to re-enroll individuals who submit documents within 20 days of their termination date, it does not explain that they may submit documents within 90 days and, if eligible, receive backdated coverage. (Id.).

113. Indeed, Ms. Hagan admitted that TennCare never specifically references a 90-day reconsideration period. (Doc. No. 400 at 161:9–11).

114. According to Ms. Hagan, TennCare does not tell its enrollees about the 90-day reconsideration period so that they do not delay returning information necessary to process their case, but she provided no basis for this concern. (Id. at 161:12–17).

    iii.    Plaintiffs' Experiences Regarding NOD Issues

115. Returning to **Ms. Noe**'s testimony related to her brother, Mr. Hill, on February 6, 2019, TennCare issued a notice to Mr. Hill indicating that TennCare would stop paying for his prescription drugs on March 9, 2019, because "You now have Medicare to pay for your prescription drugs." The notice provided he had until March 18, 2019, to appeal. (JX 44 ¶ 193).

116. On February 19, 2019, Ms. Noe filed a timely appeal by phone on Mr. Hill's behalf. (Id. ¶ 194).

117. On February 25, 2019, a Medicare Saving Program ("MSP") application was submitted for Mr. Hill. (Id. ¶ 195).

118. Mr. Hill was denied coverage for MSP for not having Medicare Part A when he should have been denied as being over income for the MSP program. (Id. ¶ 196).

119. Mr. Hill did not have MSP benefits either before or after conversion, but because he qualified for a SSI-related category, TennCare pays his Medicare Part B premiums. (Id. ¶ 192).

28

120. On May 23, 2019, TennCare issued a NOD that denied Mr. Hill eligibility for MSP benefits because he exceeded the income threshold for "the kind of TennCare Medicaid [Mr. Hill] could get" and informed him his Medicaid coverage would end on June 12, 2019, unless he appealed by that date. (JX 44 ¶ 198; PX 425; DX 246).

121. The NOD did not specify the category Mr. Hill could "get", and instead cited to the Stock Citation. (PX 425 at 5; DX 246 at 5).

122. Mr. Hill received SSDI and had no other source of income, and Ms. Noe had no reason to believe his income had changed or why TennCare believed his income had changed. (Doc. No. 397 at 20:19–21:18).

123. On May 28, 2019, Ms. Noe filed a timely appeal by phone to the May 23, 2019, notification that TennCare denied Mr. Hill coverage. (JX 44 ¶ 199).

124. On June 7, 2019, Plaintiffs' counsel, the Tennessee Justice Center ("TJC"), sent a letter to the TennCare appeals group providing information supporting Mr. Hill's eligibility in the DAC category. (Id. ¶ 200).

125. On July 3, 2019, TJC confirmed in a phone call to TennCare Connect that all documents were received and being processed. TennCare's records reflect that the representative on the call searched TEDS for a DAC form and "[d]ocuments were found." (Id. ¶ 201).

126. On July 31, 2019, TennCare issued a letter to Mr. Hill informing him that his appeal would receive a hearing. (Id. ¶ 202).

127. The July 31, 2019 letter did not provide a time or date for Mr. Hill's hearing. (Doc. No. 397 at 26:2–4).

128. While his appeal was pending, on September 27, 2019, TennCare issued another notice to Mr. Hill informing him that TennCare had terminated Mr. Hill's TennCare Medicaid and

29

MSP coverage retroactively as of July 18, 2019. The notice stated that Mr. Hill did not qualify because his monthly income exceeded the limit. (JX 44 ¶ 203).

129.    The portion of the notice titled "Why Your Coverage Is Ending" stated, "We received a change in your facts, so we checked to make sure you still qualify. We reviewed your facts and decided that you don't qualify anymore. This means your coverage will end." (Doc. No. 397 at 28:25–29:11). The document did not specify what facts disqualified Mr. Hill. (Id.)

130.    The notice also stated, "Before we made our decision we looked at you for different kinds of coverage." Based on this, Ms. Noe believed TennCare had considered Mr. Hill's DAC eligibility. (Id. at 29:14–23).

131.    On October 16, 2019, TJC filed a third eligibility appeal on Mr. Hill's behalf and requested COB. (JX 44 ¶ 204).

132.    On October 18, 2019, TJC called TennCare to discuss Mr. Hill's pending appeal, and requested the reinstatement of Mr. Hill's Continuation of Benefits ("COB"). (Id. ¶ 205).

133.    During the call, TennCare acknowledged it erred in terminating Mr. Hill's COB, and following the call from TJC, TennCare's appeals unit reinstated and backdated Mr. Hill's coverage. (Id. ¶ 206).

134.    Mr. Hill remained in pending appeal status with COB until April 21, 2020, when TennCare finally reviewed his social security information, and yet again conceded it had erred, and reinstated his coverage in the DAC category. (Id. ¶ 207).

135.    Mr. Hill remains over income for MSP benefits. (Id. ¶ 208).

136.    TennCare uploaded a notice to Mr. Hill's account dated September 9, 2021, stating that it denied his application for MSP benefits. (Id. ¶ 209).

30

137.     On October 17, 2021, the Social Security Administration sent Mr. Hill a notice that TennCare would no longer cover Mr. Hill's Medicare Part B premiums.  (Id. ¶ 210).

138.     Ms. Noe visited Mr. Hill's account on TennCare's online portal, and the September 9, 2021 notice could not be found.  (Doc. No. 397 at 30:25–31:13).

139.     TJC contacted TennCare's Office of General Counsel about the loss of Mr. Hill's MSP benefits on October 27, 2021, November 2, 2021, and November 3, 2021.   (JX 44 ¶ 211).

140.     TennCare's Drew Staniewski responded on November 4, 2021, stating that TennCare stopped Mr. Hill's Medicare Part B buy-in, again due to TennCare's error, but promised the premiums for October and November 2021 would be reimbursed within 90 days.   (Id. ¶ 212).

141.     TennCare verified Mr. Hill's eligibility in the DAC category most recently on February 8, 2023.  (Id. ¶ 213).

142.     **Dr. William Gavigan** is the father, conservator, and caretaker for Plaintiff Jeanne Gavigan, a 34-year-old woman with Down Syndrome and other intellectual disabilities.  (Doc. No. 396 at 206:21–207:1)

143.     On December 1, 2016, Ms. Gavigan became eligible for Medicaid in the Institutional category.  Ms. Gavigan enrolled in ECF CHOICES on December 8, 2016. On January 10, 2022, TennCare transitioned her into the ECF At Risk eligibility category to reflect her enrollment in the ECF CHOICES program.  (JX 44 ¶ 403).

144.     In addition to her Medicaid coverage, Ms. Gavigan began receiving MSP benefits in the SLMB category on January 1, 2013.   (Id. ¶ 404).

145.     Although Ms. Gavigan is eligible for DAC Medicaid coverage, her current eligibility category is Institutional Medicaid with an ECF At Risk categorization, which is required for her to remain eligible for the ECF CHOICES program.   (Id. ¶ 405).

31

146.    If TennCare were to change Ms. Gavigan's eligibility category to DAC in TEDS, she would lose her eligibility for ECF CHOICES.    (Id. ¶ 406).

147.    On January 12, 2022, TennCare notified Ms. Gavigan and Dr. William Gavigan that it had received a reported change in Ms. Gavigan's income.  (Id. ¶ 407).

148.    On January 12, 2022, TennCare issued Ms. Gavigan a NOD containing the Stock Citation and informing her that it approved her for continued coverage and that her MSP coverage was ending.  (Id. ¶ 408; DX 556).

149.    **Carlissa Caudill**, 60, has stage 4 COPD, chronic pneumonia, a crushed hip, and a broken tailbone among other health conditions, which require ongoing medications, breathing treatments, and hospitalizations to avoid serious adverse health outcomes.  (Doc. No. 396 at 108:13–17, 112:6–113:13, 124:11–15).  She is a qualified individual with a disability for purposes of the ADA.  (JX 43 ¶ 105(c)).

150.    On May 30, 2019, TennCare issued a Pretermination Notice containing the Stock Citation informing Ms. Caudill that her coverage would end soon but that TennCare wanted more information to see if she still qualified because, according to the notice, she did not fall into a group covered by TennCare.  (JX 44 ¶ 147).

151.    TennCare informed Ms. Caudill that she had until June 19, 2019, to respond or her coverage would end.  (Id. ¶ 148).

152.    Ms. Caudill called TennCare Connect on June 13, 2019, and filed an appeal.  (Id. ¶ 149).

153.    TennCare issued an appeal acknowledgement letter to Ms. Caudill on June 19, 2019, incorrectly telling her that she appealed after her coverage had ended. (Id. ¶ 150).

154.    On June 26, 2019, Ms. Caudill called TennCare Connect to confirm that she had timely appealed because TennCare told her that her coverage would run out that day.  (Id. ¶ 151).

155.    On the call, Ms. Caudill told the TennCare representative that she was being treated for pneumonia again, that her doctor wanted her to come in for treatment, but that she could not go because she could not afford the doctor's visit and her insurance would soon run out.  The representative submitted an appeal follow-up for Ms. Caudill and told her that if TennCare granted her COB she would have no break in coverage.  (Id. ¶ 152).

156.    TennCare conceded it had erred on July 2, 2019, and granted Ms. Caudill backdated COB because she had timely appealed.  TennCare issued a corrected appeal acknowledgment letter informing Ms. Caudill that she had continuation of benefits on July 31, 2019.  (Id. ¶ 153).

157.    On June 24, 2019, TennCare received Ms. Caudill's responses to the Pre-Term Notice in which she answered "no" to all questions but one.  In response to the question about ongoing treatment or needed treatment for breast or cervical cancer, Ms. Caudill responded "yes," and wrote in the margin that she had stage-4 COPD and other health issues.  None of the questions asked whether she received SSI.  (Id. ¶ 154).

158.    On August 15, 2019, TennCare erroneously issued a NOD terminating Ms. Caudill's Medicaid coverage starting September 4, 2019.  Citing the Stock Citation, the NOD erroneously asserted that she was not in a group covered by TennCare.  (Id. ¶ 155).

159.    TennCare gave Ms. Caudill until September 4, 2019, to appeal with COB and until September 24, 2019, to file a timely appeal.  (Id. ¶ 156).

160.    Ms. Caudill called TennCare and filed a second appeal on August 19, 2019.  (Id. ¶ 157).

161.    In response to Ms. Caudill's first appeal, TennCare sent her a letter on July 31, 2019, mailed to her address of record to which all other notices had been sent, asking her to identify the mistake she thought TennCare had made in ending her coverage.  (Id. ¶ 158).

162.    TennCare gave Ms. Caudill until August 20, 2019, to respond to this letter.  (Id. ¶ 159).

163.    On September 6, 2019, TennCare closed her first appeal because, according to the notice from TennCare, she did not give TennCare the facts needed to work her appeal.  TennCare closed Ms. Caudill's appeal pursuant to its Valid Factual Dispute Policy.  (Id. ¶ 160).

164.    TennCare discontinued COB at this time.  (Id. ¶ 161).

165.    The appeal closure notice informed Ms. Caudill that if she disagreed with the decision, she could file a petition for review in Chancery Court.  (Id. ¶ 162).

166.    Ms. Caudill did not file a petition in Chancery Court.  (Id. ¶ 163).

167.    On September 6, 2019, Ms. Caudill called TennCare Connect to inquire about her appeal and the representative informed her that TennCare had ended her coverage. The TennCare Connect representative suggested she reapply.  (Id. ¶ 164).

168.    Ms. Caudill applied through the TennCare Connect Online Portal following this call, but TennCare denied her for failure to qualify for a group of eligibility.  (Id. ¶ 165).

169.    She then submitted another application through the TennCare Connect Online Portal on September 30, 2019.  (Id. ¶ 166).

170.    TennCare again erroneously denied her application on the false grounds that she did not group into any category of Medicaid eligibility.  (Id. ¶ 167).

171.    On October 17, 2019, TJC submitted a letter to TennCare Connect and TennCare Appeals on Ms. Caudill's behalf in her open second appeal informing TennCare that Ms. Caudill

34

receives SSI benefits and should be eligible for TennCare. The letter asked TennCare to determine why it is not recognizing her SSI eligibility. (Id. ¶ 168).

172.    On November 6, 2019, TennCare reviewed Ms. Caudill's SSI information and confirmed that, contrary to its prior determinations, Ms. Caudill received SSI-cash payments. TennCare created a new case to restore and backdate her SSI Medicaid coverage. (Id. ¶ 169).

173.    Due to TennCare's error, Ms. Caudill went without coverage between September 6, 2019, and November 6, 2019. TennCare closed the gap in her coverage retroactively when it approved her for continued coverage. (Id. ¶ 170).

174.    However, during the two-month period Ms. Caudill lacked coverage, she avoided care for her chronic conditions despite her doctor's orders otherwise because she did not believe that she could convince TennCare of her eligibility through an appeal, TennCare told her she may have to pay back covered care during an appeal, and she had no way to otherwise pay for the services. (Doc. No. 396 at 117:2–120:25)

175.    On November 12, 2019, TennCare sent Ms. Caudill a notice informing her that it would close her August 19, 2019 appeal because it had resolved the issue she had appealed in her favor. (JX 44 ¶ 172).

176.    TennCare most recently confirmed Ms. Caudill's eligibility in the SSI category on December 19, 2022. (Id. ¶ 173).

177.    **Curtis Amos** is 46 years old. He lives in Surgoinsville, Tennessee with his parents. He has been enrolled in TennCare since a car accident at age 20 left him paralyzed. He has a tracheostomy, is non-ambulatory and non-verbal and requires 11 hours of professional nursing services daily, which TennCare provides. (Id. ¶ 359).

35

178.    TennCare converted Mr. Amos's Medicaid eligibility into TEDS on May 18, 2019, in the Institutional Medicaid category.  His eligibility for QMB, a Medicare Savings Program benefit category, was also converted into TEDS.  (Id. ¶ 360).

179.    At the time of conversion, Mr. Amos was not enrolled in or receiving CHOICES services or any other waiver services, nor was he residing in a nursing home or any other institution.  (Id. ¶ 361).

180.    TennCare issued Mr. Amos an Additional Information notice requesting that he provide TennCare with an approved Pre-Admission Evaluation ("PAE") on March 15, 2021.  (Id. ¶ 362).

181.    The Additional Information notice sent to Mr. Amos instructed him to contact his Managed Care Organization for help obtaining a PAE.  (Id. ¶ 363).

182.    No PAE was submitted in response to this request.  (Id. ¶ 364).

183.    On December 15, 2022, TennCare issued a Notice of Decision informing Mr. Curtis that it approved him for continuation of TennCare coverage and QMB status.  TennCare sent a Patient Liability NOD to Mr. Amos on December 15, 2022, stating that, effective January 1, 2023, his financial liability would be $1253 per month—the amount of his monthly Social Security Disability benefits.  (Id. ¶ 365).

184.    Mr. Amos, through his mother Betty Amos, filed an appeal about his patient liability on January 4, 2023, and that same day Brant Harrell at TJC sent a letter to TennCare confirming the request for an appeal.  (Id. ¶ 366).

185.    TennCare resolved this appeal in Mr. Amos' favor after receiving additional information and determining that it relied on incorrect data. (Id. ¶¶ 367–70).

186. TennCare issued Mr. Amos a Change in Patient Liability Notice on January 31, 2023. (Id. ¶ 371).

187. TennCare sent an Appeal Resolution notice to Mr. Amos on February 15, 2023. (Id. ¶ 372).

188. On February 2, 2023, and April 6, 2023, two Additional Information Notices were issued to Mr. Amos requesting that he provide an approved PAE. (Id. ¶ 373).

189. Ms. Amos called TennCare Connect on her son's behalf on February 8, 2023, and April 13, 2023, to inquire about these notices and was advised both times that Mr. Amos needed to obtain an approved PAE and to contact his MCO BlueCare for assistance in obtaining that PAE. (Id. ¶ 374).

190. TennCare never received a PAE in response to either notice. (Id. ¶ 375).

191. TennCare issued a NOD to Mr. Amos on May 1, 2023, informing him his Medicaid coverage would ending on May 22, 2023, because he did not fall "in a group covered by TennCare or Cover Kids." (Id. ¶ 376).

192. Then, on May 9, 2023, TennCare issued a reinstatement notice to Mr. Amos, advising him that he would keep his coverage. (Id. ¶ 377).

193. TennCare made the same mistake again in June—it issued a NOD terminating coverage because Mr. Amos purportedly did not fall into any group covered by TennCare and then sent a Reinstatement Notice which purported to give him his coverage back. (Id. ¶ 378).

194. On August 15, 2023, a TennCare worker erroneously terminated Mr. Amos' TennCare coverage without notice. TJC discovered the termination when it checked Mr. Amos' online TennCare Connect account. (Id. ¶ 379).

37

195.    TJC filed an appeal through the Online Portal on Mr. Amos' behalf on August 24, 2023, nine days after TennCare erroneously terminated his coverage.  The appeal requested COB pending the appeal.  (Id. ¶ 380).

196.    On August 28, 2023, Brant Harrell at TJC emailed TennCare General Counsel Lindsey Huber and defense counsel in this case requesting their intervention to prevent the imminent disruption of Mr. Amos's nursing care.  (Id. ¶ 381).

197.    On August 29, 2023, Mr. Amos' TennCare MCO, BlueCare, informed TJC that TennCare had reinstated Mr. Amos's coverage. (Id. ¶ 382).

198.    TennCare granted Mr. Amos COB as part of his August 24, 2023 appeal and acknowledged his appeal in a notice issued August 30, 2023.  (Id. ¶ 383).

199.    TennCare reviewed Mr. Amos' August 24, 2023 appeal to see if it presented a valid factual dispute.  TennCare concluded it did, informed Mr. Amos that his appeal would be sent to a hearing, and sent him a Valid Factual Dispute Acknowledgement Notice on August 30, 2023.  (Id. ¶ 384).

200.    TennCare then closed Mr. Amos' appeal when a PAE was submitted for Mr. Amos, and TennCare found him eligible and approved him for IM coverage and enrolled him in CHOICES. (Id. ¶ 386).

D.      TennCare's Appeals Processes

i.      TennCare's Good Cause and Valid Factual Dispute Policies

201.    Enrollees who receive a NOD of an adverse action have 20 days to file their appeal to be eligible for COB and 40 days from the date on the NOD to file a timely appeal.  (Doc. No. 395-1 at 14:21–7; 28:4–8).

202.    Once the appeal is filed, TennCare sends it to its Registration Unit to determine if it was timely filed and timely filed for COB.  If the appeal is found to be timely for COB, it is sent

38

to the Resolution Unit. Otherwise, it is reviewed for "good cause." TennCare reviews appeals for good cause by reviewing the call notes, case notes, and any available documents to determine if such evidence would raise an allegation of good cause. If that review identifies potential good cause, the appeal is sent to the Legal Review Unit for an additional layer of review. The Legal Review Unit also makes the final determination on good cause. When an appeal is filed after the 40-day deadline, the same protocol is followed. However, if TennCare does not identify a good cause reason for the late appeal, it is closed as untimely. Throughout this process, TennCare does not contact the enrollee. (Id. at 29:1–31:5).

203. When an appeal is closed as untimely and without good cause, enrollees receive an Appeal Resolution letter which states: "Do you have a health, mental health, or learning problem or a disability? And did that problem make it hard for you to file your appeal on time? Or did something very bad happen to you or a close family member (like a serious illness or death)? If so, tell us in writing why you could not file your appeal on time. If we agree, your appeal may be reopened." (Id. at 32:9–32:22; DX 686 at 7).

204. The definition of good cause included in the Appeal Resolution Notice is narrower than the one TennCare actually applies and includes in its rules and regulations. (Compare Doc. No. 399 at 38:24–39:11, 40:2–6 ("Do you have a health, mental health, or learning problem or a disability and did that problem make it hard for you to file your appeal on time or did something very bad happen to you or a close family member, like a serious illness or death? If so, tell us in writing why you could not file your appeal on time. If we agree, your appeal may be reopened."); with Doc. Nos. 400 at 88:21–91:8, 395-1 at 31:13–18, Tenn. Comp. R. & Regs. 1200-13-19.02(20) (defining good cause as "A legally sufficient reason. In reference to an omission or an untimely

action, a reason based on circumstances outside the party's control and despite the party's reasonable efforts.")).

205. To grant an exception from the normal appeal filing deadline, TennCare merely requires an allegation, not proof, of some good cause reason. (Doc. No. 395-1 at 33:17–34:21).

206. However, TennCare does not consider an allegation that the appellant did not receive a notice as sufficient to grant that appellant good cause. (Id. at 34:25–35:1).

207. Between April 1, 2023, and December 7, 2023, TennCare granted approximately 95% of good cause requests that reached the Legal Review Unit. (Id. at 37:2–5).

208. Because TennCare never provides notice of good cause hearings, the only opportunity enrollees have to provide good cause is when making their appeal. (Doc. No. 399 at 33:5–34:9).

209. TennCare intentionally omits information related to its good cause exception from its NODs because TennCare believes that enrollees might wait to appeal late and therefore not automatically qualify for COB during the course of their appeal. TennCare offered no persuasive evidence to support its belief. The form TennCare provides for appeals does not ask a question specific to whether an enrollee had good cause for filing an untimely appeal. Likewise, TennCare Connect workers do not ask a question about good cause when a person appeals over the phone. Doing so makes sense, as Ms. Hagan admits, after Plaintiffs filed this lawsuit and due to Plaintiffs' concerns, TennCare added a question to the call script about whether the caller had trouble with their notices. (Id. at 15:20–16:21, 19:21–20:5, 41:18–23).

210. Only when enrollees receive an Appeal Resolution Notice does TennCare provide an enrollee a definition of good cause. But at that point, TennCare has already considered their

40

appeal, reviewed it for good cause, and closed their appeal as untimely and lacking good cause. (Doc. Nos. 399 at 13:24–16:12; 400 at 86:23–87:12; JX 27).

211.    Despite the existence of the Good Cause Policy, TennCare Connect workers are trained to suggest enrollees file a new application when they call TennCare Connect after receiving a NOD and are outside the window to file a timely appeal.  This is the case even when the caller states that they want to receive coverage as quickly as possible, when it is possible that the enrollee has a good cause reason for their late appeal, and when TennCare could suggest that they file a new application and untimely appeal simultaneously.  (Doc. No. 399 at 30:2–31:9).

212.    Once determined timely or deserving of good cause, appeals move to the Resolution Unit to either be resolved in the appellant's favor or escalated to the Legal Review Unit.  The Legal Review Unit applies TennCare's Valid Factual Dispute Policy ("VFD Policy"), set forth in TENN. COMP. R. & REGS. 1200-13-19-.05(2) and (3), to determine whether the appeal presents a valid factual dispute (i.e. one that, if resolved in the appellant's favor, would have prevented the state from taking the adverse action).  The VFD Policy acts as a mechanism to screen out appeals prior to a hearing.  To determine whether a valid factual dispute exists, the Legal Review Unit attorney reviews the allegations in the appeal as well as any documents on TEDS, including any call notes and case notes.  If the Legal Review Unit attorney identifies a valid factual dispute, the appeal is moved to the Scheduling Unit to be scheduled for a hearing before an administrative judge.  If the Legal Review Unit attorney does not identify a valid factual dispute, the appellant is sent a Valid Factual Dispute Additional Information letter asking for information that would raise a valid factual dispute.  (Doc. Nos. 395-1 at 13:4–17, 37:21–40:20; JX 43 ¶¶ 77, 81, 84).

213.    Approximately 70% of appeals are resolved before the VFD process.  (JX 43 ¶ 80).

41

214. As defined in TennCare regulations, a valid factual dispute is present when the appellant alleges a dispute with TennCare that, if resolved in favor of the appellant, would entitle the appellant to relief. (Id. ¶ 78).

215. Every appeal that TennCare closes without a hearing under the valid factual dispute policy is closed pursuant to 42 C.F.R. § 431.220(b). (Id. ¶ 82).

216. In closing appeals without a hearing under the valid factual dispute policy, TennCare relies on the requirements of eligibility to serve as the "Federal or State law requiring an automatic change adversely affecting some or all beneficiaries" within the meaning of § 431.220(b). (Id. ¶ 83).

217. When Plaintiffs filed this case, TennCare included language in NODs denying coverage that said: "If you still think we made a mistake about a fact, you can have a fair hearing. If you don't think we made a mistake about a fact, you can't have a fair hearing." (Id. ¶ 85).

218. 5,238 class members received this language. (Id. ¶ 86).

219. At the behest of the Court following a hearing in March 2022, TennCare replaced the language in those notices so that they now say: "You can have a fair hearing if you still think we made a mistake and, if you're right, you would qualify for our program." (Id. ¶ 87).

220. TennCare has not sent an updated, revised NOD to the 5,238 class members who received a NOD containing the prior iteration of the fair hearing language. (Id. ¶ 86).

221. If TennCare does not conclude, based on the appellant's filed appeal, that there is a valid factual dispute, TennCare now sends the appellant a Valid Factual Dispute Additional Information Notice ("VFD AI") requesting more information to clarify the factual mistake being alleged. (Id. ¶ 88).

222. If the request for additional information is not returned, or if it is returned and TennCare concludes there is still no identifiable valid factual dispute, the appeal will be closed for lack of a valid factual dispute. (Id. ¶ 89).

223. The notice closing an appeal for no valid factual dispute informs appellants that they can petition for review in Chancery Court if they disagree with TennCare's decision. (Id. ¶ 90).

ii. Plaintiffs' Experiences with TennCare's Good Cause and Valid Factual Dispute Policies

224. Returning to **Ms. Davis**' testimony, when she discovered TennCare terminated her coverage, a TennCare Connect representative informed her that TennCare had also terminated coverage for her whole family. The representative told Ms. Davis to reapply for coverage rather than appeal. (JX 44 ¶ 178).

225. Specifically, the TennCare Connect representative said, "So the only thing you can do right now would be to apply for [a] new application." That was not true. (Doc. Nos. 396 at 181:17–25; 395-1 at 29:1–31:5).

226. Ms. Davis submitted a new application over the phone that same day. (JX 44 ¶ 179).

227. On September 4, 2019, Ms. Davis called TennCare Connect again to file an appeal on behalf of herself and her family. The appeal acknowledgement letter informed the family that "you will not keep coverage during your appeal." (Id. ¶ 180).

228. On October 17, 2019, TennCare recognized it erred and granted Ms. Davis and her five children continuation of benefits. TennCare discovered its error after a good cause review of Ms. Davis's contention that TennCare had sent her and her family's notices to the wrong address. (Id. ¶ 181).

43

229.    Ms. Davis and her family went without coverage between August 26, 2019, and October 17, 2019, but TennCare retroactively filled the gap in their coverage when it granted the family COB.  (Id. ¶ 182).

230.    On November 22, 2019, TennCare's appeals group confirmed ongoing eligibility for Ms. Davis and her children.  (Id. ¶ 183).

231.    On November 26, 2019, TennCare issued a notice to Ms. Davis and her family, informing them that it agreed it had made an error.  The notice said, "We resolved your issue, and you will receive another letter," and that TennCare had closed the appeal.  (Id. ¶ 184).

232.    Also on November 26, 2019, TennCare issued a second notice to Ms. Davis and her family approving TennCare coverage for Ms. Davis and four of her children, but denying coverage for her son, Yestin Davis Lewis because he "already [received] TennCare or CoverKids in another case."  The notice stated that Yestin's last day of TennCare coverage would be November 22, 2019.  (Id. ¶ 185).

233.    Nevertheless, Yestin continued to have open coverage after November 22, 2019, in his own case.  (Id. ¶ 186).

234.    On March 6, 2020, TennCare issued another notice to Ms. Davis, retroactively approving TennCare coverage for Yestin in the same case as Ms. Davis as of August 28, 2019.  (Id. ¶ 187).

235.    TennCare verified Ms. Davis' eligibility most recently on September 23, 2023.  (Id. ¶ 188).

236.    Two of Ms. Davis's children, Treasure Woodard and Sky Woodard, are currently undergoing renewal.  (Id. ¶ 189).

44

237.    Ms. Davis's other three children, Yestin Davis Lewis, Zyan Davis-Warren, and Xylander Davis-Smith, had their eligibility most recently reverified on September 20, 2023.  (Id. ¶ 190).

238.    When Ms. Davis sought to have medically necessary surgery once TennCare restored her coverage, she could not because she was pregnant.  Ms. Davis had significant complications during pregnancy that would have been avoided if she had TennCare coverage because she would have received the surgery as originally scheduled.  (Doc. No. 396 at 196:14–203:22).

239.    Returning **Donna Guyton**'s testimony, TennCare selected her son, Patrick, for renewal in April 2023. On May 3, 2023, TennCare issued Patrick a NOD approving his continued TennCare coverage and his continued Medicare Part B Buy-in benefits.  (JX 44 ¶ 432; DX 617).

240.    TennCare did not send any notice before it stopped covering Mr. Guyton's Medicare premiums through the Medicare Buy-in.  Ms. Guyton first learned of TennCare's actions via a May 11 letter from Social Security.  (Doc. No. 396 at 62:23-25, 65:17-20, 94:10-18).

241.    On May 18, 2023, TennCare issued Patrick a Pre-Termination Notice and Questionnaire, informing Patrick that his TennCare coverage would soon be ending and asking him to complete the questionnaire.  This was in error.  A TennCare employee wrongly believed he belonged in a different eligibility category.  (JX 44 ¶ 433; DX 619; Doc. No. 400 at 54:2–8).

242.    On that same day, TennCare wrongly issued a NOD informing the Guytons that, based on a reported change in his income, Patrick was no longer eligible to have his Medicare premiums paid by the Medicare Savings Program ("MSP"), a program that Patrick had never been enrolled in.  His premiums had been covered by the Medicare Buy-in program, a separate program for which he remained eligible.  (PX 52; Doc. No. 396 at 93:8–16).

243. On May 25, 2023, Donna Guyton called TennCare Connect to appeal what she believed was a termination of Patrick's Medicare Part B benefits, although no termination notice had been issued at this point. (JX 44 ¶ 434).

244. On the phone call, Ms. Guyton mentioned Mr. Guyton's DIDD waiver, but the representative told her they had never heard of such a waiver. (Doc. No. 396 at 71:5–10).

245. On May 30, 2023, Ms. Guyton called TennCare Connect again, and the representative advised her to complete the May 18, 2023, Pre-Termination Notice, which she did on that same day. (JX 44 ¶ 434).

246. During this phone call, the representative told Ms. Guyton that she should note Mr. Guyton's eligibility pursuant to the DIDD waiver program in the margins of the Pre-Termination Questionnaire, which Ms. Guyton did. Ms. Guyton also faxed additional documents evidencing Mr. Guyton's eligibility in the program. (Doc. No. 396 at 71:1–73:6).

247. The questionnaire did not contain questions that would enable enrollees to identify themselves as enrolled in the DIDD waiver. (Id. at 70:23–25; DX 619).

248. On the same questionnaire, Ms. Guyton also noted that Mr. Guyton had received SSI and currently received Social Security. From this information, one could infer his DAC eligibility. (Doc. No. 396 at 71:23–73:20).

249. On June 1, 2023, TennCare mailed the Guytons a separate VFD AI. (JX 44 ¶ 435).

250. Ms. Guyton did not respond to the notice because she believed she had already provided proof of Mr. Guyton's eligibility and had no additional information to add beyond what she had already submitted in the questionnaire. (Doc. No. 396 at 75:1–11).

251. On June 9, 2023, TennCare issued a NOD to Mr. Guyton informing him that his TennCare coverage would end on June 29, 2023. (JX 44 ¶ 437). The NOD stated that Mr. Guyton

46

did not qualify because, "The monthly income limit for the kind of TennCare Medicaid you get is $914.00." (DX 624). It did not state what "kind of TennCare Medicaid" he could get. The NOD also stated that, "Reasons you can have a fair hearing may include: Your income is less than $914.00." Mr. Guyton's income did indeed exceed $913.99 but did not exceed the limits for the DAC and DIDD Waiver. (Doc. No. 396 at 76:7–21, 66:15–67:9, 105:18–106:2).

252.    On June 16, 2023, TennCare closed the May 25, 2023 appeal for failure to establish a valid factual dispute. (JX 44 ¶ 436).

253.    Also on June 16, 2023, Ms. Guyton filed an appeal on Mr. Guyton's behalf over the phone with TennCare Connect regarding the termination of his TennCare coverage. Ms. Guyton filed a second appeal that same day regarding a denial of Mr. Guyton's MSP coverage. (Id. ¶ 438).

254.    Because the termination appeal was filed before he lost his TennCare coverage, Mr. Guyton kept coverage during his appeal. (Id. ¶ 439).

255.    On July 10, 2023, TennCare issued a NOD approving Mr. Guyton for ongoing TennCare eligibility, informing him he qualified to keep his Part B buy-in, and again denying MSP benefits due to his income. (Id. ¶ 440).

256.    On July 19, 2023, TennCare closed Mr. Guyton's appeal regarding the termination of his TennCare coverage because TennCare agreed it had made a mistake and resolved the appeal in Mr. Guyton's favor. (Id. ¶ 441).

257.    TennCare closed Mr. Guyton's appeal from the denial of MSP coverage on July 19, 2023, after it received a request to withdraw that appeal from his family. (Id. ¶ 442).

258.    Sadly, Mr. Guyton passed away in the hospital on July 27, 2023. (Id. ¶ 443).

47

259.    **Samantha Turner** and her husband have been on TennCare at least since 2014 and their three children: Jackson, Annaleigh, and Fionn, have been on the program since they were born.  (Doc. No. 396 at 146:5–25).

260.    The Turners' oldest child, Jackson, lost coverage in July 2018 for failing to respond to a renewal packet sent to him as part of the prior redetermination process.  (JX 44 ¶ 297).

261.    The family was diligent about checking their mail—even when they were temporarily displaced—and Ms. Turner maintains she never received a renewal packet in Summer 2018.  (Doc. No. 396 at 153:17–154:18).

262.    On March 25, 2019, Ms. Turner called TennCare Connect after learning from Jackson's pediatrician that he did not have health insurance.  She told the representative she had "received no letter or anything else stating that he was discontinued."  (JX 44 ¶ 298).

263.    On the same March 25, 2019 call, Ms. Turner appealed Jackson's termination.  (Id. ¶ 299).  During the call, the TennCare worker did not mention to Ms. Turner that she could state reasons for filing her appeal untimely or provide proof of any kind.  (PX 100).

264.    Ms. Turner did not know of any exception for filing a late appeal.  (Doc. No. 396 at 155:13–115).

265.    On April 22, 2019, TennCare sent Ms. Turner a notice informing her that it closed her appeal as untimely.  (JX 44 ¶ 299).

266.    On May 2, 2019, Ms. Turner called TennCare Connect and submitted an application for Medicaid coverage for Jackson.  (Id. ¶ 300).

267.    On May 6, 2019, TennCare mailed an Additional Information notice seeking proof of income for Trenton and Samantha Turner, and citizenship information for Jackson Turner to

verify that Trenton Turner, Samantha Turner, and Annaleigh Turner still qualified for coverage and to assess Jackson Turner for coverage.  (Id. ¶ 301).

268.    A response was due by May 26, 2019.  (Id. ¶ 302).

269.    TennCare mailed the notice to their address of record, which is the same address that was provided on the application.  (Id.  ¶ 303).

270.    On May 29, 2019, Ms. Turner called TennCare Connect to ask about the status of her application for Jackson. She told the representative she had not received anything from TennCare since she reapplied for him. The representative told her the application could take up to 45 days. The representative did not mention the additional information notice.  (Id. ¶ 304).

271.    Fionn Turner, a newborn, was added to the family's case on June 7, 2019, after a May 2, 2019 call after TennCare acknowledge it had wrongly sorted his case.  (Id. ¶ 305).

272.    When TennCare received no response to the Additional Information notice, it reauthorized coverage for Trenton, Samantha, and Fionn Turner.  (Id. ¶ 306).

273.    According to the NOD, TennCare denied Jackson Turner coverage because it did not receive information it had requested.  (Id. ¶ 307).

274.    The NOD also informed the family that because the requested information had not been returned, Annaleigh Turner's coverage would be ending on June 27, 2019, unless she appealed by that date.  (Id. ¶ 308).

275.    Annaleigh and Jackson Turner were both denied in error due to a defect in TEDS causing TEDS to not automatically grant Transitional Medicaid to children when Transitional Medicaid is authorized for their parents.  Fionn Turner's eligibility issues were the result of worker error.  (Id. ¶ 309).

49

276. Ms. Turner called TennCare Connect on June 18, 2019, and filed appeals on behalf of both children. She told the representative she had not received an additional information notice. When asked to state the reason for the appeal, she said, "I don't know what you want me to say, we're eligible. If my husband and I and my other kid gets it, then my other two kids should have insurance as well." (Id. ¶ 310).

277. After initially being denied continuation of benefits, Annaleigh received continuation of benefits on July 17, 2019, with a corrected appeals acknowledgment notice issued on July 31, 2019, informing the family of that coverage. (Id. ¶ 311).

278. On August 1, 2019, both Annaleigh Turner and Jackson Turner were sent VFD AI asking them to tell TennCare what mistake they believe TennCare made. (Id. ¶ 312).

279. Those notices stated that TennCare would terminate their coverage because they did not provide the requested information by the May 26, 2019 deadline. The notices also asked them to tell TennCare if they did in fact send that information in or if they did not get the request for that information. (Id. ¶ 313).

280. They were given until August 21, 2019, to respond to this notice, but the Turners did not respond. (Id. 44 ¶¶ 314–15; DX 410 at 4; DX 411 at 4).

281. On August 28, 2019, TennCare closed Jackson Turner's appeal, and issued an Appeal Closure notice on August 30, 2019, for failing to provide information in response to the VFD AI notice. (JX 44 ¶ 316).

282. On August 30, 2019, TennCare closed Annaleigh Turner's appeal and discontinued her COB on September 4, 2019, for failing to provide information in response to the VFD AI notice. (Id. ¶ 317).

283.   On August 30, 2019, Trenton Turner called and spoke with the TennCare appeals group.  Mr. Turner told the appeals clerk that the Turners had just received the VFD AIs after the deadline to respond.  TennCare told Mr. Turner the appeals were closed, but Mr. Turner said he would send the requested information anyway.  (Id. ¶ 318).

284.   The Turners then submitted a letter on September 3, 2019, signed by both Mr. and Ms. Turner from their shared email address, describing that they did not receive notice of Jackson's termination and explaining both children's eligibility for TennCare.  (Id. ¶ 319).

285.   On August 30, 2019, TennCare issued the family another notice requesting income information for the family, this time with a due date of September 19, 2019.  (Id. ¶ 320).

286.   TennCare received proof of income for Samantha Turner on September 18, 2019, but not for Trenton Turner.  (Id. ¶ 321).

287.   On September 30, 2019, a member portal application was filed by TJC for Jackson and Annaleigh Turner. (Id. ¶¶ 322, 329; Doc. No. 396 at 163:21–22; 164:20–24; 173:6–7).

288.   TennCare mailed an Additional Information notice requesting income and tax information for Trenton Turner on November 15, 2019, with a December 5, 2019, due date.  (JX 44 ¶ 323).

289.   On the December 5, 2019, due date, a statement was submitted that indicated that Trenton is a full-time student and stay-at-home father.  (Id. ¶ 324).

290.   Another Additional Information notice requesting Trenton Turner's income and tax information with a December 30, 2019 due date was issued.  (Id. ¶ 325).

291.   There was no response to the last Additional Information notice, but on January 8, 2020, Annaleigh Turner's eligibility was automatically approved for Child-MAGI coverage starting February 1, 2020.  (Id. ¶ 326).

51

292. On January 13, 2020, Samantha Turner called TennCare Connect, which is the first contact that TennCare Connect had with the family since the appeals for a failure to respond were filed on June 18, 2019. The TennCare Connect agent offered to file a delayed application appeal for her, but she declined and said she would have TJC do that. (Id. ¶ 327).

293. On January 21, 2020, the case was updated to reflect Trenton Turner's current job status. (Id. ¶ 328).

294. On February 18, 2020, a representative from TJC reached out to TennCare's General Counsel and provided information about this case. (Id. ¶ 329).

295. Finally, on February 19, 2020, TennCare recognized its ongoing multiple errors and approved Jackson Turner for Child-MAGI coverage with an effective date of September 30, 2019, and also backdated Annaleigh Turner's coverage to September 30, 2019, as well. Then, on April 28, 2020, Annaleigh's coverage was backdated to fill remaining gap. (Id. ¶ 330).

296. Jackson was without coverage from July 19, 2018, until February 19, 2020, but when TennCare found him eligible on February 19, 2020, it backdated his coverage to his September 30, 2019 application. Annaleigh was without coverage from September 3, 2019, until January 8, 2020. (Id. ¶ 331).

297. Each of the Turner family's eligibility was reauthorized on March 6, 2023. (Id. ¶ 332).

298. **Keith Cottle** is the father of Plaintiff Journey Cottle, who has Down's Syndrome, leukemia, and other significant developmental disabilities. (Doc. No. 397 at 56:12–17, 58:4–59:15).

299. Journey Cottle has had TennCare coverage since 2018. (Id. at 62:10–18).

300.    Keith Cottle is responsible for Journey's TennCare coverage, and consistently made his best effort to review and respond to any TennCare mail immediately (Id. at 62:19–21; 63:11–64:9).

301.    In spring 2023, Mr. Cottle received requests from TennCare for information concerning Journey's eligibility, and, on March 23, 2023, and April 6, 2023, Mr. Cottle faxed the requested information to TennCare.  (Id. at 64:11–68:25).

302.    When Mr. Cottle faxed the requested information for the second time, he was on the phone with a TennCare representative and confirmed that he had faxed the information to the correct number.  (Id. at 69:23–25; 70:16–18).

303.    On April 12, 2023, TennCare issued an Additional Information Notice requesting proof of earned income and vehicle registration information for Keith Cottle. The AI notice indicated this information was needed for to determine if Journey Cottle still qualified for coverage.  (JX 44 ¶ 387),

304.    This Additional Information notice was mailed to the Cottle's address of record, which is their current address.  (Id. ¶ 388).

305.    On May 10, 2023, a NOD for failure to provide requested information was issued to Journey indicating her last day of coverage would be May 30, 2023. The NOD also stated that an appeal needed to be filed by that date for Journey to keep her coverage during the appeal and by June 19, 2023, for the appeal to be timely.  TennCare mailed the NOD to the Cottle's address of record, which is their current address.  (Id. ¶ 389).

306.    No appeal was filed based on the May 10, 2023 NOD.  (Id. ¶ 390).

307.    Because no appeal was filed, Journey's coverage ended on May 30, 2023, as indicated in the May 10, 2023 NOD.  (Id. ¶ 391).

53

308.     Mr. Cottle found out that Journey had lost coverage sometime in June when the diapers he ordered for Journey did not arrive.   The diaper supplier informed Mr. Cottle that insurance had denied the claim.  (Id. ¶ 392).

309.     On June 26, 2023, Mr. Cottle called TennCare Connect.  He told the TennCare Connect representative that he did not receive any NOD related to his daughter's coverage and he had discovered that TennCare had an incorrect mailing address associated with her account—93 Cumberland Drive instead of the correct address of 93 Cumberland View Drive.  (JX 44 ¶ 393; Doc. No. 397 at 78:7–79:9).

310.     The TennCare Connect representative suggested that he reapply, which he did by phone at that time.  (JX 44 ¶ 393; Doc. No. 397 at 79:14–80:7).

311.     During that call, Mr. Cottle stated that he wished to do "whatever is expedient . . . to assure that [he] get[s] insurance for [his] daughter."  (Doc. No. 397 at 80:4–6).

312.     Mr. Cottle did not recall whether the TennCare Connect representative informed him that he could maintain Journey's coverage for the duration of an appeal but states that he would have accepted that option had he been told that was possible.  (Id. at 90:3–5).

313.     The TennCare Connect representative mistakenly entered the incorrect address with that new application, omitting the word "View" from the Cottles' address.  (JX 44 ¶ 394).

314.     That new application resulted in TennCare issuing an Additional Information notice to Keith Cottle on June 30, 2023.  (Id. ¶ 395).

315.     This Additional Information notice was yet again sent to the wrong address from the June 26, 2023 application.  (Id. ¶ 396).

316.     The Cottles' address was updated on a call to TennCare Connect on July 10, 2023, back to the correct address used for all other notices.  (Id. ¶ 398).

54

317.    Following that July 10, 2023 call, another Additional Information notice was issued to Keith Cottle on July 14, 2023.  (Id. ¶ 399).

318.    This Additional Information notice requested the same information as the June 30, 2023 notice, in addition to informing Cottle that with respect to the request for ECF CHOICES: "you must complete an online self-referral at: https://tpaes.tenncare.tn.gov/tmtrack/ecf/index.htm. For help with a referral call the Department of Intellectual and Developmental Disabilities for free at: In west TN call 866-372-5709. In [M]iddle TN call 800-654-4839. In [E]ast TN call 888-531-9876."  This notice was sent to the correct address, which is the Cottles' current address.  (Id. ¶ 400).

319.    On August 1, 2023, TJC reached out to TennCare by letter requesting assistance with Journey's case given her serious medical conditions. In response, as an accommodation, Journey's coverage was reinstated on August 3, 2023. (Id. ¶ 401).

320.    TennCare reevaluated Journey's eligibility and recognized that she was eligible for continued Medicaid coverage in the Child MAGI category.   (Id. ¶ 402).

321.    Plaintiff **Elijah Love's** birth was reported to TennCare on July 30, 2019 through the TEDS partner portal, TennCare Access, which is a portal through which providers such as hospitals can input presumptive eligibility information for members.  (Id. ¶ 228).

322.    Elijah was sent a NOD approving his new coverage and providing a start date that was not his date of birth.  That notice gave until September 17, 2019 to file an appeal challenging the start date of coverage.  (Id. ¶ 229).

323.    Although a mailing and a separate residential address were submitted on the partner portal application for Elijah, at that time, TEDS only uploaded the residential address into the case

file. As a result, TennCare erroneously did not mail the notice to Elijah's mailing address. Instead, this notice was mailed to Elijah's residential address. (Id. ¶¶ 230–31).

324. Ms. Leavell called TennCare Connect on January 14, 2020 and filed an appeal. (Id. ¶ 232).

325. On the call, Ms. Leavell informed the representative that Elijah could not get his immunizations due to the lack of coverage, that she had to pay $200.00 for the shots, and that there was an outstanding balance of $2,647.95 at the pediatrician's office, which she could not pay. (Id. ¶ 233).

326. That appeal was closed on January 21, 2020 as untimely. When the appeal was filed, however, no allegation was made of an incorrect address. (Id. ¶ 234).

327. As of January 21, 2020, Ms. Leavell received other non-TennCare mail at her correct address. (Id. ¶ 235).

328. On February 28, 2020, TJC sent a letter to TennCare Connect and TennCare Eligibility Appeals asking that the appeal for Elijah be reopened to address the effective date issue because they contended that his mother had not received appropriate notice. (Id. ¶ 236).

329. On March 4, 2020, TennCare recognized its computer error in Elijah's case and corrected the effective date of his coverage to his date of birth. (Id. ¶ 237).

330. Elijah's eligibility was most recently reauthorized in the Child-MAGI category on June 1, 2023. (Id. ¶ 238).

331. Returning to **Dr. Gavigan**'s testimony, he filed an appeal on his daughter's behalf on January 31, 2022, and because the appeal was timely, his daughter received continued coverage while the appeal was pending. (Id. ¶ 409).

56

332.     As part of his appeal, Dr. Gavigan sent a letter stating that his daughter qualified for coverage, as she had previously received SSI and was considered DAC eligible. (Doc. No. 396 at 210:12–213:12).

333.     On February 22, 2022, TennCare issued two notices regarding her appeal. The first was a notice stating that TennCare had received the appeal and was reviewing it. The second notice was a VFD AI requesting additional information from Ms. Gavigan in order to process her appeal. (JX 44 ¶ 410).

334.     Dr. Gavigan reiterated to TennCare that his daughter qualified as a previous recipient of SSI and was considered DAC eligible. (Doc. No. 396 at 215:20–25).

335.     Dr. Gavigan did not know that TennCare had moved his daughter to SLMB and did not mention her income during the appeals process. (Id. at 220:16–21).

336.     On March 14, 2022, TennCare closed her appeal for failure to raise a VFD. That same day, TennCare issued an Appeal Resolution notice informing Ms. Gavigan that her appeal had been closed. (JX 44 ¶ 411).

337.     On April 13, 2022, the Social Security Administration sent Dr. Gavigan a notice stating that his daughter's Medicare Part B premiums would be deducted from her monthly SSA benefits going forward. (Id. ¶ 412).

338.     This notice also informed Dr. Gavigan that SSA would be recouping the Medicare premium due for April 2022. (Id. ¶ 413).

339.     TennCare did not explain its refusal to continue paying Ms. Gavigan's Medicare premiums or afford Dr. Gavigan a choice of her eligibility category. (Doc. No. 396 at 216:13–2017:8; 220:25–221:21).

57

340.    **Dorian Heath Stevens** is a friend of Plaintiff **Johnny Walker**.  (Doc. No. 397 at 181:7–12).

341.    On June 11, 2019, a Pretermination Notice was mailed to Mr. Walker at his address of record informing him that his coverage would be ending soon but that TennCare wanted more information to see if he could keep coverage.  TennCare's stated reason for terminating his coverage was that Mr. Walker did not group into a TennCare covered category.  (JX 44 ¶ 345).

342.    Mr. Walker was given until July 1, 2019 to respond to the Pretermination Notice.  (Id. ¶ 346).

343.    On July 5, 2019, a NOD was mailed to his address of record informing him that because he did not respond to the letter sent to him asking for more information to determine if he qualified, his coverage would end on July 25, 2019.  Information on how to appeal, the need to appeal by July 25, 2019 to keep his coverage, and the need to appeal by August 14, 2019 for the appeal to be timely were included in the NOD.  (Id. ¶ 347).

344.    When no response to the Pretermination Notice was submitted and no appeal was filed, Mr. Walker's coverage ended on July 25, 2019.  (Id. ¶ 348).

345.    On August 20, 2019, Mr. Walker's sister Lori called TennCare Connect with Mr. Walker and filed an appeal over the termination of his coverage and requested that the Pretermination Notice be re-mailed to him because she alleged that Mr. Walker had not received it previously.  TennCare re-mailed the Pretermination Notice on August 22, 2019.  (Id. ¶ 349).

346.    During this phone call, Lori stated, "He has [TennCare] due to his disability and it should be continued."  (DX 442 at 5:52–6:16).

347. Also, during the phone call, Lori was never told about a good cause exception or asked to provide a reason for Mr. Walker's failure to timely respond to the Pretermination Notice. (See generally DX 442).

348. On September 12, 2019, Mr. Walker and Stevens called TennCare Connect asking if Mr. Walker could have coverage while appealing. (JX 44 ¶ 350).

349. Mr. Stevens was not told of any exception that allowed for filing a late appeal. (Doc. No. 397 at 190:10–25).

350. The response to the Pretermination Notice was received by TennCare on September 17, 2019, which was after Mr. Walker's coverage was terminated on July 25, 2019, but within 30 calendar days of the remailed Pretermination Notice. (JX 44 ¶ 351).

351. On September 23, 2019, Mr. Walker's appeal was closed as untimely because it was filed past the 40-day deadline for filing a timely appeal. (Id. ¶ 352).

352. On October 4, 2019, an application was filed for Mr. Walker through the TennCare Connect member portal. (Id. ¶ 353).

353. Mr. Walker's application was denied, and he was issued a denial notice on October 9, 2019, stating Mr. Walker did not group into any category of Medicaid eligibility. (Id. ¶ 354).

354. On October 10, 2019, TJC wrote to TennCare's General Counsel about Mr. Walker's case in which it was asserted that Mr. Walker has received SSI since the age of 17 and that because Mr. Walker receives SSI benefits, he should be eligible for Medicaid on that basis. (Id. ¶ 355).

355. TennCare reviewed this information, and, on October 11, 2019, recognized its error, and Mr. Walker's SSI Medicaid coverage was restored and backdated to the date of

termination. Mr. Walker went without coverage between July 25, 2019, and October 11, 2019. (Id. ¶ 356).

356.    When TennCare later reinstated his coverage, it backdated his coverage to July 25, 2019.  (Id. ¶ 357).

357.    Mr. Walker was most recently reauthorized for coverage in the SSI category on December 19, 2022.  (Id. ¶ 358).

358.    **Jeffery King**'s wife, Jennifer King, and son, Michael King, have TennCare coverage as active SSI-cash recipients.  (Id. ¶ 214).

359.    At the time Jeffrey King's eligibility data was converted into TEDS, he was eligible in the Caretaker Relative category.  (Id. ¶ 215).

360.    Jeffery King's daughter, Madison Stiffler, and other son, Daniel Stiffler, had eligibility in the Child-MAGI category at the time of eligibility data conversion into TEDS.  (Id. ¶ 216).

361.    On July 11, 2019, TennCare issued a renewal packet for Jeffrey King and Madison and Daniel Stiffler.  (Id. ¶ 217).

362.    The renewal packet gave the family until August 20, 2019, to respond.  (Id. ¶ 218).

363.    According to Mr. King, he received the renewal packet on August 26, 2019.  (Doc. No. 397 at 154:16–25).

364.    On August 26, 2019, Jennifer King called TennCare Connect to complete the renewal packet over the phone.  TennCare's records, dated August 26, 2019, reflect that Jennifer King "called to complete late renewal" and it was "completed and ran for eligibility," meaning it was processed for eligibility.  (Id. ¶ 219).

60

365.     Based on the discussion with TennCare Connect on August 26, 2019, the Kings were under the impression that they would still have continued healthcare coverage.  (Doc. No. 397 at 157:2–11).

366.     On August 28, 2019, TEDS issued a NOD stating that coverage was terminating on September 17, 2019 for Jeffrey King, Madison Stiffler and Daniel Stiffler unless they appealed by that date. The stated reason for termination in the NOD was, "You did not respond when we told you it was time to renew your benefits." (JX 44 ¶ 220).

367.     Jeffery King contends that he did not receive the August 28, 2019, NOD.  (Doc. No. 397 at 162:17–18).

368.     The Kings did not appeal the NOD by September 17, 2019.  (Id. at 170:2–4).

369.     On September 24, 2019, the family went to the pharmacy and learned that Mr. King, Daniel, and Madison had lost their coverage. Jennifer King called TennCare that day. Jennifer King filed an appeal on behalf of her husband and children during the call but was too late for COB.  (JX 44 ¶ 221).

370.     While on the phone with a TennCare Connect representative on September 24, 2019, Ms. King reiterated that she did not receive the renewal packet until after the response deadline.  The TennCare Connect representative did not reference the good cause exception but stated that an appeal could take up to 90 days to complete.   (Doc. No. 397 at 158:8–160:21).

371.     The Kings were neither informed of nor offered options to keep their coverage during the appeal; they also did not receive a hearing from TennCare of any kind.  (Id. at 116:9–10).

372.     The Kings reached out to the TJC for assistance.  (Id. at 163:22–164:5).

373. On December 17, 2019, the Appeals Resolution team reviewed the case, processed the renewal packet response that had been submitted on August 26, 2019, and approved coverage for Jeffery, Madison, and Daniel and backdated coverage. (JX 44 ¶ 222).

374. The family was without coverage from September 17, 2019, to December 17, 2019. (Id. ¶ 223).

375. On December 26, 2019, their appeals were closed because they had completed renewal on August 26, 2019, and were eligible for TennCare. (Id. ¶ 224).

376. Starting April 1, 2021, Jeffrey King became eligible in the SSI category. He remains eligible in that category today, and TennCare authorized his eligibility as recently as February 25, 2023. (Id. ¶ 225).

377. Daniel Stiffler's eligibility in the Child-MAGI category was reauthorized most recently on August 30, 2023. (Id. ¶ 226).

378. At the time the parties entered their stipulations, Madison Stiffler had aged out of the Child-MAGI category and her eligibility was set to terminate on November 14, 2023, for failure to respond to the Renewal Packet issued on September 8, 2023, if no appeal is filed. An appeal has been filed on her behalf. (Id. ¶ 227).

379. On April 11, 2019, **Skai Anders**'s mother, Chelsea Henegar, called TennCare Connect to update Skai's social security number, change her address, and report an income change. (JX 43 ¶ 128).

380. Following this call, Skai was mailed an Additional Information request notice telling her family they needed to verify her father's income and that this information was due on May 5, 2019. (Id. ¶ 129).

381.    When no response to this request for income verification was received, on July 3, 2019, TennCare mailed Skai a NOD informing her family that coverage would end on July 23, 2019 if an appeal was not filed by that date and that they had until August 12, 2019 to timely file an appeal.  (Id. ¶ 130).

382.    Skai should have been granted Transitional Medicaid rather than being terminated, but a computer error in TEDS led to her termination.  (Id. ¶ 131).

383.    Ms. Henegar filed an appeal by phone.  She explained that she had not received a notice that Skai's coverage was ending.  When asked to give additional information for the appeal, she said, ". . . you can say she has spina bifida and a shunt so we have to have insurance. We go to the hospital at least once a month.  So, like this MRI tomorrow—I've got to have something for the MRI."  (Id. ¶ 132).

384.    Ms. Henegar also informed the representative that Skai's father had moved out and that she was a single parent.  (Id. ¶ 133).

385.    Ms. Henegar filed an appeal on the July 24, 2019 call after the deadline for COB, and, as a result, Skai would not keep coverage during the appeal.  (Id. ¶ 134).

386.    On August 15, 2019, Ms. Henegar called TennCare Connect to ask about the status of the appeal because Skai had a surgery coming up.  The representative said she could reapply for coverage, and she did so on the phone with a second representative.  On the phone, Ms. Henegar stated again that she had not received paperwork from TennCare in advance of Skai's termination. She disclosed again that Skai's father was no longer living with them.  (Id. ¶ 135).

387.    Speaking with a third representative on August 15, 2019, Ms. Henegar again said she had not received the termination paperwork.  The representative informed Ms. Henegar that

63

Skai was terminated for not providing income information for Skai's father. Ms. Henegar again explained that Skai's father was not living with them. (Id. ¶ 136).

388.    While Skai's appeal was in progress, on September 20, 2019, TennCare Connect received a letter from TJC regarding Skai alleging that she had not received the request for additional information and providing some of the requested income information for Skai's father. (Id. ¶ 138).

389.    TJC subsequently sent a letter to TennCare Connect on October 18, 2019, alleging that Skai had not received the NOD or several other notices. (Id. ¶ 139).

390.    TJC emailed the TennCare Appeal Clerk on October 31, 2019, to inquire about the status of Skai's appeal, which had gone beyond the 90-day deadline for resolution. (Id. ¶ 140).

391.    On November 4, 2019, the TennCare Appeals group granted a good cause exception because the appeal was taking more than 90 days to process, and COB was added to Skai's appeal. (Id. ¶ 141).

392.    Skai was without coverage between July 24, 2019, when coverage ended and November 4, 2019, when COB resumed and was backdated. (Id. ¶ 142).

393.    On November 6, 2019, after determining Skai's father had been reported as out of the household so his income was no longer needed and after verifying Ms. Henegar's income through an online data source, Skai was reapproved for Child-MAGI coverage with her coverage backdated to July 24, 2019. (Id. ¶ 143).

394.    On December 10, 2019, TennCare received information from the SSA that Skai was approved for SSI-cash benefits starting January 4, 2019. Upon receipt of this information, TennCare made Skai eligible in the SSI Medicaid category. (Id. ¶ 144).

395. TennCare reverified Skai's eligibility most recently on December 19, 2022, in the SSI category. (Id. ¶ 145).

396. Skai is expected to not have to go through the standard Annual Renewal process because she is eligible in the SSI category. (Id. ¶ 146).

iii. Fair Hearings

397. If TennCare reviews an appeal and determines that the appeal is appropriate for a fair hearing, TennCare's policy is to send the enrollee who appealed a Notice of Hearing informing them of the date and time and explaining how to request an in-person hearing or contact TennCare with questions. (Id. ¶ 91).

398. CMS's temporary waiver of TennCare's obligation under 42 C.F.R. § 431.244(f) to take final administrative action within 90 days of an appeal under Section 1902(e)(14)(A) of the Social Security Act is subject to conditions stated in CMS's June 14, 2023 letter to TennCare. Relevant here, TennCare must provide the enrollee COB pending resolution of the appeal. The temporary waiver currently remains in effect until February 28, 2025 unless CMS renews or extends it. (JX 43 ¶¶ 92–93).

399. It is TennCare's policy to resolve all appeals within 90 days and, when that is not possible, to provide continuation of benefits pending appeal. (Id. ¶ 95).

400. After the national emergency, during the ongoing restarted Annual Renewal Process, if an appeal does take more than 90 days to resolve, TennCare's policy is to automatically grant the appellant continuation of benefits pending resolution of the appeal. (Id. ¶ 96).

401. **Chris Holt** is the current Deputy Director of the Eligibility Appeals Operation Group ("AOG") and has worked at TennCare since February 2014. In this role, Mr. Holt oversees and manages TennCare's Medicaid eligibility appeals process, eligibility appeals call center,

65

Appeals Quality Improvement and Compliance Unit, and eligibility appeals module within TEDS. (Doc. No. 395-1 at 6:17–8:12).

402.    Mr. Holt was unable to provide in-person testimony at trial.

403.    The parties agreed that his deposition transcript (Doc. No. 395-1) would be submitted for the Court's consideration. The Court finds Mr. Holt's testimony largely credible and concludes that his deposition supports the following findings of fact by a preponderance of the evidence.

404.    Roughly seventy percent of appeals are made over the phone through TennCare Connect. TennCare does not send appellants a hard copy or post on the TennCare Connect portal the contents of any appeal made over the phone. Thus, any Tennessee citizens who rely on TennCare Connect to file their appeal do not know the specific content of their appeal as filed by the TennCare Connect representative. (Doc. No. 395-1 at 9:10–22; 28:9–19).

405.    Not all appeals timely filed or granted good cause proceed to a hearing. Some appeals are withdrawn before a hearing can occur and others are resolved in favor of the appellant before a hearing can take place. In the latter circumstance, TennCare determines whether the issues raised in the appeal have been completely resolved and provides a Resolution Notice informing the appellant that they may call TennCare if they believe their appeal has not been fully resolved. (Doc. No. 395-1 at 10:8–12:1).

406.    Between March 19, 2019, and October 31, 2022, TennCare received 88,604 timely filed termination and redetermination related appeals. TennCare conducted 6,706 administrative appeals hearings. Out of the remaining, 81,898 appeals, 74,629 appeals or roughly 84% of all appeals were resolved in favor of the appellant without a hearing and 1,502 appeals or about 1.8% of all appeals were withdrawn. (Doc. No. 395-1 at 17:11–20:9).

66

407.    Any appeal that reaches a hearing requires additional time to after the hearing for a written order to be prepared by the administrative judge.  Administrative judges do not prepare final written orders prior to a hearing and generally publish their order within five business days of a hearing.  (Doc. No. 395-1 at 12:2–13:3).

408.    Of the 6,706 appeals that proceeded to a hearing, 3,206 did not proceed to a hearing within 90 days.  Because hearings in those 3,206 cases did not occur within 90 days, final written decisions on those appeals were necessarily announced at least 90 days after the appeal was filed. (Doc. No. 395-1 at 22:8–24).

409.    To the best of Mr. Holt's knowledge, 800 appellants during that period did not receive COB after their appeals went beyond 90 days.  (Doc. No. 395-1 at 24:2–8).

410.    During that same period, 5,767 timely appeals did not receive a hearing, were not resolved in favor of the appellant, and were not withdrawn.  (Doc. No. 395-1 at 21:7–14).

iv.    Plaintiffs' Experiences Related to Fair Hearings

411.    Returning to **Ms. Vaughn**'s case, after she received a NOD, she timely filed an appeal on May 16, 2019 and COB was granted.  (JX 44 ¶ 339).

412.    Ms. Vaughn called TennCare Connect on May 24, 2019.  The TennCare Connect representative confirmed COB, but Ms. Vaughn reported that she had tried to schedule a ride to her doctor's office but was unable because the vendor stated that their records showed that she did not have coverage.  (Id. ¶ 340).

413.    TennCare confirmed on July 29, 2019 that Ms. Vaughn would receive a fair hearing on her appeal, and her appeal remained in pending status with COB for approximately nine months. (Id. ¶ 341).

414.    On April 21, 2020, TennCare issued Ms. Vaughn a notice approving her for ongoing DAC coverage and her appeal was closed.  (Id. ¶ 342).

67

415.     Ms. Vaughn is now correctly identified in TEDS as having eligibility in the DAC category.  (Id. ¶ 343).

416.     TennCare most recently reauthorized Ms. Vaughn's eligibility in the DAC category and for SLMB MSP coverage on June 1, 2023.  (Id. ¶ 344).

E.     ADA Compliance and Reasonable Accommodations

417.     TennCare is a public entity subject to Title II of the ADA, 42 U.S.C. § 12132.   (JX 43 ¶ 98).

418.     TennCare's redetermination and disenrollment processes must comply with the ADA.   (Id. ¶ 99).

419.     TennCare does not specifically track any reasonable accommodations or mitigating measures in TEDS.  TennCare does not have a field in TEDS specifically tracking reasonable accommodations or mitigating measures, despite TEDS being capable of doing so.  TennCare relies on its TennCare Connect employees to include any mitigating measures or reasonable accommodations granted in the specific enrollee's case notes.  Thus, a TennCare employee seeking to determine whether an enrollee had requested or received a reasonable accommodation (or mitigating measure) must review the individual case notes.  (Doc. Nos. 398 at 260:25–261:22; 387-1 at 17:3–19:1; 387-2 at 21:9–24:14).

420.      TennCare does not track the disability of enrollees in TEDS, nor does TennCare maintain a database that identifies which enrollees have disabling diagnoses.  TennCare can identify that an enrollee is grouped into a category that requires a disability to group into, but not the nature of that disability.  (Doc. Nos. 398 at 260:3–24; 387-1 at 12:5–22).

421.     TennCare does not affirmatively reach out to enrollees with disabilities to personally help them navigate the redetermination process.  Rather, TennCare provides its MCOs with the names of those enrollees scheduled to undergo an annual redetermination each month and

68

reaches out to those enrollees through some combination of phone calls, email, and texting. (Doc. No. 398 at 259:1–25).

422.    If an enrollee with a disability receives TennCare benefits based on a category of eligibility that does not require that person have a disability, TennCare has no way to independently determine whether that person has a disability and might benefit from some form of accommodation. (Id. at 263:6–19).

423.    CMS has never recommended or requested that TennCare track enrollees' disabilities through TEDS. (Doc. No. 399 at 63:7–12).

i.    TennCare's Long-Term Systems & Supports Division

424.    **Kathryn Evans** is the head of TennCare's Long-term Systems and Supports Division ("LTSS") and has held that position since August 2022. As part of her role, Ms. Evans is responsible for day-to-day oversight and operation of all long-term care programs for individuals receiving TennCare. (Doc. No. 396 at 225:10–25; 247:20–249:2).

425.    Through LTSS, TennCare contracts with Area Agencies on Aging and Disability ("AAADs") to provide assistance to TennCare enrollees but the AAADs offer minimal in-person assistance. For example, the AAADs provided only four TennCare enrollees with redetermination in-person assistance in April 2023 and three in May 2023.   (Id. at 236:8–240:9).

426.    Any enrollee whose eligibility is ending or is going through renewal can contact their local AAAD directly for assistance. Such enrollees do not need to be enrolled in an LTSS program such as CHOICES, or seeking to enroll in CHOICES, to receive this assistance.   (Id. at 253:20–254:14, 254:24–255:1).

427.    Referrals are made to AAADs through several sources inside TennCare upon a request for additional assistance. When an AAAD receives a referral, the AAAD begins outreach efforts to that person to determine what kind of assistance is required. The degree of assistance,

69

including in-person assistance, that the various AAADs provide is driven by what a TennCare enrollee requests.  (Id. at 255:2–19).

428.    The current contracts between TennCare and each AAAD requires AAAD representatives to meet face-to-face with TennCare enrollees requesting in-person assistance with an application or renewal packet within five business days of receiving such a request.  (JX 43 ¶ 111).

429.    Although AAAD employees are tasked with assisting enrollees with eligibility, oddly, TennCare does not consider them or train them to be eligibility specialists.  (Id. ¶ 112).

430.    Until the annual renewal process restarted in April 2023 after the end of the PHE, TennCare did not require the AAADs to track or even submit reports about in person assistance with redeterminations provided to enrollees.  (Id. ¶ 113).

431.    Beginning in April 2023 with the end of the PHE moratorium and restart of the Annual Redetermination process that had been on hold for three years, TennCare developed special report templates to help track in-person assistance provided by AAADs and required the nine AAADs in Tennessee to report data on initial referrals and redetermination assistance. TennCare did not receive such reports prior to April 2023.  (Id. ¶ 114).

432.    For certain groups of disabled enrollees, providers, MCOs, AAADs, or advocates can submit renewal packets for them.  (Id. ¶ 115).

ii.    TennCare's Office of Civil Rights Compliance

433.    **Talley Olson** is the Director of the Office of Civil Rights Compliance ("OCRC"), a subdivision of TennCare's Office of General Counsel, and has held that role since 2015.  Ms. Olson began working at TennCare in 2007 in its Office of General Counsel as a general practice federal compliance attorney.  After serving in that capacity for five years, she became the lead

attorney for the Civil Rights Office in the LTSS Division in 2012, where she remained until taking on her current role.  (Doc. No. 398 at 128:8–129:14; JX 43 ¶ 100).

434.     Ms. Olson oversees civil rights compliance, including ADA compliance, for all of TennCare and its more than 50 contractors, as well as for TennCare's eligibility and determination processes.  (Doc. No. 398 at 130:19–136:13).

435.     Despite the vast scope of her role and those of the OCRC, Ms. Olson was the OCRC's only employee until three days before trial, when OCRC hired a legal assistant to perform administrative tasks for Ms. Olson.  (Id. at 136:14–137:18).

436.     At least through June 2021, OCRC had not provided AHS a list of policies and procedures or a script concerning ADA reasonable accommodations.  Instead, OCRC gave AHS a general directive to comply with civil rights law and a script for handling discrimination complaints.  Thus, TennCare's Call Center had no specific uniform policies on reasonable accommodations; any reasonable accommodation request went through the generic discrimination complaint procedures.  (Id. at 141:18–148:21).

437.     In January 2022, TennCare placed AHS under a corrective action plan because it discovered that the Call Center responded inconsistently to callers with disabilities.  (Id. at 149:19–150:11, 151:20–23).

438.     As part of that corrective action plan, AHS developed a separate reasonable accommodations script and reasonable accommodations procedures.  Ms. Olson believed the corrective action plan was unnecessary because, in her words, "the whole point of, like, the civil rights law is to informally resolve things."  (Id. at 150:24–151:19)

439.    The corrective action plan terminated on March 7, 2022. Since then, Ms. Olson has not made regular efforts to monitor AHS's continued implementation of the procedures developed in that plan.  (Id. at 150:19–152:9).

440.    Ms. Olson is TennCare's only decisionmaker on reasonable accommodations. Neither OCRC nor Ms. Olson has policies on how to make decisions on a request for an accommodation or on the kind of documentation required for a reasonable accommodation request. These issues are left to Ms. Olson's sole, unfettered discretion.  (Id. at 152:10–157:10).

441.    Since at least 2020, Ms. Olson has never granted a reasonable accommodation request related to TennCare eligibility redeterminations.  (Id. at 157:6–10).

442.    Ms. Olson believes that no person has ever made what she believes is a request for a "true reasonable accommodation."  She defines a "true reasonable accommodation" as a request to modify or waive a policy, procedure, practice, or rule in order for that person to participate in TennCare.  (Id. at 157:11–159:19).

443.    According to Ms. Olson, if a request is not one for a "true reasonable accommodation" request, it is a request for a "mitigating measure."  Mitigating measures do not require OCRC's intervention.  Although there is no exhaustive list of mitigating measures, examples of mitigating measures that Ms. Olson believes the Call Center can provide include reading notices to callers, referring them to an AAAD if they need in-person eligibility assistance, and allowing extra time to fill out a renewal application.  (Id. at 171:18–175:12).

444.    Ms. Olson's definition of a "true reasonable accommodation request" is inconsistent with that of the parties, who have stipulated that both Mr. Monroe and Ms. Grace made reasonable accommodation requests.

445. Ms. Olson encourages the Call Center to provide mitigating measures to whomever requests them or to connect enrollees to someone who can provide them and assumes it does so without requiring her knowledge or intervention. (Id. at 172:6–12).

446. But TennCare does not train employees on when a renewal worker or contractor can grant extra time or to check the member's case file in TEDS for information about a reasonable accommodation or mitigating measure. Thus, if one TennCare worker granted a request for extra time, there is little assurance it would be respected by another worker reviewing the case. (Doc. Nos. 387-15 at 222:10-14; 387-12 at 203:12–16).

447. According to Ms. Olson, the only way she would know when the Call Center failed to provide enrollees sufficient assistance would be if the enrollee filed a formal discrimination complaint or filed some appeal and that appeal was informally brought to her attention. (Doc. No. 398 at 193:7–22).

448. But AHS does not share Ms. Olson's definition of "mitigating measures." (Doc. No. 387-16 at 87:11–25).

449. According to AHS the only kinds of assistance Call Center workers can provide are "reading a notice to [enrollees]" or "speaking up loudly" upon request. "If it goes beyond that . . . [AHS] would then pick up on that and escalate the call to make a request to OCRC." (Doc. No. 387-17 at 98:7–99:10).

450. AHS's policies and procedures require frontline Call Center workers to forward any request for a reasonable accommodation to their supervisors who then collects the information and sends it to Ms. Olson to act upon. (Doc. No. 387-16 at 89:22–90:24).

451. Ms. Olson's only internal tracking mechanism is a confidential log containing discrimination complaints, requests for accommodations, and some requests for mitigating

measures.  But the parties stipulate the log omits at least some requests for accommodation.  Ms. Olson has no written policy for what should or should not be included in her log.  Other TennCare workers cannot access this log to know whether an enrollee has previously made a discrimination complaint or requested or received a reasonable accommodation or mitigating measure. (Id. at 177:16–179:16).

452.    Although TennCare could program TEDS to provide a space to track whether a person has requested or received a reasonable accommodation or mitigating measure, it has not done so.  Because of this, only when TennCare representatives go out of their way to include such information in enrollees' call notes does TennCare record such information.  Even then, there is no guarantee that other TennCare workers will review those call notes before acting on that enrollee's case.  (Id. at 179:17–180:2).

453.    Overall, Ms. Olson's testimony gives this Court grave concerns about TennCare's commitment to accommodate disabled enrollees.  The Court has little confidence that TennCare's system for granting reasonable accommodation is responsive to disabled enrollees.

iii.    Plaintiffs' Experiences with TennCare's ADA Compliance and Reasonable Accommodations

454.    Plaintiff **Faith Grace** has been classified as disabled by Social Security since 2005, and suffers from autonomic dysfunction, Ehlers-Danlos syndrome, postural orthostatic Tachycardia Syndrome, and other issues, which limit her movement, cognition, breathing, and eyesight, and cause flare ups, transient ischemic attacks, spinal dislocations, seizures, and strokes. (Id. at 74:16–75:1; 75:19–76:1–15; 78:24–25; 79:9–10).

455.    As a result, Ms. Grace does not leave her home often—only about four times in 2023 to see her doctor and once to pick up mail.  (Id. at 76:18–20).

456. Ms. Grace is not stable enough to regularly retrieve her own mail, and she has previously asked the Postal Service for a hardship mail delivery to her door. (Id. at 77:2–25).

457. On May 4, 2023, TennCare sent Ms. Grace a Pre-Renewal Letter letting her know that it was time to renew her benefits and that she would be receiving a Renewal Packet in the mail in the next 7–10 days. (JX 44 ¶ 416).

458. On May 11, 2023, TennCare sent Ms. Grace her Renewal Packet with a return deadline of June 20, 2023. (Id. ¶ 417).

459. That same day, Ms. Grace called TennCare Connect and submitted her renewal packet information by phone. (Id. ¶ 418).

460. On May 15, 2023, TennCare sent Ms. Grace an Additional Information Notice requesting that she submit information on her financial resources, vehicles, unearned income, and medical bills by June 4, 2023. (Id. ¶ 419).

461. Ms. Grace called TennCare Connect on June 1, 2023. (Id. ¶ 420).

462. TennCare did not receive the information requested on May 15, 2023, by the June 4, 2023, deadline, TennCare then issued Ms. Grace a NOD on June 14, 2023, denying her Medicaid for not being in a group covered by TennCare and terminating her QI coverage because she had not sent in the requested information. The NOD informed her that her last day of coverage would be July 5, 2023. (Id. ¶ 421).

463. This NOD gave Ms. Grace until July 5, 2023, to appeal these decisions if she thought TennCare had made a mistake in order to keep her coverage while her appeal was ongoing, and until July 24, 2023, for her appeal to be considered timely. (Id. ¶ 422).

464. On June 20, 2023, Ms. Grace called TennCare Connect. During this call, she requested access to her account on the TennCare Connect portal. She was informed that a notice

denying her Medicaid had been sent on June 14, 2023. Ms. Grace requested reasonable accommodations and appealed the Medicaid termination during this call. (Id. ¶ 423).

465. The reasonable accommodations Ms. Grace requested were a phone call or email if TennCare required additional information and the option to submit documents via email. (Doc. No. 398 at 82:17–20; 83:5–19; 86:5–25).

466. The TennCare Connect representative told Ms. Grace that TennCare would not accept documents submitted by email. (Id. at 86:5–25).

467. An appeal was filed for Ms. Grace on June 20, 2023. TennCare granted her COB on June 23, 2023, and gave her additional time until August 12, 2023, to submit the requested verifications. (JX 44 ¶ 424).

468. Ms. Grace submitted a new application on July 1, 2023. (Id. ¶ 425).

469. The letter dated July 7, 2023, sent by mail to Ms. Grace by the Director of Civil Rights Compliance, Ms. Talley Olson, regarding Ms. Grace's reasonable accommodation request, told Ms. Grace that the referral to the AAAD had been made on her behalf, that the AAAD could help with the eligibility process and a TennCare CHOICES PAE. Ms. Olson also provided the AAAD's phone number. (Id. ¶ 426).

470. Ms. Olson did not call or email Ms. Grace to notify her of the letter. (Doc. No. 398 at 98:6–99:11).

471. Ms. Grace spoke to Ms. Olson, on July 31, 2023. (JX 44 ¶ 427).

472. According to Ms. Grace, Ms. Olson did not help her personally. Instead, Ms. Olson transferred her to another person who never helped her. The TennCare representative Ms. Grace spoke to suggested that she contact the Department of Human Services for assistance. Ms. Grace

attempted to contact the Department of Human Services three times to no avail. (Doc. No. 398 at 100:9–101:17).

473. Ms. Grace lost her QI coverage when she failed to submit requested verifications of financial resources, unearned income, vehicles, and bank statements by the August 12, 2023 deadline. (JX 44 ¶ 414).

474. When that information was submitted on October 3, 2023, the last day of her 90-day reconsideration period, TennCare reinstated her QI coverage and retroactively filed the gap in her coverage. (Id. ¶ 415).

475. TennCare mailed and posted to Ms. Grace's TennCare Connect online account a NOD informing Ms. Grace she had continued QI coverage. (Id. ¶ 428).

476. Plaintiff **William Monroe** has TennCare coverage, qualifying under the Pickle category and as QMB eligible. (Doc. No. 402 at 1:31–38).

477. Mr. Monroe suffers from spinal stenosis, a heart condition, some hearing loss, trouble breathing, and problems with his hands, and has had both legs amputated. (Doc. No. 402 at 1:49–2:00).

478. Mr. Monroe's sister managed his healthcare until she died. More recently, Mr. Monroe's sister-in-law, a nurse, has assisted him in managing his healthcare coverage. (Doc. No. 402 at 2:06–4:12).

479. Mr. Monroe's multiple conditions render him incapable of using a computer, filling out forms, collecting information, and providing documentation on his own. (Doc. No. 402 at 4:12–5:08).

Case 3:20-cv-00240    Document 412    Filed 08/26/24    Page 77 of 116 PageID #: 25081

480.     Mr. Monroe's eligibility data converted into TEDS on April 6, 2019 with Mr. Monroe as QMB eligible.  He did not have any Medicaid coverage at that time and had been QMB only eligible since at least 2013.  (JX 44 ¶ 239).

481.      In July 2019, his case was selected for annual renewal and, because his income could not be automatically verified, he was sent a renewal packet with an August 20, 2019 due date.  (Id. ¶ 240).

482.     This stemmed from TEDS's reliance on Interchange to communicate with the federal government's data stores.  At the time, Interchange provided information once per month.  Mr. Monroe's data was not current, and he appeared over income.  (Doc. No. 400 at 76:16–77:14, 97:17–98:14)

483.     TennCare mailed the Renewal Packet to his address of record.  (JX 44 ¶ 241).

484.     When Mr. Monroe did not respond to his renewal packet, he was sent a NOD informing him that his QMB coverage would be ending on September 17, 2019 unless he completed the renewal packet or filed an appeal by that date.  (Id. ¶ 242).

485.     Mr. Monroe's sister-in-law made two calls to TennCare Connect on September 9, 2019 and completed a phone renewal.  (Id. ¶ 243).

486.     TennCare determined that Mr. Monroe wished to be evaluated for Institutional Medicaid so that he could receive HCBS.   (Id. ¶ 244).

487.     An Additional Information notice was mailed to Mr. Monroe on September 11, 2019, requesting by October 1, 2019, financial resource information, expense information, and an approved PAE so that TennCare could evaluate Mr. Monroe for Institutional Medicaid.  (Id. ¶ 245).

488.    On September 12, 2019, TJC filed an appeal on Mr. Monroe's behalf. The section of the appeal form that asks, "What kind of coverage is the appeal for?" was marked "QMB," not TennCare. In Section Seven of the form where the appellant can write in the mistake they think TennCare made TJC stated: "Mr. Monroe received no renewal notice and believes he is still eligible for QMB and Medicaid through the Pickle Amendment." The box to "ask to keep your coverage during this appeal" was also checked.  (Id. ¶ 246).

489.    This appeal was timely and requested continuation of Mr. Monroe's QMB benefits, and COB was granted on the case.  (Id. ¶ 247).

490.    On September 16, 2019, a representative from TJC called TennCare Connect with Mr. Monroe.  Mr. Monroe explained that he had been in the hospital, and also that his sister, who used to take care of his mail, had been sick and recently passed away.  Since the renewal responses from the September 9, 2019 call had not yet been processed, the TennCare Connect agent took Mr. Monroe's renewal information a second time.  The TennCare Connect agent also described the additional verification documents that it required Mr. Monroe to submit, based on the September 11 Additional Information letter.  (Id. ¶ 248).

491.    This call resulted in an Additional Information notice being issued to him on September 25, 2019, with an October 15, 2019 due date seeking information needed to determine his eligibility and once again asking for a preadmission evaluation ("PAE"), which is necessary for eligibility for the institutional Medicaid category. (Id. ¶ 249).

492.    Mr. Monroe called TennCare Connect with a TJC representative on September 25, 2019 to check on the status of his QMB coverage because he had upcoming surgeries. The TennCare Connect representative informed Mr. Monroe that he had QMB coverage at that time

and reiterated that Mr. Monroe had to send in proof of his resources to complete his CHOICES application and if he had none, to write a letter stating he had none. (Id. ¶ 250).

493.    On September 30, 2019, Mr. Monroe's TJC representative submitted a letter to TennCare on his behalf stating that Mr. Monroe does not have a trust, life insurance, burial resources, property, or other resources except for a checking account. The letter indicated that "Mr. Monroe has minimal use of his hands due to a spinal cord injury. Because of this, he is unable to sign and return this letter, but he can give verbal authorization over the phone." The letter further indicated that, because of his minimal use of his hands and inability to drive, Mr. Monroe was having difficulty gathering the remainder of the requested proof and requested in-person assistance. (Id. ¶ 251).

494.    Mr. Monroe called TennCare Connect with TJC on October 1, 2019 because he received a letter that his Medicare premiums were being withheld from his October Social Security check, even though TennCare had granted him COB. (Id. ¶ 252).

495.    TennCare's Deputy General Counsel informed TJC that a referral had been made to the AAAD to contact Mr. Monroe regarding his PAE. (Id. ¶ 253).

496.    On October 10, 2019, following the referral by TennCare for a face-to-face visit, a representative from the Northwest AAAD went to Mr. Monroe's home, interviewed him, and performed a functional assessment to obtain a PAE. (Id. ¶ 254).

497.    On October 14, 2019, at the request of TJC for an accommodation, TennCare's Office of General Counsel extended the due date for submitting the information requested from Mr. Monroe, including an approved PAE to October 29, 2019. TJC submitted the additional documents on Mr. Monroe's behalf before the extended due date. (Id. ¶ 255).

498.    Mr. Monroe did not obtain an approved PAE. (Id. ¶ 256).

499.     On October 29, 2019, TennCare mailed Mr. Monroe a NOD approving him for QMB coverage but denying him for Medicaid in the Institutional Category because he did not have an approved PAE. This notice stated that it "tells you about the decision we made for each person in your home when we closed your appeal." (Id. ¶ 257).

500.     TennCare mailed an additional NOD to Mr. Monroe on November 4, 2019, following receipt by TennCare of the denied PAE from the AAAD. The NOD once again approved him for QMB but denied him for the Institutional Medicaid category. (Id. ¶ 258).

501.     No appeals from the October 29, 2019 or November 4, 2019 NODs were filed. (Id. ¶ 259).

502.     The last correspondence that TennCare received from TJC regarding Mr. Monroe's annual renewal was an email on November 1, 2019, stating that "We are glad that Mr. Monroe was approved for QMB and that his premiums were not withheld from his social security check this month. Thank you for all your help." (Id. ¶ 260).

503.     On January 9, 2020, TennCare issued Mr. Monroe a VFD Accepted notice setting his September 12, 2019, appeal for hearing. (Id. ¶ 261).

504.     TennCare closed the September 12, 2019 appeal when a representative of Mr. Monroe called TennCare on January 29, 2020, and requested that his appeal be withdrawn. (Id. ¶ 262).

505.     On March 13, 2020, an application was submitted via the TennCare Connect Member Portal indicating Mr. Monroe wished to apply for Medicaid. Because Mr. Monroe already had existing QMB coverage, this application was sent to an eligibility worker to process. (Id. ¶ 263).

506.    The worker contacted Mr. Monroe, who indicated he needed in-home assistance, so another referral was made to the AAAD to evaluate him again for a PAE.  (Id. ¶ 264).

507.    TennCare was working on this application when Plaintiffs filed their Complaint. (Id. ¶ 265).

508.    On March 27, 2020, TennCare issued an Additional Information notice seeking bank statements and an approved PAE.  (Id. ¶ 266).

509.    On April 3, 2020, TennCare received a letter from TJC stating that Mr. Monroe was not requesting an evaluation for HCBS through the CHOICES program and requesting he be evaluated in the Pickle category.  (Id. ¶ 267).

510.    Subsequently on April 8, 2020, TennCare deemed Mr. Monroe eligible in the Pickle category.  (Id. ¶ 268).

511.    TennCare most recently reauthorized Mr. Monroe's eligibility in the Pickle category and his eligibility for QMB coverage on March 4, 2023.  (Id. ¶ 269).

512.    Mr. Monroe was not required to submit any documentation for the reauthorization of his eligibility to occur.  (Id. ¶ 270).

513.    **Dr. Peter Blanck, Ph.D., J.D.,** evaluated TennCare's policies and practices to ensure individuals with disabilities can successfully navigate the programs.  His inquiry focused on the efficacy of TennCare's systems for providing reasonable accommodations.  Specifically, Dr. Blanck studied the "systems-level organizational processes for policies and practices, and methods of administration, that affirmatively provide access to TennCare's program through redetermination processes that: (1) identify and provide needed accommodations; (2) do not screen out beneficiaries; (3) provide appropriate monitoring and oversight of program accommodations

82

and modifications; and (4) provide appropriate monitoring and oversight of access to the TennCare program redetermination process."  (PX 118 at 8–9).

514.    Dr. Blanck employed his "triangulation method" to form his opinions.    As described, his triangulation method includes "compar[ing] and contrast[ing] data sources to reach a conclusion."  Applying his method to the question before him, Dr. Black focused on the "touchstone . . . [of] whether [TennCare] is achieving what it is supposed to" and if it "do[es] so in a valid reliable way."  (PX 118 at 7).

515.    Dr. Blanck concluded that "TennCare's systems, structures and policies for compliance with disability access are insufficient and not adequately organized with different aspects of the beneficiary-facing systems referring to one another to provide assistance" in several material respects.  (Id. at 12).  Principally, he opined that:

> Enrollees face a maze of program referral circles, complaint processes, and administrative burdens to access TennCare.  Should an enrollee find her way to Ms. Olson, she faces additional paperwork and required information that TennCare often already appears to have, such as the nature of her disability.  Each time a Disability Subclass member must interact with TennCare, they must often navigate this same burdensome process to get basic assistance. . . . Because of these deficiencies, TennCare does not provide a reliable, accessible path to assistance needed to appropriately access its programs.  The agency has fragmented systems with inadequate policies and procedures rather than a comprehensive and coordinated plan regarding accessibility and accommodation for individuals with disabilities.  It appears that TennCare's structures and policies are reactive only.  Thus, they do not anticipate or appropriately plan for the system needs of the large number of individuals with diverse disabilities that such Medicaid programs serve.

(Id.).  He also concluded that, prior to the implementation of the 2022 corrective action plan, the Call Center was inadequate for its failure to understand that ADA compliance was part of its responsibilities, to have a process concerning reasonable accommodations, have reference materials for reasonable accommodations, to coordinate with OCRC on what is included in reasonable accommodations, and to receive training materials specific to reasonable accommodations.  (Id. at 12–13).

516.     In reaching these conclusions, Dr. Blanck considered thousands of pages of documents and recordings, including TennCare reports, policies, and documentation and sworn testimony of state officials and Disability subclass members.  However, Dr. Blanck did not interview any TennCare enrollees, any TennCare officials, any CMS officials, or any Medicaid officials from other states.  Nor did he review and analyze a random sample of TennCare enrollee case files.  Blanck also did not analyze the other modes of assistance being provided to disabled TennCare enrollees.  (PX 118 at 7; 398 at 13:13–14:5; see generally Doc. No. 350-3 (listing data sources)).

517.     Prior to trial, Smith sought to exclude Dr. Blanck's testimony under Federal Rule of Evidence 702 ("Rule 702"), arguing that the opinions stated in his report were neither relevant nor reliable.  (Doc. Nos. 336 at 1; 336-1 at 2–10, 12–14).  The Court reserved any ruling on Smith's motion, (Doc. No. 370 ¶ 3), and Smith raised it again at trial under Rule 702(c) and (d).  (See, e.g., Doc. No. 397 at 214:17–19; 398 at 9:11–14, 32:3–9; 64:20–21 (objecting under the Rule)).  In his post-trial brief, Smith reiterated his objection, arguing that Dr. Blanck's trial testimony reaffirmed that his opinion is not the product of reliable principles and methods.  Smith maintains that because his triangulation method does not provide any guardrails for receiving once-sided data sources— which Smith asserts occurred here.  Further, Dr. Blanck provides "no reasoned explanation describing how the triangulation method was applied to the facts at issue."  (Doc. No. 404 at 40–42).

518.     Mere days after the conclusion of trial, Rule 702 was amended.  As currently formulated, Rule 702 states:

> [a] witness who is qualified as an expert by knowledge, skill, experience training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts in the case.

Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 (1993); United States v. Davis, 970 F.3d 650, 660 (6th Cir. 2020) ("Federal Rule of Evidence codifies [the Daubert] standards, imposing four requirements that likewise seek to ensure that scientific testimony is both relevant and reliable") (internal quotations marks omitted).

519. These amendments were made well ahead of the parties' post-trial briefs. (See Doc. No. 404, 405 (filed several months after trial)).

520. Rule 702 provides a flexible standard, and "the focus . . . must be solely on principles and methodology, not on the conclusions they generate." Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012). Thus, within the Sixth Circuit, courts focus on two "key handholds" of Rule 702: "To be admissible, any relevant scientific or technical evidence must be the product of reliable principles and methods and must have been reliably applied in the case." United State v. Gissantaner, 990 F.3d 457, 463 (6th Cir. 2021).

521. Unable to grasp either handhold, Dr. Blanck's testimony fails to adhere to Rule 702(c) and (d)'s reliability requirements.

522. Dr. Blanck's testimony is not the product of reliable principles and methods. In his own words, Dr. Blanck's triangulation method is "basically an in-depth case study using multiple sources of information and multiple ways, multiples methods, for looking at that information." (Doc. No. 398 at 16:16–19; see also id. at 12:15–13:3 ("And you look for data points across difference sources of data to see whether they converge or diverge. It's a sort of a triangle with the research hypothesis at the top. And you can look at that across an array of sources, which gives you more confidence that you're not relying on any single one source")). But any conclusion reached through this method is subject to the quality and quantity of the data considered and the

85

biases of the person studying them. No doubt Dr. Blanck can compare and contrast sources he is provided, but his method offers no logical or analytical process on how many sources of information that he considers in order to accurately analyze his research question or how much weight he gives any one source. Nor can the triangulation method consistently lead to the same or even a similar conclusion; as Dr. Blanck admits, his method is only replicable by someone with the "same documents." (Id. at 15:8–17).

523. More specifically and troublesome, Dr. Blanck offers no support indicating that the triangulation method is appropriate of analyzing TennCare's reasonable accommodation systems. Indeed, he admits that he has never applied this method to a state Medicaid system. He is unaware of anyone else who has used triangulation to analyze other Medicaid systems. (Id. at 29:23–30:4).

524. Even if Dr. Blanck's "triangulation method" were proper to apply in these circumstances, the Court cannot conclude that the method was reliably deployed in this case as required by Rule 702(d). Dr. Blanck did not identify why he chose the sources he did over others. Nor did Dr. Blanck talk to any named Plaintiffs, any other TennCare enrollee, any TennCare official, any CMS official, or any Medicaid officials from other states. (Doc. No. 398 at 26:13–18, 27:5–19). He did not consider the number of disabled enrollees who successfully were renewed since 2019. (Id. at 41:19–21). Likewise, he did not seek out the total number of disabled enrollees who had been disenrolled. (Id. at 42:6–14). He did not consider the largest class of disabled persons in the TennCare program, those who are eligible by virtue of receiving SSI. (Id. at 37:8–11). He did not include in his report any assistance provided by LTSS, MCOs, community mental health centers, or Rural Health of Tennessee. (Id. at 38:10–39:15). And he did not pull a random sample of cases. (Id. at 26:19–25). At bottom, it seems that the only sources he considered were those hand-selected by the Plaintiffs. (Id. at 55:11–16 ("Q: Isn't this, then, a classic case of

86

selection bias?  Rather than looking at a random sample, you just looked at four cases that the plaintiffs pointed you to where something went wrong.  So don't you think that's a selection bias problem?  A:  Only to the extent if you think these cases are not representative of other cases.")).

525.    One man's opinion—albeit one eminently qualified man's opinion—is sometimes simply that.  For the reasons stated, his triangulation raises several "red flags that caution against certifying an expert include[ing] reliance on anecdotal evidence, improper extrapolation. . . . lack of testing, and subjectivity."  Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012) (citing Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 177 (6th Cir. 2009)); see also id. (citing Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 434 (6th Cir. 2007)) ("In addition, if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion.").  Because the triangulation method appears to dress up Dr. Blanck's views on TennCare rather than shape them, and because those views were heavily influenced by the select evidence he considered, the Court must exclude Dr. Blanck's testimony.

526.    Even if the Court did consider Dr. Blanck's testimony, it would give that testimony de minimis weight.

## III.    CONCLUSIONS OF LAW

527.    TennCare has legal obligations to enrollees that are pertinent to this case.  First, TennCare must administer benefits within the boundaries set by the Medicaid Act and its regulations.  (Id. at 6 (citing Hughes v. McCarthy, 734 F.3d 473, 475 (6th Cir. 2013)).  Second, TennCare must respect the Due Process Clause of the Fourteenth Amendment by providing adequate notice and a meaningful opportunity for enrollees to be heard before terminating an enrollee's coverage.  (Id. (citing Hamby v. Neel, 368 F.3d 549, 559–60 (6th Cir. 2004)).  Finally, TennCare must comply with the ADA's requirement that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of

87

the services, program, or activities of a public entity, or be subjected to discrimination by any such entity." (Id. (quoting 42 U.S.C. § 12132). These obligations guide the Court's analysis of the Certified Issues. (See supra Section I.C.).

A.    Certified Issues Related to TennCare Eligibility

      i.     Certified Issues 1 and 15

528.    Certified Issues 1 and 15 present overlapping inquires. Certified Issue 1 asks a factual question: "Whether the State considers/considered all categories and bases of eligibility before terminating enrollees' coverage." Certified Issue 15 focuses on disability-related eligibility categories and asks whether TennCare's alleged failure to consider those categories, if true, violates the ADA. The Court will address these questions together.

529.    Plaintiffs argue and presented persuasive evidence that TennCare's systems and policies, primarily TEDS, were flawed in myriad ways that resulted in TennCare functionally ignoring categories of eligibility. Specifically, Plaintiffs rely on to TennCare's inability to load special indicators for DAC and Widow/er data into TEDS (an error that TennCare did not correct until 2023), which led to missed screenings for these categories. Plaintiffs further highlight TennCare's failure to reliably load data that affected consideration of three SSI-related categories: DAC, Widow/er, and Pickle. This latter error caused TennCare to wrongly terminate the benefits of enrollees including **Walker**,[6] **Caudill**, and **Vaughn** on account of TEDS's failure to recognize their ongoing receipt of SSI.

530.    However, the errors Plaintiffs presented at trial do not stop with TEDS. Plaintiffs offered credible evidence that "TennCare compounded [its] problem[s] by omitting questions from

---

[6] The Court considered all of its findings of fact in reaching its conclusions of law and only spotlights certain Plaintiffs' testimony to use as an example—not at the exclusion—of other testimony.

the renewal packet and pre-term[ination] questionnaire that would prompt members to state that they previously received SSI." (Doc. No. 405 at 19). Had TennCare included such questions in the renewal packet or pretermination questionnaire, enrollees would have had an opportunity to submit the information TennCare knew TEDS struggled to recognize. TennCare also failed to consider information its enrollee's provided directly to TennCare's workers. For instance, TennCare failed to recognize **Patrick Guytan** was eligible for both the DAC and Institutional Medicaid categories even after his mother wrote as much on a response form—at the direction of a TennCare Call Center representative—and attached his approved care plan documenting that he was eligible for Institutional Medicaid.

531. Smith urges the Court to look past TennCare's litany of errors because TEDS is designed to consider each category of eligibility even when it makes the wrong eligibility determination. (Doc. No. 404 at 19–20). Specifically, Smith argues that TEDS's programing dictates that it follow business rules to test enrollees pursuant to TennCare's category of eligibility hierarchy. This ensures that TEDS considers every category and basis of eligibility before terminating an enrollee's coverage, and where that enrollee is eligible for multiple categories, that they receive the greatest amount of benefits. On this point, Smith notes that the parties have stipulated that TennCare has enrollees in every category of eligibility that exists in Tennessee. (JX 43 ¶ 54). To the extent that Smith acknowledged TEDS's failures to accurately assess eligibility, he assures the Court that "it has not been due to a failure of TEDS's process for reviewing every category of eligibility" but rather "TEDS receiving inaccurate data, worker error, or some other systems defect that did not prevent it from assessing every category of eligibility." (Doc. No. 404 at 19). On these issues, TennCare has made attempts to double check SSA's bad data, monitor

TEDS and its workers' actions through quality control processes and periodic reviews, and perform quality control audits which it reports to CMS.

532.     The Court finds unavailing Smith's attempt to sanitize TennCare's myriad errors. TennCare cannot divorce itself from TEDS or its workers, and their errors and mistakes are ultimately TennCare's errors and mistakes.  In **Mr. Hill**'s case, the flawed conversion of data caused TEDS to place him in the Pickle category instead of the DAC and then determined that he was over-income.  Thus, it was TennCare's decision to terminate his eligibility.  Likewise, in cases like the **Guytan's**, where TennCare's worker failed to exhaustively search TEDS for a DAC indicator and determined that Patrick was not DAC eligible because there was no indicator in the "normal place" and then ignored his mother's separately submitted information, the decision to terminate Patrick's healthcare coverage rested with TennCare.

533.     As Ms. Hagan acknowledged at trial, TEDS is only as good as the information it receives.  During the class period, TennCare had various systemwide defects that rendered it unable to reliably load data it used to consider individuals' eligibility.  TennCare did not properly load special indicators for DAC and Widow/er data into TEDS until April 2023.  It also struggled to reliably load data that showed members' prior receipt of SSI, affecting consideration of three of TennCare's SSI related categories.  Although TennCare was aware of these systemic issues, it was lethargic in its response and attempts to reprogram TEDS.

534.     TennCare could have prioritized the need to fix TEDS's shortcomings to ensure that it reliably considered these SSI-related categories of eligibility but did not do so.  For example, TennCare adopted its Reaccretes Process over a year after launching TEDS and only added questions regarding the prior receipt of SSI to its questionnaires in September 2023.  Until these measures were put into place, TennCare let TEDS's programming dictate eligibility

determinations all to the detriment of enrollees. Aware that TEDS either ignored or could not assess available data that was essential to eligibility determinations, TennCare closed off SSI-related categories of eligibility to its disabled enrollees who were eligible for TennCare in those categories.

535.    Having found that TennCare's flawed systems failed to consider all categories of bases of eligibility before terminating enrollees' coverage and that the categories it failed to consider were disability-related categories, the Court can move directly to the second part of Certified Issue 15—whether those failures violate the ADA. The answer is yes.

536.    The ADA prohibits states from discriminating against people with disabilities and requires them to actively ensure access to programs and services, including through program design, policy choices, and evaluations of access. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b); Tennessee v. Lane, 541 U.S. 509, 524-26, 531 (2004) (ADA is a "prophylactic measure" needed to counter "systematic deprivations of fundamental rights"); Ability Ctr. of Greater Toledo v. Sandusky, 385 F.3d 901, 907 (6th Cir. 2004). States must also ensure that their programs do not discriminate by design or policy. 42 U.S.C. § 12101(a)(5) (ADA purpose includes discriminatory policies and criteria); Ability Ctr. of Greater Toledo, 385 F.3d at 909–11; Disabled in Action v. Bd. of Elections, 752 F.3d 189, 200–02 (2d Cir. 2014). The relevant inquiry is "whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003).

537.    Plaintiffs argue, and the evidence at trial proved, that TennCare violated the ADA because TEDS "wrongly screen[ed] out people eligible in disability-related categories, including SSI, DAC, Widow/er, and Pickle." Then, TennCare sat on its hands for months before it fixed system-wide errors that caused data issues that resulted in wrongful terminations of disabled

91

individuals, such as **Mr. Walker**, **Ms. Caudill**, and **Mr. Vaughn**.  Based on its findings above, the Court agrees.  At bottom, TEDS's systemic errors blocked those with disabilities from accessing benefits to which they were legally entitled.  Although TennCare knew that TEDS was rife with flaws and that those flaws led to erroneous eligibility terminations for disabled individuals, TennCare's response was slow to address them.  By doing so, TennCare violated the ADA.

        B.      Certified Issues Related to TennCare's NODs and Timeliness of Appeals

              i.     Certified Issue 2

538.    Certified Issue 2, another purely factual Certified Issue, asks "whether TennCare Notices of Decision mislead/misled recipients to think that TennCare considers/considered all bases of eligibility, all program rules, and all facts in determining eligibility."

539.    The parties have stipulated that every NOD includes the language, "Before we made our decision we looked at you for different kinds of coverage," (JX 43 ¶ 72), and, when TennCare denies an individual healthcare coverage, its NODs state:

> "We looked at the facts we have for you. We use those facts to review you for our coverage groups to decide if you qualify. . . .  Remember, we look at the facts we have for you before we make our decision. And we use those facts to review you for our coverage groups."

(Id. ¶¶ 73–74).  These assurances are as straightforward as they are absolute.  In each NOD, TennCare asserts that it considered the facts it possesses for that enrollee and that the enrollee did not qualify based on those facts.  TennCare does not lay out what facts it believes render that person ineligible for healthcare coverage even when that person previously received coverage.  Nor does it list all of the coverage groups it considered that person for.  Instead, TennCare asks Tennesseans to trust its process for making eligibility determinations—to trust TEDS.

540.     But TEDS is flawed, and TennCare knows that it is flawed.  The Court addressed this issue in relation to Certified Issues 1 and 15:  TEDS's systemic errors and design defects caused TennCare to overlook information it possessed when evaluating whether a person qualifies for healthcare coverage and TennCare dragged its feet on instituting measures outside of TEDS that would have caught its mistakes before threatening to take away an enrollee's deserved benefits or denying coverage to a qualifying applicant.

541.     The NODs' disclosures did not account for TEDS's failings, and TennCare did not amend or supplement those disclosures while it attempted to plug TEDS's many holes.  Thus, Plaintiffs like **Mr. Hill**, **Ms. Vaughn**, and **Ms. Caudill** received NODs telling them that TennCare considered them for categories of eligibility TEDS was incapable of reliably evaluating and functionally ignored.  In this way, TennCare's disclosures were flatty untrue and inherently misleading.

        ii.      Certified Issue 3

542.     Certified Issue 3 asks "whether the NODs' citation to the 95-page compendium of TennCare regulations, Chapter 1200-13-20, satisfies and/or satisfied the notice requirements of 42 U.S.C. § 1396a(a)(3) and/or the Due Process Clause."  On this issue, the parties agree on the relevant evidence.

543.     There is no dispute that, prior to December 2022, the only legal citation in the NODs intended to support the termination decision was the Stock Citation, which directed enrollees to a 95-page compendium of TennCare's eligibility rules.  In relevant part, the NODs read:

>     We looked at the facts we have for you.  We use those facts to review you for our coverage groups to decide if you qualify.  But you don't qualify.  [Tenn. Comp. R&Reg. 1200-13-20].

93

(PX 571 at 49). Every member who was terminated or denied coverage from TennCare before December 2022, including, for example, Plaintiffs **Hill**, **Caudill**, and **Gavigan**, received a version of a NOD with this language. Ms. Hagan testified that TennCare recognized its obligation when its rules became final in August 2019, but elected to focus on other changes it regarded as more urgent. (Doc. No. 400 at 20:5–16). Thus, for over three years, TennCare knew that Medicaid regulations required it to cite a specific regulation when providing the reason for a termination or denial decision but continued to send NODs containing the Stock Citation.

544. Smith acknowledges that the Stock Citation did not point to a specific regulation or section supporting the termination decision, but he asserts that TennCare should be absolved for Due Process purposes because a plain-English explanation of the termination reason followed the Stock Citation. (See Doc. No. 404 at 32). According to Smith, TennCare "gave appellants enough information to adequately prepare for an appeal" at a time when "the eligibility rules were undergoing significant changes and TennCare believed that including more specific citations risked creating confusion through errors." (Id.). Setting aside that the Stock Citation was in place for over three years *after* TennCare's eligibility rules were finalized, Smith's excuse for keeping the Stock Citation has no basis in law, and Smith's post-hoc justifications are not credible.

545. To satisfy the Due Process Clause, notices must "detail the reasons for a proposed termination." Goldberg v. Kelly, 397 U.S. 254, 268 (1970). Discussing this standard, the Sixth Circuit has explained that "notices must comprise '(1) a detailed statement of the intended action . . . (2) the reason for the change in status . . . (3) citation to the specific statutory section requiring reduction or termination; and (4) specific notice of the recipient's right to appeal.'" Barry v. Lyon, 834 F.3d 706, 719 (6th Cir. 2016) (quoting Barry v. Corrigan, 79 F. Supp. 3d 712, 741 (E.D. Mich. 2015) (internal citation omitted)); see also Garrett v. Puett, 707 F.2d 930, 931 (6th Cir. 1983)

94

(containing the language quoted in <u>Corrigan</u>). While a plain-English explanation may go to another of the four requirements, it does not obviate the need for the third—the only requirement relevant to this Certified Issue.

546. For the same reason, Smith's attempt to contort <u>Garrett</u> in his favor is unpersuasive. According to Smith, because the Sixth Circuit blessed notices that contained plain-English explanations that were less clear than those TennCare provided with its Stock Citation, TennCare's notices must be adequate. (Doc. No. 404 at 33). But there the Sixth Circuit observed that the record showed the notices at issue contained a "citation to the specific statutory section requiring reduction or termination" of benefits. <u>Garrett</u>, 707 F.2d at 931. TennCare's notices do not.

547. On whether TennCare's long-term use of the Stock Citation violated the Medicaid Act, Smith does not defend the Stock Citation as instructive to enrollees, but rather argues that it is unenforceable under § 1983 because "the Medicaid Act says nothing about the types of legal citations that must be included in the NODs," citing to <u>Johnson v. City of Detroit</u>, 446 F.3d 614, 628 (6th Cir. 2006). (Doc. No. 404 at 33). True, the Medicaid Act is not that granular—but such granularity is unnecessary to provide Plaintiffs with an enforceable cause of action. In <u>Johnson</u>, the Sixth Circuit reiterated its conclusion in <u>Caswell v. City of Detroit Housing Commission</u>, 418 F.3d 615 (6th Cir. 2005), that plaintiffs must be able to point to a specific statutory provision that confers a right relevant to the alleged violation to pursue a claim under § 1983. 446 F.3d at 628–29. Already, a gap exists between the standard Smith sets (explicit discussion in the Medicaid Act regarding the legal citation that must be included in NODs) and what his supporting caselaw actually requires (a right relevant to the alleged violation). Smith also fails to acknowledge that the Sixth Circuit has already reviewed the Medicaid Act provision Plaintiffs rely upon, 42 U.S.C. § 1396a(a)(3) that requires TennCare to provide an opportunity for a fair hearing and concluded

95

that it creates an enforceable right under § 1983. <u>Barry</u>, 834 F.3d at 716–17 (6th Cir. 2016) (citing <u>Gean v. Hattaway</u>, 330 F.3d 758, 773 (6th Cir. 2003)). The notice requirements incorporated through <u>Goldberg</u> and 42 C.F.R. §§ 431.200–431.250, are no doubt relevant as they "flesh out the content of the statutory right." <u>Shakhnes v. Berlin</u>, 689 F.3d 244, 254 (2d Cir. 2012); <u>see also</u> <u>Kapps v. Wing</u>, 404 F.3d 105, 124 (2d Cir. 2005) ("[I]n the absence of effective notice, the other due process rights afforded a benefits claimant—such as the right to a timely hearing—are rendered fundamentally hollow.").

548. The Medicaid Act requires TennCare comply with the notice requirements fleshed out in 42 U.S.C. 1396a(a)(3)'s regulations, including the due process standards set forth in <u>Goldberg</u> and those specified in 42 C.F.R. §§ 431.200–431.250. <u>See</u> 42 C.F.R. § 431.205(d). <u>Goldberg</u> makes clear that its due process standards for fair hearings include providing notice of and the reasoning for termination decisions. <u>See</u> 397 U.S. at 267–68 ("The hearing must be 'at a meaningful time and in a meaningful manner.' In the present context these principles require that a recipient have timely and adequate notice detailing the reasons for a proposed termination . . .") (quoting <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965)). Thus, the Medicaid Act imposes the same Due Process requirements referenced above on NODs. Likewise, the "additional standards" imposed by 42 C.F.R. § 431.205(d) and the regulations it references demand, among other things, that notice of a termination decision contain "[t]he specific regulations that support, or the change in Federal or State law that requires, the action." 42 C.F.R. § 431.210(c). For the reasons described above, the Stock Citation falls short of these legal standards.

549. Plainly, TennCare's reliance on the Stock Citation instead of a citation to the specific regulation animating the termination decision violates its obligations under Due Process and the Medicaid Act.

96

iii. Certified Issue 4

550. Certified Issue 4 asks "[w]hether the NODs' omissions of an explanation why recipients do/did not qualify for every other Medicaid category violates/violated 42 U.S.C. § 1396a(a)(3) and/or the Due Process Clause." Plaintiffs do not squarely address this Certified Issue in their post-trial briefing. (See generally Doc. Nos. 405, 407). Rather, in just a single paragraph, Plaintiffs focus on the NODs' omissions of explanations related to categories the enrollee previously qualified for. (Doc. No. 405 ¶ 133).

551. Plaintiffs' reliance on Crawley v. Ahmed, 2009 WL 1384147 (E.D. Mich. May 14, 2009), highlights the mismatch between their argument and Certified Issue 4. In Crawley, the court determined that, for the purposes of a preliminary injunction, the plaintiffs (a group of Medicaid enrollees with disabilities) received insufficient notice of termination. The notice's only stated reason for termination was that the plaintiffs were no longer eligible for FIP-related Medicaid, a single category that usually covers families with dependent children, caretaker relatives of dependent children, persons under 21, and pregnant and recently pregnant women. But the notice did not address the plaintiffs' eligibility under a disability-related category. 2009 WL 1384147, at *1, *3, *26. As the court reasoned, "[s]uch notice can hardly qualify as 'adequate' because it does not include a determination of eligibility on all relevant grounds, thereby undermining any opportunity for a fair hearing." Id. at *26. The court further explained that "[a] truly fair hearing would allow Plaintiffs an opportunity to challenge the termination by proving that they are eligible for Medicaid based on disability." At most, Crawley, in relevant part, stands for the proposition that Due Process and the Medicaid Act require termination notices to explain the basis for why an individual does not fall into a category he is eligible for. The Certified Issue here asks whether TennCare is obligated to explain why an individual *does not* qualify under every eligibility category, of which there are over 40. On this point, Plaintiffs offer no argument, and

97

therefore have not established a violation of the Medicaid Act or Due Process Clause by a preponderance of the evidence.

### iv. Certified Issues 6 and 7

552. The next two Certified Issues address how TennCare informs enrollees of policies designed to assist them after they fail to meet redetermination or renewal deadlines and whether its practices comport with the Medicaid Act and Due Process. Certified Issue 6 asks "[w]hether the NODs' omissions of information concerning the good cause exception and good cause hearings violates/violated the Medicaid Act or the Due Process Clause." Certified Issue 7 asks "[w]hether the NODs' omissions of information about the 90-day reconsideration period violates/violated the Medicaid Act or the Due Process Clause." In their post-trial Proposed Findings of Fact and Conclusion of Law (Doc. No. 405), Plaintiffs combined their arguments on Certified Issues 6 and 7. To avoid repeating itself, the Court will address these Certified Issues together.

553. Plaintiffs' joint argument on Certified Issues 6 and 7 is contained in a single paragraph, which states, in full:

> *Fourth*, TennCare's failure to inform members about the 90-day reconsideration policy or Good Cause Rule violates TennCare's obligation to employ means . . . such as this one desirous of actually informing members about their rights. Common sense dictates that the likelihood of the state employing the authority is much less when a recipient (ignorant of the state's authority) does not request it.

(Doc. No. 405 ¶ 135 (internal quotation marks and citations omitted)). Here, Plaintiffs' argument and the cases Plaintiffs cite for support do not reference the Medicaid Act or any obligation arising under the Act. (Id.; see generally Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950) (considering the constitutionality of the New York Banking Law's requirements regarding notice to beneficiaries on judicial settlement of accounts by a trustee of a common trust fund); see generally Bliek v. Palmer, 102 F.3d 1472 (8th Cir. 1997) (affirming the lower court's holding that "the Due Process Clause requires a complete explanation of the DHS's authority to settle, adjust,

98

compromise, or deny all or part of any claim which results from overissuances" of food stamps)). Both <u>Mullane</u> and <u>Bliek</u> are Due Process cases.  <u>Id.</u>  Accordingly, the Court considers abandoned any argument that the practices described in either Certified Issue violate the Medicaid Act.

554.     Due Process requires NODs to "clearly" explain "the availability of an avenue of redress," <u>Memphis Light, Gas & Water Div. v. Craft</u>, 436 U.S. 1, 13–14, n.15 (1978).  "The mean employed must be such as one desirous of actually informing" the notice recipient.  <u>Mullane</u>, 339 U.S. at 315.  In <u>Memphis Light</u>, the Supreme Court held that the municipal utility's failure to notify certain customers "of the availability of a procedure for protesting a proposed termination of utility service as unjustified" ran afoul of Due Process.  436 U.S. at 15.  That decision relied directly on the "elementary and fundamental" principle articulated in <u>Mullane</u> that Due Process requires "notice reasonably calculated under all circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections."  <u>Memphis Light</u>, 436 U.S. at 13 (quoting <u>Mullane</u>, 339 U.S. at 314).

555.     In response to Plaintiffs' argument on Certified Issue 6, Smith admits that the "NODs do not contain information regarding the good cause exception" but reminds the Court that "TennCare does notify individuals who file untimely appeals of the possibility of receiving a good cause exception from the deadline when it sends them an appeal closure notice."  (Doc. No. 404 at 37).  As Smith explains, "TennCare intentionally omits this information from its NODs because it believes that telling enrollees that there are exceptions to its deadlines in some circumstances could harm enrollees who might then fail to file a timely appeal on the faulty assumption that tardiness will be overlooked."  (<u>Id.</u>).  Smith further contends that the Court should resolve Certified Issue 6 in his favor because "Plaintiffs have presented no evidence that any Plaintiff or class member was harmed by the lack of a description of the [G]ood [C]ause [P]olicy in its notices,"

99

and argues that, TennCare satisfies Due Process because enrollees "learn of the good cause exception with enough time to inform TennCare of good cause before their appeal is finally closed." (Id.).

556.    As the Court described in its findings of fact, TennCare's Good Cause Policy provides that TennCare may close an untimely appeal and may not grant COB if the enrollee failed to appeal within 20 days if the enrollee did not offer a good cause reason for his or her delay. While TennCare's NODs include an explanation of the appeals deadlines—allowing enrollees to file their appeal within 40 days to be considered timely and 20 days to also receive COB, (Doc. No. 399 at 14:3–9)—TennCare's NODs and appeal forms do not include any reference to TennCare's Good Cause Policy informing them that a timely appeal filed after 20 days might receive COB or an untimely appeal might be considered at all. (Id. at 14:20–15:13). Only when enrollees receive an Appeal Closure letter does TennCare tell them that it may excuse their untimeliness. (Id. at 15:1–4). But by the time their appeal is closed, the enrollee, who had been unaware that he or she might have to offer a good cause reason at all, has missed the opportunity to receive COB while the appeal is pending or include in the appeal a good cause explanation TennCare might accept.

557.    When TennCare finally informs enrollees of the Good Cause Policy, it describes the policy more narrowly than TennCare's written rules proscribe. TennCare's rules define good cause as "a reason based on circumstances outside the party's control and despite the party's reasonable efforts." TENN. COMP. R. & REGS. 1200-13-19-.02(20). However, the description enrollees receive lists only a few, extreme examples of good cause. (See Doc. No. 395-1 at 32:9–32:22; see also DX 686 at 7 ("Do you have a health, mental health, or learning problem or a disability? And did that problem make it hard for you to file your appeal on time? Or did something

very bad happen to you or a close family member (like a serious illness or death)? If so, tell us in writing why you could not file your appeal on time. If we agree, your appeal may be reopened.")). As a result, even with TennCare's description of the policy, enrollees eligible for a good cause exception might not believe they could receive it. Additionally, the description TennCare provides enrollees does not account for the unwritten requirements TennCare piles on top of its codified policy. For example, enrollees are not informed that TennCare requires appellants to provide supplemental evidence if their alleged good cause reason is that they did not receive a NOD TennCare purportedly placed in the mail. Thus, enrollees are often not appraised of whether or how they might qualify for good cause.

558. Multiple witnesses at trial could have benefited from a complete notice of the availably of the Good Cause Policy, including **Cottle** and **Davis**. Neither received notice of the Good Cause Policy and were steered towards filing new applications. For the foregoing reasons, the delayed and incomplete notice TennCare provides of the Good Cause Policy cannot be said to "clearly" explain "the availability of an avenue of redress." <u>Memphis Light</u>, 436 U.S. at 13.

559. Plaintiffs offered substantially less evidence on Certified Issue 7. At trial, Certified Issue 7's only touchstones were stipulations that neither the Renewal Packets nor the NODs include information regarding the 90-day reconsideration period, (Doc. No. 405 ¶ 135 (citing JX 43 ¶¶ 31, 40)), and testimony that certain enrollees, including the **Kings**, received the Renewal Packets and NODS at issue.

560. Smith concedes that TennCare does not include information regarding the 90-day reconsideration period in its NODs, but notes that TennCare informs enrollees that if they return their Renewal Packets or additional information prior to termination they will keep their coverage pending review of the untimely submission. (Doc. No. 404 at 38–39). But, as explained in the

Court's factual findings, the information TennCare provides focuses on the 20-day deadline enrollees have to respond to the Renewal Packet and, at best, only gestures at the 90-day reconsideration period. (JX 43 ¶ 42 ("You'll only have 20 days from the date on that letter to give us the facts or proof we need. What if you don't return the facts or proof we need within those 20 days? You may not be able to keep your coverage. We'll use the facts and papers you have given us to decide (even if you've only given us your Renewal Packet). So don't wait! Try to give us all your facts and proof when you send us your packet.")). Smith attempts to justify this omission for the same reason it does not include information about the good cause exception. (Doc. No. 404 at 38). In other words, TennCare believes that informing enrollees of the 90-day reconsideration period would encourage delayed submissions and result in greater loss of coverage. (Id.). However, Smith did not submit any credible evidence at trial to support the accuracy of this belief.

561. As a result, members are not aware of the 90-day reconsideration period to have their coverage reinstated. While TennCare does allude to the 90-day reconsideration period in the cover letter to its Renewal Packets, it intentionally omits specific information—like, for instance, that there is a discrete reconsideration period, that that period is up to 90 days after their termination date, or that, if deemed eligible, their coverage will be backdated. By hiding the fundamentals of the policy, TennCare fails to deploy methods "desirous of actually informing members about their rights." Mullane, 339 U.S. at 315.

v.     Certified Issues 8 and 10

562. The Certified Issues 8 and 10 concern current and former NOD language related to the VFD Policy. Certified Issue 8 asks "Whether the NODs' language instructing class members to describe the reasons they want/wanted to appeal and the facts supporting their appeal violates/violated the Medicaid Act or the Due Process Clause," while Certified Issue 10 asks "Whether the prior use of language in some NODs, telling recipients that they could only get a

102

hearing if they thought TennCare made a mistake about a fact violated the Medicaid Act or Due Process Clause."

563.    The prior iteration of the NOD's VFD language stated, "if you still think we made a mistake about a fact, you can have a fair hearing.  If you don't think we made a mistake about a fact, you can't have a fair hearing."  (JX 43 ¶ 85).  Following a hearing before this Court and at the recommendation of this Court, TennCare replaced that language in its NODs with, "You can have a fair hearing if you still think we made a mistake and, if you're right, you would qualify for our program."  (Id. ¶ 87).

564.    But Plaintiffs abandon argument on either Certified Issue, instead briefly targeting a sentence not squarely at issue.  In full, Plaintiffs write:

> *Fifth*, TennCare's shifting written notice of its VFD Policy unlawfully discourages recipients from pursuing appeals.  TennCare updated the language, but the NODs continue to contain the misleading and discouraging sentence: "You don't have a right to a fair hearing just because you don't like this decision or think it will cause problems for you."  This confusing language makes it unduly difficult for members to know whether they might satisfy TennCare's VFD Policy.

(Doc. No. 405 ¶ 136 (internal citations omitted)).  Plaintiffs offer no evidence or explanation of how the VFD Policy's language had discouraged or discourages appeals or how "discouraging language" would be unlawful.  (Id.; see also id. ¶¶ 129–30 (discussing the requirements Due Process and Medicaid impose on NODs)).  Additionally, no reasonable interpretation of either Certified Issue 8 or 10 supports the notion that Plaintiffs can prevail by focusing on the sentence their argument concerns.  Plaintiffs likewise cannot prevail because they make no legal argument demonstrating how this language makes it "unduly difficult for members to know whether they might satisfy TennCare's VFD Policy" or offends either the Medicaid Act or Due Process.

C.     Certified Issues Related to TennCare's Appeals Process

    i.     Certified Issues 9 and 12

565.    The next two Certified Issues concern the lawfulness of TennCare's policies and procedures that enrollees must navigate to obtain a fair hearing following an adverse decision terminating or limiting their healthcare coverage. Certified Issue 9 asks, "Whether the State's valid factual dispute policy violates/violated the Medicaid Act or the Due Process Clause"; and Certified Issue 12 asks "[w]hether the State systematically fails/failed to provide fair hearings at any time." For clarity, the Court will address them together.

566.    Under the Medicaid Act and its regulations, TennCare must grant a fair hearing to "[a]ny individual who requests it because he or she believes the agency has taken an action erroneously" or "denied his or her claim for eligibility," unless the "sole issue is a Federal or State law requiring an automatic change adversely affecting some or all beneficiaries." 42 C.F.R. § 431.220(a)–(b). TennCare "may not limit or interfere with the . . . freedom to make a request for a hearing," 42 C.F.R. § 431.221(b), and it must "reinstate and continue services until a decision is rendered after a hearing if . . . [a]ction is taken without the advance notice" required by the Medicaid regulations. 42 C.F.R. § 431.231(c). And "[t]he hearing system must meet the Due process standards set forth in Goldberg . . ." 42 C.F.R. § 431.205(d); see Rosen v. Goetz, 410 F.3d 919, 928 (6th Cir. 2005) (acknowledging same).

567.    Under Goldberg, which also applies independent of the Medicaid Act pursuant to the Due Process Clause, when welfare-funded medical care is discontinued, "only a pre-termination evidentiary hearing provides the recipient with procedural due process" because "a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits." 397 U.S. at 264; see also Memphis Light, Gas, & Water Division v. Craft, 436 U.S. 1, 16 (1978) ("This Court consistently has held that 'some kind of hearing is required at some

104

time before a person is finally deprived of his property interests'"); see also Hamby, 368 F.3d at 558–60 (applying Goldberg to TennCare applicants).

568. Plaintiffs argue that TennCare violates both Due Process and the Medicaid Act and its regulations through its VFD Policy. First, Plaintiffs argue that the VFD Policy violates 42 C.F.R. § 431.220(a)(1)'s requirement that TennCare afford a fair hearing to "any individual who requests it because he or she believes [TennCare] has taken an action erroneously." (Doc. No. 405 ¶ 143). Plaintiffs also assert that TennCare's denial of fair hearings for appeals that raise factual issues or issues involving the application of law to the facts conditions access to a fair hearing on the appellant's ability to justify their appeal in writing. (Doc. No. 405 ¶ 144).

569. Smith explains that "[t]he VFD [P]olicy functions to weed out appeals that challenge what the law is, not appeals that challenge the application of law to facts" and only eliminates appeals where the appellant's only contention is that the law, properly applied, should be changed. (Doc. No. 404 at 22). Relying on an expansive reading of Rosen, Smith argues that TennCare's VFD Policy has already been blessed by the Sixth Circuit. (Id. at 22–23). Smith is wrong on both the facts and the law.

570. Rosen addressed the narrow question of whether Tennessee, when eliminating a non-mandatory Medicaid program, was required pursuant to 42 C.F.R. § 431.220 to provide all recipients a pretermination hearing to determine whether they remain eligible for coverage under another Medicaid program. 410 F.3d at 925–26. The Sixth Circuit held it did not. Id. at 933. As the panel explained, 42 C.F.R. § 431.220 "grant[s] a broad right to an evidentiary hearing (when a recipient believes that an agency has 'taken an action erroneously' in terminating benefits), and impose[s] a broad limitation on that right (when the sole issue is a law 'requiring an automatic change' in benefits.))" Id. at 926. These rights and limitations were balanced by "a reading . . .

that draws a dichotomy between impermissible challenges to a State's legal or policy judgment on the one hand and permissible challenges to the relevant facts or application of law to a given beneficiary" on the other.  Id.

571.    But according to Smith, the Rosen panel "upheld TennCare's policy of denying hearings 'to beneficiaries who have failed to raise a 'valid factual dispute' about their eligibility for coverage" even if the enrollee alleges TennCare erred by not relying on valid information or in applying the law.  (Doc. No. 404 at 22–23).  In doing so, Smith attempts to extend the limitations well beyond challenges to the State's legal or policy judgments, thus placing it outside of Rosen. After all, the Rosen panel found persuasive CMS's manual, which explains that "[i]ssues of fact or judgment include issues of the application of State law or policy to the facts of the individual situation." CMS Medicaid Manual, § 2902.4, CMS.Gov, available at https://go.cms.gov/3Mhci5K (last visited July 15, 2024). CMS immediately followed this statement by explaining:

> An example of an issue involving application of agency policy to the individual situation may arise from the use of a spenddown.  If there is a question whether the formula for computing spenddown was correctly applied in an individual case, it is an issue of fact or judgment, and assistance must be continued.  If the individual challenges the use of spenddown, he is questioning the policy itself . . . .

Id. at § 2902.4(A).  According to CMS, "the distinction between issues of fact or judgment and issues of State law or agency policy will not usually be difficult to make."  Id. at § 2902.4.

572.    In Rosen, that was certainly the case.  Tennessee was terminating coverage based on a "State law or policy decision" to eliminate a Medicaid program.  410 F.3d at 926.  Contrast that with the situation presented by **Ms. Turner**, who told TennCare that she did not receive a letter requesting more information and said, "I don't know what you want me to say.  We're eligible.  If my husband and I and my other kid gets it, then my other two kids should have insurance as well" but still had the appeals for the termination of those two children closed without a hearing under TennCare's VFD Policy.  She clearly was not challenging a State law or policy

106

decision—**Ms. Turner** was undoubtedly raising a dispute over TennCare's *application* of the law to her circumstances. Still, TennCare denied her the opportunity for a fair hearing for failing to satisfy its VFD Policy.

573. In fairness, TennCare's other practices smartly avoid unnecessary hearings. For instance, TennCare does not provide for fair hearings when it determines that it may rule in the enrollee's favor prior to a hearing. Likewise, TennCare does not provide for hearings once an enrollee has withdrawn their appeal. Plaintiffs do not muster any opposition to these practices. (Doc. No. 405 ¶¶ 142–47).

574. However, its implementation of the VFD Policy creates barriers to appellants who believe that the agency has taken an action erroneously and denies them the fair hearing they are due. In the context of Certified Issues 9 and 12, the Court concludes that the VFD Policy as enforced violates the Medicaid Act and Due Process Clause. By that same token, TennCare systematically fails to provide fair hearings in violation of the Medicaid Act and Due Process Clause.

ii. Certified Issue 11

575. Certified Issue 11 addresses a specific application of TennCare's Good Cause Policy, asking, "[w]hether the State's policy of denying good cause exceptions or hearings based on allegations of non-receipt of a notice violates/violated the Medicaid Act or the Due Process Clause." Here, again, the parties agree on the relevant evidence. TennCare's rules define good cause as "a reason based on circumstances outside the party's control and despite the party's reasonable efforts." TENN. COMP. R. & REGS. 1200-13-19-.02(20). And Smith admits both that TennCare denies good cause exceptions based on an enrollee's unsubstantiated allegations that they did not receive a notice ("nonreceipt exceptions"), (Doc. No. 404 at 26 ("[U]nless TennCare's records substantiate the claim [of non-receipt] in some way (by showing mail was returned, or the

individual had recently updated their address), TennCare will not grant good cause unless the individual can offer some additional explanation as to how they failed to receive actual notice.")); and that TennCare never offers good cause hearings where such evidence might be brought forward ("nonreceipt hearings"). (See id. at 26 ("TennCare does not ever provide hearings on whether 'good cause' was present to justify altering appeals deadlines.")).

576. Though Certified Issue 11 concerns one circumstance where TennCare does not apply its Good Cause Policy, the Court's discussion regarding Certified Issue 6 remains highly relevant here. When TennCare finally discloses that the Good Cause Policy exists (i.e. after TennCare denies the appeal and no longer offers COB), it describes a narrower exception than its rules provide for. What's more, TennCare does not suggest that enrollees bolster their good cause reason with supporting evidence or tell them that in certain circumstances it requires such evidence. (See JX 27 at 846–47 ("If so, tell us in writing why you could not file your appeal on time. If we agree, your appeal may be reopened.")). Thus, any enrollee who might otherwise seek a good cause exception has no reason to believe that nonreceipt might qualify them for an exception or that to receive that exception they must provide TennCare with supporting evidence.

577. Plaintiffs argue that TennCare's unwritten policy to deny nonreceipt exceptions or hearings violates the Due Process Clause and the Medicaid Act because TennCare's own rules entitle them to fair hearings prior to the termination of their benefits and the Medicaid Act explicitly requires it. (Doc. Nos. 405 at 38; 407 at 4–5). Smith contends that its policy comports with the Due Process Clause because TennCare provides constitutionally adequate notice by mailing its NODs, regardless of whether the NODs actually reach the enrollee or not. (Doc. No. 404 at 27). According to Smith, "appellants who have additional evidence of nonreceipt are able to present that evidence to TennCare without a hearing, so the provable value, if any, of additional

procedural safeguards on the existence of good cause is nil."[7]  (Id. (internal quotation marks and citation omitted)).  Smith argues that the Medicaid Act, on the other hand, does not apply at all because "the good cause exception is solely a creation of TennCare's regulations."  (Id. at 25).

578.    At trial, the Court heard credible testimony from multiple witnesses that established by a preponderance of the evidence that they would have retained or more quickly regained TennCare healthcare coverage had TennCare not rejected their untimely appeal without granting a nonreceipt exception or nonreceipt hearing.  The **Cottles'** experience is one example.  TennCare mailed a NOD notifying Mr. Cottle that his daughter's TennCare coverage would end.  Although the parties stipulated that the notice was addressed to Mr. Cottle's correct address, TennCare's internal systems listed the Cottles' at a similar but incorrect address that was often confused with Mr. Cottle's actual address.  When the error was discovered, the Call Center representative steered him towards filing a new application and did not offer Mr. Cottle the opportunity to appeal and assert good cause, even though, as **Ms. Hagan** admitted, Mr. Cottle had a plausible good cause claim.

579.    The Court agrees that enrollees are not entitled to nonreceipt exceptions or hearings under the Medicaid Act and its regulations.  The regulation explaining when hearings are required, 42 C.F.R. § 431.220, states that "[t]he State agency must grant an opportunity for a hearing to the following: (1) any individual who requests it because he or she believes the agency has taken an action erroneously, denied his or her claim for eligibility or for covered benefits or services, or issued a determination of an individual's liability, or has not acted upon the claim with reasonable

---

[7] On this point, the Court refers Smith to its discussion on Certified Issue 6, which observed that enrollees are not informed that they should provide additional evidence of nonreceipt when filing their appeal or when seeking a good cause exception after TennCare has denied the enrollee COB or closed the enrollee's appeal altogether.  (See supra Section III.B.iv.).

promptness. . . " 42 C.F.R. § 431.220.  Plaintiffs' argument requires that right to a hearing when an enrollee believes a State agency has taken an action erroneously to extend to the denial of a good cause exception or hearing.  However, 42 C.F.R. § 431.201 defines "action" as:

> (1) A termination, suspension of, or reduction in covered benefits or services, including benefits or services for which there is a current approved prior authorization; (2) A termination, suspension of, or reduction in Medicaid eligibility, or an increase in beneficiary liability, including a determination that a beneficiary must incur a greater amount of medical expenses to establish income eligibility in accordance with § 435.121(e)(4) or § 435.831 of this chapter; (3) A determination that a beneficiary is subject to an increase in premiums or cost-sharing charges under subpart A of part 447 of this chapter; or (4) A determination by a skilled nursing facility to transfer or discharge a resident and an adverse determination by a State regarding the preadmission screening and resident review requirements of section 1919(e)(7) of this Act.

42 C.F.R. § 431.201.  The denial of good cause exception or a good cause hearing does not plausibly fall into one of these four categories of "actions" requiring a hearing under 42 C.F.R. § 431.201.  After all, a denial of good cause is not a termination decision; it is a determination that the enrollee did not timely appeal.  The Medicaid Act's regulations also provide a deadline by which appellants must appeal an action to receive a hearing.  State agencies must allow a "reasonable time" to appeal, but that time may "not exceed 90 days from the date that [the NOD] is mailed." 42 C.F.R. § 431.221.  TennCare rules do just that.  Appellants have 20 days from receipt of the NOD to appeal and receive COB and 40 days to appeal, and Plaintiffs do not argue that either number of days is an unreasonably short time.

580.    Plaintiffs' last argument, that the Medicaid Act's regulations contemplate good cause hearings when they allow agencies to "deny or dismiss a request for a hearing if . . . (b) [t]he applicant or beneficiary fails to appear at a scheduled hearing without good cause," 42 C.F.R. § 431.223, is a red herring.  That regulation addresses instances where a hearing has been granted.  Id.  So, if an appellant did not appear at a scheduled hearing on their timely appeal, TennCare could not deny them another opportunity to be heard if they had good cause for their absence.  Id.

110

But, for the reasons just stated, TennCare is not obligated under the Medicaid Act to grant good cause hearings in the first place.

581.     TennCare, however, is obligated under the Due Process Clause to grant good cause exceptions or, at a minimum, good cause hearings to enrollees who allege without additional evidence that they are entitled to a good cause exception because they did not receive their NOD. As the Supreme Court explained in Goldberg, a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest safeguarded by procedural due process in continued receipt of those benefits.  397 U.S. 254, 261–63 (1972).  These property interests are not based in "abstract need[s]" or "unilateral expectation[s]," Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  Rather, they require a "legitimate claim of entitlement" and are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Id. at 578.  The Sixth Circuit has held that TennCare enrollees have a property interest in keeping their healthcare coverage. Hambly v. Neel, 368 F.3d 549, 587–559 (6th Cir. 2004).

582.     TennCare's written Good Cause Policy broadly defines good cause, TENN. COMP. R. & REGS. 1200-13-19-.02(20), and permits appeals to be filed at any time where "good cause can be shown as to why the appeal or request for a hearing could not be filed within the required time limit."  TENN. COMP. R. & REGS. 1200-13-19-.06(3).  TennCare's rules also delineate six circumstances under which it may dismiss an appeal or request for a hearing.  TENN. COMP. R. & REGS. 1200-13-19-.07.  Relevant here, TennCare "may dismiss a previously accepted appeal upon evidence presented at a good cause hearing, pre-hearing conference, or in the pleadings that the appeal was not timely filed and that good cause for the untimely filing did not exist."  TENN. COMP. R. & REGS. 1200-13-19-.07(3).  These rules, which limit TennCare's ability to terminate an

111

enrollee's healthcare coverage, shape the enrollee's property interest in continued TennCare coverage.

583.     But TennCare's unwritten policy directly contravenes its written rules.  Economical or not, TennCare's decision to not grant nonreceipt exceptions or nonreceipt hearings when supporting evidence might be brought forward erodes enrollee's interest in their continued healthcare coverage.  Thus, Smith's argument that TennCare violates Due Process by failing to adhere to its own because the Good Cause Policy is incorrect as a matter of established law.  Likewise, Smith's argument that enrollees' constitutional procedural due process rights do not include an independent right to a good cause hearing fails because TennCare's rules create that protected interest.  Due Process does not require that TennCare keep its Good Cause Policy.  It simply requires that TennCare fairly apply the policies it keeps.

### iii.     Certified Issue 13

584.     Certified Issue 13 concerns "[w]hether the State is/was required to provide fair hearings within 90 days of an appeal and, if so, whether it fails/failed to do so."  The parties have stipulated that CMS's temporary waiver of TennCare's obligation to take final administrative action within 90 days of an appeal under Section 1902(e)(14)(A) of the Social Security Act is currently in effect.  (JX 43 ¶¶ 92–93).  Thus, the Court must resolve this issue in Smith's favor. See Christian Legal Soc'y v. Martinez, 561 U.S. 661, 666 (2010) ("Litigants, we have long recognized, are entitled to have their case tried upon the assumption that . . . facts, stipulated into the record, were established." (internal quotation marks and citation omitted)); see also Estate of Quirk v. C.I.R., 928 F.2d 751, 759 (6th Cir. 1991) ("It would seem that if the parties could challenge their prior stipulations at will, stipulations would lose much of their purpose.").  No argument was made on whether **Ms. Vaughn**'s nine-month-long appeal fell outside of CMS's temporary waiver.

D.    Certified Issues Related to ADA Compliance and Reasonable Accommodations

            i.    Certified Issue 5

585.    Certified Issue 5 asks "[w]hether Defendant lacks/lacked any system to grant requests for reasonable accommodations for disabled persons navigating TennCare."

586.    Plaintiffs concede that TennCare technically has a system in place to grant reasonable accommodations, but they argue that this system is completely useless and wholly ineffective.  For example, according to Plaintiffs, "[d]espite claims that its system merely requires someone to 'raise their hand' to ask for help, TennCare does not have the structure, policies, or monitoring to ensure that help is actually provided or to provide further accommodations if needed."  (Doc. No. 405 ¶ 161).  Plaintiffs further argue that TennCare operates off ad hoc policies and the assumption that its workers know what accommodation they may provide and will provide accommodations where appropriate.  (Id.).  They also emphasize significant gaps in its purported system—namely, that Olson and AHS disagree on what assistance the Call Center can provide without Olson's intervention.  (Id. ¶ 162).  Added together, "TennCare's lack of a meaningful system has led it to deny reasonable accommodations to members who are entitled to them."  (Id. ¶ 164).

587.    To Smith, Plaintiffs' concession that TennCare has a system—even an inadequate one—ends the inquiry into this Certified Issue.  (Doc. No. 404 at 42–43).

588.    Based upon all of the evidence presented, this Court finds, by a preponderance that TennCare's system for granting reasonable accommodations exists, even if in name only.  OCRC is disorganized, understaffed, and in desperate need of effective leadership.  With Ms. Olson at its helm, OCRC has neglected basic practices that would vastly improve its function, and, but for that negligence, the chasm between Ms. Olson's and AHS's understanding of their respective duties would not be so wide.  No doubt this system opens TennCare to substantial risk of violating the

113

ADA when any disabled individual seeks some form of help navigating its systems. But, far more importantly, it all but guarantees that disabled enrollees slip through the cracks. By any measure, OCRC and TennCare's methods of addressing the needs of its disabled enrollees requires revision. To do otherwise, TennCare fails the needy and vulnerable citizens it purports to serve.

589. However, the Court agrees with Smith that Certified Issue 5 goes to whether TennCare has *any* system for granting reasonable accommodations and it does. While this system demands overhaul, the Court cannot rewrite Certified Issue 5 after trial, that would, for all practical purposes, require certifying a reasonable accommodations subclass. The law of this Circuit does not allow it. See Hindel v. Husted, 875 F.3d 344, 347 (6th Cir. 2017) (explaining that reasonable accommodation questions rarely suited for class-wide resolution).

ii. Certified Issue 14

590. Certified Issue 14 asks, "whether the State provides/provided adequate 'in-person assistance' for disabled persons and, if not, whether that violates the ADA." For Plaintiffs to prevail on this issue, they must establish that TennCare's in-person assistance is lacking in either quality or quantity. But rather than directly address this Certified Issue, Plaintiffs assert, in full:

> Aside from its ADA duty to ensure access through in-person assistance as a reasonable accommodation, TennCare has a separate duty under the Medicaid Act to provide in-person assistance with the redetermination process "in a manner that is accessible to individuals with disabilities. TennCare does not do this in any meaningful way.

(Doc. No. 405 ¶ 165 (internal quotation marks and citation omitted)). At the outset, it bears noting that Certified Issue 14 does not concern any duty under the Medicaid Act. And, while Plaintiffs discuss how TennCare violates the ADA by failing to maintain a valid and reliable system for granting reasonable accommodations in addressing Certified Issue 5, they do not do so with respect to in-person assistance specifically. (See Doc. Nos. 405 ¶¶ 157–66; 407 at 7–9).

114

591.    The evidence Plaintiffs marshal does not establish by a preponderance that TennCare has provided inadequate in-person assistance. That evidence demonstrates that TennCare offers in-person assistance through AAADs but rarely in reality provide such assistance. (Doc. No. 405 ¶¶ 115–24). It also demonstrates that the AAADs have limited, if any, training specific to the redetermination process. (Id.). However, Plaintiffs did not present any evidence that identifies any person who asked for in-person assistance and did not receive it. (Id.). Nor did Plaintiffs offer any evidence that shows that the in-person assistance provided suffered for lack of specific training. (Id.).

592.    At bottom, Plaintiffs ask the Court to conflate an imperfect and underused system with an inadequate one. Plaintiffs have not established that the in-person assistance provided falls short of enrollees' requests for such assistance. And Plaintiffs' suggestion that this violates the Medicaid Act is beyond the scope of the Certified Issue.

E.    Smith's Remaining Arguments

593.    In a last-ditch effort to avoid liability, Smith argues that this Court lacks jurisdiction and should decertify the class because no class representative can show that TennCare continues to subject them to a present ongoing harm or an imminent future harm. (Doc. No. 404 at 46–49). According to Smith, "no class representative (indeed, no witness) has testified that the issues they experienced with their TennCare are even plausibly—let alone likely—to recur, nor could they so testify." (Id. at 47). Though TennCare has remedied some errors in TEDS and instituted certain processes that may catch the programs future mistakes, it has not yet remedied the core underlying deficiencies in its notices or appeals process. Thus, this Court retains jurisdiction and class-wide resolution remains appropriate.

## IV.   CONCLUSION

TennCare and TEDS work as intended for hundreds of thousands of enrolled Tennesseans and provides them with healthcare.  However, certain TennCare policies and practices work against this mission.  For the reasons described, the Court concludes that Smith has violated the Plaintiff Class's rights under the Medicaid Act and Due Process Clause and violated the Disability Subclass's rights under the ADA.

As the Court noted at the outset of this Memorandum Opinion, when an enrollee is entitled to state-administered Medicaid, it should not require luck, perseverance, and zealous lawyering for him or her to receive that healthcare coverage.  Luckily for the Plaintiffs, they had all three. Plaintiff Class members and Disability Subclass members lacked one or all of these apparent prerequisites and have not yet had their coverage reinstated and backdated.  No doubt, they, like the Plaintiffs who testified, more likely than not faced both financial hardships and adverse health outcomes on account of TennCare's unlawful actions.  Now, the Court must ensure they receive their deserved relief.  See, e.g., Watson v. Memphis, 373 U.S. 526, 527 (1963) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them").

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

116